No. 23-12313

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

HISPANIC FEDERATION, et al.,
*Plaintiffs-Appellees*,

v.

CORD BYRD, et al.,

*Defendants-Appellants*.

Appeal from the U.S. District Court for the Northern District of Florida,
No. 4:23-cv-218 (Walker, C.J.)

# APPELLANTS' APPENDIX – VOLUME I OF VII

Bradley R. McVay
*Deputy Secretary of State*
Joseph S. Van de Bogart
*General Counsel*
Ashley Davis
*Chief Deputy General Counsel*
Florida Department of State
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Mohammad O. Jazil*
Michael Beato
Joshua E. Pratt
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 274-1690
*Counsel for Defendant-Appellant Secretary of State Byrd*

Ashley Moody
*Attorney General*

Henry C. Whitaker*
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Robert S. Schenck
*Assistant Solicitor General*
W. David Chappell
*Senior Assistant Attorney General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*Counsel for Defendant-Appellant Attorney General Moody*

*Designates lead counsel

# INDEX TO APPENDIX

| Volume | Tab | Title |
|---|---|---|
| 1 | Dkt | *Hispanic Federation v Byrd, 4:23-cv-218* |
| 1 | 1 | Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. 32) |
| 1 | 2 | Attorney General's Notice of Joinder (Doc. 59) |
| 1 | 3 | Secretary's Response in Opposition to Motion for Preliminary Injunction (Doc. 60) |
| 1-4 | 4 | Secretary's Appendix to Response in Opposition to Motion for Preliminary Injunction, Volume 1 of 3 (Doc. 60-1) |
| 4-5 | 5 | Secretary's Appendix to Response in Opposition to Motion for Preliminary Injunction, Volume 2 of 3 (Doc. 60-2) |
| 5 | 6 | Secretary's Appendix to Response in Opposition to Motion for Preliminary Injunction, Volume 3 of 3 (Doc. 60-3) |
| 5 | 7 | Plaintiffs' Reply in support of Motion for Preliminary Injunction (Doc. 62) |
| 5-6 | 8 | Plaintiffs' Motion to Supplement Preliminary Injunction Record with Exhibits (Doc. 66) |
| 6 | 9 | Preliminary Injunction Order (Doc. 68) |
| 6 | 10 | Revised Complaint (Doc. 79) |
| 6 | 11 | Attorney General's Answer to Revised Complaint (Doc. 80) |
| 6 | 12 | Secretary's Answer to Revised Complaint (Doc. 81) |
| 6-7 | 13 | Preliminary Injunction Hearing Transcript |

# Dkt

# Hispanic Federation, et al.

**v**

# Cord Byrd, et al.

# 4:23-cv-218 (Walker, C.J.)

APPEAL,CONSOLIDATED

# U.S. District Court
# Northern District of Florida (Tallahassee)
# CIVIL DOCKET FOR CASE #: 4:23−cv−00218−MW−MAF

HISPANIC FEDERATION et al v. BYRD et al
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A FITZPATRICK
Lead case: 4:23−cv−00215−MW−MAF
Member case: (View Member Case)
Case in other court: USCA, 23−12313
Cause: 42:1983 Civil Rights Act

Date Filed: 05/25/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**HISPANIC FEDERATION** represented by

**RAYNE HAELI ELLIS**
ARNOLD & PORTER LLP − NEW YORK NY
250 WEST 55TH STREET
NEW YORK, NY 10019
212−836−7869
Email: rayne.ellis@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADRIEL I CEPEDA DERIEUX**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
212−284−7334
Fax: 212−549−2654
Email: acepedaderieux@aclu.org
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
ACLU FOUNDATION OF FLORIDA INC − MIAMI FL
4343 W FLAGLER STREET
SUITE 400
MIAMI, FL 33134
786−363−1392
Email: cmcnamara@aclufl.org
*ATTORNEY TO BE NOTICED*

**CESAR Z RUIZ**
LATINO JUSTICE PRLDEF − NEW YORK NY
475 RIVERSIDE DRIVE
SUITE 1901
NEW YORK, NY 10115
212−392−4752
Email: cruiz@latinojustice.org
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
ACLU FOUNDATION OF FLORIDA INC − MIAMI FL
4343 W FLAGLER STREET
SUITE 400
MIAMI, FL 33134
786−363−2714

Fax: 786−363−1257
Email: dtilley@aclufl.org
*ATTORNEY TO BE NOTICED*

**DAYTON CAMPBELL−HARRIS**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 BROAD STREET
NEW YORK, NY 10004
425−516−8400
Email: dcampbell−harris@aclu.org
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
LATINO JUSTICE PRLDEF − ORLANDO FL
523 W COLONIAL DRIVE
ORLANDO, FL 32804
407−600−2350
Email: dalicea@latinojustice.org
*ATTORNEY TO BE NOTICED*

**ESTEE MEIRA KONOR**
DEMOS − NEW YORK NY
80 BROAD STREET
4TH FLOOR
NEW YORK, NY 10004
330−806−9163
Email: ekonor@demos.org
*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
ARNOLD & PORTER LLP − NEW YORK NY
250 WEST 55TH STREET
NEW YORK, NY 10019
212−715−1107
Email: evan.preminger@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
ARNOLD & PORTER LLP − WASHINGTON DC
601 MASSACHUSETTS NW
WASHINGTON, DC 20001
202−942−5545
Fax: 202−942−5000
Email: jeremy.karpatkin@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**
AMERICAN CIVIL LIBERTIES UNION − NEW YORK NY
125 BROAD ST
18TH FL
NEW YORK, NY 10004
212−549−2686
Email: jebenstein@aclu.org
*ATTORNEY TO BE NOTICED*

**MEGAN CHRISTINE KEENAN**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15TH STREET NW
WASHINGTON, DC 20005

740−632−0671
Email: mkeenan@aclu.org
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
LATINO JUSTICE PRLDEF −
ORLANDO FL
REGIONAL SOUTHEAST OFFICE
523 W COLONIAL DRIVE
ORLANDO, FL 32804
321−754−1935
Fax: 212−219−3360
Email: rcruz@latinojustice.org
*ATTORNEY TO BE NOTICED*

**SOPHIA LIN LAKIN**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 BROAD STREET
18TH FLOOR
NEW YORK, NY 10004
212−519−7836
Email: slakin@aclu.org
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
ACLU FOUNDATION OF FLORIDA −
TALLAHASSEE FL
336 E COLLEGE AVENUE
SUITE 203
TALLAHASSEE, FL 32301
786−363−1769
Email: nwarren@aclufl.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PODER LATINX** represented by **CESAR Z RUIZ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RAYNE HAELI ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADRIEL I CEPEDA DERIEUX**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAYTON CAMPBELL−HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
(See above for address)

*ATTORNEY TO BE NOTICED*

**ESTEE MEIRA KONOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN CHRISTINE KEENAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOPHIA LIN LAKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VERONICA HERRERA−LUCHA** represented by **RAYNE HAELI ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADRIEL I CEPEDA DERIEUX**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CESAR Z RUIZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAYTON CAMPBELL−HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ESTEE MEIRA KONOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN CHRISTINE KEENAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOPHIA LIN LAKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORKA MARTINEZ** represented by **RAYNE HAELI ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADRIEL I CEPEDA DERIEUX**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CESAR Z RUIZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAYTON CAMPBELL−HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ESTEE MEIRA KONOR**
(See above for address)

*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN CHRISTINE KEENAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOPHIA LIN LAKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A DOE** represented by **RAYNE HAELI ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ADRIEL I CEPEDA DERIEUX**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CESAR Z RUIZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAYTON CAMPBELL−HARRIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ESTEE MEIRA KONOR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN CHRISTINE KEENAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOPHIA LIN LAKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**B DOE**                                   represented by   **ESTEE MEIRA KONOR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RAYNE HAELI ELLIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CAROLINE ANDREWS MCNAMARA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**CESAR Z RUIZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DANIEL BOAZ TILLEY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DELMARIE ALICEA**
(See above for address)
*ATTORNEY TO BE NOTICED*

**EVAN JOSHUA PREMINGER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEREMY KARPATKIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JULIE A EBENSTEIN**

(See above for address)
*ATTORNEY TO BE NOTICED*

**ROBERTO CRUZ**
(See above for address)
*ATTORNEY TO BE NOTICED*

**NICHOLAS WARREN**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CORD BYRD**
*in his official capacity as Florida Secretary of State*

represented by

**ASHLEY E DAVIS**
FLORIDA DEPARTMENT OF STATE
RA GRAY BUILDING
500 SOUTH BRONOUGH STREET
SUITE 100
TALLAHASSEE, FL 32399
850−245−6531
Email: ashley.davis@dos.myflorida.com
*ATTORNEY TO BE NOTICED*

**JOSEPH SCOTT VAN DE BOGART**
FLORIDA DEPARTMENT OF STATE
OFFICE OF GENERAL COUNSEL
500 S BRONOUGH STREET
TALLAHASSEE, FL 32399
850−245−6519
Fax: 850−245−6127
Email: joseph.vandebogart@dos.myflorida.com
*ATTORNEY TO BE NOTICED*

**JOSHUA E PRATT**
HOLTZMAN VOGEL − TALLAHASSEE FL
119 S MONROE STREET
SUITE 500
TALLAHASSEE, FL 32301
850−566−7610
Email: jpratt@holtzmanvogel.com
*ATTORNEY TO BE NOTICED*

**MICHAEL ROBERT BEATO**
HOLTZMAN VOGEL − TALLAHASSEE FL
119 S MONROE STREET
SUITE 500
TALLAHASSEE, FL 32301
850−566−7610
Email: mbeato@holtzmanvogel.com
*ATTORNEY TO BE NOTICED*

**MOHAMMAD OMAR JAZIL**
HOLTZMAN VOGEL − TALLAHASSEE FL
119 S MONROE STREET
SUITE 500
TALLAHASSEE, FL 32301
850−391−0503
Email: mjazil@holtzmanvogel.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**ASHLEY MOODY**
*in her official capacity as Florida Attorney General*

represented by

**NOAH T SJOSTROM**
FLORIDA ATTORNEY GENERAL'S OFFICE
107 W GAINES STREET
SUITE 401F
TALLAHASSEE, FL 32309
850−414−3635
Email: noah.sjostrom@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**STEPHANIE ANNE MORSE**
FLORIDA ATTORNEY GENERAL'S OFFICE
PL−01 THE CAPITOL
TALLAHASSEE, FL 32399−1050
850−414−3300
Email: stephanie.morse@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**WILLIAM DAVID CHAPPELL**
STATE OF FLORIDA − OFFICE OF THE ATTORNEY GENERAL
THE CAPITOL PL−01
107 W GAINES ST
TALLAHASSEE, FL 32399
850−414−3665
Email: william.chappell@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/25/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC−7888158.), filed by B DOE, VERONICA HERRERA−LUCHA, PODER LATINX, HISPANIC FEDERATION, NORKA MARTINEZ, A DOE. (Attachments: # 1 Summons − Byrd, # 2 Summons − Moody) (WARREN, NICHOLAS) (Entered: 05/25/2023) |
| 05/25/2023 | 2 | CIVIL COVER SHEET. (WARREN, NICHOLAS) (Entered: 05/25/2023) |
| 05/25/2023 | 3 | Corporate Disclosure Statement/Certificate of Interested Persons by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX identifying Corporate Parent TIDES ADVOCACY for PODER LATINX.. (WARREN, NICHOLAS) (Entered: 05/25/2023) |
| 05/25/2023 | 4 | NOTICE *of Similar Cases* by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (WARREN, NICHOLAS) (Entered: 05/25/2023) |
| 05/26/2023 | 5 | Summons Issued as to CORD BYRD, ASHLEY MOODY. (Attachments: # 1 Byrd) (bkp) (Entered: 05/26/2023) |
| 05/26/2023 | 6 | SUMMONS Returned Executed by B DOE, VERONICA HERRERA−LUCHA, PODER LATINX, HISPANIC FEDERATION, NORKA MARTINEZ, A DOE. All Defendants. (WARREN, NICHOLAS) (Entered: 05/26/2023) |
| 05/30/2023 | 7 | MOTION to Consolidate Cases by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (WARREN, NICHOLAS) (Entered: 05/30/2023) |
| 05/30/2023 | | Set/Reset Deadlines as to 7 MOTION to Consolidate Cases . (Internal deadline for referral to judge if response not filed earlier: **6/13/2023)**. (tss) (Entered: 05/31/2023) |
| 05/31/2023 | 8 | ORDER DIRECTING EXPEDITED RESPONSE re 7 MOTION to Consolidate Cases filed by B DOE, NORKA MARTINEZ, VERONICA HERRERA−LUCHA, PODER |

| | | |
|---|---|---|
| | | LATINX, A DOE, HISPANIC FEDERATION. The Secretary must file a response no later than June 5,2023 signed by JUDGE ALLEN C WINSOR on 5/31/23. (Internal deadline for referral to judge if response not filed earlier: **6/5/2023)**.) (bkp) (Entered: 05/31/2023) |
| 05/31/2023 | 9 | NOTICE of Voluntary Dismissal by B DOE (WARREN, NICHOLAS) (Entered: 05/31/2023) |
| 06/01/2023 | 10 | NOTICE of Appearance by JOSEPH SCOTT VAN DE BOGART on behalf of CORD BYRD (VAN DE BOGART, JOSEPH) (Entered: 06/01/2023) |
| 06/01/2023 | 11 | NOTICE of Appearance by ASHLEY E DAVIS on behalf of CORD BYRD (DAVIS, ASHLEY) (Entered: 06/01/2023) |
| 06/01/2023 | 12 | NOTICE of Appearance by STEPHANIE ANNE MORSE on behalf of ASHLEY MOODY (MORSE, STEPHANIE) (Entered: 06/01/2023) |
| 06/02/2023 | 13 | AMENDED DOCUMENT by CORD BYRD. Amendment to 11 Notice of Appearance (DAVIS, ASHLEY) (Entered: 06/02/2023) |
| 06/02/2023 | 14 | NOTICE of Appearance by NOAH T SJOSTROM on behalf of ASHLEY MOODY (SJOSTROM, NOAH) (Entered: 06/02/2023) |
| 06/05/2023 | 15 | NOTICE of Appearance by MOHAMMAD OMAR JAZIL on behalf of CORD BYRD (JAZIL, MOHAMMAD) (Entered: 06/05/2023) |
| 06/05/2023 | 16 | RESPONSE to Motion re 7 MOTION to Consolidate Cases filed by CORD BYRD. (JAZIL, MOHAMMAD) (Entered: 06/05/2023) |
| 06/05/2023 | 17 | NOTICE of Appearance by MICHAEL ROBERT BEATO on behalf of CORD BYRD (BEATO, MICHAEL) (Entered: 06/05/2023) |
| 06/05/2023 | 18 | NOTICE of Appearance by JOSHUA E PRATT on behalf of CORD BYRD (PRATT, JOSHUA) (Entered: 06/05/2023) |
| 06/06/2023 | 19 | NOTICE of Appearance by ROBERTO CRUZ on behalf of All Plaintiffs (CRUZ, ROBERTO) (Entered: 06/06/2023) |
| 06/07/2023 | 20 | MOTION to Appear Pro Hac Vice by Cesar Z. Ruiz.( Filing fee $ 208 receipt number AFLNDC−7907946.) by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ. (RUIZ, CESAR) (Entered: 06/07/2023) |
| 06/07/2023 | 21 | REASSIGNMENT ORDER. The motion to consolidate (ECF No. 7 ) is GRANTED in part as set forth above. The clerk will reassign this case to Chief Judge Walker. Signed by JUDGE ALLEN C WINSOR on 6/7/2023. (atm) (Entered: 06/07/2023) |
| 06/07/2023 | | CHIEF JUDGE MARK E WALKER added. JUDGE ALLEN C WINSOR no longer assigned to case. (atm) (Entered: 06/07/2023) |
| 06/07/2023 | 22 | NOTICE of Appearance by JULIE A EBENSTEIN on behalf of All Plaintiffs (EBENSTEIN, JULIE) (Entered: 06/07/2023) |
| 06/07/2023 | 23 | NOTICE of Appearance by JULIE A EBENSTEIN on behalf of All Plaintiffs (EBENSTEIN, JULIE) (Entered: 06/07/2023) |
| 06/07/2023 | 24 | ORDER ADMITTING CESAR Z. RUIZ PRO HAC VICE. The 20 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 06/07/2023. (rcb) Modified to edit docket text and Judge's signature on 6/8/2023 (rcb). (Entered: 06/07/2023) |
| 06/07/2023 | 25 | First MOTION to Appear Pro Hac Vice by Adriel I. Cepeda Derieux.( Filing fee $ 208 receipt number AFLNDC−7908655.) by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (CEPEDA DERIEUX, ADRIEL) (Entered: 06/07/2023) |
| 06/07/2023 | 26 | MOTION to Appear Pro Hac Vice by Dayton Campbell−Harris.( Filing fee $ 208 receipt number AFLNDC−7908687.) by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (CAMPBELL−HARRIS, DAYTON) (Entered: 06/07/2023) |

| | | |
|---|---|---|
| 06/07/2023 | 27 | MOTION to Appear Pro Hac Vice by Megan C. Keenan.( Filing fee $ 208 receipt number AFLNDC−7908697.) by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (KEENAN, MEGAN) (Entered: 06/07/2023) |
| 06/07/2023 | 28 | MOTION to Appear Pro Hac Vice by Sophia Lin Lakin.( Filing fee $ 208 receipt number AFLNDC−7908706.) by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (LAKIN, SOPHIA) (Entered: 06/07/2023) |
| 06/07/2023 | 29 | ORDER FOR SUPPLEMENTAL BRIEFING. The parties shall confer and file their supplemental briefing on or before Friday, **6/16/2023**. Signed by CHIEF JUDGE MARK E WALKER on 06/7/2023. (rcb) (Entered: 06/07/2023) |
| 06/07/2023 | 30 | ORDER CONDITIONALLY ADMITTING ADRIEL I. CEPEDA DERIEUX, DAYTON CAMPBELL−HARRIS,MEGAN C. KEENAN, AND SOPHIA LIN LAKIN PRO HAC VICE. The 25 , 26 , 27 & 28 motions are GRANTED in part. These attorneys are CONDITIONALLY ADMITTED as they have fulfilled all but one of the requirements of the Local Rules for admission. These attorneys shall file their certificates of good standing on or before **6/21/2023**, at which time this Court will determine whether to revoke their conditional admission for noncompliance with the Local Rules. Signed by CHIEF JUDGE MARK E WALKER on 06/7/2023. (rcb) (Entered: 06/08/2023) |
| 06/07/2023 | 31 | DOCKET ANNOTATION BY COURT: Re 21 Order − cases consolidated in error. (atm) (Entered: 06/08/2023) |
| 06/08/2023 | 32 | Emergency MOTION for Preliminary Injunction by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (Attachments: # 1 HF Decl., # 2 Poder Decl., # 3 Herrera−Lucha Decl., # 4 Martinez Decl., # 5 Doe Decl.) (WARREN, NICHOLAS) (Entered: 06/08/2023) |
| 06/08/2023 | 33 | MOTION for Leave to Proceed Under a Pseudonym by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (WARREN, NICHOLAS) (Entered: 06/08/2023) |
| 06/09/2023 | | Set/Reset Deadlines as to 32 Emergency MOTION for Preliminary Injunction , 33 MOTION for Leave to Proceed Under a Pseudonym . (Internal deadline for referral to judge if response not filed earlier: **6/23/2023)**. (rcb) (Entered: 06/09/2023) |
| 06/09/2023 | 34 | ORDER SETTING CONFERENCE SCHEDULE AND OTHER DEADLINES. The Clerk shall set this matter for a telephonic scheduling conference on Wednesday, **6/14/2023 11:00 AM** a.m. (ET). in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. The parties shall file a proposed briefing schedule with respect to the motion for preliminary injunction by Tuesday, **6/13/2023**. Defendants shall file a response to Plaintiffs motion to proceed anonymously, ECF No. 33 , on or before **6/16/2023)**. Plaintiffs shall file a reply with respect to this motion on or before **6/23/2023**, at which time this Court will take the motion to proceed anonymously under advisement. Signed by CHIEF JUDGE MARK E WALKER on 06/09/2023. (rcb) (Entered: 06/09/2023) |
| 06/09/2023 | 35 | NOTICE of Appearance by DANIEL BOAZ TILLEY on behalf of All Plaintiffs (TILLEY, DANIEL) (Entered: 06/09/2023) |
| 06/09/2023 | 36 | MOTION for Extension of Time to File Answer by CORD BYRD. (JAZIL, MOHAMMAD) (Entered: 06/09/2023) |
| 06/12/2023 | 37 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **6/14/2023 11:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888−684−8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. |

| | | |
|---|---|---|
| | | You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is compromised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 06/12/2023) |
| 06/12/2023 | 38 | ORDER GRANTING 36 EXTENSION. Defendant Byrd's motion is GRANTED. Defendant Byrd may file his response to Plaintiffs' complaint on or before the twenty−first day after this Court's ruling on Plaintiffs' emergency motion for preliminary injunction. Signed by CHIEF JUDGE MARK E WALKER on 06/12/2023. (rcb) (Entered: 06/12/2023) |
| 06/12/2023 | 39 | MOTION for Extension of Time to File Answer by ASHLEY MOODY. (SJOSTROM, NOAH) (Entered: 06/12/2023) |
| 06/12/2023 | 40 | ORDER GRANTING 39 EXTENSION. The 39 unopposed motion is GRANTED. Defendant Moody may file her response to Plaintiffs' complaint on or before the twenty−first day after this Court's ruling on Plaintiffs' emergency motion for preliminary injunction. Signed by CHIEF JUDGE MARK E WALKER on 06/12/2023. (rcb) (Entered: 06/12/2023) |
| 06/12/2023 | 41 | NOTICE of Appearance by DELMARIE ALICEA on behalf of All Plaintiffs (ALICEA, DELMARIE) (Entered: 06/12/2023) |
| 06/13/2023 | 42 | DOCKET ANNOTATION BY COURT: Re 41 Notice of Appearance filed by B DOE, NORKA MARTINEZ, VERONICA HERRERA−LUCHA, PODER LATINX, A DOE, HISPANIC FEDERATION **ISO PLACED IN JUDGE WALKER'S REFERRAL TO JUDGE FOLDER** (rcb) (Entered: 06/13/2023) |
| 06/13/2023 | 43 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC−7918575.) by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (KONOR, ESTEE) (Entered: 06/13/2023) |
| 06/13/2023 | 44 | INITIAL SCHEDULING ORDER. Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **6/27 /2023**. Rule 26 Meeting Report due by **7/27/2023**. Discovery due by **10/11/2023**. Status Report due by **7/13/2023**. Signed by CHIEF JUDGE MARK E WALKER on 06/13/2023. (rcb) (Entered: 06/13/2023) |
| 06/13/2023 | 45 | ORDER ADMITTING ESTEE M. KONOR PRO HAC VICE. The 43 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 06/13/2023. (rcb) (Entered: 06/13/2023) |
| 06/13/2023 | 46 | STATUS REPORT *: Joint Report on Parties' Meet−and−Confer Regarding Plaintiffs' Motion for a Preliminary Injunction* by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (EBENSTEIN, JULIE) (Entered: 06/13/2023) |
| 06/14/2023 | 47 | First MOTION to Appear Pro Hac Vice by Evan Preminger.( Filing fee $ 208 receipt number AFLNDC−7919936.) by A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (Attachments: # 1 Exhibit New York Certificate of Good Standing) (PREMINGER, EVAN) (Entered: 06/14/2023) |
| 06/14/2023 | 48 | ORDER ADMITTING EVAN PREMINGER PRO HAC VICE. The 47 motion is GRANTED. Mr. Preminger has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 06/14/2023. (rcb) (Entered: 06/14/2023) |
| 06/14/2023 | 49 | ORDER SETTING HEARING ON MOTION FOR PRELIMINARY INJUNCTION AND BRIEFING SCHEDULE. The in−person hearing on Plaintiffs' motion for preliminary injunction is set for Wednesday, **6/28/2023 09:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Defendants' response and any declarations in support thereof are due on or before 12:00 p.m. (ET) on Friday, **6/23/2023 12:00 PM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Plaintiffs' reply brief and any rebuttal declarations are due on or before 12:00 p.m. (ET) on Monday, **6/26/2023 12:00 PM** in U.S. Courthouse Tallahassee |

| | | |
|---|---|---|
| | | before CHIEF JUDGE MARK E WALKER. This Court grants Plaintiffs' request to enlarge the maximum word count to 5,000 words with respect to their reply brief. This Court STAYS the parties' deadline to brief the issue of consolidation, see ECF No. 29 , and Defendants' deadline to respond to Plaintiffs' motion for leave to proceed anonymously, ECF No. 33 . Signed by CHIEF JUDGE MARK E WALKER on 06/14/2023. (rcb) (Entered: 06/14/2023) |
| 06/15/2023 | 50 | MOTION to Appear Pro Hac Vice by Rayne Ellis.( Filing fee $ 208 receipt number AFLNDC−7922006.) by HISPANIC FEDERATION. (ELLIS, RAYNE) (Entered: 06/15/2023) |
| 06/15/2023 | 51 | NOTICE *of Filing Certificate of Good Standing* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (CAMPBELL−HARRIS, DAYTON) (Entered: 06/15/2023) |
| 06/15/2023 | 52 | NOTICE *of Filing Certificate of Good Standing* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (CEPEDA DERIEUX, ADRIEL) (Entered: 06/15/2023) |
| 06/15/2023 | 53 | NOTICE *of Filing Certificate of Good Standing* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (LAKIN, SOPHIA) (Entered: 06/15/2023) |
| 06/15/2023 | 54 | NOTICE *of Filing Certificate of Good Standing* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (KEENAN, MEGAN) (Entered: 06/15/2023) |
| 06/15/2023 | 55 | NOTICE of Appearance by JEREMY KARPATKIN on behalf of A DOE, B DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (KARPATKIN, JEREMY) (Entered: 06/15/2023) |
| 06/15/2023 | 56 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 6/15/2023. Parties discuss case status and schedule for 55 , 27 & 32 Motions for Preliminary Injunction. Ruling by Court: Defendants' responses to 55 , 27 & 32 Motions, and any declarations from defendants, due by noon on 6/23/23; Replies and plaintiffs' declarations due by noon on 6/26/23. Word limit for plaintiffs' replies enlarged to 5,000 words. Preliminary injunction hearing set for 9:00 am on 6/28/23. Cases consolidated for the purpose of preliminary injunction hearing only. Deadline for responses re: 7 Motion to Consolidate and 33 Motion to Proceed Under Pseudonym (in 4:23cv218) are stayed and will be reset after preliminary injunction hearing. Supervisors of elections' responses to plaintiffs' 1 Complaint is extended 21 days after ruling on 55 Motion (in 4:23cv215). Clerk to provide call−in number for interested parties to observe preliminary injunction hearing. Order to follow (Court Reporter Megan Hague (USDC−Tallahassee)). (vkm) (Entered: 06/15/2023) |
| 06/15/2023 | 57 | ORDER ADMITTING RAYNE ELLIS PRO HAC VICE. The 50 motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 06/15/2023. (rcb) (Entered: 06/16/2023) |
| 06/16/2023 | 58 | NOTICE OF HEARING RE: 32 Emergency MOTION for Preliminary Injunction: Preliminary Injunction Hearing set for **6/28/2023 09:00 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850−521−3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 06/16/2023) |
| 06/23/2023 | 59 | NOTICE *of Joinder* by ASHLEY MOODY (SJOSTROM, NOAH) (Entered: 06/23/2023) |

| | | |
|---|---|---|
| 06/23/2023 | 60 | RESPONSE in Opposition re 32 Emergency MOTION for Preliminary Injunction *and Incorporated Memorandum of Law* filed by CORD BYRD. (Attachments: # 1 Appendix Appendix, Vol. 1 of 3, # 2 Appendix Appendix, Vol. 2 of 3, # 3 Appendix Appendix, Vol. 3 of 3) (JAZIL, MOHAMMAD) (Entered: 06/23/2023) |
| 06/23/2023 | 61 | NOTICE OF LISTEN−ONLY PHONE LINE for 6/28/2023 Preliminary Injunction Hearing:<br><br>INTERESTED PARTIES MAY OBSERVE THIS HEARING BY CALLING THE NUMBER BELOW−−THIS HEARING MUST NOT BE BROADCAST BY ANY MEANS.<br><br>PLEASE MUTE YOUR LINE<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888−684−8852** When prompted for an access code, enter: **8131706#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **0628#** You are now in the conference call. **Remember to mute your phone.**<br><br>**Callers to this line will be able to listen ONLY, not address the Court**.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 06/23/2023) |
| 06/26/2023 | 62 | REPLY to Response to Motion re 32 Emergency MOTION for Preliminary Injunction filed by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (EBENSTEIN, JULIE) (Entered: 06/26/2023) |
| 06/28/2023 | 63 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Motion Hearing held on 6/28/2023. Court hears argument regarding Plaintiffs' 32 Motion for Preliminary Injunction. Defendants' response to 33 Motion to Proceed Under Pseudonym due **7/10/2023**; Plaintiffs' reply due **7/13/2023**. Parties to confer and file notice re: 7 Motion to Consolidate 21 days after Court's ruling on preliminary injunction and the parties' Rule 26 meeting deadline is extended same. Plaintiff Hispanic Federation to file supplement by **noon on 6/30/2023**. Defendants' response due by **5:00 pm on 6/30/2023**. Orders to follow (Court Reporter Megan Hague (USDC−Tallahassee)). (vkm) (Entered: 06/28/2023) |
| 06/28/2023 | 64 | ORDER SETTING DEADLINES. Consistent with this Court's statements on the record at the conclusion of the hearing on June 28, 2023, the parties shall confer in these three cases and file a notice indicating their positions regarding consolidation of these cases on or before twenty−one days after this Court enters an order ruling on the Plaintiffs motions for preliminary injunction. In addition, this Court reiterates that Defendants in these three cases shall file their responsive pleadings to the operative complaints on or before twenty− one days after this Court enters an order ruling on the Plaintiffs' motions for preliminary injunction. Likewise, the parties' deadlines for conferring and filing their Rule 26 reports are extended to on or before twenty−one days after this Court enters an order ruling on the Plaintiffs' motions for preliminary injunction. In Case No.: 4:23cv218, Defendants' response to Plaintiffs motion to proceed anonymously is due on or before **7/10/2023**, and Plaintiffs reply, if any, is due on or before **7/13/2023**. Finally, without objection from Defendants, Plaintiffs in Case No.: 4:23cv218 may supplement the record with certified translations of their translated declarations on or before 12:00 p.m. (ET) on **6/30/2023**. If Defendants need to be heard with respect to the certified translations, they must file a notice with this Court indicating the reason for which they wish to be heard by 5:00 p.m. (ET) on **6/30/2023**. Signed by CHIEF JUDGE MARK E WALKER on 06/28/2023. (rcb) (Entered: 06/28/2023) |
| 06/29/2023 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Proceedings held on 6/28/2023, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850−443−9797. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **7/6/2023**. Release of Transcript Restriction set for **10/4/2023**. (mah) (Entered: 06/29/2023) |
| 06/30/2023 | 66 | MOTION for Leave to File *Supplemental Record Evidence* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (Attachments: # 1 Exhibit 1 − Herrera−Lucha Certified Translation, # 2 Exhibit 2 − Martinez Certified Translation, # 3 Exhibit 3 − Doe Certified Translation, # 4 Exhibit 4 − Cruz Declaration) (EBENSTEIN, JULIE) (Entered: 06/30/2023) |
| 06/30/2023 | 67 | ORDER GRANTING 66 MOTION TO SUPPLEMENT RECORD. Plaintiffs' motion, ECF No. 66 , is GRANTED subject to any objections from Defendants filed by 5:00 p.m. (ET) on June 30, 2023. Signed by CHIEF JUDGE MARK E WALKER on 06/30/2023. (rcb) (Entered: 06/30/2023) |
| 07/03/2023 | 68 | PRELIMINARY INJUNCTION. The Florida NAACP Plaintiffs' motion for a preliminary injunction, ECF No. 55 in Case No.: 4:23cv215, is GRANTED. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered: a. Section 97.0575(1)(f), Florida Statutes (2023); and b. Section 97.0575(7), Florida Statutes (2023). The preliminary injunction binds the above−listed Defendants and their officers, agents, servants, employees, and attorneys−and others in active concert or participation with any of them−who receive actual notice of this injunction by personal service or otherwise. The Hispanic Federation Plaintiffs' motion for a preliminary injunction, ECF No. 32 in Case No.: 4:23cv218, is GRANTED. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered: a. Section 97.0575(1)(f), Florida Statutes (2023). The preliminary injunction binds the above−listed Defendants and their officers, agents, servants, employees, and attorneys−and others in active concert or participation with any of them−who receive actual notice of this injunction by personal service or otherwise. Signed by CHIEF JUDGE MARK E WALKER on 7/3/2023. (kjw) (Entered: 07/03/2023) |
| 07/10/2023 | 69 | THE ATTORNEY GENERAL'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO PROCEED UNDER A PSEUDONYM AND INCORPORATED MEMORANDUM OF LAW. (MORSE, STEPHANIE) Modified to edit title on 7/11/2023 (rcb). (Entered: 07/10/2023) |
| 07/10/2023 | 70 | RESPONSE IN OPPOSITION TO MOTION TO PROCEED UNDER PSEUDONYM AND INCORPORATED MEMORANDUM OF LAW. (JAZIL, MOHAMMAD) Modified to edit title on 7/11/2023 (rcb). (Entered: 07/10/2023) |
| 07/11/2023 | 71 | NOTICE OF APPEAL as to 68 Preliminary Injunction,,,,, by CORD BYRD, ASHLEY MOODY. ( Filing fee $505 Receipt Number AFLNDC−7964872.) (Attachments: # 1 Exhibit Doc. 68, Preliminary Injunction, 4:23−cv−218) (JAZIL, MOHAMMAD) (Entered: 07/11/2023) |
| 07/12/2023 | 72 | NOTICE of Appearance by WILLIAM DAVID CHAPPELL on behalf of ASHLEY MOODY (CHAPPELL, WILLIAM) (Entered: 07/12/2023) |
| 07/12/2023 | 73 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 71 Notice of Appeal. (rcb) (Entered: 07/12/2023) |
| 07/12/2023 | | Set Deadlines re 71 Notice of Appeal. Clerk to check status of Appeal on **10/10/2023**. Certificate of Readiness (FRAP 11) due by **7/26/2023**. (rcb) (Entered: 07/12/2023) |
| 07/12/2023 | 74 | TRANSCRIPT REQUEST by CORD BYRD for proceedings held on June 28, 2023 before Judge Mark E. Walker, Chief United States District Judge, Court Reporter:Megan Hague (BEATO, MICHAEL) (Entered: 07/12/2023) |

| | | |
|---|---|---|
| 07/13/2023 | 75 | FIRST JOINT STATUS REPORT. (CEPEDA DERIEUX, ADRIEL) Modified to edit title on 7/14/2023 (rcb). (Entered: 07/13/2023) |
| 07/13/2023 | 76 | REPLY to Response to Motion re 33 MOTION for Leave to Proceed Under a Pseudonym filed by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (CEPEDA DERIEUX, ADRIEL) (Entered: 07/13/2023) |
| 07/14/2023 | | Set Deadline− Status Report due by **8/14/2023**. (rcb) (Entered: 07/14/2023) |
| 07/14/2023 | 77 | ORDER DEFERRING DETERMINATION OF ENTITLEMENT TO, AND AMOUNT OF,FEES AND COSTS. This Court has considered, without hearing, the unopposed motion by the plaintiffs in Case No. 4:23cv215 (Florida NAACP Plaintiffs) and in Case No. 4:23cv218 ("Hispanic Federation Plaintiffs") to defer determination of entitlement to, and amount of, fees and costs stemming from this Courts July 3, 2023, preliminary injunction order. ECF No. 106 . The motion is GRANTED. The deadline to move for fees stemming from this Court's July 3, 2023, preliminary injunction order, as well as from any subsequent order this Court issues in these cases, is fourteen days after final judgment is entered. Signed by CHIEF JUDGE MARK E WALKER on 7/14/2023. (rcb) (Entered: 07/14/2023) |
| 07/17/2023 | 78 | ORDER DENYING 33 MOTION TO PROCEED UNDER PSEUDONYM. Plaintiff Doe's motion to proceed under a pseudonym, ECF No. 33 , is DENIED. Plaintiffs must file their complaint without pseudonyms no later than Monday, **7/24/2023**. Signed by CHIEF JUDGE MARK E WALKER on 7/17/2023. (rcb) (Entered: 07/17/2023) |
| 07/19/2023 | 85 | USCA Acknowledgment #23−12313 Re: 71 Notice of Appeal. (rcb) (Entered: 07/26/2023) |
| 07/24/2023 | 79 | REVISED COMPLAINT NAMING ALL PLAINTIFFS FILED PURSUANT TO ECF NO. 78 (EBENSTEIN, JULIE) Modified to edit title on 7/25/2023 (rcb). (Entered: 07/24/2023) |
| 07/24/2023 | 80 | *Florida Attorney General's* ANSWER to Complaint *at ECF 79* by ASHLEY MOODY. (MORSE, STEPHANIE) (Entered: 07/24/2023) |
| 07/24/2023 | 81 | *Secretary of State's* ANSWER to 1 Complaint, *PLAINTIFFS' REVISED COMPLAINT* by CORD BYRD. (JAZIL, MOHAMMAD) (Entered: 07/24/2023) |
| 07/24/2023 | 82 | NOTICE *of Hispanic Federation Plaintiffs' Supplemental Briefing in Support of Consolidation* by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX (EBENSTEIN, JULIE) (Entered: 07/24/2023) |
| 07/24/2023 | 83 | REPORT of Rule 26(f) Planning Meeting. (EBENSTEIN, JULIE) (Entered: 07/24/2023) |
| 07/25/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 83 Report of Rule 26(f) Planning Meeting (rcb) (Entered: 07/25/2023) |
| 07/25/2023 | 84 | ORDER RE: 7 CONSOLIDATING CASES FOR SCHEDULING AND TRIAL AND SETTING SCHEDULING DEADLINES.The Hispanic Federation Plaintiffs motion to consolidate, ECF No. 7 in Case No. 4:23cv218, is GRANTED with respect to the Florida NAACP Plaintiffs case, Case No.: 4:23cv215. The consolidated bench trial is special set for a two−week trial period that begins on Monday, **4/1/2024 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. The discovery deadline is extended to **12/18/2023**.A pleading may be amended only by **8/15/2023**, or on a motion showing good cause for not amending by that date. The deadline for filing summary−judgment motions is 21 days after the discovery deadline, **1/8/2024**, but the motions should be filed at the earliest appropriate time. Signed by CHIEF JUDGE MARK E WALKER on 7/25/2023. (rcb) (Entered: 07/25/2023) |
| 07/26/2023 | 86 | Pursuant to F.R.A.P. 11(c), #23−12313 the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 71 Notice of Appeal, Appeal No. 23−12313. The entire record on appeal is available electronically. (rcb) (Entered: 07/26/2023) |

| | | |
|---|---|---|
| 07/28/2023 | 87 | ORDER CONSOLIDATING RE: 7 CASES FOR SCHEDULING AND TRIAL AND SETTING SCHEDULING DEADLINES. The Hispanic Federation Plaintiffs' motion to consolidate, ECF No. 7 in Case No. 4:23cv218, is GRANTED with respect to the League Plaintiffs' case, Case No.: 4:23cv216 The consolidated bench trial is special set for a two−week trial period that begins on Monday, **4/1/2024 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. The discovery deadline is extended to **12/18/2023**. A pleading may be amended only by **8/15/2023**, or on a motion showing good cause for not amending by that date. The deadline for filing summary−judgment motions is 21 days after the discovery deadline, **1/8/2024**, but the motions should be filed at the earliest appropriate time. Signed by CHIEF JUDGE MARK E WALKER on 7/28/2023. (rcb) (Entered: 07/28/2023) |
| 08/03/2023 | 88 | SECRETARY OF STATE'S INITIAL DISCLOSURE. (JAZIL, MOHAMMAD) Modified to edit title on 8/4/2023 (rcb). (Entered: 08/03/2023) |
| 08/03/2023 | 89 | ATTORNEY GENERAL'S INITIAL RULE 26(a)(1) DISCLOSURES. (SJOSTROM, NOAH) Modified to edit title on 8/4/2023 (rcb). (Entered: 08/03/2023) |
| 08/07/2023 | 90 | PROTECTIVE ORDER.The Hispanic Federation Plaintiffs in Case No. 4:23−cv−218 also agreed to the protective order. Id. at 2. The motion is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 8/7/2023. (rcb) (Entered: 08/10/2023) |
| 08/14/2023 | 91 | STATUS REPORT by HISPANIC FEDERATION. (RUIZ, CESAR) (Entered: 08/14/2023) |
| 08/15/2023 | | Set Deadline− Status Report due by **9/15/2023**. (rcb) (Entered: 08/15/2023) |
| 08/16/2023 | 92 | TRANSCRIPT REQUEST by ASHLEY MOODY for proceedings held on 6/28/23 before Judge Chief Judge Walker, Court Reporter:Megan Hague (CHAPPELL, WILLIAM) (Entered: 08/16/2023) |
| 08/22/2023 | 93 | NOTICE of Appearance by CAROLINE ANDREWS MCNAMARA on behalf of All Plaintiffs (MCNAMARA, CAROLINE) (Entered: 08/22/2023) |
| 08/24/2023 | 94 | PROTECTIVE ORDER.. The motion is GRANTED Re: 141 in. 4:23cv215−MW/MAF. Signed by CHIEF JUDGE MARK E WALKER on 8/24/2023. (rcb) (Entered: 08/24/2023) |
| 08/24/2023 | 95 | MOTION to Extend Time by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (Attachments: # 1 Exhibit Plaintiff's Rule 26(a)(1) Initial Disclosures, # 2 Exhibit Email Reflecting Service of Disclosures) (EBENSTEIN, JULIE) (Entered: 08/24/2023) |
| 08/24/2023 | 96 | ORDER GRANTING 95 UNOPPOSED MOTION FOR LEAVE TO FILE PLAINTIFFS' RULE 26 DISCLOSURES OUT OF TIME. The 95 unopposed motion is GRANTED. Plaintiffs shall file their Rule 26 disclosures as a separate docket entry on or before **8/25/2023**. Signed by CHIEF JUDGE MARK E WALKER on 8/24/2023. (rcb) (Entered: 08/24/2023) |
| 08/25/2023 | 97 | RULE 26 Disclosures by A DOE, VERONICA HERRERA−LUCHA, HISPANIC FEDERATION, NORKA MARTINEZ, PODER LATINX. (EBENSTEIN, JULIE) (Entered: 08/25/2023) |

# 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as Florida Secretary of State, *et al.*,

*Defendants*.

Case No. 4:23-cv-218-MW-MAF

**PLAINTIFFS' EMERGENCY MOTION
FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and A. Doe ("Plaintiffs"), respectfully move the Court for a preliminary injunction against the enforcement of SB7050's non-citizen restrictions by Defendants Cord Byrd, in his official capacity as Secretary of State, and Ashley Moody, in her official capacity as Attorney General.

The provision of SB7050 that pertains to non-citizens—section 97.0575(1)(f)—enacts discriminatory restrictions on third-party voter registration organizations and their individual staff's First Amendment rights to core political speech and association. Section 97.0575 also violates the Fourteenth Amendment's Equal Protection Clause by discriminating against Plaintiffs Herrera-Lucha,

Martínez, and Doe on the basis of their citizenship status. As more fully set forth in Plaintiffs' memorandum in support of this motion, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm from the enforcement of SB7050 in the absence of preliminary relief. The balance of equities tilts strongly in Plaintiffs' favor, and an injunction protecting their constitutional rights is in accord with the public interest. Because the Law and its attendant harms will take effect on July 1, 2023, absent relief from this Court, Plaintiffs' need for relief is urgent. Therefore, a preliminary injunction should issue.

# MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ....8
II. STATEMENT OF FACTS ....10
A. Plaintiffs' Engagement in Voter Registration Activities .... 10
B. The Challenged Law's Burdensome Provisions .... 11
C. The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts .... 13
III. ARGUMENT ....20
A. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. .... 21
B. Plaintiffs Will Likely Prevail on the Merits. .... 23
1. Plaintiffs Have Standing. .... 23
2. Plaintiffs' First Amendment Claim Will Likely Succeed. .... 25
3. Plaintiffs' Equal Protection Claim Will Likely Succeed. .... 36
C. The Public Interest and Balance of Hardships Favor Injunctive Relief..... 41
IV. CONCLUSION ....42

## TABLE OF AUTHORITIES

### Cases

*American Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) .................................................... 31, 33

*American-Arab Anti-Discrimination Committee v. City of Dearborn*,
418 F.3d 600 (6th Cir. 2005) .............................................................. 32

*Arcia v. Florida Secretary of State*,
772 F. 3d 1335 (11th Cir. 2014) ......................................................... 24

*Arizona Dream Act Coalition v. Brewer*,
855 F.3d 957 (9th Cir. 2017) .............................................................. 39

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ............................................................................ 29

*Bernal v. Fainter*,
467 U.S. 216 (1984) ................................................................ 37, 38, 40, 41

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) .................................................... 20, 41

*Cabell v. Chavez-Salido*,
454 U.S. 432 (1982) ............................................................................ 38

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ........................................................... 21

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .............................................................................. 32

*Clean-up '84 v. Heinrich*,
590 F.Supp. 928 (M.D. Fla. 1984) ....................................................... 21

*Clean Up '84 v. Heinrich*,
759 F.2d 1511 (11th Cir. 1985) ........................................................... 33

*Dandamudi v. Tisch*,
686 F.3d 66 (2d Cir. 2012) .................................................................. 37

*Department of Agriculture v. Moreno*,
413 U.S. 528 (1973) ...................................................................... 39, 40

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................ 21

*Estrada v. Becker*,
917 F.3d 1298 (11th Cir. 2019) .......... 38, 39

*Florida State Conference of the NAACP. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) .......... 24

*Georgia Coalition for the People's Agenda v. Kemp*,
347 F. Supp. 3d 1251 (N.D. Ga. 2018) .......... 22

*Gonzalez v. Immigration & Customs Enforcement*,
416 F. Supp. 3d 995 (C.D. Cal. 2019) .......... 16

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 24

*In re Griffiths*,
413 U.S. 717 (1973) .......... 41

*Indiana State Conference of the NAACP v. Lawson*,
326 F.Supp.3d 646 (S.D. Ind. 2018) .......... 22

*KH Outdoor v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) .......... 21, 42

*Kusper v. Pontikes*,
414 U.S. 51 (1973) .......... 27

*Lawrence v. Texas*,
539 U.S. 558 (2003) .......... 39

*League of Women Voters of Florida v. Browning* (*Browning I*),
575 F. Supp.2d 1298 (S.D. Fla. 2008) .......... 29, 30, 35

*League of Women Voters of Florida v. Browning* (*Browning II*),
863 F.Supp.2d 1155 (N.D. Fla. 2012) .......... passim

*League of Women Voters of Florida v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006) .......... passim

*League of Women Voters of Florida v. Detzner*,
314 F.Supp.3d 1205 (N.D. Fla. 2018) .......... 41

*League of Women Voters of Florida v. Lee*,
595 F.Supp.3d 1042 (N.D. Fla. 2022) .......... 13

*League of Women Voters of Missouri v. Ashcroft*,
336 F. Supp. 3d 998 (W.D. Mo. 2018) .......... 22

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 22

*LeClerc v. Webb*,
419 F.3d 405 (5th Cir. 2005) .... 39

*Massachusetts v. Oakes*,
491 U.S. 576 (1989) .... 30

*Nationalist Movement v. City of Cumming*,
934 F.2d 1482 (11th Cir. 1991) .... 30

*Pinson v. JPMorgan Chase Bank, National Association*,
942 F.3d 1200 (11th Cir. 2019) .... 25

*Priorities USA v. Nessel*,
2022 WL 4272299 (E.D. Mich. Sept. 15, 2022) .... 28

*Project Vote v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) .... 22

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997) .... 31

*Romer v. Evans*,
517 U.S. 620 (1996) .... 39

*Smith v. California*,
361 U.S. 147 (1959) .... 31, 32

*Speech First v. Cartwright*,
32 F. 4th 1110 (11th Cir. 2022) .... 24, 30

*Tennessee State Conference of NAACP. v. Hargett*,
420 F.Supp.3d 683 (M.D. Tenn. 2019) .... 27

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) .... 29

*Towbin v. Antonacci*,
885 F.Supp.2d 1274 (S.D. Fla. 2012) .... 21

*United States v. Carolene Products Co.*,
304 U.S. 144 (1938) .... 38

*United States v. Williams*,
553 U.S. 285 (2008) .... 31

*Video Software Dealers Association v. Webster*,
773 F.Supp. 1275 (W.D. Mo. 1991) .... 32

*Village of Hoffman Estates v. Flipside, Hoffman Estates*,
455 U.S. 489 (1982) .... 33

*Vital Pharmaceuticals v. Alfieri*,
23 F.4th 1282 (11th Cir. 2022) .................................................................. 20

*VoteAmerica v. Schwab*,
No. CV 21-2253-KHV, 2023 WL 3251009 (D. Kan. May 4, 2023) ............ 27, 29

*Weaver v. Bonner*,
309 F.3d 1312 (11th Cir. 2002) .................................................................. 31

**Statutes**

52 U.S.C. § 20501 ............................................................................................ 9

Fla. Stat. § 97.0525 ........................................................................................ 34, 41

Fla. Stat. § 97.057 .......................................................................................... 34, 41

Fla. Stat. § 97.0575 .................................................................. 8, 11, 13, 33, 35, 12,

Fla. Stat. § 104.011 ..................................................................................... 36, 40, 42

Fla. Stat. § 104.012 ..................................................................................... 36, 40, 42

Fla. Stat. § 104.42 ....................................................................................... 36, 40, 42

Fla. Stat. § 117.01 .............................................................................................. 40

Fla. Stat. § 817.02 .............................................................................................. 40

**Other Authorities**

ACLU of Florida,
*Citizens on Hold: A Look at ICE's Flawed Detainer System in Miami-Dade County* (Mar. 20, 2019) ............................................................................... 17

*Florida Senate Floor Debate on SB7050* (Apr. 26, 2023) ..................................... 34

S. Rep. No. 103-6 (1993) ........................................................................................ 9

Plaintiffs Hispanic Federation and Poder Latinx ("Organizational Plaintiffs"), and Verónica Herrera-Lucha, Norka Martínez, and A. Doe ("Individual Plaintiffs") submit this memorandum in support of their motion for a preliminary injunction.

## I. PRELIMINARY STATEMENT

This case asks whether a state can substantially interfere with private organizations' and individuals' right to associate with, encourage, communicate with, and assist eligible citizens with registering to vote. It cannot. Plaintiffs challenge section 97.0575(1)(f) of the Florida Statutes as amended by SB7050 (the "Law"), which suppresses the protected speech and association of voter-engagement organizations (including their staff and volunteers) and reduces access to the franchise by restricting voter registration efforts.[1] The Law is already negatively affecting Plaintiffs' critical work, and will have a draconian impact on Organizational Plaintiffs' voter registration efforts and prohibit Individual Plaintiffs from engaging in protected speech activity when it takes effect on July 1, 2023. It should be enjoined.

Organizational Plaintiffs are civic organizations that encourage political participation by helping underrepresented communities register to vote. Known as third-party voter registration organizations ("TPVROs"), Organizational Plaintiffs' staff and volunteers explain the importance of voter registration and participation,

---

1 Statutory citations are to the statutes as amended by SB7050, Laws of Fla. ch. 2023-120.

distribute and collect voter registration applications from Floridians who are eligible to vote, and deliver completed applications to election officials.

Without groups like Organizational Plaintiffs, fewer individuals register to vote. Congress has specifically recognized that "unfair registration laws and procedures can have a direct and damaging effect on voter participation" and has sought to lower barriers to voter participation by, among other things, "permit[ting] organizations to go to the voter with organized registration drives." S. Rep. No. 103-6, at 2, 12 (1993); 52 U.S.C. § 20501. Organizational Plaintiffs provide that opportunity to underrepresented communities throughout Florida.

Individual Plaintiffs are non-citizens, authorized to work in the United States, who engage in voter registration activities. Their canvassing skills and relationships in their communities enable TPVROs to engage underrepresented communities and support eligible citizens' access to the franchise.

Plaintiffs' voter registration activities are core political speech and association critical to American democracy. But the Law turns Plaintiffs' core First Amendment activity into a high-risk enterprise. It limits their effectiveness in promoting democratic participation, interferes with their ability to register voters, and chills speech by placing overbroad and unwarranted limitations on who can assist voters with registration and imposing substantial fines for noncompliance. And it discriminates against Individual Plaintiffs based on their citizenship status. The

Court should enjoin these flagrant violations of the First and Fourteenth Amendments.

## II. STATEMENT OF FACTS

### A. Plaintiffs' Engagement in Voter Registration Activities[2]

Organizational Plaintiffs are registered TPVROs. TPVROs play an important role in registering voters. Organizational Plaintiffs help reach voters who might not otherwise register to vote, including voters with limited access to technology or limited English-language proficiency. Both organizations operate statewide. HF Decl. ¶ 7; Poder Decl. ¶ 7. Hispanic Federation has registered more than 90,000 voters since the 2016 election cycle, including eligible voters in each of Florida's 67 counties. HF Decl. ¶ 11. Poder Latinx has registered over 48,000 eligible Florida voters. Poder Decl. ¶ 10.

Individual Plaintiffs likewise play a role in registering eligible Floridians. Plaintiff Herrera-Lucha has canvassed for TPVROs since 2016. She currently serves as State Field Director for Mi Vecino, a registered TPVRO. In that role, she both does direct canvassing work to register eligible voters and plans and coordinates Mi Vecino's Florida voter registration campaigns. Herrera-Lucha Decl. ¶¶ 7-10.

---

2 Plaintiffs summarize the facts most relevant to their preliminary injunction motion; the facts are presented more fully in Plaintiffs' Declarations, attached as exhibits hereto. *See* Ex. 1, Decl. of Frederick Vélez III Burgos ("HF Decl."); Ex. 2, Decl. of Nancy Batista ("Poder Decl."); Ex. 3, Decl. of Verónica Herrera-Lucha ("Herrera-Lucha Decl."); Ex. 4, Decl. of Norka Martínez ("Martínez Decl."); Ex. 5, Decl. of A. Doe ("Doe Decl.").

Plaintiffs Martínez and Doe both currently work in paid staff positions as canvassers who help eligible Floridians register to vote. Martínez Decl. ¶¶ 9-11; Doe Decl. ¶ 12-15, 18.

While Individual Plaintiffs cannot themselves vote, they view voter registration as an important way to help eligible citizens exercise their rights and engage on issues critical to all who live in their communities. Individual Plaintiffs believe that helping eligible citizens in their underrepresented communities to register to vote will help American democracy more fully reflect and promote its constituents' values. Herrera-Lucha Decl. ¶ 25; Martínez Decl. ¶¶ 16, 23; Doe Decl. ¶ 11, 19-20.

**B. The Challenged Law's Burdensome Provisions**

The Law requires that, before engaging in voter registration activities, a TPVRO must affirm to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications on behalf of" the TPVRO is "a citizen of the United States." Fla. Stat. § 97.0575(1)(f).

The Law imposes a $50,000 fine on TPVROs for each violation—specifically, for "each such person" collecting or handling applications on the organization's behalf. *Id.* It authorizes the Secretary of State to refer any instance in which he "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement. *Id.* § 97.0575(8).

There is no cap on the amount that any one organization can be fined for such persons' assistance, nor is knowledge of the violation required to impose fines. Help from three volunteers the organization didn't know were non-citizens would cost $150,000 in fines. Assistance from 15 people the organization didn't know were non-citizens would cost $750,000 in fines—nearly $100,000 more than Hispanic Federation's entire 2022 Florida programming budget. HF Decl. ¶ 15.

The Law's impermissibly vague and overbroad commands exacerbating its harsh penalties. Regulated individuals and organizations cannot know which requirements apply to them, or which steps to take to ensure compliance. For example, the Law nowhere defines the words that describe the conduct at issue—"collecting" and "handling."[3] It's also unclear whether the Law bans non-citizens from reviewing applications to make sure eligible registrants have correctly filled them out; supervising other canvassers who physically collect applications; encouraging eligible citizens to complete applications if the non-citizen doesn't touch the application; directing eligible citizens to the organization's online application portal; or even being present in an office where applications are processed. *See, e.g.*, HF Decl. ¶ 34. The statutory language leaves these—and myriad

[3] TPVROs "must register and provide" to state officials "[t]he names, permanent addresses, and temporary addresses, if any, of each registration agent registering persons to vote" who "collect or handle voter registration applications." Fla. Stat. § 97.0575(1). The Law expressly excludes "persons who only solicit applications" from the regulations, but does not otherwise define "collect" or "handle." *Id.*

other questions—unaddressed. The Law's vague and overbroad requirements will diminish Plaintiffs' participatory messaging and chill constitutionally-protected core political speech.

Absent relief from this Court, the Law will take effect on July 1, 2023. The Law is only one of a number of recently-enacted burdens that SB7050 imposes on TPVROs to hamper their mission and limit the efficacy of their work. *See also, e.g.*, Fla. Stat. § 97.0575(4), (5)(a), (7), (11). And it follows a broader pattern in Florida of chilling third-party voter registration activities under the guise of election integrity, including restrictions passed in 2011 that this Court invalidated for placing an undue burden on TPVROs, *see League of Women Voters of Fla. v. Browning* (*Browning II*), 863 F.Supp.2d 1155, 1167-68 (N.D. Fla. 2012), and restrictions passed after the 2020 election that are subject to ongoing litigation, *see League of Women Voters of Fla. v. Lee*, 595 F.Supp.3d 1042 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part*, 66 F.4th 905 (11th Cir. 2023).

### C. The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts

The Law severely burdens Plaintiffs' voter registration activities, as well as the communities and constituencies Plaintiffs serve, in at least six distinct ways.

*First*, the Law will decimate Organizational Plaintiffs' voter registration workforce. Concretely, it will result in Hispanic Federation losing approximately 70 percent of its canvassers. HF Decl. ¶ 23. It will also paralyze Poder Latinx's voter

registration work, as approximately 90 percent of its staff are non-citizens. Poder Decl. ¶ 24. The Law will prevent both groups from employing those people to assist in registering voters. The abrupt loss of the assistance and speech these non-citizen volunteers and staff provide will severely restrict Organizational Plaintiffs' effectiveness to promote democratic participation.

Without its non-citizen staff, Poder Latinx cannot engage in the constitutionally-protected speech needed to meet its registration goals. Because of the Law, Poder Latinx has already been unable to fill open positions, and has had to turn down otherwise qualified candidates based solely on their citizenship. If the Law takes effect, instead of expanding its voter registration work, Poder Latinx will be lucky to field a single team to register voters. Poder Decl. ¶¶ 21-22.

*Second*, any attempt to comply with the Law will tie up significant resources, because the ban on non-citizens handling and collecting voter registration forms will result in Plaintiffs losing non-citizen staff's experience and institutional knowledge. Many of Organizational Plaintiffs' most experienced canvassers will be instantly affected: people who have risen to senior and leadership positions, those who have developed deep relationships with the communities Plaintiffs serve, and those who train Organizational Plaintiffs' new canvassers. HF Decl. ¶¶ 25-26; Poder Decl. ¶¶ 24-27.

Losing these relationships will have tangible impacts on Organizational

Plaintiffs' speech and association. Non-citizen employees' relationships with local businesses allow canvassers to register voters on the businesses' properties. The loss of those relationships will silence Organizational Plaintiffs, because the staff that local businesses know and trust can no longer engage in voter registration. Poder Decl. ¶ 26; HF Decl. ¶ 25.

Organizational Plaintiffs will also have to redirect funding that would have gone to community programming towards hiring, vetting, and training new staff and volunteers, as well as rebuilding institutional knowledge and relationships. For example, to comply with the new Law, Hispanic Federation will need to divert resources from its capacity-building efforts to strengthen Latino nonprofits, community organizing, and public policy advocacy in the areas of education, health, economic empowerment, and the environment. HF Decl. ¶¶ 38, 43. And Poder Latinx will need to divert resources from its issue-based organizing around climate justice and economic justice. Poder Decl. ¶ 39.

*Third*, because the Law applies with strict liability and imposes a $50,000 fine for each non-citizen who handles or collects voter registration forms, Organizational Plaintiffs will be forced to take significant additional measures to ensure their staff and volunteers are citizens. These measures will frustrate efforts to work with potential staff and volunteers who are, in fact, U.S. citizens. HF Decl. ¶ 32; Poder Decl. ¶¶ 33-34. That is so, because confirming citizenship status is not always easy.

For example, one court recently described determining citizenship as a "complex inquiry" that "illustrates the fluidity one may experience with respect to immigration status," turning on factors such as "which parent is a citizen, when that parent became a citizen, whether the person's parents were married, whether and when the U.S. citizen parent lived in the United States and for how long, whether the father legitimated the child," whether (and when) "the child lived in the custody of the U.S. citizen parent or parents," and "whether a person's grandparent(s) were U.S. citizens or whether a person or their parent(s) served in the U.S. Armed Forces." *Gonzalez v. Immigr. & Customs Enf't*, 416 F.Supp.3d 995, 1004 (C.D. Cal. 2019), *rev'd and vacated on other grounds*, 975 F.3d 788 (9th Cir. 2020).

There is no reliable government database for Plaintiffs to determine an employee or volunteer's citizenship status. Even federal government officials routinely mistake persons' status, because the central immigration database "'frequently' shows naturalized citizens as green card holders" and gives "no information on derivative citizenship," which is why "many U.S. citizens become exposed to possible false arrest when ICE relies [] on deficient databases." *Id.* at 1018 (citation omitted). Difficulty determining status is a problem known to Florida, as reflected by recent reports about ICE mistakenly targeting hundreds of

incarcerated U.S. citizens in Miami-Dade County for deportation.[4]

Because Organizational Plaintiffs would be strictly liable for even inadvertent violations, they will also have to turn away help from *citizens* whose status cannot be readily verified. For example, Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can show *proof* of citizenship, requiring it to turn away even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish the requisite proof. HF Decl. ¶ 32. And Poder Latinx will sever community-service partnerships that enabled local student volunteers to register voters, because of the added hurdle of confirming students' citizenship status. Poder Decl. ¶ 34.

*Fourth*, the threat of investigation and civil enforcement will meaningfully limit Organizational Plaintiffs' voter registration work. Even the threat of an investigation by the Department of State or Attorney General for a violation of the Law will chill Plaintiffs' speech and association, let alone the threat of enforcement. The threat of fines materially compounds this chilling effect. It threatens Organizational Plaintiffs with substantial monetary liability, which will chill their voter registration speech and activities, and is already affecting their planning for Florida's 2023 local elections. HF Decl. ¶¶ 36-42; Poder Decl. ¶¶ 37-43.

---

[4]   ACLU of Florida, *Citizens on Hold: A Look at ICE's Flawed Detainer System in Miami-Dade County* (Mar. 20, 2019), https://www.aclufl.org/en/publications/citizens-hold-look-ices-flawed-detainer-system-miami-dade-county.

The fine imposed for just one non-citizen volunteer or staffer is $50,000—a substantial amount. This fine naturally chills TPVROs' operations. Hispanic Federation's budget last year for Florida programming was approximately $650,000, making any $50,000 penalty a severe budgetary hit. A single fine would force cutbacks in civic engagement programs and put public health initiatives—like Hispanic Federation's vaccine program—at risk as well. This chilling effect's political and health implications will disproportionately fall on the communities of color that Hispanic Federation chiefly serves. HF Decl. ¶¶ 38-45.

In response to the Law's threat of civil penalties, some organizations are considering halting all voter registration activities as of July 1, 2023. They have multiple sound reasons to do so: because of the threat of costly fines, for example, Hispanic Federation's largest funders have already said they will withhold donations earmarked for voter registration efforts in Florida. *Id.* ¶ 37. Moreover, even if Organizational Plaintiffs do not cease these activities, they will significantly scale back the volume of voter registration drives they conduct, because most of their staff and volunteers will be banned from participating. *Id.* ¶ 41; Poder Decl. ¶ 42.

*Fifth*, the Law will impact and harm the communities and constituents that Plaintiffs serve. Plaintiffs will register substantially fewer citizens to vote than they could absent the Law. Organizational Plaintiffs work closely with Latino citizens to help them register to vote, relying in part on a network of key community activists

who help shape the organizations' agendas and who play a critical role in implementing their programs. The Law will impact Latino voters who are part of the community and constituency that Organizational Plaintiffs serve through their voter registration programs. HF Decl. ¶¶ 44-45; Poder Decl. ¶¶ 45-47.

*Sixth*, the Law will have devastating personal and professional consequences for Individual Plaintiffs, all of whom are currently employed in paid staff positions to assist eligible Floridians with registering to vote. Herrera-Lucha Decl. ¶¶ 11, 20-21; Martínez Decl. ¶ 15; Doe Decl. ¶¶ 18, 23-24. Individual Plaintiffs revere our Nation's democratic ideals. They relish the opportunity to educate and engage community members, helping them understand the significance of their right to vote. They believe that enabling better access to democracy can build accountability and positive change. And because they cannot vote as non-citizens, the voter registration work they do is critical to ensuring that their communities receive adequate representation, as they must rely on eligible voters to protect their interests. Herrera-Lucha Decl. ¶¶ 24-25; Doe Decl. ¶¶ 17, 19-20.

Individual Plaintiffs' rights to engage in political speech and association with TPVROs and community members about the importance of civic engagement and voting will be significantly diminished if the Law goes into effect. The Law will also harm them personally and professionally. As the State Field Director for a registered TVPRO, Plaintiff Herrera-Lucha both canvasses and oversees other canvassers. If

the Law takes effect, she cannot retain this role, which will harm Herrera-Lucha's career and financially impact her ability to provide for herself and her four dependents. Herrera-Lucha Decl. ¶¶ 20-21. Plaintiff Martínez is limited in her physical health, and her work as a canvasser has enabled her to support her family while caring for her wellbeing. If the Law takes effect, she can no longer work as a canvasser or support her family in a way consistent with her physical limitations. Martínez Decl. ¶¶ 15, 20-21. Likewise, the Law will prevent Plaintiff Doe from holding a job where she helps register eligible voters in Florida and will deprive her of her main source of income and the ability to conduct meaningful work that supports her community. Doe Decl. ¶ 23-25.

## III.   ARGUMENT

A preliminary injunction is warranted if plaintiffs show: (1) a likelihood of suffering irreparable harm; (2) a substantial likelihood of success on the merits; (3) the balance of hardships favor them; and (4) the injunction serves the public interest. *Vital Pharms. v. Alfieri*, 23 F.4th 1282, 1290-91 (11th Cir. 2022).

A preliminary injunction's main purpose is to keep the status quo until a final decision on the merits can be reached. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). As the Law has not gone into effect, enjoining it will maintain the status quo pending the decision on the merits.

**A. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.**

Both Organizational and Individual Plaintiffs will suffer—and have already suffered—harms to their First Amendment rights because of the Law's onerous burdens on speech and association, and its facial citizenship-based classification. *See supra* Section II.C. Loss of these "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "[e]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because Plaintiffs' harms "cannot be made whole by money damages and because [the Law] has [a] chilling effect on the free speech and associational rights of [Plaintiffs] and those similarly-situated." *Towbin v. Antonacci*, 885 F.Supp.2d 1274, 1295 (S.D. Fla. 2012); *see also Clean-up '84 v. Heinrich*, 590 F.Supp. 928 (M.D. Fla. 1984). "[T]he intangible nature of the benefits flowing" from these rights means that "if th[ey] are not jealously safeguarded, persons will be deterred ... from exercising [them] in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).

Extinguished opportunities to register voters also constitute irreparable harm, because "when a plaintiff loses an opportunity to register a voter, the opportunity is

gone forever." *Browning II*, 863 F.Supp.2d at 1167.[5] Interrupting voter registration operations causes organizations and their workforce to lose valuable time and opportunity to engage in core political speech and add new registrants to the election rolls, irreparably harming them. *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006). That means Organizational Plaintiffs "will [] suffer irreparable injury distinct from the injuries of eligible voters," because "Plaintiffs' organizational missions, including registration and mobilization efforts, will ... be frustrated and [] resources will be diverted" in response to the Law. *Ga. Coal. for People's Agenda v. Kemp*, 347 F.Supp.3d 1251, 1268 (N.D. Ga. 2018). Those "mobilization opportunities cannot be remedied once lost." *Id.*

Individual Plaintiffs will be irreparably harmed by the loss of opportunity to engage in protected voter registration activities and will suffer such harm on the basis of their citizenship status. The Law will also diminish their ability to speak and associate with their community at other events: TPVROs often integrate voter registration efforts into events that educate or serve their communities in other ways, *see, e.g.*, HF Decl. ¶ 17; Poder Decl. ¶ 16, and the Law significantly deters organizations from including Individual Plaintiffs in any activity that could involve

---

[5]   *See also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *League of Women Voters of Mo. v. Ashcroft*, 336 F.Supp.3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of NAACP v. Lawson*, 326 F.Supp.3d 646, 662-63 (S.D. Ind. 2018); *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1350 (N.D. Ga. 2016); *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006).

voter registration. The self-censorship that the Law promotes will carve Individual Plaintiffs out of activities that do not directly involve handling or collecting voter registration forms, impeding Individual Plaintiffs' speech and associational activities. Absent relief, Plaintiffs will lose opportunities to educate community members and help voters register.

Plaintiffs are also currently irreparably harmed because they cannot plan for the future. The Law's overbreadth and vagueness, *see infra* Section III.B.2.b, make it impossible for Plaintiffs to foresee what voter registration activities they can undertake. Each day of planning that Plaintiffs lose diminishes the effectiveness of their voter registration activities and deepens the irreparable injury on Plaintiffs' ability to carry out their mission.

And the Law's prohibition, if it takes effect, will be irreparable. Its threatened impact has already imperiled Organizational Plaintiffs' funding, and if effected, it will endanger their ability to continue operating altogether. HF Decl. ¶¶ 36-43; Poder Decl. ¶¶ 37-44. The Law will also require Organizational Plaintiffs to terminate some of their most experienced personnel, whose experience and knowledge are irreplaceable.

**B. Plaintiffs Will Likely Prevail on the Merits.**

1. <u>Plaintiffs Have Standing.</u>

The Law is already inflicting injuries that confer Article III standing on

Plaintiffs. It will continue to do so after its effective date in several ways.

*First*, the Law's limitations on non-citizen assistance in voter registration activities and concurrent financial penalties will chill Plaintiffs' First Amendment activities, including their voter registration efforts. *See supra* Section II.C. "Litigants who are being chilled from engaging in constitutional activity ... suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." *Speech First v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

*Second*, the Law will harm Organizational Plaintiffs by impeding voter-registration activities central to their missions, while forcing them to divert time and resources to attempt to comply with the Law at the expense of other organizational priorities. *See supra* Section II.C; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). And "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *see Browning*, 522 F.3d at 1165 (organization's diversion of personnel and time to respond to election law established standing).

These injuries are traceable to the Law's challenged provisions. The injunction requested would remedy Plaintiffs' harm by lifting the threat of significant civil penalties, removing the need for Plaintiffs to divert their resources, and eliminating the direct harm to their voter registration activities.

Individual Plaintiffs' standing is also clear: not only will the Law preclude them from engaging in protected speech and association, they will lose their current sources of income—jobs handling and collecting voter registration applications—as a result. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) ("economic harm is a quintessential injury in fact").

2. Plaintiffs' First Amendment Claim Will Likely Succeed.

The Law imposes burdens on core political expression and association, *infra* Section III.B.2.a, which are only magnified by the Law's overbreadth and vagueness, *infra* Section III.B.2.b. None of the resulting burdens survive exacting scrutiny or even rational basis review, *infra* Section III.B.2.c.

*a. The Law restricts core First Amendment freedoms.*

Laws regulating voter registration touch on "core First Amendment activity." *Browning II*, 863 F.Supp.2d at 1158-59. And laws restricting third-party voter registration activity "reduce[] the total quantum of speech." *Cobb*, 447 F.Supp.2d at 1332 (citation omitted). It's clear why: "as part of [] voter registration drives, [plaintiffs] persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions." *Id.* at 1333; *see supra* Section II.A & C. Indeed, Plaintiffs' efforts to help others register to vote are themselves political statements; they signal that Plaintiffs value

the democratic process and believe in the capacity of popular will to shape the government's composition and direction.

Because "this case involves a limitation on political expression," the Law must meet "exacting scrutiny." *Meyer v. Grant*, 486 U.S. 414, 420 (1988); *see also Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 204 (1999). In *Meyer*, for example, the Supreme Court applied "exacting scrutiny" in striking down a law that banned paying people who circulated ballot-initiative petitions, finding it "restricted political expression." *Meyer*, 486 U.S. at 420-22.

As in *Meyer*, Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Id.* at 422. Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions," *id*. at 421, and is intimately intertwined with the whole of Plaintiffs' speech and associative activities. *See also Buckley*, 525 U.S. at 186-87 (striking down a similar restriction as in *Meyer*). When Plaintiffs handle and collect Florida citizens' voter registration applications, they engage those citizens regarding the importance of voting, civic engagement, and other issues of organizational importance. HF Decl. ¶¶ 17, 19, 26; Poder Decl. ¶¶ 16, 18, 27.

Nor is Plaintiffs' protected First Amendment activity severable from any "purely logistical aspects of the voter registration process." *Tenn. State Conf. of*

*N.A.A.C.P. v. Hargett*, 420 F.Supp.3d 683, 699 (M.D. Tenn. 2019). It cannot be "sliced and diced" to avoid constitutional scrutiny. *See id.* Courts have consistently recognized that this kind of expressive political speech cannot be disaggregated to avoid cutting into protected activity. *Cf. Meyer*, 486 U.S. at 421-22 ("[C]irculati[ng] a petition involves ... interactive communication concerning political change."); *see also Cobb*, 447 F.Supp.2d at 1332 (finding restrictive third-party voter registration law "analogous to [the law] in *Meyer*").

The Law also restricts Plaintiffs' association with their staff, volunteers, and other Florida citizens through voter registration activities. *Supra* Section II.A & C. There is no "doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) (citations omitted). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *VoteAmerica v. Schwab*, --- F.Supp.3d ---, No. CV 21-2253-KHV, 2023 WL 3251009, at *10 (D. Kan. May 4, 2023) (citations omitted). "Public endeavors which 'assist with voter registration are intended to convey a message that voting is important,' and [those that] expend resources 'to broaden the electorate to include allegedly under-served communities' qualify as expressive conduct which implicates the First Amendment freedom of

association." *Id.* (citation omitted).

The Law will impede Plaintiffs' associational rights by limiting the audience they can reach, and their ability to broaden the electorate. It prohibits non-citizen staff and volunteers—and, given its strict liability standard and substantial fines, citizens who cannot or are unwilling to furnish proof of citizenship—from engaging eligible voters. In so doing, the Law severely burdens Organizational Plaintiffs' associational rights, eliminating the majority of the workforce that they rely on to broaden the base of public participation. Its burdens will necessarily reduce the volume and reach of Organizational Plaintiffs' voter registration activity, *see* HF Decl. ¶ 41; Poder Decl. ¶ 42, inhibiting their association with Florida citizens through voter registration outreach. And of course, it bans Individual Plaintiffs from engaging in these associational activities altogether. *See supra* Section II.C.

Further, the Law violates the right to "associate for political purposes" and freely engage with members of the public. *Buckley*, 525 U.S. at 215 (citation omitted). It "decreases the pool" of volunteers and staff who will engage in voter registration activity, "limit[ing] the number of voices who will convey" Plaintiffs' messages and decreasing "'the size of the audience [Plaintiffs] can reach.'" *Id.* at 183 (citations omitted); *Priorities USA v. Nessel*, No. 2:19-CV-13341, 2022 WL 4272299, at *6 (E.D. Mich. Sept. 15, 2022) (distinguishing absentee-ballot regulation from *Meyer* because the challenged law did not "restrict[] the number of

persons who could convey the political message"); HF Decl. ¶ 24; Poder Decl. ¶ 24.

The Law's onerous requirements—and the substantial strict liability fines they threaten—burden Plaintiffs' political expression, diminishing their ability to convey their message and engage more individuals in the political process. The Law burdens Plaintiffs' political speech, and is "accordingly 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (citation omitted).

The standard does not change if the Court approaches the level of scrutiny through the *Anderson-Burdick* framework. *See generally VoteAmerica*, 2023 WL 3251009, at *15. In applying that framework, courts "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997). "Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest." *Id.*

The Law's burdens on Plaintiffs' speech and association rights are severe. They are the kind of "direct restrictions or preconditions" on constitutionally-protected activity that courts have warned against. *See League of Women Voters of Fla. v. Browning* (*Browning I*), 575 F.Supp.2d 1298, 1322 (S.D. Fla. 2008). In

*Browning I*, plaintiffs challenged a measure that imposed disclosure requirements and deadlines on TPVROs' activities. The district court explained that "Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity." *Browning I*, 575 F.Supp.2d at 1321-22. But the court concluded that the challenged law did *not* "direct[ly] restrict[] or precondition[] [] those interactions," because it did "not ... restrict[] ... who is eligible to participate in voter registration drives or what methods or means [TPVROs] may use to solicit new voters and distribute registration applications." *Id.*

The Law here does precisely what *Browning* warned against: it restricts "who is eligible to participate in voter registration drives" and the "methods or means [TPVROs] may use to solicit new voters and distribute registration applications." *Id.* By banning most of Organizational Plaintiffs' staff—and, likewise, precluding Individual Plaintiffs—from participating in voter registration, the Law limits the means by which Plaintiffs can register voters.

*b. The Law's overbreadth and vagueness magnify the burdens on Plaintiffs' speech and association.*

The Law is also unconstitutionally overbroad. "[O]verbreadth doctrine is designed 'to prevent the chilling of protected expression.'" *Speech First*, 32 F.4th at 1125 (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989)); *Nationalist Movement v. City of Cumming*, 934 F.2d 1482, 1485 (11th Cir. 1991). Overbreadth

"results when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1502 (11th Cir. 1990); *see United States v. Williams*, 553 U.S. 285, 292 (2008). Courts are especially concerned about overbroad and vague laws that may improperly chill speech. *See Reno v. Am. Civ. Liberties Union,* 521 U.S. 844, 871-72 (1997).

A statute's overbreadth is judged by its "'possible direct and indirect burdens on speech.'" *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002) (citations omitted). Here, the Law's indirect burdens plainly reveal its overbreadth. For example, Hispanic Federation will no longer work with canvassers who fail to provide proof of citizenship, including even U.S.-citizen staff and volunteers who cannot (or choose not to) furnish such proof. HF Decl. ¶ 32. And Poder Latinx will cease its partnerships with local schools and student canvassers because of the added hurdle of confirming students' citizenship status. Poder Decl. ¶ 34. These two acts of "self-censorship, compelled by the State," will reduce Organizational Plaintiffs' ability to engage in plainly lawful and protected activities to broaden the electorate, and so their burden will "become the public's burden," resulting in fewer eligible Floridians registering to vote. *Smith*, 361 U.S. at 153-54.

The Law's breadth is "magnified by [] strict-liability phrasing." *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010). Because the absence of a scienter

requirement "may tend to work a substantial restriction on the freedom of speech and of the press," strict liability "cannot be applied in settings where [it has] the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Smith v. California*, 361 U.S. 147, 150-51 (1959). Here, the Law imposes a monetary fine large enough to put TPVROs out of business without any kind of scienter requirement. That risk is magnified because the key prohibited activities of "collecting" or "handling" are undefined. The Law will thereby impose a "a severe limitation on" TPVROs' ability to engage with eligible voters. *Id.* at 153.[6] Thus, the Law's "strict liability component … chills the exercise of First Amendment rights" and is unconstitutional because "any statute that chills the exercise of First Amendment rights must contain a knowledge element." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) (citation omitted).

Imprecise laws may also be attacked via vagueness challenge under the Due Process Clause. *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999); Compl. ¶¶ 111-118 (alleging due process violation). The Law fails to define what constitutes "collecting or handling voter registration applications," particularly regarding non-

---

6 Though *Smith* examined a criminal law, where "a fine may be imposed by the state for violating the Act," the Law still "carries … the risk of self-censorship discussed in *Smith.*" *Video Software Dealers Ass'n v. Webster*, 773 F.Supp. 1275, 1282 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992).

citizens who manage or supervise other employees' registration activities, input or transmit applicants' data electronically, or inadvertently come into contact with an application at a TPVRO office or event. HF Decl. ¶ 34. Its vagueness makes it all the more overbroad. In conducting its analysis, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 n.6 (1982). Thus, the Law's vagueness "affects overbreadth analysis," because "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'" *Id*.

Because Organizational Plaintiffs and other TPVROs will be "inhibited in utilizing their protected first amendment communications [due to] the overly broad statute," the Law is unconstitutionally overbroad. *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1514 (11th Cir. 1985). To the extent any of the conduct section 97.0575 proscribes can be lawfully prohibited, the Law reaches "at least potentially, protected speech," *Am. Booksellers*, 919 F.2d at 1502, by deterring Plaintiffs from communicating civic and political messages, and from engaging in associational activity important to advancing their missions and beliefs, providing the public with fewer options to register to vote and fewer opportunities to associate with Plaintiffs in meaningful civic activities. In this way, the Law's overbreadth and vagueness amplify the severity of its burdens on Plaintiffs' speech.

c. *The Law is not designed to serve any legitimate government interest, nor narrowly tailored to serve a compelling one.*

The Law's provisions are not meaningfully designed to serve any legitimate government interest. SB7050 classifies *all* non-citizens as untrustworthy based solely on their citizenship status, including lawful permanent residents and veteran non-citizens who have served in the U.S. military. It also blanket-bans, *e.g.*, non-citizens who can work in Florida's Division of Elections and Department of Highway Safety & Motor Vehicles from voter registration activities, notwithstanding that they have access to the same information found on voter registration forms, *see* Fla. Stat. §§ 97.0525, .057.

During legislative debate, the bill's sponsors cited "protecting [] sensitive information" on completed registration forms as the Law's rationale; they also voiced their view "that there are certain rights in our country that only citizens get to enjoy."[7] And Senator Hutson, who co-introduced the bill, commented that it was meant to ensure "illegal[s]" didn't handle voter registration applications.[8]

These comments ignore that Florida's government entrusts non-citizens to work in various positions where they handle the same "sensitive information" at

[7] *Fla. Senate Floor Debate on SB7050*, at 49:36-50:49 (Apr. 26, 2023), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000.

[8] *Fla. Senate Floor Debate on SB7050*, at 48:35-49:02 (Apr. 26, 2023), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000&Redirect=true.

issue. Nor does SB7050 exempt non-citizens who are *lawfully* in the United States. And no evidence of non-citizens mishandling voter registration applications was presented or discussed during SB7050's two Senate committee hearings.

To be sure, the state "has a substantial interest in seeing that those who collect voter-registration applications actually get them to an appropriate voter-registration office." *Browning II*, 863 F.Supp.2d at 1163. That "interest is sufficient" to know "the identity of those who run a voter-registration organization and [that] of any employee or volunteer who collects voter-registration applications." *Id.* But Organizational Plaintiffs already submit that information to the Division of Elections under current law. Fla. Stat. § 97.0575(1)(c); HF Decl. ¶ 31; Poder Decl. ¶ 32.

The Law's wholesale ban on a specific class from engaging in voter registration activities, as well as its punitive fines, are a different thing altogether. The Law: (a) completely prohibits a (suspect) class of employees and volunteers from engaging in registration work without any evidence or legitimate basis for believing that they will not properly return the application, *cf. Browning I*, 575 F.Supp.2d at 1322, and (b) carries a fine sufficient to put TPVROs out of business for inadvertent mistakes about a person's citizenship status or about what constitutes the undefined "collecting" or "handling" that the law prohibits, *cf. Cobb*, 447 F.Supp.2d at 1338-39 ("The instant case is distinguishable from [cases challenging disclosure requirements] because the threat of fines has rationally chilled Plaintiffs'

exercise of free speech and association, as well as that of Plaintiffs' volunteers.").

The state's interests in the integrity of the voter registration process and registration records are already directly addressed by other provisions of Florida law. For example, it is already a crime to submit false voter registration information, Fla. Stat. § 104.011; offer an eligible citizen financial consideration in exchange for becoming a registered voter, *id.* § 104.012(1); or alter a voter registration application without the applicant's consent, *id.* § 104.012(4). And the supervisor of elections has authority "to investigate fraudulent registrations" and report findings to prosecutors. *Id.* § 104.42(1). There is no evidence that these provisions are insufficient or that the challenged provisions further protect the integrity of the voter registration process. *See Meyer*, 486 U.S. at 426-27 (state failed to show challenged procedures were necessary where pre-existing procedures were "adequate to the task of minimizing the risk of improper conduct").

Ultimately, not only is the Law *not* narrowly tailored to serve any compelling government interest, it serves no purpose other than to make it prohibitively difficult for civic organizations to help legitimate, qualified, eligible citizens register to vote.

3. Plaintiffs' Equal Protection Claim Will Likely Succeed.

The Law also discriminates against Individual Plaintiffs because of their citizenship status, in violation of the Equal Protection Clause.

Ordinarily, "a state law that discriminates on the basis of alienage can be

sustained only if it can withstand strict judicial scrutiny." *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984); *see also Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012) ("[T]reating groups differently based on the members' alienage [i]s akin to discriminating against a group because of their race or color."). The Supreme Court has applied strict scrutiny to invalidate laws excluding non-citizens from "employment in permanent positions in the competitive class of the state civil service," "membership in the State Bar," "the practice of civil engineering," and appointment as a notary. *Bernal*, 467 U.S. at 220, 226 (citations omitted).

While there is a limited "narrow political-function exception" to strict scrutiny, *Bernal*, 467 U.S. at 220-21, it is not applicable here. This exception is cabined to roles that "routinely exercise discretionary power" of the state, "plac[ing] them in a position of direct authority over other individuals," like probation officers, teachers, or police. *Id.* Individuals who collect or handle voter registration applications are not "invested either with policymaking responsibility or broad discretion in the execution of public policy." *Id.* at 226. Nor, for that matter, do they routinely "exercise [] authority over individuals." *Id.*[9]

[9] Courts apply a two-part test to determine if a citizenship-based restriction fits the political-function exception. Courts ask whether: (1) the regulation is "sufficiently tailored," and (2) the regulation applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions,'" or "officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Id.* at 221-22 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 440 (1982)) (citations omitted). Neither factor applies. *See infra*.

*Bernal* proves the point. There, the Supreme Court struck down a statute prohibiting non-citizens from being notaries. *Id.* at 222-23. The Court "recognize[d] the critical need for a notary's duties to be carried out correctly and with integrity"—much like those of persons who register voters. *Id.* at 225. But it reasoned that "a notary's duties ... hardly implicate responsibilities that go to the heart of a representative government." *Id.* Rather, roles that come within the "the political-function exception" are "invested either with policymaking responsibility or broad discretion in the execution of public policy that requires the routine exercise of authority over individuals." *Id.* at 226. Neither notaries (in *Bernal*) nor TPVRO employees (here) are so invested.

Further, strict scrutiny is especially warranted for laws, like this one, "that affect[] *resident* aliens," and reach further than "*illegal* aliens." *Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (emphasis in original). "The Supreme Court has noted [] a 'more searching judicial inquiry' may be needed when a state law targets 'discrete and insular minorities' [with] no direct voice in the political process." *Id.* at 1310 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)). And it "has in fact found that resident aliens are the type of 'discrete and insular' minorities [with] no political voice [who] qualify for heightened scrutiny." *Id.*; *see also, e.g.*, *LeClerc v. Webb*, 419 F.3d 405, 417 (5th Cir. 2005) ("Characterizing resident aliens as a *Carolene Products* minority reconciles the

breadth of rights and responsibilities they enjoy with their lack of political capacity.").

Individual Plaintiffs have thus shown a likelihood of success on their equal protection claims. The Law explicitly discriminates against non-citizens on the basis of their citizenship status—a suspect classification. There is no compelling reason for this discrimination. In debates, legislators cited no examples of non-citizens mishandling or failing to return voter registration forms.

Even if those problems existed, preventing an entire suspect class of people from an activity based on their citizenship status serves no compelling—or even rational—goal. Rather, by legislators' admission, the Law intends to prevent non-citizens—or, more specifically, as SB7050 co-sponsor Senator Hutson stated, "illegal[s]"—from helping register eligible voters. The Law is marked by "a dogged animus against" non-citizens, which "[t]he Supreme Court has made very clear [] cannot constitute a legitimate state interest[.]" *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 970 (9th Cir. 2017) (citing *Romer v. Evans*, 517 U.S. 620, 634 (1996)). "[A] bare [] desire to harm a politically unpopular group," *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), cannot serve "legitimate state interests." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring in the judgment).

*Moreno* highlights the Law's discrimination against Individual Plaintiffs. In *Moreno*, the Court struck down a law preventing households where unrelated

individuals lived from receiving food stamps because it purposefully "discriminate[d] against hippies." 413 U.S. at 534. The government's asserted interest—preventing food stamp fraud—did not meet even rational basis review. *Id.* at 535-38. Lawmakers assert similar fraud-prevention motives here. But as in *Moreno*, SB7050 is overinclusive and "does not operate [] as rationally to further the prevention of fraud." *Id.* at 537. Other election code provisions already do that, *see* Fla. Stat. §§ 104.011, .012, .42, and additional nondiscriminatory laws criminalize identification-theft-related behavior, *see, e.g.*, Fla. Stat. § 817.02 (criminalizing obtaining property by false personification). Because the Law does not serve a rational interest, it cannot survive any level of constitutional scrutiny.

Nor is the Law sufficiently tailored to serve Defendants' purported goals. At a minimum, it is "fatally underinclusive," specifying "only one particular post with respect to which the State asserts a right to exclude aliens" while allowing non-citizens to perform other similar functions. *Bernal*, 467 U.S. at 222. For example, a "permanent resident alien may apply and be appointed" as a notary public, a position that also involves handling signatures and other personal information. Fla. Stat. § 117.01(1). And non-citizens can have access to the same information on completed registration forms, *e.g.*, if they serve on Florida's Elections Commission or various state agencies. Fla. Stat. §§ 97.0525, .057. Such underinclusivity "tends to undercut the [] claim that the classification serves legitimate political ends." *Bernal*, 467 U.S.

at 221. Moreover, "it is appropriate that a State bear a heavy burden when it deprives [aliens] of employment opportunities." *In re Griffiths*, 413 U.S. 717, 722 (1973). Defendants fail to satisfy that burden.

**C. The Public Interest and Balance of Hardships Favor Injunctive Relief.**

"The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition. And allowing responsible organizations to conduct voter-registration drives—thus making it easier for citizens to register and vote—promotes democracy." *Browning II*, 863 F.Supp.2d at 1167. "Quite simply, allowing for easier and more accessible voting for all segments of society serves the public interest." *League of Women Voters of Fla. v. Detzner*, 314 F.Supp.3d 1205, 1224 (N.D. Fla. 2018).

An injunction wouldn't alter the existing framework that ensures only qualified voters can register, and it would leave open a critical path to voter registration. Ensuring this pathway stays open particularly serves the public interest.

Nor would an injunction harm the public. It only preserves the status quo pending determination on the merits. *See Bloedorn*, 631 F.3d at 1229. An injunction preventing the Law's implementation: (a) would not alter qualifications to be an eligible voter in Florida; (b) would not change any of the robust statutes that already govern improper voter registration (*e.g.*, Fla. Stat. §§ 104.011, .012, .42); and (c) would only prevent the imposition of extraordinary burdens on civic organizations

and non-citizen individuals. The injunction will not cause harm; it just preserves Florida law as-is.

Moreover, the state will suffer no harm from being enjoined from enforcement because the Law will likely be found unconstitutional, *supra* Section III.D. The state has no valid interest in enforcing an unconstitutional enactment. *KH Outdoor*, 458 F.3d at 1272-73.

## IV. CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin the Law and grant all relief that it deems just and proper.

## LOCAL RULE 7.1(C) CERTIFICATE OF CONFERRAL

On June 1, 2023, counsel for Plaintiffs conferred with counsel for both Defendants. The Defendants oppose the Motion.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 7,958 words.

Respectfully submitted this 8th day of June, 2023,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Adriel I. Cepeda Derieux*
Julie A. Ebenstein (FBN 91033)
Megan C. Keenan*
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
acepedaderieux@aclu.org
jebenstein@aclu.org
mkeenan@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Roberto Cruz (FBN 18436)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org

Estee M. Konor†
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

Cesar Z. Ruiz*
Fulvia Vargas De-Leon†
Ghita Schwarz†
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
fvargasdeleon@latinojustice.org
gschwarz@latinojustice.org

Evan Preminger†
Rayne Ellis†
**Arnold & Porter Kaye Scholer LLP**
250 W. 55th Street
New York, NY 10019
(212) 836-7786
evan.preminger@arnoldporter.com
rayne.ellis@arnoldporter.com

John A. Freedman†
Jeremy Karpatkin†
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

*Attorneys for Plaintiffs*

* *Admitted pro hac vice*
† *Motion for leave to appear pro hac vice forthcoming*

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, *etc.*, *et al.*,

*Defendants*.

Case No. 4:23-cv-218-AW-MAF

**Declaration of Frederick Vélez III Burgos
(Pursuant to 28 U.S.C. § 1746)**

1. My name is Frederick Vélez III Burgos and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**<u>Personal Background</u>**

2. I have lived in Florida since 2018.

3. I currently live in Miami, Florida, in Miami-Dade County.

4. I have an educational background in political science, having received a Bachelor's Degree from the University of Puerto Rico.

5. From February 21, 2020 until the present, I have been the National Civic Engagement Director of the Hispanic Federation.

## HISPANIC FEDERATION

6. Hispanic Federation is a 501(c)(3) nonprofit, nonpartisan, community organizing, and advocacy organization.

7. Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions through work in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement. Hispanic Federation works locally, statewide in Florida, and nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance programs.

8. Hispanic Federation runs over 15 programs in Florida, ranging from making health care services and vaccination accessible, to running errands to assist community members, to capacity-building efforts to strengthen Latino nonprofits, to registering eligible citizens to vote. Hispanic Federation has been conducting civic engagement and voter registration work in Florida since 2016.

9. Hispanic Federation's voter engagement work assists the Hispanic electorate to register to vote, apply for vote-by-mail ballots, and vote on election day and during early voting. These activities are meant to ensure the representation of the Hispanic community's interests in government by helping Hispanic voters become involved in elections and civic participation.

10. Hispanic Federation engages with voters across Florida, and primarily operates in Broward, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Pinellas, Pasco, Seminole, and Volusia Counties.

11. Hispanic Federation is a registered third-party voter registration organization. Hispanic Federation has registered voters in each of Florida's 67 counties. Since the 2016 election cycle, Hispanic Federation has registered over 90,000 voters.

12. Hispanic Federation helps to reach voters who might not otherwise register to vote, including voters with limited access to technology or limited proficiency in the English language.

13. In my capacity as National Civic Engagement Director, I am the spokesperson for Hispanic Federation. I am responsible for overseeing all civic engagement efforts from Hispanic Federation and ensuring all applicable local, state, and federal laws are followed.

14. Hispanic Federation typically employs between 80 and 90 staff members at any given time, with about 100 total staff members that we have employed over the years.

15. Last year, Hispanic Federation's budget for Florida voter registration programming comprised just over $650,000. This budget is comparable to what we have received in previous cycles, however; the costs associated with running the voter registration program and complying with all rules and regulations have

increased, effectively lowering the number of forms we can collect compared to years prior.

16. Hispanic Federation sends teams of canvassers to daily hot spots in areas with high traffic from Latino communities, such as supermarkets, small businesses, and festival events. Sending canvassers to these hot spots requires building relationships within the communities Hispanic Federation serves—for example, certain business owners only allow Hispanic Federation to station canvassers at their storefronts if specific canvassers that the business owner knows and trusts are present.

17. Hispanic Federation also integrates voter registration into its other community engagement events, as part of the organization's holistic approach. When we do health care and hunger relief, we also attach canvassers to those teams to help register eligible citizens to vote.

18. Hispanic Federation also assists voters to register to vote through an online portal for registration.

19. During voter registration events, Hispanic Federation's canvassers interact with community members, provide eligible citizens with voter registration applications, and retrieve completed voter registration applications. Hispanic Federation always aims to collect as many voter registration applications as possible at these events, and, as a whole, collects a significant number of voter registration applications. Over the course of a given year, Hispanic Federation usually collects

and submits 20,000 voter registration forms, collecting nearly 16,605 in 2022.

20. Hispanic Federation was planning to continue to conduct voter registration activities in the future, with the aim of collecting as many voter registration applications as possible. Based on its past experiences conducting voter registration activities in Florida, Hispanic Federation expects that through these future activities, we would help approximately 20,000 people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

**The Law's Impact on Hispanic Federation**

21. Before the addition of new subsection (f) to Section 97.0575(1) of the Florida Statutes (the "Law"), Hispanic Federation planned to continue all this voter registration work and planned to expand its voter registration work in the coming years, including efforts to engage more diverse communities. For example, Hispanic Federation plans to register 8,000 voters in South Florida during 2023 – expanding from efforts in 2022. Also, as 2024 is a presidential election year, Hispanic Federation was planning to engage in even more voter registration work than in recent years, as there is always an increased interest in voter registration during a presidential election.

22. If the Law takes effect, Hispanic Federation's voter registration efforts will be materially handicapped.

23. Many of Hispanic Federation's canvassers are non-citizens. Canvassers are citizens of Venezuela, the Dominican Republic, Colombia, or Mexico, but all our

employees are authorized to work in the United States. Our non-citizen canvassers include highly competent and educated individuals, including doctors, engineers, lawyers, and administrators.

24.     The Law will result in Hispanic Federation losing approximately 70 percent of its canvasser workforce. Losing these staff members will make it difficult for us to continue registering voters, and impossible to continue registering voters at the same rates we have done in past election cycles.

25.     Many of Hispanic Federation's non-citizen canvassers who handle and return voter registration forms have worked with Hispanic Federation since 2016 and are among the organization's most experienced canvassers. These non-citizen staff have developed deep relationships within their communities, including with local business owners who allow Hispanic Federation to conduct voter registration efforts at their locations. These non-citizen canvassers and staff also train new canvassers. Losing these senior members would decimate the senior ranks of Hispanic Federation's voter registration leaders, leaving them unable to participate in their First Amendment protected speech.

26.     Hispanic Federation's non-citizen canvassers often had skills that made them especially capable of forming relationship in the community and assisting eligible citizens to register to vote. For example, non-citizens can speak to naturalized U.S. citizens in the naturalized citizen's native language, and can explain how the U.S. voter registration process differs from the process in their native

country, all of which helps eligible citizens better understand the registration process and participate in American democracy. Without our non-citizen workforce, we will have a more difficult time reaching these communities of eligible citizens.

27.     It is important to Hispanic Federation's mission that non-citizens can assist with voter registration organizations. Non-citizens represent a sizable portion of the Latino community in the United States and in Florida and can provide a unique perspective about the importance of participating in our democratic process, and how it differs from our community's various countries of origins.

28.     Hispanic Federation is assessing its programs and policies in the wake of the citizenship requirement. As Hispanic Federation creates its Civic Engagement program, it is clear we will need to be in compliance and implement required rules and regulations. Lamentably, this will result in a loss of time as we ensure we are in compliance with a rule that prohibits speech activity by members of the Hispanic Federation team.

29.     Hispanic Federation has remained compliant with all Federal regulations for hiring and will continue to do so. If required to implement the citizenship requirement, the organization faces a series of difficult conversations and a move to hire new civic engagement campaign staff members. Hispanic Federation does not believe that citizenship serves as a marker of an individual's commitment to the civic process. This amounts to discrimination based on citizenship, and an employee's citizenship status does not affect the quality of their work – especially

when they have worked in this field for years.

30.     Because of the Law, Hispanic Federation will have to recruit from a new pool of staff, which lowers retention, heightens training costs, and increases the risk of mistakes by new staff. Hispanic Federation will also have to spend money on online advertisements to hire from this new pool.

31.     Hispanic Federation will also need to focus more time and resources toward asking for proof of citizenship. Hispanic Federation is committed to adhering to all regulations and requirements for lawful employment in the United States as required through the I-9 verification process. Hispanic Federation engages in I-9 verification and confirm that employees are authorized to work in the United States. Hispanic Federation already submits the required information about employees to the Division of Elections, in compliance with existing law. The additional step of verifying proof of citizenship is an unnecessary and discriminatory burden that Hispanic Federation is being forced to undertake. But because the Law imposes fines for even the unknowing use of non-citizen staff, to impose a fine, self-reporting or anything short of proof of citizenship would create too much risk for Hispanic Federation to continue operating, especially with a $50,000 fine per head for any non-citizen who assists our organization. These efforts to determine the citizenship status of all staff who assist with registration applications will require use of Hispanic Federation's limited time and resources.

32.     Because the Law imposes a strict liability standard that threatens

Plaintiffs with substantial financial penalties based on a mistake about an employee's citizenship status, Plaintiffs will have to turn away help even from citizens. For example, because Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can demonstrate proof of citizenship, we will have to turn down even U.S.-citizen staff who cannot (or do not wish to) furnish the requisite proof. People who are willing to provide their name and address to our organization are not always willing to submit proof of citizenship in order to register voters. As a result, these additional steps requiring specific proof of citizenship serve to deter not only non-citizens but citizens without the sufficient proof for work.

33. If the Law takes effect, Hispanic Federation will need to convey to any and all new hires working in Civic Engagement the need for a proof of citizenship. This will require the need to shift recruitment tactics and language included in the job descriptions for clarity when engaging with potential staff. Hispanic Federation is also still assessing how to best manage the maintenance of records for required citizenship paperwork.

34. Hispanic Federation is also still developing guidelines to ensure that the activity taking place in our office space is complying with all the new regulations. Hispanic Federation will need to create space where materials will be out of reach from accidental "handling" of voter registration forms by anyone who does not meet the minimum qualifications for the program. Hispanic Federation may need to

prohibit access to non-citizens—including all office visitors and building maintenance staff—to parts of the office to ensure non-citizen team members do not "handle" voter registration forms. Segregating limited office space in this way would further impair Hispanic Federation's ability to effectively carry out voter registration efforts and other community programming.

35. As a grassroots organization, the goal of Hispanic Federation's voter registration activities is to reach out to and involve people in the democratic process where they are, which can include community and campus events, attending church and cultural festivals, and other last-minute requests for assistance with voter registration, as well as recruiting staff. The Law's requirements will make it much more difficult to undertake impromptu voter registration efforts, or respond positively to late requests for voter registration tables at community events. These constraints hamper the flexibility that is critical to effective voter outreach programs.

36. The real threat of significant financial penalties to Hispanic Federation will meaningfully limit our voter registration efforts. The Law imposes a $50,000 fine on the organization for "each such person"—that is, each non-citizen—collecting or handling an application on Hispanic Federation's behalf. Fl. Stat. § 97.0575(1)(f). The total amount of money that organizations could be fined appears uncapped.

37. Because of the threat of severe fines, Hispanic Federation's largest funders expressed they may withhold donations unless voter registration efforts

cease in Florida, unwilling to risk that their donations may be wasted toward these fines rather than going to assisting eligible citizens with registering to vote.

39. Even if Hispanic Federation is able to maintain its funding sources, Hispanic Federation's budget last year for its Florida programming comprised just over $650,000, which makes each $50,000 penalty a severe hit on our programming budget. A $50,000 fine would result not only in civic engagement programs being cut back, but also public health initiatives—like Hispanic Federation's vaccine program—facing financial cuts as well. The political and health implications will fall disproportionately on communities of color where Hispanic Federation focuses its services.

40. Hispanic Federation has not yet decided what it is going to do when faced with this dilemma if the Law goes into effect.

41. In response to threat of financial risks, Hispanic Federation is considering imposing a moratorium on all voter registration activities after July 1, 2023.

42. Even if Hispanic Federation does not impose a complete moratorium on all voter registration activities, Hispanic Federation does not have the resources to effectively comply with the Law and continue our current levels of voter registration activities. We will have to significantly scale back the volume of voter registration drives we conduct to help eligible Floridians register to vote, simply because a majority of our staff are forbidden from assisting, and because we are

already experiencing difficulty recruiting new staff to engage in these activities given the Law's limitations.

42.   Because Hispanic Federation has not made any decision yet about continuing to conduct voter registration drives if the Law goes into effect on July 1, 2023, Hispanic Federation cannot plan its voter registration activities for the next year as well as it has in the past. This lack of advanced planning is going to impact how effective Hispanic Federation can be in its voter registration activities in 2024, a big loss given that it is a Presidential election year and the primary election is fast approaching.

43.   Additionally, to conduct even curtailed voter registration activities while trying to comply with the Law, Hispanic Federation will be required to divert resources, such as staff time, to more of the administrative tasks required by the Law away from other activities to advance their mission, such as capacity-building efforts to strengthen other Latino non-profits or making health care services more accessible to the communities we serve. Furthermore, when conducting voter registration activities after the Law is in effect, Hispanic Federation will need to spend more time on the required administrative tasks and less time on actual voter registration of individuals, making the voter registration activities less effective.

44.   The Law will also impact and harm the communities and constituents that Plaintiffs serve and work with, including both citizens and non-citizens. Constricting our workforce will decrease the total number of voter registration

events that Hispanic Federation will conduct in the future, which will reduce the number of voters we can reach.

45. Plaintiffs will register substantially fewer eligible citizens to vote than they could absent the Law. In this way, the Law will impact the community and constituency Hispanic Federation serves through its voter registration programs—namely, Hispanic (and other) people who are eligible to vote. Hispanic Federation works closely with Hispanic citizens to help them register to vote, relying in part on a network of key community activists who help shape the organization's agendas and who play a critical role in implementing its programs. Thus, the Law will impact and harm Hispanic Federation's constituents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2023.

Frederick Velez III Burgos

Frederick Vélez III Burgos

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as Florida Secretary of State, *et al.*,

*Defendants*.

Case No.4:23-cv-218-AW-MAF

**Declaration of Nancy Batista
(Pursuant to 28 U.S.C. § 1746)**

1. My name is Nancy Batista and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**Personal Background**

2. I have lived in Florida since 2005.

3. I currently live in Kissimmee, Florida, in Osceola County.

4. I have an educational background in Health Services Administration and Business Administration. I have received a degree of Associates in Arts from Valencia Community College, a degree of Bachelor of Science for Health Care

Administration from the University of Central Florida, and a degree of Master of Business Administration with a Dual Concentration in Human Resources and Project Management from Herzing University.

5. I am a CoFounder of Poder Latinx. The organization was founded in 2019. I was the first Florida Director for the organization when we first launched our program. In 2022, I became the Field Director for Poder Latinx in its National capacity, and I continue to hold that position today.

**PODER LATINX**

6. Poder Latinx is a fiscally sponsored project of Tides Advocacy, a California nonprofit public benefit corporation. Poder Latinx is a social justice, organizing, and civic engagement organization whose mission is to help ensure that Latinx communities, inclusive of immigrants and people of color, are decision-makers in our democracy.

7. Poder Latinx works locally and statewide in Florida to expand the electorate by conducting year-round civic engagement activities, community empowerment, leadership development, and issue-based organizing with a focus on three key issues: immigrant justice, climate justice, and economic justice.

8. Poder Latinx carries out its mission to expand the electorate by encouraging people to register to vote through in-person activities, via digital campaigns, and phone/text banking. In 2020, Poder Latinx's voter turnout program knocked on 105,000 doors ahead of the 2020 election. Poder Latinx's civic

engagement work is focused on educating voters on how to exercise their right to vote, the accepted types of identification necessary to vote, how to request vote-by-mail ballots, and how to return their ballots.

9.      Poder Latinx's voter registration, voter education, and civic engagement work is carried out throughout the state of Florida with a specific focus on Broward, Lake, Orange, Osceola, Miami Dade, Palm Beach, Polk, and Seminole.

10.     Poder Latinx is a registered third-party voter registration organization. Since 2019, Poder Latinx has registered over 48,000 Florida voters.

11.     Poder Latinx helps to reach voters who might not otherwise register to vote, including voters with limited access to technology or limited proficiency in the English language.

12.     In my capacity as a CoFounder and currently the Field Director, I am a spokesperson for Poder Latinx. I am responsible for overseeing the field work and the integrated voter engagement efforts.

13.     Poder Latinx employs approximately 10 staff members in Florida, and between 5 to 30 field employees during the midterm years and 10 to 60 field employees during the presidential years in Florida.

14.     Last year Poder Latinx's annual budget for voter registration and voter engagement activities  for the entire organization comprised just over 1 million dollars. A sizable portion of that total is allocated to Poder Latinx's voter registration operations in the state of Florida. The costs associated with running our Florida voter

registration operations and complying with all the rules and regulations have increased and it is likely that it will negatively impact our ability to sustain and expand our voter registration programs.

15. Poder Latinx's canvassing teams typically consist of one lead and four canvassers. These teams are in the field anywhere from four to six hours a day (or eight hours a day for leads), five days a week. Poder Latinx leads build relationships with business owners, teachers, healthcare workers, and other community leaders to determine where voter registration activities can take place. Based on those relationships, leads then drive their canvassing team to locations throughout the day where they expect to engage Latinx communities.

16. Poder Latinx also integrates voter registration into its other community engagement events, as part of the organization's holistic approach. When we host events about climate justice, we also attach canvassers to those teams to help register eligible citizens to vote. While we are engaging the community on issues, canvassing door to door, we are also asking them if they are registered to vote.

17. Poder Latinx also has assisted voters to register to vote through an online portal for voter registration.

18. During voter registration events, Poder Latinx's leads and canvassers interact with community members, provide eligible citizens with voter registration applications, and retrieve completed voter registration applications. Back at our offices, Poder Latinx's staff will process these applications and will review them to

ensure they have been filled out correctly, and then return the forms to the appropriate supervisors of elections office.

19. Poder Latinx always aims to collect as many voter registration applications as possible at its events, and, as a whole, collects a significant number of voter registration applications. Over the course of a given year, Poder Latinx usually collects and has submitted 1,000 to 29,000 voter registration forms annually, collecting nearly 18,000 forms total in 2022 and a total of about 48,000 voter registrations from 2019 to the present.

20. Poder Latinx was planning to continue to conduct voter registration activities in the future, with the aim of collecting as many voter registration applications as possible. Based on its past experiences conducting voter registration activities in Florida, Poder Latinx expects that through these future activities, we would help approximately 6,000 to 24,000 people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

**The Law's Impact on Poder Latinx**

21. Before the addition of new subsection (f) to Section 97.0575(1) of the Florida Statutes (the "Law"), Poder Latinx planned to continue all this voter registration work and planned to expand its voter registration work in the coming years, including efforts to engage more diverse communities. In 2023, Poder Latinx aimed to help 6,000 new eligible citizens register to vote, and planned to expand on the ground work into other counties in southern Florida and in the panhandle. Also,

as 2024 is a presidential election year, Poder Latinx was planning to engage 24,000 potential voters, which is even more voter registration work than in recent years, as there is always an increased interest in voter registration during a presidential election.

22.    If the Law takes effect, Poder Latinx's voter registration efforts will be devastated. Instead of expanding voter registration work across the state, Poder Latinx will be lucky to field a single team in central Florida to register voters with the Law in place.

23.    The majority of Poder Latinx's canvassers are non-citizens. Many of our canvassers are citizens of Venezuela or Colombia, but all of our employees are authorized to work in the United States.

24.    The Law will result in Poder Latinx losing the majority of its workforce—approximately 90 percent of its staff, and approximately 70 percent of its volunteers—including canvassers who knock on doors, field leads who drive the canvassers to different communities, field organizers who recruit and manage volunteers and community organizers who coordinate community engagement programs. Our staff members and volunteers handle completed voter registration forms in the field, and then return completed voter registration forms to the county supervisors of the elections office. Losing these staff members and volunteers will make it difficult for Poder Latinx to continue registering voters, and impossible to continue registering voters at the same rates we have done in past election cycles.

In particular, without our non-citizen workforce, Poder Latinx will lose nearly all of our qualified leads.

25.     The Law's prohibition on non-citizens handling and collecting voter registration forms will result in Poder Latinx losing not only its non-citizen staff, but the institutional knowledge they carry. Many non-citizens serve as senior staff at Poder Latinx who have worked their way up over the course of multiple election cycles: from canvassers, to field leads, to organizers. Knowledge obtained on their journey to Poder Latinx organizers is shared with new staff starting work as canvassers. The loss of this institutional knowledge will meaningfully damage Poder Latinx's effectiveness in registering voters. Starting from scratch on training will require a huge investment of money and time—we will have to reinvent the wheel instead of moving forward with a well-oiled machine. Starting from scratch also increases the risk of mistakes by new staff and volunteers, which can lead to fines for our organization.

26.     The Law also burdens Poder Latinx with the loss of the relationships its non-citizen staff have built. Poder Latinx field leads and community organizers build relationships with businesses in the community—like grocery stores and restaurants—who allow Poder Latinx canvassers to register voters on their properties. Without these relationships, Poder Latinx's ability to engage potential voters at those locations will be limited, because the staff those local businesses know are now prohibited from engaging in voter registration work.

27.     Poder Latinx's non-citizen canvassers often had skills that made them especially capable of forming relationships in the community and assisting eligible citizens to register to vote. For example, non-citizens can speak to naturalized U.S. citizens in the naturalized citizen's native language, and can explain how the U.S. voter registration process differs from the process in their native country, all of which helps eligible citizens better understand the registration process and participate in American democracy. Without our non-citizen workforce, we will have a more difficult time reaching these communities of eligible citizens and potential voters.

28.     It is important to our organization and aligned with our overall mission that non-citizens can assist with voter registration efforts. Many of the non-citizens who do this work are well-versed in voter registration language in Spanish and are able to properly assist the community, and many of them have also been trained extensively on the process. As an organization that prioritizes immigrant justice as one of primary issues, it is difficult for us to turn away staff who are qualified with a work permit and have the skills to do the work and have had the experience of doing so for a couple of cycles. They are members of our community and have contributed greatly to our democracy.

29.     Turning away employees and volunteers based on their citizenship status often stigmatizes and demoralizes the very communities we are trying to engage in our immigration justice work.  Take, for example, our partnership with

local schools, where we opened the opportunity to students who need community service hours. Adding a filtering layer for citizenship status would be detrimental to the work we are trying to do: if any students who are non-citizens feel that we are discriminating against them because of their status, this will not help empower our youth to take on the challenge of helping to register their family and friends, this will unmotivate them and make them feel like they cannot be a part of the process of democracy.

30. The Law will have destructive effects on Poder Latinx's relationships with the non-citizens we have employed. These employees are authorized to work in the United States, but can no longer work the job they have relied on and were counting on. The law creates a discriminatory effect on our non-citizen employees, forbidding us from hiring them even though they are authorized to work in this country. Our full-time employees will lose not only their source of income, but the health care that employment with Poder Latinx provided them.

31. The Law is already impacting Poder Latinx's ability to recruit new staff and volunteers. Because of the Law, Poder Latinx has already been unable to fill open, paid positions, and has had to turn down otherwise qualified candidates who applied for those positions based solely on their citizenship. We were ready to offer field organizer positions, and unfortunately we had to stop the process because of the possibility of this new law.

32. Poder Latinx will also need to expend more time and resources toward

asking for proof of citizenship. We already engage in I-9 verification and confirm that our employees are authorized to work in the United States. And Poder Latinx already submits the required information about our employees and volunteers to the Division of Elections, in compliance with existing law. The additional step of verifying proof of citizenship is an unnecessary and discriminatory burden that Poder Latinx is being forced to undertake. But because the Law imposes fines for even the unknowing use of non-citizen staff and volunteers, to impose a fine, self-reporting or anything short of proof of citizenship would create too much risk for Poder Latinx to continue operating, especially with a $50,000 fine per head for any non-citizen who assists our organization. These efforts to determine the citizenship status of all staff and volunteers who assist with registration applications will require use of Poder Latinx's limited time and resources.

33. Because the Law imposes a strict liability standard that threatens Plaintiffs with substantial financial penalties based on a mistake about an employee's or volunteer's citizenship status, Plaintiffs will have to turn away help even from citizens. For example, because Poder Latinx will no longer let individuals assist with voter registration efforts unless they can demonstrate proof of citizenship, we will have to turn down even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish the requisite proof. Many people who are willing to provide their name and address to our organization would not be willing to submit proof of citizenship in order to volunteer.

34. The Law's strict liability standard and substantial fines have also dissuaded Poder Latinx from re-engaging certain volunteer bases altogether. For example, Poder Latinx formerly maintained partnerships with local teachers wherein Poder Latinx trained students and volunteers to help out with voter registration efforts in exchange for the community service hours that their school required for graduation. Poder Latinx will no longer maintain its community service partnerships that enabled local student volunteers to assist with voter registration efforts, because of the added hurdle of confirming the students' citizenship status.

35. As a grassroots organization, the goal of Poder Latinx's voter registration activities is to reach out to and involve people in the democratic process where they are, which can include campus events, community events, fairs, parades, marches, food truck stops, graduation and other last-minute requests for assistance with voter registration, as well as recruiting last-minute volunteers. The Law's requirements will make it much more difficult to accept walk-up volunteers for events in Florida, undertake impromptu voter registration efforts, or respond positively to late requests for voter registration tables at community events.. This hampers the flexibility that is critical to effective voter outreach programs.

36. Poder Latinx does not currently have a process to record keep for tracking citizenship, nor does it have the bandwidth to create a process that will ensure to do so in a manner that we can protect the sensitive documentation. Having to do this will add additional burden to our hiring process.

37.    The real threat of significant financial penalties to Poder Latinx will meaningfully limit our voter registration efforts. The Law imposes a $50,000 fine on the organization for "each such person"—that is, each non-citizen—collecting or handling an application on Poder Latinx's behalf. Fl. Stat. § 97.0575(1)(f). The total amount of money that organizations could be fined appears uncapped.

38.    Poder Latinx's funders have indicated reluctance to risk that their donations may be wasted toward these fines rather than going to assisting eligible citizens with registering to vote. As a result, Poder Latinx's program was supposed to start in early May, but Poder Latinx's funders have delayed funding until after the Law's effects are known, unsure of whether they will continue to fund voter registration efforts in Florida.

39.    Even if Poder Latinx is able to maintain its funding sources, Poder Latinx's budget last year for its Florida programming comprised several hundred thousand dollars, which makes each $50,000 penalty a severe hit on their programming budget. A $50,000 fine would result not only in civic engagement programs being cut back, but also public health initiatives—like Poder Latinx's organizing surrounding immigrant justice, climate justice, and economic justice—facing financial cuts as well. The political and health implications will fall disproportionately on communities of color where Poder Latinx focuses its services.

40.    Poder Latinx has not yet decided what it is going to do when faced with this dilemma if the Law goes into effect.

41.    In response to the threat of financial risks, Poder Latinx is considering imposing a moratorium on all of our voter registration activities after July 1, 2023. Poder Latinx is reluctant to submit an affirmation of compliance with state law because of the risk of substantial civil penalties for an inadvertent vetting error. It is very hard to ensure perfection in vetting volunteers on scarce resources.

42.    Even if Poder Latinx does not impose a complete moratorium on all voter registration activities, Poder Latinx does not have the resources to effectively comply with the Law and continue our current levels of voter registration activities. We will have to significantly scale back the volume of voter registration drives we conduct to help eligible Floridians register to vote, simply because a majority of our staff and volunteers are forbidden from assisting, and because we are already experiencing difficulty recruiting new staff or volunteers to engage in these activities given the Law's limitations.

43.    Because Poder Latinx has not made any decision yet about continuing to conduct voter registration drives if the Law goes into effect on July 1, 2023, Poder Latinx cannot plan its voter registration activities for the next year as well as it has in the past. This lack of advanced planning is going to impact how effective Poder Latinx can be in its voter registration activities in 2024, a big loss given that it is a Presidential election year and the primary election is fast approaching.

44.    Additionally, to conduct even curtailed voter registration activities while trying to comply with the Law, Poder Latinx will be required to divert

resources, such as volunteer time, to more of the administrative tasks required by the Law away from other activities to advance our mission. Furthermore, when conducting voter registration activities after the Law is in effect, Poder Latinx will need to spend more volunteer time on the required administrative tasks and less time on actual voter registration of individuals, making the voter registration activities less effective.

45. The Law will also impact and harm the communities and constituents that Plaintiffs serve and work with, including both citizens and non-citizens. Constricting our workforce will definitely decrease the total number of voter registration events that Poder Latinx will conduct in the future, which will reduce the number of voters we can reach.

46. Plaintiffs will register substantially fewer eligible citizens to vote than they could absent the Law. In this way, the Law will impact the community and constituency Poder Latinx serves through its voter registration programs—namely, Latinx (and other) people who are eligible to vote. Poder Latinx works closely with eligible Latinx citizens of the United States to help them register to vote, relying in part on a network of key community activists who help shape the organization's agendas and who play a critical role in implementing its programs. Thus, the Law will impact and harm Poder Latinx's constituents.

47. Poder Latinx's voter registration programs reach various communities including students and Latinx bilingual and monolingual community members.

Without our non-citizen staff capacity, the ability of the organization to reach these communities and support them will be diminished.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2023.

____________________________________

Nancy Batista

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as Florida Secretary of State, *et al.*,

*Defendants*.

Case No. 4:23-cv-218-AW-MAF

**DECLARATION OF VERONICA HERRERA-LUCHA
(Pursuant to 28 U.S.C. § 1746)**

1. My name is Veronica Herrera-Lucha (a.k.a. Veronica Guadalupe Herrera-Lucha or Veronica Guadalupe Herrera) and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**Personal Background**

2. I have lived in Florida since 2016 and have been a Lawful Permanent Resident (LPR) since January 29th, 2007. LPRs like me are also known as “green card” holders. We are non-citizens who are lawfully authorized to live permanently within the United States. LPRs may accept an offer of employment without special restrictions, own property, receive financial assistance at public colleges and universities, and join the Armed Forces. We can also apply to become U.S. citizens if we meet certain eligibility requirements.

3.      I currently live in St. Cloud, Florida, in Osceola County.

4.      I have an educational background in Law and Politics, having received a Law Degree from the Universidad de Administracion de Negocios in El Salvador, a Master's Degree studies (completed coursework but degree not conferred) in Political Sciences from the Universidad Centroamericana José Simeón Cañas (UCA) in El Salvador, and a Masters in International Law from the Universidad de Salamanca in Spain.

5.      In 1998, I began to work at *Fondo de Inversion Social para el Desarrollo Local* in El Salvador as a legal counsel.  While employed, USAID issued a call for applications to individuals representing their nations as election observers in the United States.  I applied to the U.S. Visitor Program and was selected to be an organizer by the Political Section in the United States Embassy in El Salvador.   The purpose of the exchange was to support discussions amongst the two nations and meet respective counterparts.   In October 2000, I started the course in Texas, continued in Pennsylvania, Washington DC, and California, and finished in Florida. The US Department of State sponsored the event.  During the course of studies, I learned about the US elections system and citizenship participation.  During my visits to several states, I saw voting sites and community gatherings.  We also met with political analysts at Georgetown University in Washington, DC.  In Texas, we went to Austin and met members of the State's Legislature.  Also in Austin, I received a certificate of honored guest from then Texas Governor George W. Bush.

In Pennsylvania and California, we participated in Spanish radio shows and meetings with community leaders.  In Florida, we talked with several Supervisors of Elections during the Gore-Bush election controversy.

6.     After coming to the United States, I was driven by my passion for equity, and so began working on, and volunteering for, political campaigns in Central Florida in 2017.

7.     Starting as a volunteer and a canvasser, I participated in door-to-door voter registration and get-out-the-vote efforts for several Florida organizations and consulting firms.  Because of the cyclical nature of campaigning, I was never given leadership opportunities earlier in my career.

8.     I am currently employed by Mi Vecino, Inc., a year-round direct voter contact organization in Florida.  Mi Vecino is a registered third-party voter registration organization.  At Mi Vecino, our efforts focus on Central Florida, including the Hispanic communities in Polk, Osceola, Orange, and Brevard Counties.

9.     My career with Mi Vecino began in mid-2021 as the Central Florida Regional Field Director. I was promoted to the Florida State Field Director position a year later in 2022, and I currently remain employed in this position.

10.    As Mi Vecino's Florida State Field Director, I am responsible for overseeing Mi Vecino's voter registration activities. My primary responsibilities are to manage a team of full-time staff, plan and coordinate Florida voter registration

campaigns, and create/implement systems for the voter registration teams. I report to Mi Vecino's Chief Executive Officer (CEO), President of the Board of Directors, and Co-Founder, Devon Murphy-Anderson.

11.     I am paid a salary of $55,000 a year by my employer.  I am the only member of my family with a steady income.  My income supports three (3) family members living in Florida and one (1) family member in El Salvador.

12.      I am one of Mi Vecino's seven (7) current permanent employees. We engage in canvassing every day and engage with the community all year around. We attend food banks activities, and participate in city hall events, festivals, parades, children and adult activities, and any other events with more than 10 people expected to attend.  We also visit universities, technical colleges, evangelical churches, and other community partners.  Our outreach efforts include trips to the tax collectors' offices and local businesses.  In July 2023, I was scheduled to participate in the Independence Day events and right to vote celebrations in Osceola, Orange, and Polk Counties in coordination with local governments and community organizations.

13.     During voter registration events, I always interact with multiple individuals and collect voter registration forms, which one of Mi Vecino's employees then deliver to local election officials. I always aim to assist as many eligible members of our community to register as possible.

14.     Non-citizen canvassers like me play an important role in third-party voter registration organizations. Non-citizen canvassers like me often have built

trusting and empathic relationships and networks that make them especially able to help certain communities register to vote. For example, I have built a network with community, academic, religious, and political leaders that support voter registration efforts. Citizen employees often do not have the same background, political knowledge, or persuasive skills that non-citizen employees use to articulate the needs of the community to leaders. For example, Mi Vecino's non-citizen staff and volunteers have Spanish, Creole, or French language proficiency skills that enabled them to help certain communities register to vote, which is critical to assist communities like the Haitian community in Polk County with voter registration.

15.    I was planning to continue to conduct voter registration activities in the future, with the aim of engaging as many community members as possible. Based on my past experiences conducting and organizing voter registration activities in Florida, I expect that through these future activities, we would help thousands of people register to vote in any given year if it were not for the new restrictions in Florida SB 7050.

16.    Before the recent changes to the law, I planned to continue engaging in voter registration work and planned to help expand Mi Vecino's voter registration work in the coming years, including efforts to engage more diverse communities.

17.    Also, 2024 is a presidential election year, and under my supervision, I was planning to engage Mi Vecino in even more voter registration work than in recent years, as there is always an increased interest in voter registration during a

presidential election.

18.    The new law, which comes into effect on July 1, 2023, would prohibit me from collecting or handling voter registration applications on behalf of Mi Vecino.

19.    After July 1, 2023, I would not be able to participate in or execute the voter registration plans I have been organizing because of the new law.  At Mi Vecino, I am the only employee in a leadership position with significant knowledge and experience in voter registration. Without my leadership, Mi Vecino will lose the canvassing, organizing, and training that I currently conduct, and the network I have built with leaders that support voter registration efforts. As a result, Mi Vecino will have a more difficult time reaching the Latino, Black, and Haitian communities that it serves.

20.    After July 1, 2023, the Law will also have an adverse impact on my family and me. My family is left without the primary provider and a steady income. I am in the middle of purchasing a home.  I also planned to educate the children, assist my mother, and pay for our transportation, among others.  My family's financial future and wellbeing are directly at risk.

21.    Moreover, after finding an organization that believed in me and gave me an opportunity to work, my career trajectory and professional development will be frustrated by the new law.  My career is more than a job.  I enjoy my work and it allows me to practice in my chosen area of study.  If the new law comes into effect,

I will have no prospects to work in this career field.

22.    My family and I feel harm from the stigma of my citizenship status from SB 7050 and all related discriminatory laws enacted in Florida this year.  The government and community relations have suffered.  On June 1, 2023, for example, I was stopped by the police while driving my son to school.  The policeman asked for proof of my citizenship status and referenced SB1718 as the source of his apparent authority.  I explained that SB1718 did not come to effect until July 1.  However, to prevent any situation in front of my son, I pulled my green card and showed it to the policeman.  Later, my son, who is a US citizen, asked me if I should change the color of my hair to blond and use bright color contacts to hide my identity.  This is the stigma my family and I suffer thanks to these laws.

23.    I first got interested in voter registration in August 2016.  While looking for work in Indeed, I saw a vacancy with Hard Knock for canvassers.  The pay was $15 an hour.  My previous opportunities as a paralegal paid less ($11 an hour).  This is when I decided to pursue a career in voter registration.

24.    Voter registration is meaningful to me because I can educate the public about the important to vote and elect local candidates.  I also like to work with the youth, who are sometimes treated as apathetic, and explain the importance of their vote.  In the day to day, I see myself explaining the importance of local elections versus state elections, and of the political balance in government.

25.    Through my voter registration work, I have helped my community

engage on issues that matter to them.  In Orange County, my voter registration efforts have helped the community to stabilize rent through the electoral process.  I knew this issue affected my community, including me personally, because my rent was increased from $1,450 to $1,998.  I helped to make sure that eligible voters in my community were registered and aware that a related measure was on the ballot.  Last year, I worked to register and engage eligible citizens to vote in Osceola, in Zip Codes 34143 and 34144.  Through my registration work in those communities, I raised awareness about Spanish speaking candidates running for election, and a Spanish speaking Vice-Mayor was elected.  In Poinciana, Polk County, we have a high presence of Puerto Ricans affected by Hurricane Maria who never registered to vote in Florida.  My work in that community helped to increase the number of Puerto Ricans and eligible US citizens from Haiti who were registered to vote.

**DISCLAIMER:** This document has been translated into Spanish for the Affiant's review and approval.  A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5 2023.

Veronica Guadalupe Herrera 06/05/2023

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA LA DIVISIÓN DE TALLAHASSEE DEL DISTRITO NORTE DE FLORIDA**

HISPANIC FEDERATION, *et al.,*

*Demandantes,*

en.

CORD BYRD*, etc., et al.,*

*Acusados.*

Caso núm. 4:23-cv-218-AW-MAF

TRANSLATION

**Declaración del demandante Verónica Herrera-Lucha (de conformidad con 28 U.S.C. § 1746)**

1. Mi nombre es Verónica Herrera-Lucha (también conocida como Verónica Guadalupe Herrera-Lucha o Verónica Guadalupe Herrera), soy mayor de 18 años, y plenamente competente para hacer esta declaración. Bajo pena de perjurio, declaro lo siguiente:

**Antecedentes personales**

2. He vivido en Florida desde 2016 y he sido residente permanente legal (LPR) desde el 29 de enero de 2007. Los LPR, como yo, también se conocen como titulares de "tarjeta verde". Somos no-ciudadanos que estamos legalmente autorizados a vivir permanentemente dentro de los Estados Unidos. Los LPR pueden aceptar una oferta de empleo sin restricciones especiales, poseer propiedades, recibir asistencia financiera en colegios y universidades públicas y unirse a las Fuerzas Armadas. También podemos solicitar convertirnos en ciudadanos estadounidenses si cumplimos con ciertos requisitos de elegibilidad.

3. Actualmente vivo en St. Cloud, Florida, en el condado de Osceola.

4. Tengo una formación académica en Derecho y Política, habiendo recibido una Licenciatura en Derecho de la Universidad de Administración de Negocios en El Salvador, una Maestría (cursos completados, pero no conferidos) en Ciencias Políticas de la Universidad Centroamericana José Simeon Cafias (UCA) en El Salvador, y una Maestría en Derecho Internacional de la Universidad de Salamanca en España.

5. En 1998, comencé a trabajar en el *Fondo de Inversión Social para el Desarrollo Local* en El Salvador como Asesora Legal. Mientras estaba empleada, USAID emitió una convocatoria de solicitudes a individuos para que representasen a sus naciones como observadores electorales en los Estados Unidos. Apliqué al Programa de Visitantes de los Estados Unidos y fui seleccionada para ser organizadora por la Sección Política de la Embajada de los Estados Unidos en El Salvador. El propósito del intercambio fue apoyar las discusiones entre las dos naciones y reunirse con sus respectivas contrapartes. En octubre de 2000, comencé el curso en Texas, continué en Pensilvania, Washington DC y California, y terminé en Florida. El Departamento de Estado de los Estados Unidos patrocinó el evento. Durante el curso de los estudios, aprendí sobre el sistema electoral de los Estados Unidos y la participación ciudadana. Durante mis visitas a varios estados, vi sitios de votación y reuniones comunitarias. También nos reunimos con analistas políticos en la Universidad de Georgetown en Washington, DC. En Texas, fuimos a Austin, y conocimos a miembros de la Legislatura

TRANSLATION

del Estado. También en Austin, recibí un certificado de invitada de honor del entonces gobernador de Texas, George W. Bush. En Pensilvania y California, participamos en programas de radio en español y reuniones con líderes comunitarios. En Florida, hablamos con varios Supervisores de Elecciones durante la controversia electoral Gore-Bush.

6. Después de venir a los Estados Unidos, me impulsó mi pasión por la equidad, por lo que comencé a trabajar y ofrecerme como voluntaria para campañas políticas en Florida Central en el 2017.

7. Comenzando como voluntaria y encuestadora, participé en el registro de votantes puerta a puerta y en los esfuerzos para obtener el voto para varias organizaciones y firmas consultoras de Florida. Debido a la naturaleza cíclica de las campañas, nunca me dieron oportunidades de liderazgo al principio de mi carrera.

8. Actualmente soy empleada de Mi Vecino, Inc., una organización de contacto directo con votantes durante todo el año en Florida. Mi Vecino es una organización registrada de registro de votantes de terceros. En Mi Vecino, nuestros esfuerzos se enfocan en la Florida Central, incluidas las comunidades hispanas en los condados de Polk, Osceola, Orange y Brevard.

9. Mi carrera con Mi Vecino comenzó a mediados de 2021 como Directora Regional de Campo de Florida Central. Fui ascendida al puesto de Directora de Campo del Estado de Florida un año después, en 2022, y actualmente sigo empleada en este puesto.

TRANSLATION

10. Como Directora de Campo del Estado de Florida de Mi Vecino, soy responsable de supervisar las actividades de registro de votantes de Mi Vecino. Mis principales responsabilidades son administrar un equipo de personal de tiempo completo, planificar y coordinar el registro de votantes de Florida, y crear/implementar sistemas para los equipos de registro de votantes. Me reporto a la Directora Ejecutiva (CEO) de Mi Vecino, Presidenta de la Junta Directiva, y Cofundadora, Devon Murphy-Anderson.

11. Mi empleador me paga un salario de $55,000 al año. Soy el único miembro de mi familia con un ingreso estable. Mis ingresos mantienen a tres (3) miembros de la familia que viven en Florida y un (1) miembro de la familia en El Salvador.

12. Soy uno de los siete (7) empleados permanentes actuales de Mi Vecino. Nos involucramos en campañas todos los días y nos involucramos con la comunidad durante todo el año. Asistimos a actividades de bancos de alimentos y participamos en eventos del ayuntamiento, festivales, desfiles, actividades para niños y adultos, y cualquier otro evento con más de 10 personas que se espera que asistan. También visitamos universidades, colegios técnicos, iglesias evangélicas y otros socios comunitarios. Nuestros esfuerzos de divulgación incluyen viajes a las oficinas de los recaudadores de impuestos y a las empresas locales. En julio de 2023, estabamos programados para participar en los eventos del Día de la Independencia y las celebraciones del derecho al voto en los condados de Osceola, Orange y Polk en coordinación con los gobiernos locales y las organizaciones comunitarias.

TRANSLATION

13. Durante los eventos de registro de votantes, siempre interactúo con varias personas y recopilo formularios de registro de votantes, que uno de los empleados de Mi Vecino luego entrega a los funcionarios electorales locales. Siempre intento ayudar a tantos miembros elegibles de nuestra comunidad a registrarse como sea posible.

14. Los encuestadores no-ciudadanos como yo juegan un papel importante en las organizaciones de registro de votantes de terceros. Los encuestadores no-ciudadanos como yo a menudo han construido relaciones y redes de confianza y empática que los hacen especialmente capaces de ayudar a ciertas comunidades a registrarse para votar. Por ejemplo, he construido una red con líderes comunitarios, académicos, religiosos y políticos que apoyan los esfuerzos de registro de votantes. Los empleados ciudadanos a menudo no tienen los mismos antecedentes, conocimiento político o habilidades persuasivas que los empleados no ciudadanos usan para articular las necesidades de la comunidad a los líderes. Por ejemplo, el personal y los voluntarios no-ciudadanos de Mi Vecino tienen habilidades de dominio del idioma español, criollo o francés que les permitieron ayudar a ciertas comunidades a registrarse para votar, lo cual es fundamental para ayudar a comunidades como la comunidad haitiana en el condado de Polk con el registro de votantes.

15. Estaba planeando continuar llevando a cabo actividades de registro de votantes en el futuro, con el objetivo de involucrar a tantos miembros de la comunidad como fuera posible. Basada en mis experiencias pasadas realizando y organizando

TRANSLATION

actividades de registro de votantes en Florida, esperaba que, a través de estas actividades futuras, ayudáramos a miles de personas a registrarse para votar en un año determinado, si no fuera por las nuevas restricciones en Florida SB 7050.

16. Antes de los recientes cambios a la ley, planeaba continuar participando en el trabajo de registro de votantes y planeaba ayudar a expandir el trabajo de registro de votantes de Mi Vecino en los próximos años, incluyendo esfuerzos para involucrar a comunidades más diversas.

17. Además, como el 2024 es un año de elecciones presidenciales, y bajo mi supervisión, estaba planeando involucrar a Mi Vecino en aún más trabajo de registro de votantes que en los últimos años, ya que siempre hay un mayor interés en el registro de votantes durante una elección presidencial.

18. La nueva ley, que entrará en vigor el 1 de julio de 2023, me prohibiría recopilar o manejar solicitudes de registro de votantes en nombre de Mi Vecino.

19. Después del 1 de julio de 2023, no podría participar ni ejecutar los planes de registro de votantes que he estado organizando debido a la nueva ley. En Mi Vecino, soy el único empleado en una posición de liderazgo con un conocimiento y experiencia significativos en el registro de votantes. Sin mi liderazgo, Mi Vecino perderá el escrutinio, la organización y la capacitación que actualmente realizo, y la red que he construido con líderes que apoyan los esfuerzos de registro de votantes. Como resultado, Mi Vecino tendrá más dificultades para llegar a las comunidades latinas, negras y haitianas a las que sirve.

TRANSLATION

20. Después del 1 de julio de 2023, la Ley también tendrá un impacto adverso en mi familia y en mí. Mi familia se queda sin el proveedor principal y un ingreso estable. Estoy en medio de la compra de una casa. También planeé educar a los niños, ayudar a mi madre y pagar nuestro transporte, entre otros. El futuro financiero y el bienestar de mi familia están directamente en riesgo.

21. Además, después de encontrar una organización que creyó en mí y me dio la oportunidad de trabajar, mi trayectoria y desarrollo profesional se verán frustrados por la nueva Ley. Mi carrera es más que un trabajo. Disfruto de mi trabajo y me permite practicar en mi área de estudio elegida. Si la nueva Ley entra en vigor, no tendré perspectivas de trabajar en este campo profesional.

22. Mi familia y yo sentimos daño por el estigma de mi estatus de ciudadanía de SB 7050 y todas las leyes discriminatorias relacionadas promulgadas en Florida este año. Las relaciones entre el gobierno y la comunidad han sufrido. El 1 de junio de 2023, por ejemplo, la policía me detuvo mientras llevaba a mi hijo a la escuela. El policía pidió pruebas de mi estado de ciudadanía y se refirió a SB1718 como la fuente de su aparente autoridad. Le expliqué que SB1718 no entró en vigor hasta el 1 de julio. Sin embargo, para evitar cualquier situación frente a mi hijo, saqué mi tarjeta verde y se la mostré al policía. Más tarde, mi hijo, que es ciudadano estadounidense, me preguntó si debía cambiar el color de mi cabello a rubio y usar lentes de contacto de colores

TRANSLATION

brillantes para ocultar mi identidad. Este es el estigma que mi familia y yo sufrimos gracias a estas leyes.

23. Me interesé por primera vez en el registro de votantes en agosto de 2016. Mientras buscaba trabajo en Indeed, vi una vacante con Hard Knock para encuestadores. La paga era de 15 dólares por hora. Mis oportunidades anteriores como asistente legal pagaban menos ($ 11 por hora). Fue entonces cuando decidí seguir una carrera en el registro de votantes.

24. El registro de votantes es significativo para mí porque puedo educar al público sobre lo importante de votar y elegir candidatos locales. También me gusta trabajar con los jóvenes, que a veces son tratados como apáticos, y explicar la importancia de su voto. En el día a día, me veo explicando la importancia de las elecciones locales frente a las elecciones estatales, y del equilibrio político en el gobierno.

25. A través de mi trabajo de registro de votantes, he ayudado a mi comunidad participar en temas que les importan. En el Condado de Orange, mis esfuerzos de registro de votantes han ayudado a la comunidad a estabilizar el alquiler a través del proceso electoral. Sabía que este problema afectaba a mi comunidad, incluyéndome a mí personalmente, porque mi alquiler aumentó de $1,450 a $1,998. Ayudé a asegurarme de que los votantes elegibles en mi comunidad estuvieran registrados y supieran que una medida relacionada estaba en

TRANSLATION

la boleta electoral. El año pasado, trabajé para registrar e involucrar a los ciudadanos elegibles para votar en Osceola, en los códigos postales 34143 y 34144. A través de mi trabajo de registro en esas comunidades, creé conciencia sobre los candidatos de habla hispana que se postulaban para las elecciones, y se eligió a un vicealcalde de habla hispana. En Poinciana, condado de Polk, tenemos una alta presencia de puertorriqueños afectados por el huracán María que nunca se registraron para votar en Florida. Mi trabajo en esa comunidad ayudó a aumentar el número de puertorriqueños y ciudadanos estadounidenses elegibles de Haití que estaban registrados para votar.

RENUNCIA: Este documento ha sido traducido al español para su revisión y aprobación por parte del declarante. Se adjunta una copia de la traducción.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el 5 de junio de 2023

Veronica Guadalupe Herrera

TRANSLATION

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, *etc., et al.*,

*Defendants*.

Case No. 4:23-cv-218-AW-MAF

**Declaration of Norka Martínez
(Pursuant to 28 U.S.C. § 1746)**

1. My name is Norka Martínez, and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**Personal Background**

2. I have lived in the United States since 2017.

3. I have lived in Florida since 2017.

4. I currently live in Kissimmee, Florida, in Osceola County.

5. I am a citizen of Venezuela.

6. I have had Temporary Protected Status in the United States since 2022.

7. I am authorized to work in the United States.

8. I have a college degree in computer science, having received qualifications in Venezuela.

**Voter Registration Work**

9. I have been assisting with voter registration efforts since 2022.

10. I worked during the 2022 election cycle.

11. I have assisted with voter registration efforts in paid roles. In the past I have worked for both Hard Knocks and Mi Familia Vota as a canvasser. For the past 15 months I have served as a canvasser for Mi Vecino.

12. In each of those roles, I have provided eligible voters with voter registration applications, and have assisted eligible voters who are interested in registering to vote.

13. I have been trained by my organization to conduct voter registration outreach in the community and I am trained on a continuing basis as the rules and regulations change around my work as a field organizer helping register voters.

14. During my time as a canvasser, I have encountered many individuals with questions and concerns about how they can access their right to vote. Personally, I have built many relationships with members of the community, and I enjoy working in the field engaging them on how to access their right to vote.

15. Working as a canvasser and I have been able to provide for myself and loved ones. It serves as my primary occupation and without it I would struggle

to support myself and loved ones financially.

16. I think voter registration work is important because it is essential to being able to vote. Voting is essential because as citizens voters protect the interests of our whole community. Voting is necessary to defend democracy and voter registration work is important to me because it is crucial to protecting all of our rights.

**Impact of Florida SB 7050**

17. If the law goes into effect, I will have to stop doing voter registration work.

18. If the law goes into effect, I will lose my current job.

19. I entered into an exclusive contract with my employer to perform my work as a canvasser for a permanent position with the organization.

20. The law will make it difficult for me to find work that my body can handle. I have physical limitations on my ability to perform hard or arduous labor, because I developed back and wrist issues from performing other types of work earlier in my career. Working in voter registration allows me to prioritize my health and avoid the strain of more physically taxing work. I enjoy speaking with people and it's the lightest non-physically taxing job I can do. In comparison to prior jobs I had, cleaning up construction sites where I injured my wrists and also when I previously worked in Amazon which carrying heavy boxes caused me a lot

of hip pain, my job as a canvasser limits my physical exposure which protects my health.

21.    I will lose significant financial stability if I am not able to work as a canvasser. My job as a canvasser is my sole source of income and if I lose it, I will have trouble covering bills, medical costs, and other household expenses. I will also be less able to provide support for my family, including my sisters, niece, and their children, all of whom are in my home country Venezuela and who I currently help support financially.

22.    I have gained valuable experience working in the field as a canvasser. By participating in this work, I have developed many skills which support my ability to effectively do my job and engage members of the community.

23.    The law will severely limit my ability to engage with community-based organizations doing voter registration work and with the eligible citizens who I could be helping to register to vote, because I will not be able to volunteer or work as a canvasser, which primarily involves handling and collecting voter registration forms which is prohibited by the law given my status.

**DISCLAIMER:** This document has been translated into Spanish for the Affiant's review and approval. A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2023

Norka Martínez

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA LA DIVISIÓN DE TALLAHASSEE DEL DISTRITO NORTE DE FLORIDA**

HISPANIC FEDERATION, *et al.*,

*Demandantes,*

en.

CORD BYRD*, etc., et al.*,

*Acusados.*

Caso núm. 4:23-cv-218-AW-MAF

**Declaración de Norka Martínez**
**(De conformidad con 28 U.S.C. § 1746)**

1. Mi nombre es Norka Martinez y soy mayor de 18 años y plenamente competente para hacer esta declaración. Bajo pena de perjurio declaro lo siguiente:

**Antecedente Personal**

2. He vivido en los Estados Unidos desde el 2017.

3. He vivido en la Florida desde el 2017.

4. Actualmente vivo en Kissimmee, Florida, en el condado de Osceola.

5. Soy de Venezuela.

6. He tenido Estatus de Protección Temporal (TPS) en los Estados Unidos desde el 2022.

7. Estoy autorizada a trabajar en los Estados Unidos.

8.      Recibí mis calificaciones de título universitario en computadoras en

Venezuela.

**Trabajo de Registro de Votante**

9.      He asistido con los esfuerzos de registro de votantes desde el 2022.

10.     Trabaje durante el ciclo de elecciones del 2022.

11.     He asistido con esfuerzos de registro de votantes en puestos con pago.

En el pasado, trabaje con Hard Knocks y Mi Familia Vota como encuestador. En

los últimos 15 meses he trabajado como encuestador para Mi Vecino.

12.     En cada una de estas posiciones, le he proveído a votantes elegibles

con formularios de registración para votar y he asistido a votantes elegibles quien

están interesados en registrarse para votar.

13.     He sido entrenada por mi organización para dirigir esfuerzos de

registro de votante en la comunidad y soy entrenada continuamente sobre las reglas

y cambios de regulaciones relacionado a mi trabajo como organizadora de campo

ayudando a registrar a los votantes.

14.     Durante mi tiempo como encuestador, me he encontrado con muchos

individuos que tienen preguntas o preocupaciones sobre cómo pueden acceder su

derecho a votar. Personalmente, yo he creado muchas relaciones con miembros de

la comunidad y disfruto trabajar en el campo explicando cómo pueden acceder su

derecho a votar.

15. Trabajando como encuestador he podido proveer para mi familia y yo. Este trabajo sirve como mi ocupación primaria y sin él se mi hiciera difícil proveer para mis seres queridos y yo económicamente.

16. Pienso que el trabajo de registro de votante es importante porque es esencial para poder votar. Votar es esencial porque como ciudadanos los votantes protegen los intereses de toda la comunidad. Es necesario votar para defender la democracia y para mí el trabajo de registro de votante es esencial para proteger todos nuestros derechos.

**Impacto de la Ley de Florida SB7050**

17. Si la ley entra en vigencia, tendré que dejar de hacer el trabajo de registro de votante.

18. Si la ley entra en vigencia, perderé mi trabajo.

19. Entre en un contrato exclusivo con mi empleador para hacer el trabajo de encuestador en una posición permanente con la organización.

20. La ley hará que tenga dificultad encontrando un trabajo que pueda manejar físicamente. Tengo ciertas limitaciones físicas en mi habilidad de hacer labores de trabajo difíciles o arduos porque desarrolle problemas en la espalda y muñeca trabajando en otras posiciones al principio de mi carrera. Trabajando en registro de votantes me permite priorizar mi salud y evitar el estrés de un trabajo que sería más agotador físicamente. Me gusta hablar con las personas y es el

trabajo menos agotador físicamente que puedo hacer. En comparación con otros trabajos que he tenido en el pasado, como limpiando sitios de construcciones donde me lastime las dos muñecas y también cuando anteriormente trabajaba en Amazon cargando cajas pesadas me causo mucho dolor en la cadera, mi trabajo como encuestador limita el tener que exponerme a trabajos muy físicos y protege mi salud.

21.     Perderé significante estabilidad financiar si no puedo trabajar como encuestador. Mi trabajo como encuestador es mi única fuente de ingreso y si lo pierdo, tendré dificultad para cubrir mis gastos, costos médicos, y otros gastos del hogar. también no podre proveer apoyo para mi familia, incluyendo mis hermanas, sobrinas, y sus niños, todos que viven en Venezuela y a quien actualmente apoyo económicamente.

22.     He adquirido una valiosa experiencia trabajando como encuestador. Participando en este trabajo, he desarrollado muchas habilidades que apoyan mi capacidad para hacer mi trabajo efectivamente e involucrar a miembros de la comunidad.

23.     La ley severamente limitara mi habilidad de involucrarme con organizaciones comunitarias que apoyan el trabajo de registro de votantes y con los ciudadanos elegibles quien puedo ayudar a registrarse a votar porque no podré ser voluntaria o trabajar como encuestador, cual principalmente implica manejar y

colectar solicitudes de registración de votante que es ahora prohibido por la ley basado en mi estatus.

**DESCARGO DE RESPONSABILIDAD:** Este documento ha sido traducido al español para la revisión y aprobación del declarante. Se adjunta una copia de la declaración.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el 6 de junio de 2023

Norka Martínez

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, *et al.*,

*Plaintiffs*,

v.

CORD BYRD, *etc.*, *et al.*,

*Defendants*.

Case No. 4:23-cv-218-AW-MAF

**Declaration of Plaintiff A. Doe
(Pursuant to 28 U.S.C. § 1746)**

1. My name is Plaintiff A. Doe and I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

**Personal Background**

2. I have lived in the United States since December 2017.

3. I have lived in Florida since 2017.

4. I currently live in Kissimmee, Florida, in Osceola County.

5. I am a citizen of Venezuela.

6. I came to the United States because I feel this country respects people's rights. Security is nonexistent in Venezuela. In Venezuela I faced difficult economic circumstances and feared persecution by the government,

because of my work in the country. I came to the United States seeking protection from the government.

7. I applied for Temporary Protected Status in 2021 and it was granted in 2022.

8. I am authorized to work in the United States.

9. I have an educational background in marketing administration, having received a degree for that specialization in Venezuela.

10. I am invested in working with communities and interacting with others to learn about their cultures. My past professional experience as a vendor contributes to my ability to educate and effectively communicate the importance of not only registering, but also casting a ballot. Although I am limited English proficient, I am able to make connections with the Hispanic community which, I believe, is the most misinformed about voting.

11. I feel a deep sense of connection to the community I serve which I am every bit a part of. Aside from voter registration I engage deeply with the issues impacting the community and provide emotional support to these individuals who often have no one else to speak to.

**Voter Registration Work**

12. I have been assisting with voter registration efforts since 2019.

13. I have worked during portions of the 2019, 2020, 2021 and 2022

election cycles. This included voter registration work alongside phone banking, educating individuals on COVID protocols and census work.

14.   I have assisted with voter registration efforts in paid and volunteer roles. I canvassed for Poder Latinx in 2019, 2020 and 2021. The times I canvassed for Poder Latinx ranged from as little as 2-3 months to extended periods of time in the range of 7-8 months. I currently work as a canvasser at Mi Vecino, a community-based organization that focuses on registering voters throughout Florida. I have worked here since November 2021 until the present.

15.   In each of those roles, I have provided eligible voters with voter registration applications, and have assisted eligible voters who are interested in registering to vote.

16.   I have been trained by my organization to conduct voter registration outreach in the community and I am trained on a continuing basis as the rules and regulations change around my work as a canvasser helping register voters. I have also trained other canvassers on how to register voters in the state. I also review voter registration applications that we obtain from voters to determine whether any errors were made in completing the form.

17.   My role as a canvasser involves a lot of social interaction with members of the community. Many members of our community are not informed about voting, to inform them requires that we build trust and listen to them. In my

role as a canvasser, I go to them and provide critical information on their rights to ensure they can go and vote. Through my work as a canvasser, I have built many relationships which help me provide education and serve my community.

18. Working as a canvasser has allowed me to provide for myself and my loved ones. It serves as my primary occupation and accounts for 90% of my income. Without my job as a canvasser, I would struggle to support myself financially and would not be able to cover basic necessities.

19. I believe registering to vote is important because as a citizen it is your civic duty. As a citizen you have rights and responsibilities, and voting is an important part of them. Without registering to vote you cannot vote which means you cannot ensure you have representation which means our democracy does not truly represent all of our community.

20. Promoting civic engagement is important to me. In the past I have also volunteered for civic engagement organizations to be a poll monitor and have assisted on workshops conducted by Hispanic Federation and Poder Latinx on naturalization efforts and educating individuals on their rights.

**<u>Impact of Florida SB 7050</u>**

21. If the law goes into effect, I will have to stop doing voter registration work.

22. If the law goes into effect, I will lose my current job.

23.    The law will make finding work for myself incredibly difficult for several reasons. First, employment in the state of Florida is seasonal and it will be difficult to find work on such short notice. Second, I have built my skills in this area, and it would be difficult to transfer my expertise to a different job within the state. Third, this job is incomparable to other jobs I could pursue, even if I was able to find work on such short notice it would not necessarily be precisely what my responsibilities are in my role as a canvasser. Lastly, I do not have the ability to pick up and leave or travel long distances to perform similar work.

24.    If I lose my job, I will lose financial stability because my canvassing work accounts for 90% of my income. I will be unable to cover my rent and the cost of basic necessities. I do not have any additional safety nets and rely on my income from my work as a canvasser to cover my living costs. I will also be less able to provide support for my family, including my brothers and niece who I currently help support financially.

25.    I have built key skills working as a canvasser. These skills include communication and community engagement skills which are essential to the work I do. Building up these skills has contributed to me being able to effectively connect and motivate individuals to register to vote and go out and vote. The law will severely limit my ability to engage with community-based organizations doing voter registration work and with the eligible citizens who I could be helping to

register to vote, because I will not be able to volunteer or work as a canvasser, which primarily involves handling and collecting voter registration forms which is prohibited by the law given my status.

26.    I feel discriminated against because when I was granted work authorization there were no such limitations on my ability to engage in this work but now that has changed for reasons that I do not understand. As individuals with work authorization, we contribute greatly to the United States, and we value participating in its economy. The restrictions imposed by the law unfairly restrict me from doing a job that I care for and value and this distinction causes unjust harm to me and other individuals with work authorization who want to be productive members of this country and provide for ourselves.

27.    I am concerned that pursuing this case under my name may pose risks to my personal safety and pending asylum application. I fear that, despite my temporary protected status, I could face additional scrutiny and harassment by state and local officials in retaliation for challenging this law. I also fear that, in the current highly charged political environment, I may be harassed by individuals online and by individuals in the media due to anti-immigrant sentiments. I believe proceeding under a pseudonym will allow me to be protected and avoid unnecessary complications.

**DISCLAIMER:** This document has been translated into Spanish for the Affiant's review and approval. A copy of the translation is attached.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8th, 2023.

A. Doe

Plaintiff A. Doe

**EN EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA LA DIVISIÓN DE TALLAHASSEE DEL DISTRITO NORTE DE FLORIDA**

**HISPANIC FEDERATION, *et al.*,**
***Demandantes,***
**en.**
**CORD BYRD, *etc.*, *et al.*,**
***Acusados.***

**Caso núm. 4:23-cv-218-AW-MAF**

**Declaración de Demandante A. Doe**
**(De conformidad con 28 U.S.C. § 1746)**

1. Mi nombre es Demandante A. Doe y soy mayor de 18 años y plenamente competente para hacer esta declaración. Bajo pena de perjurio declaro lo siguiente:

**<u>Antecedente Personal</u>**

2. He vivido en los Estados Unidos desde el 2017

3. He vivido en Florida desde el 2017.

4. Actualmente vivo en Kissimmee, Florida, en el condado de Osceola.

5. Soy de Venezuela

6. Vine a los Estados Unidos porque siento que este país respecta los derechos humanos. La seguridad es inexistente en Venezuela. En Venezuela yo enfrente circunstancias económicas difíciles y temía persecución por el gobierno

por mi trabajo en el país. Vine a los Estados Unidos buscando protección del gobierno.

7. Aplique para Estatus de Protección Temporal (TPS) en el 2021 y fue otorgado en el 2022.

8. Estoy autorizada a trabajar en los Estados Unidos.

9. Me eduqué en administración del área de mercado y recibí un título universitario en esa especialización en Venezuela.

10. Estoy invertida en trabajando con la comunidad e interactuando con otros para aprender de sus culturas. Mis anteriores experiencias profesionales como vendedora contribuyen a mi habilidad para educar y efectivamente comunicar la importancia de no solo registrarse, pero también votar. Aunque mi competencia en inglés es limitado, tengo la habilidad de hacer conexiones con la comunidad Hispana, la que pienso es la mas mal informada sobre la votación.

11. Siento un gran sentido de conexión con la comunidad a la que sirvo y de cual soy parte. Aparte de registro de votante yo interactuó profundamente con los problemas que impactan a la comunidad y le proveo apoyo emocional a los individuos quien no tienen con quien hablar.

**Trabajo de Registro de Votante**

12. He asistido con los esfuerzos de registro de votantes desde el 2019.

13.     He trabajado en porciones de las elecciones del 2019, 2020, 2021, y 2022. Esto ha incluido registración de votantes y trabajando en maratones telefónicos educando a los individuos sobre los protocolos de COVID y trabajo de censo.

14.     Yo he asistido con los esfuerzos de registro de votante en puestos con pago y también como voluntaria. He sido encuestador para Poder Latinx en el 2019, 2020, y 2021. Las veces que he sido encuestador para Poder Latinx han sido desde periodos de 2-3 meses y por periodos extendidos de 7-8 meses. Actualmente trabajo como encuestador en Mi Vecino, una organización comunitaria que se en foca en registrando a los votantes a lo largo de la Florida. He trabajado ahí desde noviembre del 2021 hasta ahora.

15.     En cada una de estas posiciones, le he proveído a votantes elegibles con los formularios de registración y le he asistido a los votantes quien están interesado en registrarse para votar.

16.     He sido entrenada por mi organización para dirigir esfuerzos de registro de votante en la comunidad y soy entrenada continuamente sobre las reglas y cambios de regulaciones relacionado a mi trabajo como encuestador ayudado a registrar los votantes. También he entrenado a otros encuestadores a como registrar votantes en el estado. También reviso las aplicaciones de registro de votantes que obtenemos para determinar si algún error se hizo en completando el formulario.

17.   Mi posición como encuestador requiere mucha interacción social con miembros de la comunidad. Muchos miembros de la comunidad no están informados sobre el voto, y para informarlos tengo que establecer confianza y escucharlos. En mi posición como encuestador, yo voy y le proveo información esencial sobre sus derechos al voto y me aseguro de que puedan ir a votar. Como encuestador he creado muchas relaciones la cual me han ayudada a proveer educación y servir mi comunidad.

18.   Trabajando como un encuestador me ha permitido proveer para mis seres queridos y yo. Sirve como mi ocupación primaria y es la fuente de 90% de mi ingreso. Sin mi trabajo como encuestador, se me haría difícil apoyarme económicamente y no pudiera cubrir las necesidades básicas.

19.   Pienso que registrándose a votar es importante porque como ciudadano deber cívico. Como ciudadano tienes derechos y responsabilidades, y votando es una parte importante de esas responsabilidades. Si no te registras para votar no puedes votar la cual significa que no puedes asegurar que tendrás representación y la cual significa que nuestra democracia no es en verdad representante de todos en nuestra comunidad.

20.   Promocionando la involucración cívica es importante para mí. En el pasado también he sido voluntaria para organizaciones de involucramiento cívico como observadora de elecciones y he asistido a talleres dirigidos por Hispanic

Federation y Poder Latinx sobre los esfuerzos de la ciudadanía y educando a los individuos sobres sus derechos.

**Impacto de la Ley de Florida SB7050**

21. Si la ley entra en vigencia, tendré que dejar de hacer el trabajo de registro de votante.

22. Si la ley entra en vigencia, perderé mi trabajo.

23. Con esta ley se me hará increíblemente difícil encontrar trabajo por varias razones. Primeramente, el empleo en el estado de la Florida es por temporadas y se me hará difícil encontrar trabajo en tan corto plazo. Segundo, he desarrollado mis habilidades en esta área y se me haría difícil transferir mis competencias a un trabajo diferente en el estado. Tercero, este trabajo es incomparable a otros trabajos que pueda buscar, y aunque encuentre trabajo en tan corto plazo no sería precisamente las responsabilidades de mi trabajo como encuestador. Por último, no tengo la habilidad de recoger e irme o viajar a largas distancias para hacer un trabajo similar.

24. Si pierdo mi trabajo, perderé la estabilidad económica porque mi trabajo como encuestador es la fuente de 90% de mi ingreso. No podre cubrir el pago de vivienda y los costos de necesidades básicas. Yo no tengo otros apoyos de seguridad económica y dependo de mi ingreso del trabajo de encuestador para

cubrir mis costos. También tendré menos oportunidad para apoyar a mi familia, incluyendo a mis hermanos y sobrina a quien ayudo económicamente.

25.    He desarrollado habilidades clave para el trabajo de encuestador. Estas habilidades incluyen comunicación e involucrando a la comunidad y son habilidades esenciales a el trabajo que hago. Desarrollando estas habilidades a contribuido a que sea más efectúa conectándome y motivando a los individuos a que se registren para votar y que vallan a votar. La ley severamente limitaría mi habilidad de interactuar con organizaciones comunitarias quien están haciendo el trabajo de registro de votante y los ciudadanos eligibles a cuál podría estar ayudando a registrarse para votar, porque no podre ser voluntaria o trabajar como encuestador, la cual principalmente implica manejar y colectar formularios de registro de votante la cual ahora es prohibido bajo la ley basado en mi estatus.

26.    Me siento discriminada ya que cuando me otorgaron el permiso de trabajo no había estas limitaciones en la habilidad de hacer este trabajo y ahora eso a cambiado por razones que no entiendo. Como individuos con permiso de trabajo, nosotros contribuimos grandemente a los Estados Unidos, y valoramos poder participar en la economía. Estas restricciones impuestas por la ley injustamente me restringen de hacer un trabajo que aprecio y valoro y esta distinción me causa una injusticia a mi y a otros individuos con permiso de trabajo quien quieren ser miembros productivos de este país y proveer para nosotros.

27.     Estoy preocupada que al ser parte de este caso bajo mi nombre puede causar riesgo a mi seguridad personal y mi aplicación de asilo que esta pendiente. Temo que, aunque tenga estatus de protección temporal (TPS), pueda enfrentar escrutinio adicional y acoso por los oficiales estatales y locales en represalia por impugnar la ley. También temo que, en un ambiente político tan cargado, pueda ser acosada por individuos por el internet y por individuos en las redes que tienen sentimientos contra los inmigrantes. Creo que procediendo bajo un seudónimo me permitiría ser protegida e evitar complicaciones innecesarias.

**DESCARGO DE RESPONSABILIDAD:** Este documento ha sido traducido al español para la revisión y aprobación del declarante. Se adjunta una copia de la declaración.

Declaro bajo pena de perjurio que lo anterior es verdadero y correcto.

Ejecutado el _____ de junio de 2023

______________________________
A. Doe

# 2

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, et al.,

Plaintiffs,

v. Case No. 4:23-cv-218-AW-MAF

CORD BYRD, et al.,

Defendants.
_________________________________/

**DEFENDANT ATTORNEY GENERAL ASHLEY MOODY'S NOTICE OF JOINDER IN DEFENDANT SECRETARY OF STATE CORD BYRD'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant, Ashley Moody, in her official capacity as Florida Attorney General, by and through undersigned counsel, hereby gives notice that she joins in and adopts the Response in Opposition to Motion for Preliminary Injunction and Incorporated Memorandum of Law to be filed by Defendant Secretary of State Cord Byrd on June 23, 2023, together with all supporting facts, documents, exhibits, and declarations filed therewith.

Respectfully Submitted,

*/s/ Noah Sjostrom*
Noah Sjostrom
Assistant Attorney General
Fla. Bar No. 1039142
noah.sjostrom@myfloridalegal.com
Stephanie A. Morse

Special Counsel
Fla. Bar No. 0068713
stephanie.morse@myfloridalegal.com
Office of the Attorney General
Complex Litigation Bureau
PL 01 The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3635

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of June 2023, a true and correct copy of this document was filed electronically with the Clerk of Court through the CM/ECF filing system, which provides notice to all counsel of record.

*/s/ Noah Sjostrom*
Noah Sjostrom

**3**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, et al.,

*Plaintiffs*,

v. Case No. 4:23-cv-218-MW/MAF

CORD BYRD, in his official capacity as Florida Secretary of State, et al.,

*Defendants*.
___________________________________/

**SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

Plaintiffs seek extraordinary relief. None is warranted. The provision of Florida's election code that Plaintiffs challenge will not affect them until September 30, 2023. Till then, much of the dispute must shift to Florida's rulemaking process. Rulemaking will flesh out definitional issues (resolving many of Plaintiffs' concerns about vagueness and overbreadth) and otherwise crystalize the issues in dispute. Allowing this process to run its course would also further foundational principles of comity and federalism.

Comity and federalism aside, Plaintiffs are not entitled to the relief they seek. The provision they challenge concerns third-party voter registration organizations ("3PVROs"). 3PVROs remain the source of endless complaints. Regulating them makes sense. As does trying different policy approaches to see what works.

The Florida Legislature gets to choose the policies. There's nothing extraordinary about that. The U.S. and Florida Constitutions entrust the Florida Legislature with authority to make such changes. *See* U.S. Const. art I., § 4; Fla. Const. art. III, § 1; Fla. Const. art. VI, § 1. The Florida Legislature exercised its prerogative in passing Senate Bill 7050 ("SB 7050"), which the Governor signed into law. *See* Chapter 2023-120, Laws of Florida ("2023 Law"). This Court should now decline Plaintiffs' invitation to upend the measured policy changes. It should deny the motion for preliminary injunction.

## STATEMENT OF THE CASE AND FACTS

### I. The provision of Florida law being challenged.

Plaintiffs Hispanic Federation, Poder Latinx, Veronica Herrera-Lucha, Norka Martínez, A. Doe, and B. Doe ("Plaintiffs") claim that the following provision of the 2023 Law governing section 97.0575 3PVROs violates federal law:

1. Section 97.0575(1)(f), Florida Statutes, which requires a 3PVRO to affirm that each person collecting or handling voter registration applications on behalf of the 3PVRO is a citizen of the United States, and provides that a 3PVRO is liable for a $50,000 fine for each non-U.S. citizen who collects or handles voter registration applications on behalf of the 3PVRO ("**Non-U.S. Citizen Volunteer Restriction**").[1]

*See* ECF No. 1 (Plaintiffs' Complaint).[2] Plaintiffs only seek to preliminarily enjoin the Secretary's and the Attorney General's respective enforcement of this provision. *See* ECF No. 32 (Plaintiffs' Preliminary-Injunction Motion).

### II. The 2023 Law builds on Florida's solid foundation.

The 2023 Law builds upon the solid foundation of Florida's election laws by amending numerous provisions of chapters 97, 98, 99, 100, 101, 102, 103, 104, 105, and 106 of the Florida Election Code. *See* Ch. 2023-120, pp. 1-5, Laws of Fla. (summarizing the statutory provisions amended by the 2023 Law), http://laws.flrules.org/2023/120;

[1] This provision applies to employees as well. For consistency's sake, it will be referred to as Non-U.S. Citizen Volunteer Restriction.

[2] Two other challenges have been brought against specific provisions contained in the 2023 Law. 4:23-cv-215 (N.D. Fla. 2023); 4:23-cv-216 (N.D. Fla. 2023).

*see also* § 97.011, Fla. Stat. (explaining that chapters 97 to 106 of the Florida Statutes constitute the "Florida Election Code"). Updates to the Florida Election Code include:

- Mandating that all those whose duties require verification of signatures to undergo signature match training, Ch. 2023-120, § 1, Laws of Fla.;
- Regulating 3PVROs, a frequent source of complaints, *id.* at § 4;
- Ensuring voter information cards provide voters with up-to-date access to their most current polling place locations, *id.* at § 5;
- Increasing information governmental entities must provide for list registration maintenance purposes, *id.* at § 11;
- Enhancing requirements for post-election reports, *id.* at §§ 12, 36;
- Mandating that candidate oaths provide voters with notice of outstanding fines, fees, or penalties owed by candidates for violations of state and local ethics requirements, *id.* at § 15, 43;
- Closing the "ghost candidate" loophole in both primary and general elections, *id.* at § 23;
- Narrowing the category of individuals who can request vote-by-mail ballots on behalf of a voter, *id.* at § 26;
- Clarifying the prohibition against voting more than one ballot at any election, *id.* at § 41; and
- Ensuring that voter guides are transparent, *id.* at § 49.

The Florida Legislature enacted the 2023 Law—including the challenged provision applicable to 3PVROs—to further Florida's important interests in, among other things, safeguarding election integrity, preventing voter fraud, and promoting

uniformity, efficiency, and confidence in the election system as a whole.[3] The process used to enact the 2023 Law was run-of-the mill.

Florida's most recent sixty-day legislative session took place from March 7 to May 5, 2023. *See* Art. II, § 3(b), (d), Fla. Const. SB 7050—which became the 2023 Law—was introduced on March 30, 2023. *See* Fla. S. Bill History of SB 7050 (2023), https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=BillHistory. Like most bills, SB 7050 was the subject of various revisions. *See id.* After weeks of committee hearings, floor hearings, amendments, and debate, the Senate on April 26 and the House on April

---

[3] *See, e.g.*, Fla. S. Floor, Debate Regarding SB 7050 – Part 2, at 1:43:18-1:43:53 (April 26, 2023) (Bill Sponsor Senator Burgess: "Related to third-party voter registration organizations, since 2005 there have been regulations on 3PVROs. In every election cycle, there are issues with certain actors within these organizations. . . . I agree that voting is a sacred part of our democracy. And that's why our bill holds those who are custodians of a person's access to voting to a very high standard."), https://thefloridachannel.org/videos/4-26-23-senate-session-part-2/; Fla. S. Floor, Debate Regarding SB 7050 – Part 1, at 59:57-1:44 (April 26, 2023) (Senator Burgess: "The reality is if a third-party voter registration organization fails to submit timely somebody's voter registration, that voter is disenfranchised. . . . And so that's why it's important that we continue to ensure that 3PVROs are adhering to their mission and meeting a standard that we're laying out in law to protect their fiduciary responsibility that they voluntarily seek by asking for voter [sic] registrations."), https://thefloridachannel.org/videos/4-26-23-senate-session-part-1/; Fla. S. Comm. on Fiscal Policy, Debate Regarding SB 7050, at 7:52:20-7:52:25 (April 20, 2023) (Senator Burgess: "Why are we making [all] these changes [in SB 7050]? Well we're doing a great job, but we can always improve in our process."), https://thefloridachannel.org/videos/4-20-23-senate-committee-on-fiscal-policy/; Fla. S. Comm. on Ethics and Elections, Debate Regarding SB 7050, at 23:31-23:40 (April 4, 2023) (Senator Burgess: "This bill strengthens requirements for third-party voter registration organizations to protect individuals who entrust their personal information and voter registration applications to them."), https://thefloridachannel.org/videos/4-4-23-senate-committee-on-ethics-and-elections/.

28 passed the final text of SB 7050. *See id.* Governor DeSantis approved SB 7050 on May 24, 2023. *See* Ch. 2023-120, p. 55, Laws of Fla.

The 2023 Law is consistent with the Legislature's longstanding regulation of 3PVROs as fiduciaries. Florida law provides that "[a] third-party voter registration organization that collects voter registration applications serves as a *fiduciary* to the applicant." § 97.0575(3)(a), Fla. Stat. (emphasis added); *see* Ch. 2005-277, Laws of Fla. (creating section 97.0575, Florida Statutes). A 3PVRO's primary duty as a fiduciary—a role it voluntarily undertakes—is ensuring that each voter registration application entrusted to it by an applicant is "promptly delivered" to the Division of Elections or the supervisor of elections in the county in which the applicant resides "within [the statutorily prescribed number of] days after the application [is] completed by the applicant, but not after registration closes for the next ensuing election." § 97.0575(3)(a), Fla. Stat. If a 3PVRO fails to deliver a voter registration application prior to the book-closing deadline, that applicant's right to vote is extinguished. *See* § 97.053(2), Fla. Stat. (explaining that an applicant is not eligible to vote in an election unless their completed voter registration application is received by a voter registration official and verified prior to the date of book closing for an election); § 97.055, Fla. Stat. (establishing the book-closing deadline for elections).

Over the years, Florida has amended section 97.0575 on several occasions to ensure that 3PVROs are adhering to their fiduciary duties. *See* Ch. 2007-30, § 2, Laws

of Fla.; Ch. 2011-40, § 4, Laws of Fla.; Ch. 2021-11, § 7, Laws of Fla.[4] The 2023 Law was not enacted in a vacuum. While many 3PVROs ably fulfill their fiduciary duties, recent history shows that some unfortunately do not. *See generally* App. at 89 (Declaration of Andrew Darlington).

As explained in the declaration of Andrew Darlington, the current Director of the Department of State's Office of Election Crimes and Security ("Office"), the Office regularly receives complaints of 3PVROs violating Florida's election laws via a variety of sources including election fraud complaints, 3PVRO complaints, and complaints from supervisors of elections or their staff. App. at 90-91. Relatedly, Florida law requires the Office to submit an annual report to the President of the Senate, the Speaker of the House of Representatives, and the Governor detailing information on the Office's investigations of alleged election law violations or election irregularities conducted during the prior calendar year. App. at 90-91; *see* § 97.022(7), Fla. Stat. The Office submitted its most recent report on January 15, 2023 for the 2022 calendar year,

---

[4] Florida law imposes fiduciary duties on a variety of other relationships including brokers to clients, §§ 475.01, 475.278, Fla. Stat., trustees to beneficiaries, § 518.11, Fla. Stat., managing members of LLCs to members, § 605.04091, Fla. Stat., corporate directors to shareholders, § 607.0830, Fla. Stat., general partners to limited partners, § 620.1408, Fla. Stat., partners to partners, § 620.8404, Fla. Stat., and guardians to wards, § 744.446, Fla. Stat. Florida has a long history of recognizing fiduciary relationships and their concomitant duties. *See, e.g.*, *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (explaining that "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation" (quoting Restatement (Second) of Torts § 874 cmt. a.)); *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927) (describing the general parameters of a fiduciary relationship).

which is incorporated by reference in Director Darlington's declaration and attached hereto. App. at 90-91; *see generally* App. at 97 (January 15, 2023 Florida Department of State Office of Election Crimes and Security Report). As evidenced in the report, during 2022, the Office reviewed a large number of complaints involving 3PVROs. App. at 97-188. Notably, the Office reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Florida Statutes, and assessed statutory fines against those 3PVROs that did not comply with the statutory requirements. App. at 90-91.

Also incorporated by reference in Director Darlington's declaration and attached hereto are a sampling of 3PVRO complaints received, 3PVRO fine letters issued, and 3PVRO referrals made by the Department of State between the years 2016 and 2023. App. at 91; *see generally* App. at 362. The Office is concerned with the quantity and types of violations of Florida's election laws by 3PVROs alleged in or evidenced by these documents (especially those that resulted in the assessment of fines, those that resulted in referrals to other agencies for further investigation, and those that resulted in criminal prosecution). App. at 91. The types of violations alleged in or evidenced by these documents include among other things:

a. 3PVROs failing to deliver voter registration applications to election officials before the book closing deadline for federal or state elections. (Whenever a new applicant's voter registration application is not delivered by a 3PVRO prior to the book closing deadline, that voter is deprived of the right to vote in the next election.)

b. 3PVROs failing to deliver voter registration applications to the division or the supervisor of elections in the county in which the applicant resides within 14 days after applications are completed by applicants.

c. 3PVROs failing to deliver voter registration applications to the correct supervisor of elections in the county in which the applicant resides.

d. 3PVRO agents charged or alleged with violation of a criminal statute.

App. at 91. Also incorporated by reference to Director Darlington's declaration are news articles, a press release, and a letter that discuss 3PVRO issues. App. at 960.

Director Darlington's declaration further explains that, generally speaking, the 2023 Law Florida promotes the State's interests in safeguarding election integrity, preventing voter fraud, and promoting uniformity, efficiency, and confidence in the election system as a whole. App. at 91-95. The 2023 Law reflects the State's continuing efforts to protect the right to vote by ensuring that 3PVROs are abiding by their fiduciary duties under Florida law. App. at 91-95.

The provision of the 2023 Law that Plaintiffs challenge is reasonable, rational, constitutional, and legal voting regulation. Notwithstanding these facts, Plaintiffs filed suit and are seeking preliminary injunctive relief.

## III.   The 3PVRO-related provision won't apply to Plaintiffs until September 30, 2023.

As noted above, Plaintiffs seek to enjoin enforcement of the Non-U.S. Citizen Volunteer Restriction. They fear that the challenged provision of the 2023 Law (and their perceived harms) will take effect on July 1, 2023. Not true.

The 2023 Law states that "this act shall take effect July 1, 2023" "[e]xcept as otherwise expressly provided in this act." Ch. 2023-120, § 52, Laws of Fla. The 2023 Law goes on to say that "[t]he requirements of [section 97.0575] are retroactive for any third-party voter registration organization registered with the department as of July 1, 2023, and must be complied with within 90 days after the department provides notice to the third-party voter registration organization of the requirements contained in this section." *Id.* at § 4 (renumbering and amending § 97.0575(12), Fla. Stat.). The Department of State intends to issue the requisite notice—which starts the ninety-day clock within which Plaintiffs' must comply with the new requirements—on July 1, 2023. Accordingly, at the earliest, Plaintiffs need not comply with the 2023 Law's changes to section 97.0575 until September 30, 2023. *See* § 97.0575(12), Fla. Stat.

Indeed, Notices of Rule Development regarding the Rules governing 3PVROs and vote-by-mail ballots were published on June 22, 2023 and Plaintiffs (along with other stakeholders) are invited to the workshop scheduled for July 10, 2023 to participate in crafting the language and forms. *See* Fla. Admin. Code. R. 1S-2.042 (Third-Party Voter Registration Organizations); Fla. Admin. Code R. 1S-2.055 (Vote-by-mail

Requests); Fla. Admin. Reg. § 1, Vol. 49, No. 122[5]; *see also* § 97.012(1)-(2), Fla. Stat.; § 97.012(9), Fla. Stat.; § 101.62(1)(a), Fla. Stat.; § 101.62(6), Fla. Stat.; § 101.662, Fla. Stat.; § 120.54, Fla. Stat. Copies of the current drafts of Rule language are attached hereto. App. at 1-87. Florida law authorizes stakeholders and members of the public to provide comments to the Division about the proposed rules, including any proposed changes thereto. *See generally* § 120.54, Fla. Stat. Plaintiffs are welcome to share their perspective.

The proposed rules concern the provision at issue before this Court. The proposed rules elucidate the meaning of the phrase "collecting or handling" as used in the Non-U.S. Citizen Volunteer Restriction. If adopted, the proposed rules will almost certainly moot various aspects of Plaintiffs' claims and their related request for preliminary injunctive relief. At the very least, any finalized rules have the potential to narrow the scope of the issues now before this Court. And, rulemaking should be complete prior to the challenged requirements becoming effective on October 1, 2023.

No preliminary injunction is appropriate or necessary.

## RELEVANT LEGAL STANDARD

The "extraordinary and drastic remedy" of a preliminary injunction, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998), requires the movant to clearly establish: (1) a substantial likelihood of success on the merits; (2) irreparable harm

[5] Available at: http://www.FLRules.org/gateway/View_Notice.asp?id=27257308 (3PVRO); http://www.FLRules.org/gateway/View_Notice.asp?id=27257405 (vote-by-mail).

absent the injunction; (3) harm to the movant that outweighs any harm to the opposing party; and (4) that the injunction furthers the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The first two factors are the most important and, when the State is the non-moving party, the last two factors merge. *Swain v. Junior*, 958 F.3d 1081, 1088, 1091 (11th Cir. 2020). The opposing party also doesn't have "the burden of coming forward and presenting its case against a preliminary injunction." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 442 (1974)). And, absent class certification, "injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (cleaned up) (emphasis added).

## ARGUMENT

Given the ongoing rulemaking, *Burford* abstention (or deferral of any preliminary injunction until after September 30, 2023) is appropriate. Alternatively, this Court should deny the motion because Plaintiffs can't meet any of the four prongs necessary to obtain a preliminary injunction. There is no likelihood of success on constitutional or statutory grounds. There is no irreparable harm. And the equities and public interest tilt decidedly in the State's favor.

## I. THIS COURT SHOULD ABSTAIN OR OTHERWISE DEFER RULING ON PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION.

### A. *Burford* abstention is appropriate at this juncture.

Federal courts should abstain from deciding cases where doing so furthers the "paramount interests of another sovereign" and the "principles of comity and federalism." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). Those interests and principles weigh in favor of abstention "when, by exercising its jurisdiction, a federal court would interfere with an ongoing state administrative proceeding or action." *Deal v. Tugalo Gas Co.*, 991 F.3d 1313 (11th Cir. 2021). In other words, such abstention—*Burford* abstention—is appropriate to avoid "disrupt[ion] [of] a state's effort, through its administrative agencies, to achieve uniformity and consistency in addressing a problem." *Siegel*, 234 F.3d at 1173.

As in this response, and in the attachments, the State is in the process of rulemaking. That process should conclude before October 1, 2023. Federal judicial intervention before then would interfere with the rulemaking process; however, rulemaking has the potential to resolve many of the issues—such as vagueness and overbreadth—now before this Court. Any remaining issues would be further streamlined. If ever a case called for abstention, this is it. And so, the Secretary asks this Court to exercise its discretion and abstain. *Cf. Harman v. Forssenius*, 380 U.S. 528, 534 (1965) ("Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law,

abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication.").

**B.   Deferring is otherwise appropriate at this juncture.**

Or this Court can defer ruling on Plaintiffs' motion until after September 30, 2023. This is for two reasons.

*First*, the requested injunctive relief is unnecessary to maintain the status quo. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). As explained previously, notwithstanding the July 1, 2023 effective date of the 2023 Law, Plaintiffs need not comply with any of the 2023 Law's changes to section 97.0575 until September 30, 2023. *See* § 97.0575(12), Fla. Stat. That's because the Department's July 1, 2023 notice to Plaintiffs will start running the ninety-day clock within which Plaintiffs' must comply with such changes. *See id.* In other words, Plaintiffs' request to preliminarily enjoin the enforcement of a provision of section 97.0575—i.e., the Non-U.S. Citizen Volunteer Restriction—is already being accomplished for a ninety-day period by automatic operation of Florida law. No temporary injunction is necessary to maintain the status quo at this time.

*Second*, and relatedly, many aspects of Plaintiffs' challenges to the provision of the 2023 Law will almost certainly become moot within the ninety-day period. Among

other things, Florida law provides the Department with broad authority to "adopt by rule uniform standards for the proper and equitable interpretation and implementation . . . of the Election Code" and "[p]rovide uniform standards for the proper and equitable implementation of the registration laws by administrative rule." § 97.012(1)-(2), Fla. Stat.; *see* § 120.54, Fla. Stat. Consistent with those and other grants of authority, the Department of State has initiated rulemaking to implement the 2023 Law's changes to section 97.0575 3PVROs. *See also* § 97.012(9), Fla. Stat.; § 101.62(1)(a), Fla. Stat.; § 101.62(6), Fla. Stat.; § 101.662, Fla. Stat. The rules will have a real-world winnowing effect on Plaintiffs' claims and will necessarily narrow the scope of injunctive relief being sought by them. And once final, there is no reasonable expectation that the Department will repeal them. *See A.R. v. Sec'y Fla. Ag. for Health Care Admin.*, 769 F. App'x 718, 724-28 (11th Cir. 2019) (discussing the standards for mootness and determining that the district court properly dismissed certain counts within the plaintiffs' complaint as "moot" after the Florida Agency for Healthcare Administration promulgated a new rule).

Under the circumstances, it makes little sense to decide Plaintiffs' preliminary-injunction motion on a truncated timeline during a ninety-day period. Again, Plaintiffs are not yet affected by the changes to the 2023 Law they seek to enjoin. The rulemaking will clarify state law, through a state process. Those clarifications will resolve many of the claims now before this Court such as how to comply with the Non-U.S. Citizen

Volunteer Restriction. Interpretive concerns of the phrase "collecting or handling" will also be addressed. So the State asks this Court to stay its hand.

## II. ALTERNATIVELY, THIS COURT SHOULD DENY PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION.

If the Court is inclined to rule on Plaintiffs' preliminary-injunction motion, the motion should be denied.

### A. Plaintiffs are unlikely to succeed on the merits.[6]

#### i. The Non-U.S. Citizen Volunteer Restriction isn't vague.

**a.** Plaintiffs are unlikely to succeed on the merits of their vagueness challenge against the Non-U.S. Citizen Volunteer Restriction. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A vague statute involves not just points of imprecision or confusion, but "hopeless indeterminacy" and "grave uncertainty." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213-14 (2018). "Courts should not lightly declare laws to be void for vagueness." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66

[6] Plaintiffs contend that they have standing to challenge the Non-U.S. Citizen Volunteer Restriction. Given the expedited briefing schedule, the Secretary generally focuses his attention on Plaintiffs' preliminary-injunction arguments instead of Plaintiffs' standing arguments. Nonetheless, this Court has "an independent obligation to examine" its "own jurisdiction" and may do so sua sponte. *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (cleaned up).

F.4th 905, 946 (11th Cir. 2023). "Facial vagueness [only] occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *Id.* (citation omitted).

**b.** Plaintiffs argue that the Non-U.S. Citizen Volunteer Restriction is vague because the statute does not define what it means to "collect[] or handl[e]" voter registration applications. *See* § 97.0575(1)(e)-(f), Fla. Stat. That's wrong. "[A] statute is not ambiguous merely because it contains a term without a statutory definition." *United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997).

The plain meaning of the words "collect" and "handle" allay any concerns. "[C]ollect" is commonly understood to mean "to gather" "from a number of persons." *Merriam-Webster's Collegiate Dictionary* 243 (11th ed. 2005). "[H]andle," ordinarily means "to manage with the hands." *Merriam-Webster's Collegiate Dictionary* 565 (11th ed. 2005); *see The American Heritage Dictionary* 796 (5th ed. 2018) (same). Both words thus require some physical custody. The physical custody requirement becomes clearer still when considering the words together. For example, a postman who "collects" letters from mailboxes takes physical possession of the letters. He continues to "handle" the letters on behalf of the senders until he gives them to the recipient or another postman responsible for processing the letters.

"Person[s] collecting or handling voter registration applications on behalf of [3PVROs]" are much like the postman. *See* § 97.0575(5)(a), Fla. Stat.; *see also* § 97.053, Fla. Stat. (providing an avenue for the "hand deliver[y]" of voter registration

applications by the applicant or a "third party"). They "collect" physical applications directly from applicants, and continue to "handle" the physical applications on behalf of the applicants until taking the applications to the Division of Elections, the supervisor of elections for the county in which the applicant resides, or to another agent of the 3PVRO responsible for actually delivering the applications to election officials.

The statute thus provides people of reasonable intelligence with notice of what "collecting or handling" voter registration applications means: physically collecting or handling completed voter registration applications—not *blank* forms—or otherwise exercising custody over completed voter registration applications. Contrary to Plaintiffs' position, there are no restrictions on encouraging eligible citizens to complete applications without the non-citizen touching the application, directing eligible citizens to online content, or supervising those who collect or handle completed applications. And it's equally clear that a 3PVRO volunteer physically reviewing a completed voter registration form falls within the statute's ambit.

**c.** To the extent that Plaintiffs harbor doubt about the meaning of the statute because the word "handle" can also mean "to have overall responsibility for supervising or directing," *Merriam-Webster's Collegiate Dictionary* 565 (11th ed. 2005), they ignore the statute's context. The statutory prohibition applies to "collecting or handling *voter registration applications*," § 97.0575(1)(e), Fla. Stat. (emphasis added), not collecting or handling *persons* who collect or handle voter registration applications. Had the Florida Legislature intended to accomplish what the Plaintiffs say, it could have done so by

stating "collecting or handling, or supervising or directing the collecting or handling, of voter registration applications." It didn't.

**ii. The Non-U.S. Citizen Volunteer Restriction isn't overbroad.**

Plaintiffs are also unlikely to succeed on the merits of their overbreadth challenge against the Non-U.S. Citizen Volunteer Restriction. A statute is impermissibly overbroad under the First Amendment—and facially unconstitutional—if its "application to protected speech [is] substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *League of Women Voters*, 66 F.4th at 948 (quoting *Virginia v. Hicks*, 539 U.S. 113, 120 (2003)). "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second is to determine whether the challenged statute as construed prohibits a substantial amount of protected speech in comparison to its legitimate sweep. *See id.* at 297. "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988) (citation omitted). "[P]erfection is not required." *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1378 (11th Cir. 2021) (citation omitted).

The Non-U.S. Citizen Volunteer Restriction is not overbroad. As explained above, the statute prohibits non-citizens from collecting or handling voter registration

applications. No more. No less. As explained in greater detail below, the statute doesn't concern protected speech—much less a substantial amount of protected speech. Overbreadth isn't implicated. Plaintiffs' concerns about strict liability are ameliorated by the Department's pending rules. And, as further explained below, even if the statute did encompass some protected speech, the State's interests outweigh any potential First Amendment concerns.

**iii. The Non-U.S. Citizen Volunteer Restriction complies with the First Amendment.**

**a.** More broadly, Plaintiffs are unlikely to succeed on their First Amendment challenge to the Non-U.S. Citizen Volunteer Restriction. The First Amendment protects the freedom of speech and the freedom to associate. At its heart is the freedom to engage in "political discourse" and "direct one-on-one communication" about politics. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). A related right is the freedom to politically associate. *NAACP v. Button*, 371 U.S. 415, 417 (1961). That said, the First Amendment doesn't protect non-expressive conduct. *Rumsfeld v. FAIR*, 547 U.S. 47, 65-66 (2006). If conduct isn't "inherently expressive," it doesn't come within the First Amendment's ambit. *Id.* Otherwise, "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

**b.** In this instance, Plaintiffs say that the Non-U.S. Citizen Volunteer Restriction infringes on their First Amendment rights to engage in core political speech and to

politically associate. That's because some of Plaintiffs' volunteers—non-citizens—can't engage with eligible voters, and that Plaintiff organization can't enlist their support. The problem with this argument is twofold.

*First*, the argument depends, in part, on an expansive reading of the prohibition imposed. To reiterate, based on text and context, the Secretary interprets "collecting or handling voter registration applications on behalf of" 3PVROs as physically collecting or handling *completed* voter-registration applications on behalf of 3PVROs. That prohibition doesn't apply to *blank* applications. And that prohibition doesn't concern the *supervision* of those who collect or handle completed applications. The rulemaking now underway will test that interpretation. At the very least, because the Secretary must promote election uniformity, his interpretation of this provision of the State's election-code provision should be given weight. *See Hamer v. Musselwhite*, 376 F.2d 479, 481 (5th Cir. 1967). That's the interpretation this Court must assess. *See generally Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

*Second,* regulating who can collect and handle *completed* voter-registration applications is a regulation of non-expressive conduct, not speech. Non-citizens can still walk up to eligible voters, discuss the importance of voting and registering to vote, discuss politics more generally, encourage someone to register to vote, and even provide a blank voter-registration application. The non-citizens just can't collect or handle completed voter-registration forms with critical applicant-specific information on the completed form. Collecting or handling completed voter registration forms conveys no

message; the person with custody simply acts as a fiduciary for the registrant. Neither speech nor expressive conduct is thus being regulated. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) (regulations concerning "the receipt and delivery of completed voter-registration applications" are "non-expressive activities"); *LWVFL v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (the "collection and handling of voter registration applications is not inherently expressive activity"); *see also Feldman v. Reagan*, 843 F.3d 366, 392 (9th Cir. 2016) (en banc) ("ballot collection" isn't "expressive conduct protected under the First Amendment").

The Supreme Court's decision in *Meyer* doesn't require a contrary result. *Meyer* concerned a state's attempt to bar proponents of initiative petitions from paying signature gatherers. 486 U.S. at 421. That prohibition violated the First Amendment because it "limit[ed] the number of voices" that could convey the proponents' "message," which "limit[ed] [the proponents'] ability to make" their petition "the focus of statewide discussion." *Id.* at 422-23. The prohibition, in turn, "reduc[ed] the total quantum of speech on a public issue." *Id.* at 423. Critically, the "petition itself [was] the protected speech," and the "circulation and submission of an initiative petition [was] closely intertwined with the underlying political ideas put forth by the petition." *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 897 n.13 (5th Cir. 2012).

But the petition process is very different that the voter-registration process. The "very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign." *Id.* In the voter-registration context, the

constitutionally protected activities—encouraging voting—doesn't "implicate a third-party's right to process the application." *Id.* That's because "[v]oter registration applications are individual, not associational, and may be successfully submitted without the aid of another." *Id.*

Nor does receiving and moving a completed application from Point A to Point B convert non-expressive conduct into protected speech or conduct. "One does not 'speak'" "by handling another person's 'speech'"—a completed application. *Steen*, 732 F.3d at 390. It also doesn't matter that speech occurred before the prohibited conduct. "While political organizations undoubtedly engage in protected activities," voter-registration "collection does not acquire First Amendment protection merely because it is carried out along with protected activities and speech." *Feldman*, 843 F.3d at 393.

Saying that collection and handling of completed applications communicates an organization's mission strains credulity as well. Imagine if an organization's goal was to *discourage* voting and voter registration. In that scenario, under Plaintiffs' theory, the First Amendment would be "used to protect that group's 'right' to successfully achieve its expressive goals of preventing others from voting by throwing the registration cards away." *Andrade*, 488 F. App'x at 897 n.12. That can't be.

**c.** The Non-U.S. Citizen Volunteer Restriction also runs the *Anderson-Burdick* gauntlet unscathed. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test assesses whether election-related regulations satisfy the requirements of the First and Fourteenth Amendments. If the regulations

impose a severe burden on the right to vote, then the regulations must withstand strict scrutiny. *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 450-51 (2008). If the burden is modest, then a reasonable, nondiscriminatory regulation need only be backed by an important governmental interest. *Id.* Post-hoc rationalizations can be enough. *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). Specific evidence to support governmental interest isn't needed, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009), because states can act "without waiting for" problems "to occur and be detected within its own borders." *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). States have a compelling interest in maintaining orderly election administration and in "avoiding confusion, deception, and even frustration of the democratic process." *Cowen v. Sec'y of Ga.*, 22 F.4th 1227, 1234 (11th Cir. 2022) (citations omitted). They also have a compelling interest in "ensuring that all voter registration[] applications are properly and timely submitted," in "holding third-party voter registration organizations accountable for the applications they collect," and in "preventing instances of fraud." *Browning*, 575 F. Supp. 2d at 1310, 1323 (noting that the Department "submitted approximately thirteen written complaints received in 2004 by the Division of Elections relating to persons who registered to vote with third-party organizations, following which, these persons unsuccessfully attempted to exercise their right to vote" and that "[a]t the time of voting, the complainants were advised they were not registered to vote because the forms they had filled out had never been turned in").

In this instance, the State has strong and compelling interests in safeguarding election integrity, preventing voter fraud, and promoting confidence in the election system as a whole. The Non-U.S. Citizen Volunteer Restriction safeguards election integrity and prevents voter fraud by prohibiting ineligible-to-vote non-citizens from collecting and handling voter registration applications. It also promotes voter confidence by reasonably ensuring that applicants' voter registration applications are not collected or handled by such persons. Prohibiting non-citizens from collecting or handling voter registration applications is the least restrictive means to achieve those interests. The State legitimately concluded that non-citizens should not be trusted with the responsibility of ensuring that voter registration applications are timely delivered to election officials. Though all legal non-citizens are welcome to Florida, they can't vote, serve on a jury, or hold public office. It makes sense to also exclude them from serving as fiduciaries for citizens seeking to register to vote.

In sum, the Non-U.S. Citizen Volunteer Restriction regulates non-expressive conduct. It's not a content-based restriction on protected speech. Plaintiffs can freely associate with non-citizens who wish to solicit voter registration. Plaintiffs can still benefit from whatever institutional knowledge their non-citizen volunteers possess. And the State isn't "plac[ing] any restrictions on" the "methods or means third-party voter registration organizations may use to *solicit* new voters and *distribute* registration applications." *Browning*, 575 F. Supp. 2d at 1322 (emphasis added). "Instead," the Non-U.S. Citizen Volunteer Restriction "simply regulates an administrative aspect of the

electoral process—the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants." *Id.* (emphasis added). The State has compelling interests in such regulations to safeguard the integrity of the elections and each registration application.

#### iv. The Non-U.S. Citizen Volunteer Restriction satisfies the Equal Protection Clause.

**a.** Plaintiffs are unlikely to succeed on the merits of their Equal Protection challenge against the Non-U.S. Citizen Volunteer Restriction. The Supreme Court has "never suggested that" restraints imposed by States on aliens are "inherently invalid, nor" has it "held that all limitations on aliens are suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Instead, the level of judicial scrutiny (and the evidence required to satisfy that scrutiny) depends on several considerations.

The category of alien matters. The Supreme Court has subjected restraints on resident aliens to strict scrutiny. *E.g.*, *Graham v. Richardson*, 403 U.S. 365, 376 (1971). Rational-basis review applies to other categories, such as nonimmigrant aliens or illegal aliens. *Estrada v. Becker*, 917 F.3d 1298, 1308-10 (11th Cir. 2019) (illegal aliens); *LeClerc v. Webb*, 419 F.3d 405, 418 (5th Cir. 2005) (nonimmigrant aliens). This is so because, unlike resident aliens, other aliens have temporary ties to the country and may be generally removable. *Estrada*, 917 F.3d at 13010; *LeClerc*, 419 F.3d 405 at 418.

But even when strict scrutiny applies, the Supreme Court has carved out an exception for restraints on positions or occupations that serve a "political function." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). The exception is a two-prong test.

*First*, courts must examine the tailoring of the restraint. A restraint "that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the" restraint "serves legitimate political ends." *Bernal v. Fainter*, 467 U.S. 216, 221-22 (1984) (citation omitted).

*Second*, the restraint must apply to positions whose "functions" "go to the heart of representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). For example, the Supreme Court stated that "persons holding state elective or important nonelective executive, legislative, and judicial positions," and those "officers who participate directly in the formulation, execution, or review of broad public policy," fall within this description. *Id.*; *see also Cabell*, 454 U.S. at 440 n.7 (stating that this "language is far reaching and no limits on it were suggested"). For this prong, what matters is whether the "actual *function*" of the position has "power of the sort that a self-governing community could properly entrust only to full-fledged members of that community." *Bernal*, 467 U.S. at 223-24 (emphasis in the original).

**b.** Florida's Non-U.S. Citizen Volunteer Restriction passes constitutional muster. Illegal aliens should not be in the country. They are subject to deportation at any time. Allowing these illegal aliens to collect and handle completed applications risks the applications never making it to an election official. Similar risks apply to those here

legally, but temporarily; someone on a student visa might leave shortly before the expiration of the visa and before ensuring that a voter registration application they collected gets to the relevant election official. Rational basis is thus satisfied.

For the resident aliens—those who reside in the United States and can work in the United States but remain citizens of another country—the political-function exception applies. *First*, the Non-U.S. Citizen Volunteer Restriction isn't overinclusive; "it applies narrowly to only one category of persons: those wishing to" collect and handle completed voter-registration applications. *Id.* at 223. And the provision isn't underinclusive; it ensures that only those with strong, "unequivocal legal bond[s]" to the community are *collecting* and *handling* completed voter-registration applications. *Ambach v. Norwick*, 441 U.S. 71, 75 (1979). Merely having access to "the same information on completed forms" is different from undergoing the fiduciary duty of handling and collecting completed applications. ECF No. 32 at 40.

*Second*, the proper collection and handling of completed voter-registration applications "go[es] to the heart of representative government." *Sugarman*, 413 U.S. at 647. To be sure, those who collect and handle completed applications aren't vested with discretion or engage in policy making. *Cabell*, 454 U.S. at 446-47; *Foley*, 435 U.S. at 296. But for members of the political community to receive a "ballot" or select "a legislator," *Foley*, 435 U.S. at 296, their voter-registration application must be collected and handled properly. The proper handling of this piece of paper by a citizen of the United States is thus "crucial to the continued good health of a democracy," *Ambach*, 441 U.S. at 79,

arguably more so than the exclusions for teachers and cops the Supreme Court has upheld. *See generally id.* at 68 (states can prohibit non-citizens from serving as teachers); *Foley*, 435 U.S. at 291 (states can prohibit non-citizens from serving as police officers). Citizens have the most direct stake in the results of the elections for which the forms are being collected.

**B.   Plaintiffs haven't shown irreparable harm.**

Irreparable harm must be "serious and *immediate*." *Siegel*, 234 F.3d at 1177 (emphasis in the original). Absent an injunction, harm must be "imminent." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). After all, "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (emphasis in the original).

There's no immediate or imminent harm to Plaintiffs in this case. That's because (1) the 2023 Law, by its very terms, delays enforcement of its 3PVRO provision against Plaintiffs until September 30, 2023, and (2) the Department of State is engaging in rulemaking that is likely to moot many of Plaintiffs' arguments. These two factors militate against granting their preliminary-injunction motion and militate in favor of (at the very least) deferring judgment until the rulemaking is completed.

**C. Plaintiffs fail to establish the remaining factors.**

The remaining preliminary-injunction factors weigh against granting a preliminary injunction. The public benefits from the State ensuring proper election administration. *Cowen*, 22 F.4th at 1234; *Browning*, 575 F. Supp. 2d at 1323.

The public is also served when the State enforces its laws. The State is harmed when it's prevented from doing so. *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (the State is "harmed" when it can't "apply its own laws"); *see also Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating" its laws, "it suffers a form of irreparable harm." (cleaned up)).

Because Plaintiffs haven't established a constitutional violation, haven't shown irreparable harm, and haven't shown that the extraordinary relief they request in the public interest, these factors tilt decidedly in the State's favor.

**CONCLUSION**

This Court should deny the motion for preliminary injunction. The kind of "extraordinary" and "drastic" relief that Plaintiffs seek is simply not warranted here. *McDonald's Corp.*, 147 F.3d at 1306. The State of Florida has made a measured decision to regulate its elections—a decision entrusted to it by the federal and state constitutions. Neither the law nor the facts provide a basis to preliminarily enjoin the Non-U.S. Citizen Volunteer Restriction.

Dated: June 23, 2023

Respectfully submitted,

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Joshua E. Pratt (FBN 119347)
jpratt@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

**LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to Local Rule 7.1(F), this motion and memorandum of law contains 7,197 words excluding the case style, signature block, and any certificate of service.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

# 4

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

HISPANIC FEDERATION, et al.,

*Plaintiffs*,

v. Case No. 4:23-cv-218-MW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

*Defendants*.
______________________________________/

# INDEX TO APPENDIX

| Tab | Title | Vol No. |
|---|---|---|
| A | Ch. 2023-120, Laws of Fla. (SB 7050) | 1 |
| B | Notice of Rule Development by the Department of State, Fla. Admin. Code R. 1S-2.042 (Third Party Voter Registration Organizations) | 1 |
| C | Draft Rule Language On-File with the Department of State, Fla. Admin. Code R. 1S-2.042 (Third Party Voter Registration Organizations) | 1 |
| D | Notice of Rule Development by the Department of State, Fla. Admin. Code R. 1S-2.055 (Vote-by-mail Requests) | 1 |

| | | |
|---|---|---|
| E | Draft Rule Language On-File with the Department of State, Fla. Admin. Code R. 1S-2.055 (Vote-by-mail Requests) | 1 |
| F | Declaration of Andrew Darlington | 1 |
| G | Attachment to Declaration of Andrew Darlington – January 15, 2023 Florida Department of State Office of Election Crimes and Security Report | 1 |
| H | Attachment to Declaration of Andrew Darlington – 2016 to 2023 3PVRO Complaints Received, 3PVRO Fine Letters Issued, and 3PVRO Referrals Made by the Department of State | 1-3 |
| I | Attachment to Declaration of Andrew Darlington – Press Release, News Articles, and Letter | 3 |

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

# TAB A

CHAPTER 2023-120

Committee Substitute for Senate Bill No. 7050

An act relating to elections; amending s. 97.012, F.S.; requiring the Secretary of State to provide mandatory formal signature matching training to specified persons; requiring the Department of State to adopt specified rules; amending s. 97.052, F.S.; conforming a provision to changes made by the act; amending s. 97.057, F.S.; conforming a cross-reference; amending s. 97.0575, F.S.; requiring that third-party voter registration organizations provide to the Division of Elections the general election cycle for which they are registering persons to vote, beginning on a certain date; requiring that third-party voter registration organizations provide to the division certain affirmations; providing that a third-party voter registration organization is liable for certain fines in certain circumstances; providing that the registration of such organizations expires at the conclusion of the organizations' lawful responsibilities following such election cycle, beginning on a certain date; requiring such organizations to provide applicants with a specified receipt; requiring the division to adopt by rule a uniform format for such receipt by a specified date; revising the timeframe within which such organizations must deliver applications to the division or a supervisor of elections; revising the fines for failure to submit applications to the division or the supervisor within the specified timeframe; prohibiting a person collecting applications on behalf of a third-party voter registration organization from copying specified information from the application for reasons other than complying with specified requirements; providing criminal penalties; prohibiting organizations from providing prefilled voter registration applications to applicants; providing civil penalties; providing for retroactive application; amending s. 97.071, F.S.; revising the contents of voter information cards; providing construction; providing applicability; amending s. 98.065, F.S.; revising the procedures a supervisor must incorporate as part of his or her list maintenance program; deleting a provision relating to the address to which certain voter registration mail must be addressed; revising requirements applicable to registration list maintenance programs; requiring a supervisor to conduct a certain review of voter registration records at least annually and take certain actions; amending s. 98.0655, F.S.; deleting a provision that requires an address confirmation request to include a certain statement; amending s. 98.075, F.S.; deleting the scheduled repeal of a public records exemption for certain voter registration information from another state or the District of Columbia; requiring the supervisor to remove the name of a registered voter from the statewide voter registration system within a specified timeframe if certain conditions exist; requiring the supervisor to coordinate with his or her respective clerk of the court to obtain information of those registered voters convicted of a felony who have not had their voting rights restored; requiring a supervisor to adhere to specified procedures before the removal of a registered voter from the statewide voter

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 5 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 181 of 248

registration system; providing construction; requiring the notice that the supervisor must provide to a potentially ineligible voter to include a specified statement; authorizing a supervisor to post a specified notice on the county's website or the supervisor's website; requiring the notice to contain specified statements; requiring the supervisor to make a final determination of the voter's eligibility within a specified timeframe and remove the name of a registered voter within a specified timeframe if the registered voter fails to respond or responds in a certain manner to certain notices; requiring the supervisor to review evidence and make a determination of eligibility within a specified timeframe in certain circumstances; requiring the supervisor to remove an ineligible voter within a specified timeframe and notify the voter that he or she has the right to appeal the determination of ineligibility; requiring the supervisor to schedule and issue notice of a hearing within a specified timeframe after receiving the voter's hearing request; requiring that the hearing be held within a specified timeframe; authorizing the voter to request an extension; conforming provisions to changes made by the act; amending s. 98.077, F.S.; deleting a reference to the department from a provision requiring correspondence to include certain information; requiring a supervisor to publish a specified notice in a newspaper, on the county's website, or on the supervisor's website; requiring that signature updates used to verify signatures on ballot certificates or petitions be received by the supervisor before the voter's ballot is received, his or her provisional ballot is cast, or the petition is submitted for signature verification; requiring the supervisor to use the signature on file at the time the vote-by-mail ballot is received, the provisional ballot is cast, or the petition is reviewed; providing an exception; amending s. 98.093, F.S.; requiring the Department of Health to weekly furnish a specified list to the Department of State; requiring clerks of the circuit court to weekly furnish specified information to the Department of State; requiring the clerks to provide certain information to the department for specified purposes; requiring the Department of Law Enforcement to identify and report specified persons to the Department of State at least weekly; requiring the Florida Commission on Offender Review to furnish data on clemency to the Department of State at least weekly; requiring the Department of Corrections to identify persons convicted of a felony and committed to its custody, and to provide such information to the Department of State, at least weekly; requiring the Department of Highway Safety and Motor Vehicles to weekly furnish specified information to the Department of State; revising construction; making technical changes; amending s. 98.0981, F.S.; requiring supervisors to submit specified reports to the department within a specified timeframe; requiring supervisors to prepare a reconciliation report and submit such report to the department; providing requirements for, and the required format of, the report; revising the requirement that supervisors transmit to the department, in a specified format, the completely updated voting history information for each qualified voter who voted; defining the term "unique precinct identifier"; requiring supervisors to submit a specified geographical information system map to the department; requiring the department

App. 0005

to submit an election summary report containing certain information to the Legislature following the certification by the Elections Canvassing Commission of specified elections; deleting certain file specifications; revising the timeframe for a supervisor to collect and submit to the department precinct-level election results after certification by the commission of specified elections; revising the procedures for compiling such results; requiring the supervisor to research and address questions or issues identified by the department in such results; requiring the supervisor to provide amended precinct-level election results to the department within a specified timeframe, if certain conditions exist; requiring the department to publish such results online within a specified timeframe; specifying requirements for the website; requiring certain files to be created in accordance with, and providing requirements for, a certain rule; defining the term "unique precinct identifier"; providing the timeframe within which the department must compile and make available certain precinct-level statistical data; requiring the department to adopt specified rules; amending s. 99.012, F.S.; defining the term "qualify" for purposes of restrictions on individuals qualifying for public office; revising applicability; providing construction; amending s. 99.021, F.S.; revising the form of the candidate oath to require that candidates acknowledge certain outstanding fines, fees, or penalties relating to ethics or campaign finance violations; creating s. 99.0215, F.S.; requiring a candidate to designate in the candidate's oath the name he or she wishes to have printed on the ballot, subject to specified conditions; requiring a candidate to file a specified affidavit simultaneously with the oath if the candidate wishes to use a nickname, which is subject to certain conditions; defining the term "political slogan"; prohibiting the use of a professional title or degree except in specified circumstances; amending s. 99.097, F.S.; requiring the person or organization that submits signatures for a local or statewide issue to pay the supervisor in advance for checking the signatures; making technical changes; amending s. 100.021, F.S.; providing alternative methods for providing notice of a general election; amending s. 100.141, F.S.; revising the methods by which a supervisor may publish notice of a special election; amending s. 100.342, F.S.; specifying that the notice for a special election or referendum may be published on the county's website, the municipality's website, or the supervisor's website, as applicable; amending s. 101.001, F.S.; revising requirements for specified maps maintained by supervisors of elections; authorizing supervisors of elections to coordinate with other governmental entities for a certain purpose; deleting a provision requiring supervisors to provide the department certain data on precincts in the county; deleting a provision requiring the department to maintain a certain database; requiring supervisors of elections to include changes in the name of a precinct in a certain document; amending s. 101.048, F.S.; providing that specified persons are entitled to vote a provisional ballot; amending s. 101.151, F.S.; requiring the word "incumbent" to appear next to a candidate's name on an election ballot under specified conditions; amending s. 101.5612, F.S.; revising the methods by which certain notice may be provided; amending s. 101.6103, F.S.; conforming a cross-

reference; making technical changes; amending s. 101.62, F.S.; specifying that a supervisor must accept requests for vote-by-mail ballots only from specified persons; providing that a request may be made through a supervisor's website; requiring the department to adopt by rule a uniform statewide application for a written request for a vote-by-mail ballot by a specified date; requiring a supervisor to cancel a request for a vote-by-mail ballot if certain mail sent by the supervisor to the voter is returned to the supervisor as undeliverable; requiring a voter who subsequently requests a vote-by-mail ballot to provide or confirm his or her current residential address; requiring the supervisor to add certain information to the voter's registration record if such information is provided in the vote-by-mail request; revising the definition of the term "immediate family"; deleting a provision requiring vote-by-mail ballot requests to be received by a specified time before the supervisor mails a vote-by-mail ballot; revising the day after which a supervisor may not mail a vote-by-mail ballot; providing the deadline for submitting a vote-by-mail ballot request; revising the means by which and the period during which a supervisor must provide a vote-by-mail ballot to a voter; prohibiting a supervisor from personally delivering a vote-by-mail ballot to certain voters or delivering a vote-by-mail ballot to certain voters' designees during a certain period unless certain conditions exist; making technical changes; amending s. 101.67, F.S.; requiring the supervisor to segregate and treat certain ballots as provisional; amending s. 101.68, F.S.; prohibiting vote-by-mail ballots from being counted if two or more ballots arrive in one mailing envelope; making technical changes; amending s. 101.6923, F.S.; requiring that a specified statement be included in a vote-by-mail ballot provided to certain voters; making technical changes; amending s. 101.6925, F.S.; revising the deadline for a voter to make specified information available to the supervisor before a vote-by-mail ballot may be canvassed; amending s. 101.694, F.S.; conforming a cross-reference; amending s. 101.71, F.S.; revising the methods by which certain notice may be provided; requiring certain public, tax-supported buildings to be made available for use as early voting locations upon the request of the supervisor; amending s. 101.733, F.S.; revising the methods by which certain notice may be provided; amending s. 102.111, F.S.; revising the time at which the Elections Canvassing Commission shall meet to certify returns; amending s. 102.112, F.S.; revising the timeframe in which county returns must be filed with the department; amending s. 102.141, F.S.; requiring a certain number of alternate canvassing board members; revising the methods by which certain notice may be provided; requiring the supervisor to file a report with the Division of Elections within a specified timeframe; revising the requirements for the report; requiring the division to review the report and offer specified training to supervisors based on the report; requiring the department to submit an analysis of specified reports to the Governor and the Legislature by a specified date; amending s. 103.021, F.S.; revising the timeframe within which a political party executive committee must submit its presidential electors to the Governor for nomination; requiring the state executive committee of each party to submit specified information; requiring that electors be qualified registered voters and members of

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 8 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 184 of 248

the political party for which they are named as electors; specifying that a required oath be made in writing; revising the timeframe within which the Governor must certify the electors to the department; revising the timeframe within which a minor political party must submit its list of presidential electors to the department; requiring presidential electors to file with the Governor a certain written oath; providing that certain acts constitute a resignation of the position of presidential elector; amending s. 103.022, F.S.; requiring certain write-in candidates to submit specified information; amending s. 103.091, F.S.; authorizing a qualifying office to accept and hold qualifying papers for candidates for political party offices within a specified timeframe before the qualifying period; amending s. 104.16, F.S.; providing applicability; amending s. 104.18, F.S.; providing that a prosecution for voting more than one ballot may proceed in any jurisdiction in which a ballot was willfully cast; providing that it is not necessary to prove which ballot was cast first; defining the term “votes more than one ballot at any election”; amending s. 104.42, F.S.; authorizing a supervisor to report certain findings to the Office of Election Crimes and Security rather than the Florida Elections Commission; amending s. 105.031, F.S.; revising the form of the candidate’s oath to require that candidates for judicial office acknowledge certain outstanding fines, fees, or penalties relating to ethics or campaign finance violations; amending s. 106.03, F.S.; requiring the division to adopt specified rules; amending s. 106.07, F.S.; revising reporting intervals for candidates and political committees from monthly to quarterly; preempting local governments from establishing reporting schedules that differ from certain requirements; conforming a cross-reference; amending s. 106.0702, F.S.; conforming a cross-reference; amending s. 106.0703, F.S.; revising reporting intervals for electioneering communications organizations from monthly to quarterly; conforming a cross-reference; amending s. 106.08, F.S.; adding text messages to the items that do not constitute contributions to be counted toward certain contribution limits; creating s. 106.1436, F.S.; defining the term “voter guide”; prohibiting a person from representing that a voter guide is an official publication of a political party; providing an exception; providing disclosure requirements for such voter guides; providing criminal penalties and fines; amending s. 106.265, F.S.; increasing the maximum civil fines that may be imposed for specified violations; providing that fines assessed against a political committee also attach jointly and severally to the chair of the political committee under specified conditions; amending s. 322.142, F.S.; authorizing the Department of Highway Safety and Motor Vehicles to provide certain reproductions to a supervisor of elections; providing effective dates.

Be It Enacted by the Legislature of the State of Florida:

Section 1. Subsection (17) of section 97.012, Florida Statutes, is amended to read:

App. 0006

97.012 Secretary of State as chief election officer.—The Secretary of State is the chief election officer of the state, and it is his or her responsibility to:

(17) Provide mandatory formal signature matching training to supervisors of elections and county canvassing board members. Any person whose duties require verification of signatures must undergo signature matching training. The department shall adopt rules governing signature matching procedures and training.

Section 2. Paragraph (g) of subsection (3) of section 97.052, Florida Statutes, is amended to read:

97.052 Uniform statewide voter registration application.—

(3) The uniform statewide voter registration application must also contain:

(g) A statement informing the applicant that if the application is being collected by a third-party voter registration organization, the organization might not deliver the application to the division or the supervisor in the county in which the applicant resides in less than 10 ~~14~~ days or before registration closes for the next ensuing election, and that the applicant may instead elect to deliver the application in person or by mail or choose to register online. The statement must further inform the applicant how to determine whether the application has been delivered.

Section 3. Subsection (13) of section 97.057, Florida Statutes, is amended to read:

97.057 Voter registration by the Department of Highway Safety and Motor Vehicles.—

(13) The Department of Highway Safety and Motor Vehicles must assist the Department of State in regularly identifying changes in residence address on the driver license or identification card of a voter. The Department of State must report each such change to the appropriate supervisor of elections who must change the voter's registration records in accordance with s. 98.065(4) ~~s. 98.065(5)~~.

Section 4. Section 97.0575, Florida Statutes, is amended to read:

97.0575 Third-party voter registration organizations ~~registrations~~.—

(1) Before engaging in any voter registration activities, a third-party voter registration organization must register and provide to the division, in an electronic format, the following information:

(a) The names of the officers of the organization and the name and permanent address of the organization.

(b) The name and address of the organization's registered agent in the state.

(c) The names, permanent addresses, and temporary addresses, if any, of each registration agent registering persons to vote in this state on behalf of the organization. This paragraph does not apply to persons who only solicit applications and do not collect or handle voter registration applications.

(d) Beginning November 6, 2024, the specific general election cycle for which the third-party voter registration organization is registering persons to vote.

(e) An affirmation that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization has not been convicted of a felony violation of the Election Code, a felony violation of an offense specified in s. 825.103, a felony offense specified in s. 98.0751(2)(b) or (c), or a felony offense specified in chapter 817, chapter 831, or chapter 837. A third-party voter registration organization is liable for a fine in the amount of $50,000 for each such person who has been convicted of a felony violation of the Election Code, a felony violation of an offense specified in s. 825.103, a felony offense specified in s. 98.0751(2)(b) or (c), or a felony offense specified in chapter 817, chapter 831, or chapter 837 who is collecting or handling voter registration applications on behalf of the third-party voter registration organization.

(f) An affirmation that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of America. A third-party voter registration organization is liable for a fine in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter registration applications on behalf of the third-party voter registration organization.

(2) Beginning November 6, 2024, the registration of a third-party voter registration organization automatically expires at the conclusion of the specific general election cycle for which the third-party voter registration organization is registered.

(3)~~(2)~~ The division or the supervisor of elections shall make voter registration forms available to third-party voter registration organizations. All such forms must contain information identifying the organization to which the forms are provided. The division shall maintain a database of all third-party voter registration organizations and the voter registration forms assigned to the third-party voter registration organization. Each supervisor of elections shall provide to the division information on voter registration forms assigned to and received from third-party voter registration organizations. The information must be provided in a format and at times as required by the division by rule. The division shall ~~must~~ update information on third-party voter registrations daily and make the information publicly available.

(4) A third-party voter registration organization that collects voter registration applications shall provide a receipt to an applicant upon accepting possession of his or her application. The division shall adopt by rule a uniform format for the receipt by October 1, 2023. The format must include, but need not be limited to, the name of the applicant, the date the application is received, the name of the third-party voter registration organization, the name of the registration agent, the applicant's political party affiliation, and the county in which the applicant resides.

(5)(a)~~(3)(a)~~ A third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant and shall ensure~~, ensuring~~ that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender, is ~~must be~~ promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 10 ~~14~~ days after the application is ~~was~~ completed by the applicant, but not after registration closes for the next ensuing election. If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections in the county in which the applicant resides, the third-party voter registration organization is liable for the following fines:

1. A fine in the amount of $50 per each day late, up to $2,500, for each application received by the division or the supervisor of elections in the county in which the applicant resides more than 10 ~~14~~ days after the applicant delivered the completed voter registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf. A fine in the amount of $2,500 ~~$250~~ for each application received if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

2. A fine in the amount of $100 per each day late, up to $5,000, for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, before book closing for any given election for federal or state office and received by the division or the supervisor of elections in the county in which the applicant resides after the book-closing deadline for such election. A fine in the amount of $5,000 ~~$500~~ for each application received if the third-party voter registration organization or any person, entity, or agency acting on its behalf acted willfully.

3. A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections in the county in which the applicant resides. A fine in the amount of $5,000 ~~$1,000~~ for any application not submitted if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

The aggregate fine which may be assessed pursuant to this paragraph ~~which may be assessed~~ against a third-party voter registration organization,

including affiliate organizations, for violations committed in a calendar year is $250,000 ~~$50,000~~.

(b) A showing by the third-party voter registration organization that the failure to deliver the voter registration application within the required timeframe is based upon force majeure or impossibility of performance shall be an affirmative defense to a violation of this subsection. The secretary may waive the fines described in this subsection upon a showing that the failure to deliver the voter registration application promptly is based upon force majeure or impossibility of performance.

(6)~~(4)~~ If a person collecting voter registration applications on behalf of a third-party voter registration organization alters the voter registration application of any other person, without the other person's knowledge and consent, in violation of s. 104.012(4) and is subsequently convicted of such offense, the applicable third-party voter registration organization is liable for a fine in the amount of $5,000 ~~$1,000~~ for each application altered.

(7) If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(8)~~(5)~~ If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order.

(9)~~(6)~~ The division shall adopt by rule a form to elicit specific information concerning the facts and circumstances from a person who claims to have been registered to vote by a third-party voter registration organization but who does not appear as an active voter on the voter registration rolls. The division shall also adopt rules to ensure the integrity of the registration process, including controls to ensure that all completed forms are promptly delivered to the division or a supervisor in the county in which the applicant resides.

(10)~~(7)~~ The date on which an applicant signs a voter registration application is presumed to be the date on which the third-party voter registration organization received or collected the voter registration application.

(11) A third-party voter registration organization may not mail or otherwise provide a voter registration application upon which any

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 13 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 189 of 248

information about an applicant has been filled in before it is provided to the applicant. A third-party voter registration organization that violates this section is liable for a fine in the amount of $50 for each such application.

(12)~~(8)~~ The requirements of this section are retroactive for any third-party voter registration organization registered with the department as of July 1, 2023 ~~on the effective date of this act~~, and must be complied with within 90 days after the department provides notice to the third-party voter registration organization of the requirements contained in this section. Failure of the third-party voter registration organization to comply with the requirements within 90 days after receipt of the notice shall automatically result in the cancellation of the third-party voter registration organization's registration.

Section 5. Subsections (1) and (3) of section 97.071, Florida Statutes, are amended to read:

97.071 Voter information card.—

(1) A voter information card must ~~shall~~ be furnished by the supervisor to all registered voters residing in the supervisor's county. The card must contain:

(a) Voter's registration number.

(b) Date of registration.

(c) Full name.

(d) Party affiliation.

(e) Date of birth.

(f) Address of legal residence.

(g) Precinct number.

(h) Polling place address and a link to the supervisor's website to provide the most current polling place locations.

(i) Name of supervisor and contact information of supervisor.

(j) The following statement: "This card is for information purposes only. This card is proof of registration but is not legal verification of eligibility to vote. It is the responsibility of a voter to keep his or her eligibility status current. A voter may confirm his or her eligibility to vote with the Department of State."

(k)~~(j)~~ Other information deemed necessary by the supervisor.

(3) In the case of a change of name, address of legal residence, polling place address, or party affiliation, the supervisor shall issue the voter a new

App. 0011

voter information card. A temporary change made to a polling location pursuant to ss. 101.71 and 101.74 does not require the issuance of a new voter information card.

Section 6. The amendments made to s. 97.071, Florida Statutes, by this act, only apply to new and replacement voter information cards issued on or after July 1, 2023.

Section 7. Subsections (2), (3), and (4), paragraph (c) of subsection (5), and paragraph (a) of subsection (7) of section 98.065, Florida Statutes, are amended, and a new subsection (6) is added to that section, to read:

98.065 Registration list maintenance programs.—

(2) A supervisor must incorporate one or more of the following procedures in the supervisor's annual registration list maintenance program under which the supervisor shall:

(a) Use change-of-address information supplied by the United States Postal Service through its licensees to identify registered voters whose addresses might have changed. Additionally, in odd-numbered years, unless the supervisor is conducting the procedure specified in paragraph (b), the supervisor must identify change-of-address information from address confirmation final notices ~~returned nonforwardable return-if-undeliverable address confirmation requests~~ mailed to all registered voters who have not voted in the preceding two general elections or any intervening election and who have not made a request that their registration records be updated during that time; or

(b) Identify change-of-address information from returned nonforwardable return-if-undeliverable address confirmation requests ~~mail~~ sent to all registered voters in the county.

~~(3) Address confirmation requests sent pursuant to paragraph (2)(a) and mail sent pursuant to paragraph (b) must be addressed to the voter's address of legal residence, not including voters temporarily residing outside the county and registered in the precinct designated by the supervisor pursuant to s. 101.045(1). If a request is returned as undeliverable, any other notification sent to the voter pursuant to subsection (5) or s. 98.0655 must be addressed to the voter's mailing address on file, if any.~~

(3)~~(4)~~ A registration list maintenance program must be conducted by each supervisor, at a minimum, once each year, beginning no later than April 1, and must be completed at least ~~not later than~~ 90 days before the date of any federal election. All list maintenance actions associated with each voter must be entered, tracked, recorded, and maintained in the statewide voter registration system.

(4)~~(5)~~

App. 0012

(c) If an address confirmation request required by paragraph (2)(b) ~~(2)(a)~~ is returned as undeliverable without indication of an address change, ~~or there is no response from the voter within 30 days,~~ or if any other nonforwardable return-if-undeliverable mail is returned as undeliverable with no indication of an address change, the supervisor must ~~shall~~ send an address confirmation final notice to ~~all addresses on file for~~ the voter.

(6) The supervisor shall, at a minimum, conduct an annual review of voter registration records to identify registration records in which a voter is registered at an address that may not be an address of legal residence for the voter. For those registration records with such addresses that the supervisor has reasonable belief are not legal residential addresses, the supervisor shall initiate list maintenance activities pursuant to s. 98.075(6) and (7).

(7)(a) No later than July 31 and January 31 of each year, the supervisor must certify to the department the address list maintenance activities conducted during the first 6 months and the second 6 months of the year, respectively, including the number of address confirmation requests sent, the number of voters designated as inactive, and the number of voters removed from the statewide voter registration system.

Section 8. Paragraph (c) of subsection (1) of section 98.0655, Florida Statutes, is amended to read:

98.0655 Registration list maintenance forms.—The department shall prescribe registration list maintenance forms to be used by the supervisors which must include:

(1) An address confirmation request that must contain:

~~(c) If the address confirmation request is required by s. 98.065(2)(a), a statement that if the voter has not changed his or her legal residence or has changed his or her legal residence within the state, the voter should return the form within 30 days after the date on which the notice was sent to the voter;~~ and

Section 9. Paragraph (c) of subsection (2) and subsections (3) through (8) of section 98.075, Florida Statutes, are amended to read:

98.075 Registration records maintenance activities; ineligibility determinations.—

(2) DUPLICATE REGISTRATION.—

(c) Information received by the department from another state or the District of Columbia upon the department becoming a member of a nongovernmental entity as provided in subparagraph (b)1., which is confidential or exempt pursuant to the laws of that state or the District of Columbia, is exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. The department shall provide such information to the supervisors to conduct registration list maintenance activities. ~~This paragraph is~~

~~subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2023, unless reviewed and saved from repeal through reenactment by the Legislature.~~

(3) DECEASED PERSONS.—

(a)1. The department shall identify those registered voters who are deceased by comparing information received from:

a. The Department of Health as provided in s. 98.093;

b. The United States Social Security Administration, including, but not limited to, any master death file or index compiled by the United States Social Security Administration; and

c. The Department of Highway Safety and Motor Vehicles.

2. Within 7 days after receipt of such information through the statewide voter registration system, the supervisor shall remove the name of the registered voter.

(b) The supervisor shall remove the name of a deceased registered voter from the statewide voter registration system within 7 days after ~~upon~~ receipt of a copy of a death certificate issued by a governmental agency authorized to issue death certificates.

(4) ADJUDICATION OF MENTAL INCAPACITY.—The department shall identify those registered voters who have been adjudicated mentally incapacitated with respect to voting and who have not had their voting rights restored by comparing information received from the clerk of the circuit court as provided in s. 98.093. The department shall review such information and make an initial determination as to whether the information is credible and reliable. If the department determines that the information is credible and reliable, the department must ~~shall~~ notify the supervisor and provide a copy of the supporting documentation indicating the potential ineligibility of the voter to be registered. Upon receipt of the notice that the department has made a determination of initial credibility and reliability, the supervisor shall adhere to the procedures set forth in subsection (7) before ~~prior to~~ the removal of a registered voter from the statewide voter registration system.

(5) FELONY CONVICTION.—

(a) The department shall identify those registered voters who have been convicted of a felony and whose voting rights have not been restored by comparing information received from, but not limited to, a clerk of the circuit court, the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, or a United States Attorney's Office, as provided in s. 98.093. The department shall review such information and make an initial determination as to whether the information is credible and reliable. If the department determines that the information is credible and reliable, the department must ~~shall~~ notify the supervisor and provide a copy

of the supporting documentation indicating the potential ineligibility of the voter to be registered. Upon receipt of the notice that the department has made a determination of initial credibility and reliability, the supervisor shall adhere to the procedures set forth in subsection (7) before ~~prior to~~ the removal of a registered voter's name from the statewide voter registration system.

(b) The supervisors shall coordinate with their respective clerks of the court to obtain information pursuant to s. 98.093 to identify registered voters within their respective jurisdictions who have been convicted of a felony during the preceding week and whose voting rights have not been restored. The supervisor shall adhere to the procedures set forth in subsection (7) before the removal of a registered voter's name from the statewide voter registration system. For purposes of this paragraph, a supervisor's duties under subsection (7) begin upon his or her determination that the information received from the clerk is credible and reliable.

(6) OTHER BASES FOR INELIGIBILITY.—Subsections (2)-(5) do not limit or restrict the department or the supervisor in his or her duty to act upon direct receipt of, access to, or knowledge of information from any governmental entity that identifies a registered voter as potentially ineligible. If the department or supervisor receives information from any governmental entity ~~sources~~ other than those identified in subsections (2)-(5) that a registered voter is ineligible because the voter ~~he or she~~ is deceased, adjudicated a convicted felon without having had his or her voting rights restored, adjudicated mentally incapacitated without having had his or her voting rights restored, does not meet the age requirement pursuant to s. 97.041, is not a United States citizen, is a fictitious person, or has listed an address ~~a residence~~ that is not his or her address of legal residence, the supervisor must adhere to the procedures set forth in subsection (7) before ~~prior to~~ the removal of the name of a registered voter who is determined to be ineligible ~~a registered voter's name~~ from the statewide voter registration system.

(7) PROCEDURES FOR REMOVAL.—

(a) If the supervisor receives notice or information pursuant to subsections (4)-(6), the supervisor of the county in which the voter is registered must ~~shall~~:

1. Notify the registered voter of his or her potential ineligibility by mail within 7 days after receipt of notice or information. The notice must ~~shall~~ include:

a. A statement of the basis for the registered voter's potential ineligibility and a copy of any documentation upon which the potential ineligibility is based. Such documentation must include any conviction from another jurisdiction determined to be a similar offense to murder or a felony sexual offense, as those terms are defined in s. 98.0751.

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 18 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 194 of 248

b. A statement that failure to respond within 30 days after receipt of the notice may result in a determination of ineligibility and in removal of the registered voter's name from the statewide voter registration system.

c. A return form that requires the registered voter to admit or deny the accuracy of the information underlying the potential ineligibility for purposes of a final determination by the supervisor.

d. A statement that, if the voter is denying the accuracy of the information underlying the potential ineligibility, the voter has a right to request a hearing for the purpose of determining eligibility.

e. Instructions for the registered voter to contact the supervisor of elections of the county in which the voter is registered if assistance is needed in resolving the matter.

f. Instructions for seeking restoration of civil rights pursuant to s. 8, Art. IV of the State Constitution and information explaining voting rights restoration pursuant to s. 4, Art. VI of the State Constitution following a felony conviction, if applicable.

<u>g. The following statement: "If you attempt to vote at an early voting site or your normal election day polling place, you will be required to vote a provisional ballot. If you vote by mail, your ballot will be treated as a provisional ballot. In either case, your ballot may not be counted until a final determination of eligibility is made. If you wish for your ballot to be counted, you must contact the supervisor of elections office within 2 days after the election and present evidence that you are eligible to vote."</u>

2. If the mailed notice is returned as undeliverable, the supervisor <u>must, within 14 days after receiving the returned notice, either publish</u> ~~shall publish~~ notice once in a newspaper of general circulation in the county in which the voter was last registered <u>or publish notice on the county's website as provided in s. 50.0311 or on the supervisor's website, as deemed appropriate by the supervisor</u>. The notice <u>must</u> ~~shall~~ contain the following:

a. The voter's name and address.

b. A statement that the voter is potentially ineligible to be registered to vote.

c. A statement that failure to respond within 30 days after the notice is published may result in a determination of ineligibility by the supervisor and removal of the registered voter's name from the statewide voter registration system.

d. An instruction for the voter to contact the supervisor no later than 30 days after the date of the published notice to receive information regarding the basis for the potential ineligibility and the procedure to resolve the matter.

App. 0016

e. An instruction to the voter that, if further assistance is needed, the voter should contact the supervisor of elections of the county in which the voter is registered.

f. A statement that, if the voter denies the accuracy of the information underlying the potential ineligibility, the voter has a right to request a hearing for the purpose of determining eligibility.

g. The following statement: "If you attempt to vote at an early voting site or your normal election day polling place, you will be required to vote a provisional ballot. If you vote by mail, your ballot will be treated as a provisional ballot. In either case, your ballot may not be counted until a final determination of eligibility is made. If you wish for your ballot to be counted, you must contact the supervisor of elections office within 2 days after the election and present evidence that you are eligible to vote."

3. If a registered voter fails to respond to a notice pursuant to subparagraph 1. or subparagraph 2., the supervisor must ~~shall~~ make a final determination of the voter's eligibility within 7 days after expiration of the voter's timeframe to respond. If the supervisor determines that the voter is ineligible, the supervisor must ~~shall~~ remove the name of the registered voter from the statewide voter registration system within 7 days. The supervisor shall notify the registered voter of the supervisor's determination and action.

4. If a registered voter responds to the notice pursuant to subparagraph 1. or subparagraph 2. and admits the accuracy of the information underlying the potential ineligibility, the supervisor must, as soon as practicable, ~~shall~~ make a final determination of ineligibility and ~~shall~~ remove the voter's name from the statewide voter registration system. The supervisor shall notify the registered voter of the supervisor's determination and action.

5. If a registered voter responds to the notice issued pursuant to subparagraph 1. or subparagraph 2. and denies the accuracy of the information underlying the potential ineligibility but does not request a hearing, the supervisor must ~~shall~~ review the evidence and make a ~~final~~ determination of eligibility no later than 30 days after receiving the response from the voter. If the supervisor determines that the registered voter is ineligible, the supervisor must remove the voter's name from the statewide voter registration system upon such determination and notify the registered voter of the supervisor's determination and action and that the removed voter has a right to appeal a determination of ineligibility pursuant to s. 98.0755. If such registered voter requests a hearing, the supervisor must ~~shall~~ send notice to the registered voter to attend a hearing at a time and place specified in the notice. The supervisor shall schedule and issue notice for the hearing within 7 days after receiving the voter's request for a hearing and shall hold the hearing no later than 30 days after issuing the notice of the hearing. A voter may request an extension upon showing good cause by submitting an affidavit to the supervisor as to why he or she is unable to attend the scheduled hearing. Upon hearing all evidence presented at the

hearing, the supervisor shall make a determination of eligibility within 7 days. If the supervisor determines that the registered voter is ineligible, the supervisor must shall remove the voter's name from the statewide voter registration system and notify the registered voter of the supervisor's determination and action and that the removed voter has a right to appeal a determination of ineligibility pursuant to s. 98.0755.

(b) The following shall apply to this subsection:

1. All determinations of eligibility must shall be based on a preponderance of the evidence.

2. All proceedings are exempt from the provisions of chapter 120.

3. Any notice must shall be sent to the registered voter by certified mail, return receipt requested, or other means that provides a verification of receipt or must shall be published in a newspaper of general circulation where the voter was last registered, on the county's website as provided in s. 50.0311, or on the supervisor's website, whichever is applicable.

4. The supervisor shall remove the name of any registered voter from the statewide voter registration system only after the supervisor makes a final determination that the voter is ineligible to vote.

5. Any voter whose name has been removed from the statewide voter registration system pursuant to a determination of ineligibility may appeal that determination under the provisions of s. 98.0755.

6. Any voter whose name was removed from the statewide voter registration system on the basis of a determination of ineligibility who subsequently becomes eligible to vote must reregister in order to have his or her name restored to the statewide voter registration system.

(8) CERTIFICATION.—

(a) No later than July 31 and January 31 of each year, the supervisor shall certify to the department that the supervisor has the activities conducted the activities required pursuant to this section during the first 6 months and the second 6 months of the year, respectively. The certification must shall include the number of persons to whom notices were sent pursuant to subsection (7), the number of persons who responded to the notices, the number of notices returned as undeliverable, the number of notices published in the newspaper, on the county's website, or on the supervisor's website, the number of hearings conducted, and the number of persons removed from the statewide voter registration system systems and the reasons for such removals.

(b) If, based on the certification provided pursuant to paragraph (a), the department determines that a supervisor has not satisfied the requirements of this section, the department shall satisfy the appropriate requirements for

that county. Failure to satisfy the requirements of this section constitutes ~~shall constitute~~ a violation of s. 104.051.

Section 10. Subsections (2), (3), and (4) of section 98.077, Florida Statutes, are amended to read:

98.077 Update of voter signature.—

(2) The ~~department and~~ supervisors of elections shall include in any correspondence, other than postcard notifications and notices relating to eligibility, sent to a registered voter information regarding when, where, and how to update the voter's signature and shall provide the voter information on how to obtain a voter registration application from a voter registration official which can be returned to update the signature.

(3) At least once during each general election year before the presidential preference primary or the primary election, whichever occurs first, the supervisor shall publish in a newspaper of general circulation or other newspaper in the county, on the county's website as provided in s. 50.0311, or on the supervisor's website, as deemed appropriate by the supervisor, a notice specifying when, where, or how a voter can update his or her signature that is on file and how a voter can obtain a voter registration application from a voter registration official.

(4) Except as authorized in ss. 101.048 and 101.68:

(a) All signature updates for use in verifying vote-by-mail voter certificates, ~~and~~ provisional ballot voter certificates, or petitions ~~ballots~~ must be received by the appropriate supervisor before the voter's ~~elector's~~ ballot is received by the supervisor or, in the case of provisional ballots, before the voter's ~~elector's~~ ballot is cast or, in the case of a petition, before the petition is submitted for signature verification.

(b) The signature on file at the time the vote-by-mail ballot is received, ~~or~~ at the time the provisional ballot is cast, or at the time a petition is reviewed is the signature that must ~~shall~~ be used in verifying the signature on the vote-by-mail voter certificates, ~~and~~ provisional ballot voter certificates, or petitions, respectively. For signatures requiring secondary or tertiary review, older signatures from previous registration updates may be used.

Section 11. Section 98.093, Florida Statutes, is amended to read:

98.093 Duty of officials to furnish information relating to deceased persons, persons adjudicated mentally incapacitated, persons convicted of a felony, and persons who are not United States citizens.—

(1) DUTIES.—In order to identify ineligible registered voters and maintain accurate and current voter registration records in the statewide voter registration system pursuant to procedures in s. 98.065 or s. 98.075, it is necessary for the department and supervisors of elections to receive or

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

access certain information from state and federal officials and entities in the format prescribed.

~~(2)~~ To the maximum extent feasible, state and local government agencies shall facilitate provision of information and access to data to the department, including, but not limited to, databases that contain reliable criminal records and records of deceased persons. State and local government agencies that provide such data must ~~shall~~ do so without charge if the direct cost incurred by those agencies is not significant.

(2)~~(a)~~ DEPARTMENT OF HEALTH.—The Department of Health shall furnish weekly ~~monthly~~ to the department a list containing the name, address, date of birth, date of death, social security number, race, and sex of each deceased person 17 years of age or older whose death was reported during the preceding week.

(3)~~(b)~~ CLERK OF THE CIRCUIT COURT.—Each clerk of the circuit court shall furnish weekly to the department and to the supervisors in their respective jurisdictions the following information ~~monthly to the department~~:

(a)~~1.~~ Information identifying ~~A list of~~ those persons who have been adjudicated mentally incapacitated with respect to voting during the preceding week and ~~calendar month, a list of~~ those persons whose mental capacity with respect to voting has been restored during the preceding week. The information must include each person's name; address; date of birth; race; sex; and, if available, his or her Florida driver license number or Florida identification card number or the last four digits of his or her social security number. The clerk shall provide the information to the department to assist a supervisor in identifying registered voters in his or her county who are adjudicated mentally incapacitated outside of his or her county pursuant to s. 98.075(4).

(b) Information identifying ~~calendar month, and a list of~~ those persons who have responded to ~~returned signed~~ jury notices during the preceding week from ~~months to~~ the clerk of the circuit court and whose response indicated ~~indicating~~ a change of address. The information must ~~Each list shall~~ include each person's ~~the~~ name;~~,~~ address;~~,~~ date of birth;~~,~~ race;~~,~~ sex;~~,~~ and, if ~~whichever is~~ available, the Florida driver license number or~~,~~ Florida identification card number~~,~~ or the last four digits of his or her social security number ~~of each such person~~.

(c)~~2.~~ Information on the terms of sentence for felony convictions, including any financial obligations for court costs, fees, and fines, of all persons listed in the clerk's records whose last known address in the clerk's records is within this state and who have been convicted of a felony during the preceding week ~~month~~. The information may be provided to the supervisor directly by the clerk ~~individual clerks~~ of the circuit court or may be provided on the clerk's ~~their~~ behalf through the Comprehensive Case Information System. The clerk shall provide the information to the

department to assist a supervisor in identifying registered voters in his or her county who are adjudicated of a felony outside of his or her county. For each felony conviction reported, the information must include:

1.~~a.~~ The full name;~~,~~ last known address;~~,~~ date of birth;~~,~~ race;~~,~~ sex;~~,~~ and, if available, the Florida driver license number or Florida identification card number, as applicable;~~,~~ and the last four digits of the social security number of the person convicted.

2.~~b.~~ The amounts of all financial obligations, including restitution and court costs, fees, and fines, and, if known, the amount of financial obligations not yet satisfied.

3.~~c.~~ The county in which the conviction occurred.

4.~~d.~~ The statute number violated, statute table text, date of conviction, and case number.

(4)~~(c)~~ UNITED STATES ATTORNEYS.—Upon receipt of information from the United States Attorney~~,~~ listing persons convicted of a felony in federal court, the department shall use such information to identify registered voters or applicants for voter registration who may be potentially ineligible based on information provided in accordance with s. 98.075.

(5)~~(d)~~ DEPARTMENT OF LAW ENFORCEMENT.—The Department of Law Enforcement shall identify and report to the department at least weekly those persons who have been convicted of a felony during the preceding week who appear in the voter registration records supplied by the statewide voter registration system~~, in a time and manner that enables the department to meet its obligations under state and federal law~~.

(6)~~(e)~~ FLORIDA COMMISSION ON OFFENDER REVIEW.—The Florida Commission on Offender Review shall furnish at least weekly ~~bimonthly~~ to the department data, including the identity of those persons granted clemency in the preceding month or any updates to prior records which have occurred in the preceding month. The data must ~~shall~~ contain the commission's case number and the person's name, address, date of birth, race, gender, Florida driver license number, Florida identification card number, or the last four digits of the social security number, if available, and references to record identifiers assigned by the Department of Corrections and the Department of Law Enforcement, a unique identifier of each clemency case, and the effective date of clemency of each person.

(7)~~(f)~~ DEPARTMENT OF CORRECTIONS.—The Department of Corrections shall identify and report to the department at least weekly those persons who have been convicted of a felony and committed to its custody or placed on community supervision during the preceding week. ~~The information must be provided to the department at a time and in a manner that enables the department to identify registered voters who are convicted felons and to meet its obligations under state and federal law.~~

(8)(g) DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES.—The Department of Highway Safety and Motor Vehicles shall furnish weekly monthly to the department the following information:

(a)1. Information identifying A list of those persons whose names have been removed from the Florida driver license or Florida identification card database during the preceding week because they have been licensed or been issued an identification card in another state. The information list must contain the person's name, last known Florida address, date of birth, sex, last four digits of his or her social security number, and Florida driver license number or Florida identification card number and, if available, the address and the state in which the person is now licensed of each such person.

(b)2. Information identifying A list of those persons who during the preceding week presented evidence of non-United States citizenship upon being issued a new or renewed Florida driver license or Florida identification card. The information list must contain the person's name; address; date of birth; last four digits of the; social security number, if applicable; and Florida driver license number or Florida identification card number, as available applicable; and alien registration number or other legal status identifier, of each such person.

(c) Information identifying those persons for which it has received official information during the preceding week that the person is deceased. The information must contain the name, address, date of birth, last four digits of the social security number, Florida driver license number or Florida identification card number, and date of death of each such person.

(9)(3) CONSTRUCTION.—This section does not limit or restrict the supervisor in his or her duty to act upon direct receipt of, access to, or knowledge of official information from these and other governmental entities that identify a registered voter as potentially ineligible and to initiate removal of remove the name of the registered voter who is determined to be ineligible names of persons from the statewide voter registration system pursuant to s. 98.075(7) based upon information received from other sources.

Section 12. Section 98.0981, Florida Statutes, is amended to read:

98.0981 Reports; voting history; statewide voter registration system information; precinct-level election results; book closing statistics; live turnout data.—

(1) VOTING HISTORY AND STATEWIDE VOTER REGISTRATION SYSTEM INFORMATION.—Each supervisor shall submit the reports required by this subsection to the department no later than 10 business days after the Elections Canvassing Commission certifies the results of an election.

(a) *Reconciliation.*—For each presidential preference primary election, special primary election, special election, primary election, and general election, the supervisor shall reconcile the aggregate total of ballots cast in each precinct to the aggregate number of voters with voter history pursuant to paragraph (b) and the precinct-level election results pursuant to subsection (3) and submit a reconciliation report. The report must be submitted to the department in an electronic format pursuant to file format and specifications set forth by rule. The report must include a written explanation if the reconciliation results in a discrepancy between the voter history and the election results.

(b) *Voting history.*—For each ~~Within 30 days after certification by the Elections Canvassing Commission of a~~ presidential preference primary, special election, special primary election, primary election, or general election, as applicable, supervisors of elections shall transmit completely updated voting history information for each qualified voter to the department. Such information must be provided~~,~~ in a uniform electronic format pursuant to file specifications adopted by the department by rule. The voting history information must include: ~~specified in paragraph (d), completely updated voting history information for each qualified voter who voted~~

1. The unique identifier assigned to each qualified voter within the statewide voter registration system.

2. Each qualified voter's unique precinct identifier, as designated by the county within the statewide voter registration system, at the time of voting. For purposes of this subparagraph, the term "unique precinct identifier" means an alphanumeric code representing the precinct name or number and containing no more than the maximum characters as specified by rule.

3. Specifics as to each qualified voter's voting history, including whether the qualified voter voted a regular ballot during the early voting period, voted during the early voting period using a provisional ballot that was subsequently counted, voted a regular ballot at a precinct location, voted at a precinct location using a provisional ballot that was subsequently counted, voted by vote-by-mail ballot, attempted to vote by a timely received vote-by-mail ballot that was not counted, attempted to vote by a vote-by-mail ballot that was received untimely, attempted to vote by provisional ballot that was not counted, or did not vote.

(c) *Precinct boundaries.*—For each presidential preference primary election, special primary election, special election, primary election, and general election, the supervisor shall submit to the department the geographical information system map of precinct boundaries created and maintained pursuant to s. 101.001 for the applicable election.

(2)~~(b)~~ LEGISLATIVE REPORT.—

(a) *Specifications.*—~~After receipt of the information in paragraph (a),~~ The department shall prepare an election summary compiled for a

presidential preference primary election, special primary election, special election, primary election, or general election, as applicable, ~~a report~~ in an electronic format which contains the following information~~, separately compiled for the primary and general election for all voters qualified to vote in either election~~:

1. The voting history information as transmitted under paragraph (1)(b) and the precinct boundaries as transmitted under paragraph (1)(c). ~~unique identifier assigned to each qualified voter within the statewide voter registration system;~~

2. All information provided by each qualified voter on his or her voter registration application pursuant to s. 97.052(2), except that which is confidential or exempt from public records requirements.~~;~~

3. Each qualified voter's date of registration.~~;~~

4. Each qualified voter's ~~current~~ state representative district, state senatorial district, ~~and~~ congressional district, county commission district, and school board district at the time of voting, assigned by the supervisor of elections~~;~~

~~5. Each qualified voter's current precinct; and~~

~~6. Voting history as transmitted under paragraph (a) to include whether the qualified voter voted at a precinct location, voted during the early voting period, voted by vote-by-mail ballot, attempted to vote by vote-by-mail ballot that was not counted, attempted to vote by provisional ballot that was not counted, or did not vote~~.

(b)~~(c)~~ *Submission.*—Within 60 ~~45~~ days after ~~certification by~~ the Elections Canvassing Commission certifies ~~of~~ a presidential preference primary, special election, primary election, or general election, the department shall submit ~~send~~ to the President of the Senate, the Speaker of the House of Representatives, the Senate Minority Leader, and the House Minority Leader an election summary ~~a~~ report in electronic format that includes all information set forth in paragraph (a) ~~(b)~~.

~~(d) File specifications are as follows:~~

~~1. The file shall contain records designated by the categories below for all qualified voters who, regardless of the voter's county of residence or active or inactive registration status at the book closing for the corresponding election that the file is being created for:~~

~~a. Voted a regular ballot at a precinct location.~~

~~b. Voted at a precinct location using a provisional ballot that was subsequently counted.~~

~~c. Voted a regular ballot during the early voting period.~~

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 27 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 203 of 248

~~d. Voted during the early voting period using a provisional ballot that was subsequently counted.~~

~~e. Voted by vote-by-mail ballot.~~

~~f. Attempted to vote by vote-by-mail ballot, but the ballot was not counted.~~

~~g. Attempted to vote by provisional ballot, but the ballot was not counted in that election.~~

~~2. Each file shall be created or converted into a tab-delimited format.~~

~~3. File names shall adhere to the following convention:~~

~~a. Three-character county identifier as established by the department followed by an underscore.~~

~~b. Followed by four-character file type identifier of "VHO3" followed by an underscore.~~

~~c. Followed by FVRS election ID followed by an underscore.~~

~~d. Followed by Date Created followed by an underscore.~~

~~e. Date format is YYYYMMDD.~~

~~f. Followed by Time Created - HHMMSS.~~

~~g. Followed by ".txt".~~

~~4. Each record shall contain the following columns: Record Identifier, FVRS Voter ID Number, FVRS Election ID Number, Vote Date, Vote History Code, Precinct, Congressional District, House District, Senate District, County Commission District, and School Board District.~~

~~(e) Each supervisor of elections shall reconcile, before submission, the aggregate total of ballots cast in each precinct as reported in the precinct-level election results to the aggregate total number of voters with voter history for the election for each district.~~

~~(f) Each supervisor of elections shall submit the results of the data reconciliation as described in paragraph (e) to the department in an electronic format and give a written explanation for any precincts where the reconciliation as described in paragraph (e) results in a discrepancy between the voter history and the election results.~~

(3)~~(2)~~ PRECINCT-LEVEL ELECTION RESULTS.—

(a)1. Within 10 business ~~30~~ days after ~~certification by~~ the Elections Canvassing Commission certifies ~~of~~ a presidential preference primary election, special election, special primary election, primary election, or

general election, as applicable, the supervisors of elections shall collect and submit to the department precinct-level election results for the election in a uniform electronic format specified by paragraph (c). ~~The precinct-level election results shall be compiled separately for the primary or special primary election that preceded the general or special general election, respectively.~~ The results must ~~shall~~ specifically include for each precinct the total of all ballots cast for each candidate or nominee to fill a national, state, county, or district office or proposed constitutional amendment, with subtotals for each candidate and ballot type. When one or more ballot types, also known as counting groups, in a race or an issue have fewer than 30 voters voting on the ballot, the ballot type must be reported as zero except for the total votes counting group for that precinct. Ballot types or counting groups include election day, early voting, vote-by-mail, provisional voting, and total votes ~~However, ballot type or precinct subtotals in a race or question having fewer than 30 voters voting on the ballot type or in the precinct may not be reported in precinct results~~. For purposes of this paragraph, the term "all ballots cast" means ballots cast by voters who cast a ballot~~,~~ whether at a precinct location;~~,~~ by vote-by-mail ballot~~,~~ including overseas vote-by-mail ballots;~~,~~ during the early voting period;~~,~~ or by provisional ballot.

2. Upon request from the department, a supervisor must research and address, as appropriate, any questions or issues identified by the department pertaining to the precinct-level election results. If the information as originally submitted is changed or corrected, the supervisor must provide an amended precinct-level election results file no later than 10 business days after the request from the department.

(b) The department shall make such information available online no later than 60 days after the Elections Canvassing Commission certifies the presidential preference primary election, special primary election, special election, primary election, or general election, as applicable. The website containing the information must include ~~on a searchable, sortable, and downloadable database via its website that also includes~~ the file layout and codes. The information must ~~database shall~~ be searchable and sortable by county, precinct, and candidate;~~. The~~ must ~~database shall~~ be downloadable in a tab-delimited format; and must~~. The database shall~~ be available for download county-by-county ~~and also as a statewide file. Such report shall also be made available upon request~~.

(c) The files containing the precinct-level election results must ~~shall~~ be created in accordance with the applicable file specification as set forth by rule. The rule must, at a minimum, provide that~~:~~

~~1. The precinct-level results file shall be created or converted into a tab-delimited text file.~~

~~2. The row immediately before the first data record shall contain the column names of the data elements that make up the data records. There shall be one header record followed by multiple data records.~~

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

~~3.~~ the data records ~~shall~~ include the following columns: County Name, Election Number, Election Date, Unique Precinct Identifier, Precinct Polling Location, Total Registered Voters, Total Registered Republicans, Total Registered Democrats, Total Registered All Other Parties, Contest Name, Candidate/Retention/Issue Name, Candidate Florida Voter Registration System ID Number, Division of Elections Unique Candidate Identifying Number, Candidate Party, District, Undervote Total, Overvote Total, Write-in Total, and Vote Total. For purposes of this paragraph, the term “unique precinct identifier” means an alphanumeric code representing the precinct name or number and containing no more than the maximum characters as specified by rule.

(4)~~(3)~~ PRECINCT-LEVEL BOOK CLOSING STATISTICS.—No later than 10 days after the date of book closing for ~~but before the date of~~ an election as defined in s. 97.021 to fill a national, state, county, or district office, or to vote on a proposed constitutional amendment, the department shall compile and make available the following precinct-level statistical data for each county:

(a) Unique precinct identifier ~~numbers~~. For purposes of this subsection, the term “unique precinct identifier” means an alphanumeric code representing the precinct name or number and containing no more than the maximum characters as specified by rule.

(b) Total number of active registered voters by party for each precinct.

(5)~~(4)~~ LIVE TURNOUT DATA.—On election day, each supervisor of elections shall make live voter turnout data, updated at least once per hour, available on his or her website. Each supervisor shall transmit the live voter turnout data to the division, which must create and maintain a real-time statewide turnout dashboard that is available for viewing by the public on the division’s website as the data becomes available.

(6)~~(5)~~ REPORTS PUBLICLY AVAILABLE.—The department shall also make publicly available the reports and results required in subsections (1)-(4) ~~(1)-(3)~~.

(7)~~(6)~~ RULEMAKING.—The department shall adopt rules and prescribe forms to carry out the purposes of this section.

Section 13. Effective upon becoming a law, present paragraph (b) of subsection (1) of section 99.012, Florida Statutes, is redesignated as paragraph (c), a new paragraph (b) is added to that subsection, and paragraph (c) is added to subsection (7) of that section, to read:

99.012 Restrictions on individuals qualifying for public office.—

(1) As used in this section:

(b) “Qualify” means to fulfill the requirements set forth in s. 99.061(7)(a) or s. 105.031(5)(a).

(7) This section does not apply to:

(c) Persons seeking the office of President or Vice President of the United States.

Section 14. The amendments made to s. 99.012, Florida Statutes, by this act are intended to clarify existing law. Any person seeking the office of President or Vice President of the United States is not subject to the requirements of chapter 99, Florida Statutes, which govern candidate qualifying, specifically those which require the submission of certain documents, full and public disclosures of financial interests, petition signatures, or the payment of filing fees. This section shall take effect upon this act becoming a law.

Section 15. Paragraph (d) of subsection (1) of section 99.021, Florida Statutes, is redesignated as paragraph (e), and a new paragraph (d) is added to that subsection, to read:

99.021 Form of candidate oath.—

(1)

(d) In addition, each candidate, whether a party candidate, a candidate with no party affiliation, or a write-in candidate, shall, at the time of subscribing to the oath or affirmation, state in writing whether he or she owes any outstanding fines, fees, or penalties that cumulatively exceed $250 for any violations of s. 8, Art. II of the State Constitution, the Code of Ethics for Public Officers and Employees under part III of chapter 112, any local ethics ordinance governing standards of conduct and disclosure requirements, or chapter 106. If the candidate owes any outstanding fines, fees, or penalties exceeding the threshold amount specified in this paragraph, he or she must also specify the amount owed and each entity that levied such fine, fee, or penalty. For purposes of this paragraph, any such fines, fees, or penalties that have been paid in full at the time of subscribing to the oath or affirmation are not deemed to be outstanding.

Section 16. Section 99.0215, Florida Statutes, is created to read:

99.0215 Name of candidate.—

(1) Each candidate shall designate in the oath or affirmation specified in s. 99.021 the name that he or she wishes to have printed on the ballot, or in the case of a write-in candidate, the name that he or she wishes to have voters write in on the ballot when voting for him or her. Such designation must include the candidate's legal given name or names, a shortened form of the candidate's legal given name or names, an initial or initials of the candidate's legal given name or names, or a bona fide nickname customarily related to the candidate and by which the candidate is commonly known, immediately followed by the candidate's legal surname. If applicable, a candidate may place one of the following designations after the legal surname: "Sr.," "Jr.," or a numerical designation such as "II."

(2) If a candidate wishes to designate a nickname, the candidate must file an affidavit that must be verified under oath or affirmation pursuant to s. 92.525(1)(a), attesting that the nickname complies with the requirements of this section. The affidavit must be filed simultaneously with the oath or affirmation specified in s. 99.021. Any nickname designated by a candidate may not be used to mislead voters. A candidate may not designate a nickname that implies the candidate is some other person, that constitutes a political slogan or otherwise associates the candidate with a cause or an issue, or that is obscene or profane. For purposes of this subsection, the term "political slogan" means any word or words expressing or connoting a position, an opinion, or a belief that the candidate may espouse, including, but not limited to, any word or words conveying any meaning other than that of the general identity of the candidate.

(3) Unless a candidate has the same name as, or a name similar to, one or more candidates for the same office, an educational or professional title or degree may not be added to his or her name designation.

Section 17. Subsections (4) and (5) of section 99.097, Florida Statutes, are amended to read:

99.097 Verification of signatures on petitions.—

(4)(a) The supervisor must ~~shall~~ be paid in advance the sum of 10 cents for each signature checked or the actual cost of checking such signature, whichever is less, by the candidate or, in the case of a petition to have a local ~~an~~ issue placed on the ballot, by the person or organization submitting the petition. In the case of a petition to place a statewide issue on the ballot, the person or organization submitting the petition must pay the supervisor in advance the cost posted by the supervisor pursuant to s. 100.371(11) for the actual cost of checking signatures to place a statewide issue on the ballot.

(b) However, if a candidate, a person, or an organization seeking to have an issue placed upon the ballot cannot pay such charges without imposing an undue burden on personal resources or upon the resources otherwise available to such candidate, person, or organization, such candidate, person, or organization ~~shall~~, upon written certification of such inability given under oath to the supervisor, is ~~be~~ entitled to have the signatures verified at no charge.

(c) In the event a candidate, person, or organization submitting a petition to have an issue placed upon the ballot is entitled to have the signatures verified at no charge, the supervisor of elections of each county in which the signatures are verified at no charge shall submit the total number of such signatures checked in the county to the Chief Financial Officer no later than December 1 of the general election year, and the Chief Financial Officer shall cause such supervisor of elections to be reimbursed from the General Revenue Fund in an amount equal to 10 cents or the actual cost for each name checked ~~or the actual cost of checking such signatures~~, whichever is applicable as set forth in paragraph (a) ~~less~~. In no event may ~~shall~~ such

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 32 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 208 of 248

reimbursement of costs be deemed or applied as extra compensation for the supervisor.

(d) Petitions must ~~shall~~ be retained by the supervisors for a period of 1 year following the election for which the petitions were circulated.

(5) The results of a verification pursuant to subparagraph (1)(a)2. may be contested in the circuit court by the candidate; an announced opponent; a representative of a designated political committee; or a person, party, or other organization submitting the petition. The contestant must ~~shall~~ file a complaint, together with the fees prescribed in chapter 28, with the clerk of the circuit court in the county in which the petition is certified or in Leon County if the petition covers more than one county within 10 days after midnight of the date the petition is certified; and the complaint must ~~shall~~ set forth the grounds on which the contestant intends to establish his or her right to require a complete check of the petition pursuant to subparagraph (1)(a)1. In the event the court orders a complete check of the petition and the result is not changed as to the success or lack of success of the petitioner in obtaining the requisite number of valid signatures, then such candidate, unless the candidate has filed the oath stating that he or she is unable to pay such charges; announced opponent; representative of a designated political committee; or party, person, or organization submitting the petition, unless such person or organization has filed the oath stating inability to pay such charges, shall pay to the supervisor of elections of each affected county for the complete check an amount calculated at the rate of 10 cents for each additional signature checked or the actual cost of checking such additional signatures, as applicable ~~whichever is less~~.

Section 18. Section 100.021, Florida Statutes, is amended to read:

100.021 Notice of general election.—The Department of State shall, in any year in which a general election is held, make out a notice stating what offices and vacancies are to be filled at the general election in the state, and in each county and district thereof. During the 30 days before ~~prior to~~ the beginning of qualifying, the department ~~of State~~ shall have the notice published two times in a newspaper of general circulation in each county; and, in counties in which there is no newspaper of general circulation, it shall send to the sheriff a notice of the offices and vacancies to be filled at such general election by the qualified voters of the sheriff's county or any district thereof, and the sheriff shall have at least five copies of the notice posted in conspicuous places in the county. Notice may be provided alternatively by publishing notice on the division's website, on the county's website as provided in s. 50.0311, or on the supervisor's website, as deemed appropriate by the supervisor.

Section 19. Subsection (3) of section 100.141, Florida Statutes, is amended to read:

100.141 Notice of special election to fill any vacancy in office.—

App. 0030

(3) The department shall deliver a copy of such notice to the supervisor of elections of each county in which the special election is to be held. The supervisor shall have the notice published two times in a newspaper of general circulation in the county at least 10 days before ~~prior to~~ the first day set for qualifying for office or, for at least 10 days before the first day set for qualifying for office, publish notice on the county's website as provided in s. 50.0311 or on the supervisor's website. ~~If such a newspaper is not published within the period set forth, the supervisor shall post at least five copies of the notice in conspicuous places in the county not less than 10 days prior to the first date set for qualifying.~~

Section 20. Section 100.342, Florida Statutes, is amended to read:

100.342 Notice of special election or referendum.—In any special election or referendum not otherwise provided for~~,~~ there must ~~shall~~ be at least 30 days' notice of the election or referendum by publication in a newspaper of general circulation in the county, district, or municipality, or publication on the county's website as provided in s. 50.0311, the municipality's website, or the supervisor's website, as applicable ~~as the case may be~~. The publication must ~~shall~~ be made at least twice, once in the fifth week and once in the third week before ~~prior to~~ the week in which the election or referendum is to be held. If the applicable website becomes unavailable or there is no newspaper of general circulation in the county, district, or municipality, the notice must ~~shall~~ be posted in no less than five places within the territorial limits of the county, district, or municipality.

Section 21. Subsection (3) and paragraph (a) of subsection (4) of section 101.001, Florida Statutes, are amended to read:

101.001 Precincts and polling places; boundaries.—

(3)(a) Each supervisor of elections shall maintain a geographical information system ~~suitable~~ map ~~drawn to a scale no smaller than 3 miles to the inch and~~ clearly delineating all major observable features such as roads, streams, and railway lines and showing the current geographical boundaries of each precinct, representative district, and senatorial district, and other type of district in the county subject to the elections process in this code. A supervisor may coordinate with other governmental entities to comply with this subsection.

~~(b) The supervisor shall provide to the department data on all precincts in the county associated with the most recent decennial census blocks within each precinct.~~

~~(c) The department shall maintain a searchable database that contains the precincts and the corresponding most recent decennial census blocks within the precincts for each county, including a historical file that allows the census blocks to be traced through the prior decade.~~

(b)~~(d)~~ The supervisor of elections shall notify the Secretary of State in writing within 10 days after any reorganization of precincts and shall furnish a copy of the geographical information system compatible map showing the ~~current~~ geographical boundaries and designation of each new precinct. ~~However, if precincts are composed of whole census blocks, the supervisor may furnish, in lieu of a copy of the map, a list, in an electronic format prescribed by the Department of State, associating each census block in the county with its precinct.~~

(c)~~(e)~~ Any precinct established or altered under ~~the provisions of~~ this section must ~~shall~~ consist of areas bounded on all sides only by census block boundaries from the most recent United States Census. If the census block boundaries split or conflict with a municipal or other political subdivision ~~another political~~ boundary ~~listed below~~, the boundary listed below may be used as a precinct boundary:

1. Governmental unit boundaries reported in the most recent Boundary and Annexation Survey published by the United States Census Bureau; or

~~2. Visible features that are readily distinguishable upon the ground, such as streets, railroads, tracks, streams, and lakes, and that are indicated upon current census maps, official Department of Transportation maps, official municipal maps, official county maps, or a combination of such maps;~~

~~3. Boundaries of public parks, public school grounds, or churches; or~~

2.~~4.~~ Boundaries of counties, incorporated municipalities, or other political subdivisions that meet criteria established by the United States Census Bureau for block boundaries.

(4)(a) Within 10 days after there is any change in the division, name, number, or boundaries of the precincts, or the location of the polling places, the supervisor of elections shall make in writing an accurate description of any new or altered precincts, setting forth the boundary lines and shall identify the location of each new or altered polling place. A copy of the document describing such changes must ~~shall~~ be posted at the supervisor's office.

Section 22. Subsection (1) of section 101.048, Florida Statutes, is amended to read:

101.048 Provisional ballots.—

(1) At all elections, a voter claiming to be properly registered in the state and eligible to vote at the precinct in the election but whose eligibility cannot be determined, a person whom an election official asserts is not eligible, including, but not limited to, a person to whom notice has been sent pursuant to s. 98.075(7), but for whom a final determination of eligibility has not been made, and other persons specified in the code shall be entitled to vote a provisional ballot. Once voted, the provisional ballot must ~~shall~~ be placed in a secrecy envelope and thereafter sealed in a provisional ballot

envelope. The provisional ballot <u>must</u> ~~shall~~ be deposited in a ballot box. All provisional ballots <u>must</u> ~~shall~~ remain sealed in their envelopes for return to the supervisor of elections. The department shall prescribe the form of the provisional ballot envelope. A person casting a provisional ballot <u>has</u> ~~shall have~~ the right to present written evidence supporting his or her eligibility to vote to the supervisor of elections by not later than 5 p.m. on the second day following the election.

Section 23. Paragraph (b) of subsection (4) of section 101.151, Florida Statutes, is amended to read:

101.151 Specifications for ballots.—

(4)

(b) When two or more candidates running for the same office on <u>an</u> ~~a primary~~ election ballot have the same or a similar surname, the word "incumbent" <u>must</u> ~~shall~~ appear next to the incumbent's name.

Section 24. Subsection (2) of section 101.5612, Florida Statutes, is amended to read:

101.5612 Testing of tabulating equipment.—

(2) On any day not more than 25 days before the commencement of early voting as provided in s. 101.657, the supervisor of elections shall have the automatic tabulating equipment publicly tested to ascertain that the equipment will correctly count the votes cast for all offices and on all measures. If the ballots to be used at the polling place on election day are not available at the time of the testing, the supervisor may conduct an additional test not more than 10 days before election day. Public notice of the time and place of the test shall be given at least 48 hours prior thereto by publication on the <u>county website as provided in s. 50.0311, on the</u> supervisor of elections' website<u>, or</u> ~~and~~ once in one or more newspapers of general circulation in the county<u>. If the applicable website becomes unavailable</u> or~~,~~ if there is no newspaper of general circulation in the county, ~~by posting~~ the notice <u>must be posted</u> in at least four conspicuous places in the county. The supervisor or the municipal elections official may, at the time of qualifying, give written notice of the time and location of the public preelection test to each candidate qualifying with that office and obtain a signed receipt that the notice has been given. The Department of State shall give written notice to each statewide candidate at the time of qualifying, or immediately at the end of qualifying, that the voting equipment will be tested and advise each candidate to contact the county supervisor of elections as to the time and location of the public preelection test. The supervisor or the municipal elections official shall, at least 30 days before the commencement of early voting as provided in s. 101.657, send written notice by certified mail to the county party chair of each political party and to all candidates for other than statewide office whose names appear on the ballot in the county and who did not receive written notification from the supervisor or municipal elections

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

official at the time of qualifying, stating the time and location of the public preelection test of the automatic tabulating equipment. The canvassing board shall convene, and each member of the canvassing board shall certify to the accuracy of the test. For the test, the canvassing board may designate one member to represent it. The test shall be open to representatives of the political parties, the press, and the public. Each political party may designate one person with expertise in the computer field who shall be allowed in the central counting room when all tests are being conducted and when the official votes are being counted. The designee may ~~shall~~ not interfere with the normal operation of the canvassing board.

Section 25. Subsection (1) of section 101.6103, Florida Statutes, is amended to read:

101.6103 Mail ballot election procedure.—

(1) Except as otherwise provided in subsection (7), the supervisor of elections shall mail all official ballots with a secrecy envelope, a return mailing envelope, and instructions sufficient to describe the voting process to each elector entitled to vote in the election within the timeframes specified in s. 101.62(3) ~~s. 101.62(4)~~. All such ballots must ~~shall~~ be mailed by first-class mail. Ballots must ~~shall~~ be addressed to each elector at the address appearing in the registration records and placed in an envelope which is prominently marked "Do Not Forward."

Section 26. Section 101.62, Florida Statutes, is amended to read:

101.62 Request for vote-by-mail ballots.—

(1) REQUEST.—

(a) The supervisor shall accept a request for a vote-by-mail ballot only from a voter or, if directly instructed by the voter, a member of the voter's immediate family or the voter's legal guardian ~~from an elector in person or in writing~~. A request may be made in person, in writing, by telephone, or through the supervisor's website. The department shall prescribe by rule by October 1, 2023, a uniform statewide application to make a written request for a vote-by-mail ballot which includes fields for all information required in this subsection. One request is deemed sufficient to receive a vote-by-mail ballot for all elections through the end of the calendar year of the next regularly scheduled general election, unless the voter ~~elector~~ or the voter's ~~elector's~~ designee indicates at the time the request is made the elections within such period for which the voter ~~elector~~ desires to receive a vote-by-mail ballot. The supervisor must cancel a request for a vote-by-mail ballot ~~Such request may be considered canceled~~ when any first-class mail or nonforwardable mail sent by the supervisor to the voter ~~elector~~ is returned as undeliverable. If the voter requests a vote-by-mail ballot thereafter, the voter must provide or confirm his or her current residential address.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(b) The supervisor may accept a ~~written, an in-person, or a telephonic~~ request for a vote-by-mail ballot to be mailed to a voter's ~~an elector's~~ address on file in the Florida Voter Registration System from the voter ~~elector~~, or, if directly instructed by the voter ~~elector~~, a member of the voter's ~~elector's~~ immediate family~~,~~ or the voter's ~~elector's~~ legal guardian. If an in-person or a telephonic request is made, the voter ~~elector~~ must provide the voter's ~~elector's~~ Florida driver license number, the voter's ~~elector's~~ Florida identification card number, or the last four digits of the voter's ~~elector's~~ social security number, whichever may be verified in the supervisor's records. If the ballot is requested to be mailed to an address other than the voter's ~~elector's~~ address on file in the Florida Voter Registration System, the request must be made in writing. A written request must be signed by the voter ~~elector~~ and include the voter's ~~elector's~~ Florida driver license number, the voter's ~~elector's~~ Florida identification card number, or the last four digits of the voter's ~~elector's~~ social security number. However, an absent uniformed services ~~service~~ voter or an overseas voter seeking a vote-by-mail ballot is not required to submit a signed, written request for a vote-by-mail ballot that is being mailed to an address other than the voter's ~~elector's~~ address on file in the Florida Voter Registration System. ~~For purposes of this section, the term "immediate family" has the same meaning as specified in paragraph (4)(c).~~ The person making the request must disclose:

1. The name of the voter ~~elector~~ for whom the ballot is requested.

2. The voter's ~~elector's~~ address.

3. The voter's ~~elector's~~ date of birth.

4. The voter's ~~elector's~~ Florida driver license number, the voter's ~~elector's~~ Florida identification card number, or the last four digits of the voter's ~~elector's~~ social security number, whichever may be verified in the supervisor's records. If the voter's registration record does not already include the voter's Florida driver license number or Florida identification card number or the last four digits of the voter's social security number, the number provided must be recorded in the voter's registration record.

5. The requester's name.

6. The requester's address.

7. The requester's driver license number, the requester's identification card number, or the last four digits of the requester's social security number, if available.

8. The requester's relationship to the voter ~~elector~~.

9. The requester's signature (written requests only).

(c) Upon receiving a request for a vote-by-mail ballot from an absent voter, the supervisor of elections shall notify the voter of the free access

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 38 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 214 of 248

system that has been designated by the department for determining the status of his or her vote-by-mail ballot.

(d) For purposes of this section, the term "immediate family" refers to the following, as applicable:

1. The voter's spouse, parent, child, grandparent, grandchild, or sibling, or the parent, child, grandparent, grandchild, or sibling of the voter's spouse.

2. The designee's spouse, parent, child, grandparent, grandchild, or sibling, or the parent, child, grandparent, grandchild, or sibling of the designee's spouse.

~~(2) A request for a vote-by-mail ballot to be mailed to a voter must be received no later than 5 p.m. on the 10th day before the election by the supervisor. The supervisor shall mail vote-by-mail ballots to voters requesting ballots by such deadline no later than 8 days before the election.~~

(2)~~(3)~~ ACCESS TO VOTE-BY-MAIL REQUEST INFORMATION.—For each request for a vote-by-mail ballot received, the supervisor shall record the following information: the date the request was made; the identity of the voter's designee making the request, if any; the Florida driver license number, Florida identification card number, or last four digits of the social security number of the voter ~~elector~~ provided with a written request; the date the vote-by-mail ballot was delivered to the voter or the voter's designee or the date the vote-by-mail ballot was delivered to the post office or other carrier; the address to which the ballot was mailed or the identity of the voter's designee to whom the ballot was delivered; the date the ballot was received by the supervisor; the absence of the voter's signature on the voter's certificate, if applicable; whether the voter's certificate contains a signature that does not match the voter's ~~elector's~~ signature in the registration books or precinct register; and such other information he or she may deem necessary. This information must ~~shall~~ be provided in electronic format as provided by division rule. The information must ~~shall~~ be updated and made available no later than 8 a.m. of each day, including weekends, beginning 60 days before the primary until 15 days after the general election and shall be contemporaneously provided to the division. This information is ~~shall be~~ confidential and exempt from s. 119.07(1) and shall be made available to or reproduced only for the voter requesting the ballot, a canvassing board, an election official, a political party or official thereof, a candidate who has filed qualification papers and is opposed in an upcoming election, and registered political committees for political purposes only.

(3)~~(4)~~ DELIVERY OF VOTE-BY-MAIL BALLOTS.—

(a) No later than 45 days before each presidential preference primary election, primary election, and general election, the supervisor of elections shall send a vote-by-mail ballot as provided in subparagraph (d)2. ~~(c)2.~~ to each absent uniformed services voter and to each overseas voter who has requested a vote-by-mail ballot.

App. 0036

(b) The supervisor shall mail a vote-by-mail ballot to each absent qualified voter, other than those listed in paragraph (a), who has requested such a ballot, between the 40th and 33rd days before the presidential preference primary election, primary election, and general election.

(c) Except as otherwise provided in paragraph (a) or paragraph (b) ~~subsection (2) and after the period described in this paragraph~~, the supervisor shall mail vote-by-mail ballots within 2 business days after receiving a request for such a ballot, but no later than the 10th day before election day. The deadline to submit a request for a ballot to be mailed is 5 p.m. local time on the 12th day before an upcoming election.

(d)~~(c)~~ Upon a request for a vote-by-mail ballot, the supervisor shall provide a vote-by-mail ballot to each voter ~~elector~~ by whom a request for that ballot has been made~~,~~ by one of the following means:

1. By nonforwardable, return-if-undeliverable mail to the voter's ~~elector's~~ current mailing address on file with the supervisor or any other address the voter ~~elector~~ specifies in the request. The envelopes must be prominently marked "Do Not Forward."

2. By forwardable mail, e-mail, or facsimile machine transmission to absent uniformed services voters and overseas voters. The absent uniformed services voter or overseas voter may designate in the vote-by-mail ballot request the preferred method of transmission. If the voter does not designate the method of transmission, the vote-by-mail ballot must ~~shall~~ be mailed.

3. By personal delivery ~~before 7 p.m. on election day~~ to the voter after vote-by-mail ballots have been mailed and up to 7 p.m. on election day ~~elector,~~ upon presentation of the identification required in s. 101.043.

4. By delivery to the voter's ~~a~~ designee after vote-by-mail ballots have been mailed and up to 7 p.m. on election day ~~or up to 9 days before the day of an election~~. Any voter ~~elector~~ may designate in writing a person to pick up the ballot for the voter ~~elector~~; however, the person designated may not pick up more than two vote-by-mail ballots per election, other than the designee's own ballot, except that additional ballots may be picked up for members of the designee's immediate family. ~~For purposes of this section, "immediate family" means the designee's spouse or the parent, child, grandparent, grandchild, or sibling of the designee or of the designee's spouse.~~ The designee shall provide to the supervisor the written authorization by the voter ~~elector~~ and a picture identification of the designee and must complete an affidavit. The designee shall state in the affidavit that the designee is authorized by the voter ~~elector~~ to pick up that ballot and shall indicate if the voter ~~elector~~ is a member of the designee's immediate family and, if so, the relationship. The department shall prescribe the form of the affidavit. If the supervisor is satisfied that the designee is authorized to pick up the ballot and that the signature of the voter ~~elector~~ on the written authorization matches the signature of the voter ~~elector~~ on file, the supervisor must ~~shall~~ give the ballot to that designee for delivery to the voter ~~elector~~.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

5. Except as provided in s. 101.655, the supervisor may not deliver a vote-by-mail ballot to a voter ~~an elector~~ or a voter's designee pursuant to subparagraph 3. or subparagraph 4., respectively, during the mandatory early voting period and up to 7 p.m. on election day, ~~an elector's immediate family member on the day of the election~~ unless there is an emergency, to the extent that the voter ~~elector~~ will be unable to go to a designated early voting site in his or her county or to his or her assigned polling place on election day. If a vote-by-mail ballot is delivered, the voter ~~elector~~ or his or her designee must ~~shall~~ execute an affidavit affirming to the facts which allow for delivery of the vote-by-mail ballot. The department shall adopt a rule providing for the form of the affidavit.

(4)~~(5)~~ SPECIAL CIRCUMSTANCES.—If the department is unable to certify candidates for an election in time to comply with paragraph (3)(a) ~~(4)(a)~~, the Department of State is authorized to prescribe rules for a ballot to be sent to absent uniformed services voters and overseas voters.

(5)~~(6)~~ MATERIALS.—Only the materials necessary to vote by mail may be mailed or delivered with any vote-by-mail ballot.

(6)~~(7)~~ PROHIBITION.—Except as expressly authorized for voters having a disability under s. 101.662, for overseas voters under s. 101.697, or for local referenda under ss. 101.6102 and 101.6103, a county, municipality, or state agency may not send a vote-by-mail ballot to a voter unless the voter has requested a vote-by-mail ballot in the manner authorized under this section.

Section 27. Subsection (1) of section 101.67, Florida Statutes, is amended to read:

101.67 Safekeeping of mailed ballots; deadline for receiving vote-by-mail ballots.—

(1)(a) The supervisor of elections shall safely keep in his or her office any envelopes received containing marked ballots of absent electors, and he or she shall, before the canvassing of the election returns, deliver the envelopes to the county canvassing board along with his or her file or list kept regarding said ballots.

(b) To the extent practicable, the supervisor of elections shall segregate any vote-by-mail ballots received from a person to whom notice has been sent pursuant to s. 98.075(7), but for whom a final determination of eligibility has not been made, and shall treat them as provisional ballots for individual review by the county canvassing board. The supervisor shall attempt to contact each voter whose ballot has been set aside under this paragraph in the same manner as if the voter had voted a provisional ballot under s. 101.048.

Section 28. Subsection (1) of section 101.68, Florida Statutes, is amended to read:

101.68 Canvassing of vote-by-mail ballot.—

(1)(a) The supervisor of the county where the absent elector resides shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register to determine whether the elector is duly registered in the county and must record on the elector's registration record that the elector has voted. During the signature comparison process, the supervisor may not use any knowledge of the political affiliation of the elector ~~voter~~ whose signature is subject to verification.

(b) An elector who dies after casting a vote-by-mail ballot but on or before election day shall remain listed in the registration books until the results have been certified for the election in which the ballot was cast. The supervisor shall safely keep the ballot unopened in his or her office until the county canvassing board canvasses the vote pursuant to subsection (2).

(c) If two or more vote-by-mail ballots for the same election are returned in one mailing envelope, the ballots may not be counted.

(d) Except as provided in subsection (4), after a vote-by-mail ballot is received by the supervisor, the ballot is deemed to have been cast, and changes or additions may not be made to the voter's certificate.

Section 29. Section 101.6923, Florida Statutes, is amended to read:

101.6923 Special vote-by-mail ballot instructions for certain first-time voters.—

(1) This section applies ~~The provisions of this section apply~~ to voters who are subject to ~~the provisions of~~ s. 97.0535 and who have not provided the identification or information required by s. 97.0535 by the time the vote-by-mail ballot is mailed.

(2) A voter covered by this section must ~~shall~~ be provided with printed instructions with his or her vote-by-mail ballot in substantially the following form:

READ THESE INSTRUCTIONS CAREFULLY BEFORE MARKING YOUR BALLOT. FAILURE TO FOLLOW THESE INSTRUCTIONS MAY CAUSE YOUR BALLOT NOT TO COUNT.

1. In order to ensure that your vote-by-mail ballot will be counted, it should be completed and returned as soon as possible so that it can reach the supervisor of elections of the county in which your precinct is located no later than 7 p.m. on the date of the election. However, if you are an overseas voter casting a ballot in a presidential preference primary or general election, your vote-by-mail ballot must be postmarked or dated no later than the date of the election and received by the supervisor of elections of the county in which

you are registered to vote no later than 10 days after the date of the election. Note that the later you return your ballot, the less time you will have to cure signature deficiencies, which is authorized until 5 p.m. local time on the 2nd day after the election.

2. Mark your ballot in secret as instructed on the ballot. You must mark your own ballot unless you are unable to do so because of blindness, disability, or inability to read or write.

3. Mark only the number of candidates or issue choices for a race as indicated on the ballot. If you are allowed to "Vote for One" candidate and you vote for more than one, your vote in that race will not be counted.

4. Place your marked ballot in the enclosed secrecy envelope and seal the envelope.

5. Insert the secrecy envelope into the enclosed envelope bearing the Voter's Certificate. Seal the envelope and completely fill out the Voter's Certificate on the back of the envelope.

a. You must sign your name on the line above (Voter's Signature).

b. If you are an overseas voter, you must include the date you signed the Voter's Certificate on the line above (Date) or your ballot may not be counted.

c. A vote-by-mail ballot will be considered illegal and will not be counted if the signature on the Voter's Certificate does not match the signature on record. The signature on file at the start of the canvass of the vote-by-mail ballots is the signature that will be used to verify your signature on the Voter's Certificate. If you need to update your signature for this election, send your signature update on a voter registration application to your supervisor of elections so that it is received before your vote-by-mail ballot is received.

6. Unless you meet one of the exemptions in Item 7., you must make a copy of one of the following forms of identification:

a. Identification which must include your name and photograph: United States passport; debit or credit card; military identification; student identification; retirement center identification; neighborhood association identification; public assistance identification; veteran health identification card issued by the United States Department of Veterans Affairs; a Florida license to carry a concealed weapon or firearm; or an employee identification card issued by any branch, department, agency, or entity of the Federal Government, the state, a county, or a municipality; or

b. Identification which shows your name and current residence address: current utility bill, bank statement, government check, paycheck, or government document (excluding voter information card).

7. The identification requirements of Item 6. do not apply if you meet one of the following requirements:

a. You are 65 years of age or older.

b. You have a temporary or permanent physical disability.

c. You are a member of a uniformed service on active duty who, by reason of such active duty, will be absent from the county on election day.

d. You are a member of the Merchant Marine who, by reason of service in the Merchant Marine, will be absent from the county on election day.

e. You are the spouse or dependent of a member referred to in paragraph c. or paragraph d. who, by reason of the active duty or service of the member, will be absent from the county on election day.

f. You are currently residing outside the United States.

8. Place the envelope bearing the Voter's Certificate into the mailing envelope addressed to the supervisor. Insert a copy of your identification in the mailing envelope. DO NOT PUT YOUR IDENTIFICATION INSIDE THE SECRECY ENVELOPE WITH THE BALLOT OR INSIDE THE ENVELOPE WHICH BEARS THE VOTER'S CERTIFICATE OR YOUR BALLOT WILL NOT COUNT.

9. Mail, deliver, or have delivered the completed mailing envelope. Be sure there is sufficient postage if mailed.

10. FELONY NOTICE. It is a felony under Florida law to accept any gift, payment, or gratuity in exchange for your vote for a candidate. It is also a felony under Florida law to vote in an election using a false identity or false address, or under any other circumstances making your ballot false or fraudulent.

Section 30. Subsections (1) and (3) of section 101.6925, Florida Statutes, are amended to read:

101.6925 Canvassing special vote-by-mail ballots.—

(1) The supervisor of the county where the voter ~~absent elector~~ resides shall receive the voted special vote-by-mail ballot, at which time the mailing envelope must ~~shall~~ be opened to determine if the voter has enclosed the identification required or has indicated on the Voter's Certificate that he or she is exempt from the identification requirements.

(3) If the identification is not enclosed in the mailing envelope and the voter has not indicated that he or she is exempt from the identification requirements, the supervisor must ~~shall~~ check the voter registration records to determine if the voter's identification was previously received or the voter had previously notified the supervisor that he or she was exempt. The

envelope with the Voter's Certificate may ~~shall~~ not be opened unless the identification has been received or the voter has indicated that he or she is exempt. The ballot must ~~shall~~ be treated as a provisional ballot and may ~~until 7 p.m. on election day and shall~~ not be canvassed unless the supervisor has received the required identification or written indication of exemption by 5 ~~7~~ p.m. local time on the 2nd day following the ~~on~~ election ~~day~~.

Section 31. Subsection (1) of section 101.694, Florida Statutes, is amended to read:

101.694 Mailing of ballots upon receipt of federal postcard application.

(1) Upon receipt of a federal postcard application for a vote-by-mail ballot executed by a person whose registration is in order or whose application is sufficient to register or update the registration of that person, the supervisor shall send the ballot in accordance with s. 101.62(3) ~~s. 101.62(4)~~.

Section 32. Subsections (2) and (5) of section 101.71, Florida Statutes, are amended to read:

101.71 Polling place.—

(2) Notwithstanding ~~the provisions of~~ subsection (1), whenever the supervisor of elections of any county determines that the accommodations for holding any election at a polling place designated for any precinct in the county are unavailable, are inadequate for the expeditious and efficient housing and handling of voting and voting paraphernalia, or do not comply with the requirements of s. 101.715, the supervisor shall, not less than 30 days before ~~prior to~~ the holding of an election, provide for the voting place for such precinct to be moved to another site that is accessible to the public on election day in said precinct or, if such is not available, to another site that is accessible to the public on election day in a contiguous precinct. If such action of the supervisor results in the voting place for two or more precincts being located for the purposes of an election in one building, the supervisor of elections shall provide adequate supplies, equipment, and personnel are available to accommodate the voters for the precincts that are collocated. When any supervisor moves any polling place pursuant to this subsection, the supervisor shall, not more than 30 days or fewer than 7 days before ~~prior to~~ the holding of an election, give notice of the change of the polling place for the precinct involved, with clear description of the voting place to which changed, by publication on the county's website as provided in s. 50.0311, on the supervisor's website, or at least once in a newspaper of general circulation in the county ~~and on the supervisor of elections' website~~. A notice of the change of the polling place involved shall be mailed~~,~~ at least 14 days before ~~prior to~~ an election~~,~~ to each registered elector or to each household in which there is a registered elector.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(5) Public, tax-supported buildings must ~~shall~~ be made available for use as polling places, or early voting locations that meet the requirements specified in s. 101.657, upon the request of the supervisor of elections.

Section 33. Subsection (2) of section 101.733, Florida Statutes, is amended to read:

101.733 Election emergency; purpose; elections emergency contingency plan.—Because of the existing and continuing possibility of an emergency or common disaster occurring before or during a regularly scheduled or special election, and in order to ensure maximum citizen participation in the electoral process and provide a safe and orderly procedure for persons seeking to exercise their right to vote, generally to minimize to whatever degree possible a person's exposure to danger during declared states of emergency, and to protect the integrity of the electoral process, it is hereby found and declared to be necessary to designate a procedure for the emergency suspension or delay and rescheduling of elections.

(2) The Governor, upon consultation with the Secretary of State, shall reschedule any election suspended or delayed due to an emergency. The election shall be held within 10 days after the date of the suspended or delayed election or as soon thereafter as is practicable. Notice of the election must ~~shall~~ be published on the affected county's website as provided in s. 50.0311, on the affected supervisor's website, or at least once in a newspaper of general circulation in the affected area and, where practicable, broadcast as a public service announcement on radio and television stations at least 1 week before ~~prior to~~ the date the election is to be held.

Section 34. Subsection (2) of section 102.111, Florida Statutes, is amended to read:

102.111 Elections Canvassing Commission.—

(2) The Elections Canvassing Commission shall meet at 8 ~~9~~ a.m. on the 9th day after a primary election and at 8 ~~9~~ a.m. on the 14th day after a general election to certify the returns of the election for each federal, state, and multicounty office. If a member of a county canvassing board that was constituted pursuant to s. 102.141 determines, within 5 days after the certification by the Elections Canvassing Commission, that a typographical error occurred in the official returns of the county, the correction of which could result in a change in the outcome of an election, the county canvassing board must certify corrected returns to the Department of State within 24 hours, and the Elections Canvassing Commission must correct and recertify the election returns as soon as practicable.

Section 35. Subsection (2) of section 102.112, Florida Statutes, is amended to read:

102.112 Deadline for submission of county returns to the Department of State.—

(2) Returns must be filed no later than noon ~~by 5 p.m.~~ on the 8th ~~7th~~ day following a primary election and no later than ~~by~~ noon on the 13th ~~12th~~ day following the general election. However, the Department of State may correct typographical errors, including the transposition of numbers, in any returns submitted to the Department of State pursuant to s. 102.111(2).

Section 36. Subsection (1), paragraph (b) of subsection (2), and subsection (10) of section 102.141, Florida Statutes, are amended to read:

102.141 County canvassing board; duties.—

(1) The county canvassing board shall be composed of the supervisor of elections; a county court judge, who shall act as chair; and the chair of the board of county commissioners. The names of the canvassing board members must be published on the supervisor's website upon completion of the logic and accuracy test. At least two alternate canvassing board members must be appointed pursuant to paragraph (e). In the event any member of the county canvassing board is unable to serve, is a candidate who has opposition in the election being canvassed, or is an active participant in the campaign or candidacy of any candidate who has opposition in the election being canvassed, such member shall be replaced as follows:

(a) If a ~~no~~ county court judge is unable ~~able~~ to serve or if all are disqualified, the chief judge of the judicial circuit in which the county is located must ~~shall~~ appoint as a substitute member a qualified elector of the county who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed. In such event, the members of the county canvassing board shall meet and elect a chair.

(b) If the supervisor of elections is unable to serve or is disqualified, the chair of the board of county commissioners must ~~shall~~ appoint as a substitute member a member of the board of county commissioners who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed. The supervisor, however, shall act in an advisory capacity to the canvassing board.

(c) If the chair of the board of county commissioners is unable to serve or is disqualified, the board of county commissioners must ~~shall~~ appoint as a substitute member one of its members who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed.

(d) If a substitute member or alternate member cannot be appointed as provided elsewhere in this subsection, or in the event of a vacancy in such office, the chief judge of the judicial circuit in which the county is located must ~~shall~~ appoint as a substitute member or alternate member a qualified elector of the county who is not a candidate with opposition in the election

being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed.

(e)1. The chief judge of the judicial circuit in which the county is located shall appoint a county court judge as an alternate member of the county canvassing board or, if each county court judge is unable to serve or is disqualified, shall appoint an alternate member who is qualified to serve as a substitute member under paragraph (a). Any alternate may serve in any seat.

2. The chair of the board of county commissioners shall appoint a member of the board of county commissioners as an alternate member of the county canvassing board or, if each member of the board of county commissioners is unable to serve or is disqualified, shall appoint an alternate member who is qualified to serve as a substitute member under paragraph (d).

3. If a member of the county canvassing board is unable to participate in a meeting of the board, the chair of the county canvassing board or his or her designee must ~~shall~~ designate which alternate member will serve as a member of the board in the place of the member who is unable to participate at that meeting.

4. If not serving as one of the three members of the county canvassing board, an alternate member may be present, observe, and communicate with the three members constituting the county canvassing board, but may not vote in the board's decisions or determinations.

(2)

(b) Public notice of the canvassing board members, alternates, time, and place at which the county canvassing board shall meet to canvass the absent electors' ballots and provisional ballots must be given at least 48 hours prior thereto by publication on the county's website as provided in s. 50.0311, on the supervisor's website, or ~~and published~~ in one or more newspapers of general circulation in the county. ~~or,~~ If the applicable website becomes unavailable or there is no newspaper of general circulation in the county, the notice must be posted ~~by posting such notice~~ in at least four conspicuous places in the county. The time given in the notice as to the convening of the meeting of the county canvassing board must be specific and may not be a time period during which the board may meet.

(10)(a) The supervisor ~~At the same time that the official results of an election are certified to the Department of State, the county canvassing board~~ shall file a report with the Division of Elections on the conduct of the election no later than 20 business days after the Elections Canvassing Commission certifies the election. The report must, at a minimum, describe all of the following:

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

1. All equipment or software malfunctions at the precinct level, at a counting location, or within computer and telecommunications networks supporting a county location, and the steps that were taken to address the malfunctions.~~;~~

2. All election definition errors that were discovered after the logic and accuracy test, and the steps that were taken to address the errors.~~;~~

3. All ballot printing errors, vote-by-mail ballot mailing errors, or ballot supply problems, and the steps that were taken to address the errors or problems.~~;~~

4. All staffing shortages or procedural violations by employees or precinct workers which were addressed by the supervisor of elections or the county canvassing board during the conduct of the election, and the steps that were taken to correct such issues.~~;~~

5. All instances where needs for staffing or equipment were insufficient to meet the needs of the voters.~~; and~~

6. Any additional information regarding material issues or problems associated with the conduct of the election.

(b) If a supervisor discovers new or additional information on any of the items required to be included in the report pursuant to paragraph (a) after the report is filed, the supervisor must ~~shall~~ notify the division that new information has been discovered no later than the next business day after the discovery, and the supervisor must ~~shall~~ file an amended report signed by the supervisor of elections on the conduct of the election within 10 days after the discovery.

(c) Such reports must ~~shall~~ be maintained on file in the Division of Elections and must ~~shall~~ be available for public inspection.

(d) The division shall review the conduct of election reports ~~utilize the reports submitted by the canvassing boards~~ to determine what problems may be likely to occur in other elections and disseminate such information, along with possible solutions and training, to the supervisors of elections.

(e) The department shall submit the analysis of these reports for the general election as part of the consolidated reports required under ss. 101.591 and 101.595 to the Governor, the President of the Senate, and the Speaker of the House of Representatives by February 15 of each year following a general election.

Section 37. Section 103.021, Florida Statutes, is amended to read:

103.021 Nomination for presidential electors.—Candidates for presidential electors shall be nominated in the following manner:

(1)(a) The Governor shall nominate the presidential electors of each political party. The state executive committee of each political party shall by resolution recommend candidates for presidential electors and deliver a certified copy thereof to the Governor no later than noon on August 24 ~~before September 1~~ of each presidential election year. The Governor shall nominate only the electors recommended by the state executive committee of the respective political party.

(b) The state executive committee of each political party shall submit the Florida voter registration number and contact information of each presidential elector. Each such presidential elector must ~~shall~~ be a qualified registered voter of this state and member ~~elector~~ of the party he or she represents who has taken a written ~~an~~ oath that he or she will vote for the candidates of the party that he or she is nominated to represent.

(c) The Governor shall certify to the Department of State no later than 5 p.m. on August 24 ~~or before September 1~~, in each presidential election year, the names of a number of electors for each political party equal to the number of senators and representatives which this state has in Congress.

(2) The names of the presidential electors may ~~shall~~ not be printed on the general election ballot, but the names of the actual candidates for President and Vice President for whom the presidential electors will vote if elected must ~~shall~~ be printed on the ballot in the order in which the party of which the candidate is a nominee polled the highest number of votes for Governor in the last general election.

(3) Candidates for President and Vice President with no party affiliation may have their names printed on the general election ballots if a petition is signed by 1 percent of the registered voters ~~electors~~ of this state, as shown by the compilation by the Department of State for the last preceding general election. A separate petition from each county for which signatures are solicited shall be submitted to the supervisor of elections of the respective county no later than noon on July 15 of each presidential election year. The supervisor shall check the names and, on or before the date of the primary election, shall certify the number shown as registered voters ~~electors~~ of the county. The supervisor shall be paid by the person requesting the certification the cost of checking the petitions as prescribed in s. 99.097. The supervisor shall then forward the certificate to the Department of State which shall determine whether or not the percentage factor required in this section has been met. When the percentage factor required in this section has been met, the Department of State shall order the names of the candidates for whom the petition was circulated to be included on the ballot and shall allow ~~permit~~ the required number of persons to be certified as presidential electors in the same manner as party candidates.

(4)(a) A minor political party that is affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States may have the names of its candidates for President and Vice President of the United States printed on the general

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 50 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 226 of 248

election ballot by filing with the Department of State a certificate naming the candidates for President and Vice President and listing the required number of persons to serve as presidential electors. Notification to the Department of State under this subsection must ~~shall~~ be made no later than 5 p.m. on August 24 ~~by September 1~~ of the year in which the general election is held. When the Department of State has been so notified, it shall order the names of the candidates nominated by the minor political party to be included on the ballot and shall allow ~~permit~~ the required number of persons to be certified as presidential electors in the same manner as other party candidates. As used in this section, the term "national party" means a political party that is registered with and recognized as a qualified national committee of a political party by the Federal Election Commission.

(b) A minor political party that is not affiliated with a national party holding a national convention to nominate candidates for President and Vice President of the United States may have the names of its candidates for President and Vice President printed on the general election ballot if a petition is signed by 1 percent of the registered voters ~~electors~~ of this state, as shown by the compilation by the Department of State for the preceding general election. A separate petition from each county for which signatures are solicited must ~~shall~~ be submitted to the supervisors of elections of the respective county no later than noon on July 15 of each presidential election year. The supervisor shall check the names and, on or before the date of the primary election, shall certify the number shown as registered voters ~~electors~~ of the county. The supervisor shall be paid by the person requesting the certification the cost of checking the petitions as prescribed in s. 99.097. The supervisor shall then forward the certificate to the Department of State, which shall determine whether or not the percentage factor required in this section has been met. When the percentage factor required in this section has been met, the Department of State shall order the names of the candidates for whom the petition was circulated to be included on the ballot and shall allow ~~permit~~ the required number of persons to be certified as presidential electors in the same manner as other party candidates.

(5) When for any reason a person nominated or elected as a presidential elector is unable to serve because of death, incapacity, or otherwise, the Governor may appoint a person to fill such vacancy who possesses the qualifications required for the elector to have been nominated in the first instance. Such person shall file with the Governor a written ~~an~~ oath that he or she will support the same candidates for President and Vice President that the person who is unable to serve was committed to support.

(6) A presidential elector's refusal or failure to vote for the candidates for President and Vice President of the party the presidential elector was nominated to represent constitutes his or her resignation of the position. The vote he or she cast may not be recorded, and his or her position as a presidential elector must be filled as provided in subsection (5).

Section 38. Section 103.022, Florida Statutes, is amended to read:

App. 0048

103.022 Write-in candidates for President and Vice President.—

(1) Persons seeking to qualify for election as write-in candidates for President and Vice President of the United States may have a blank space provided on the general election ballot for their names to be written in by filing an oath with the Department of State at any time after the 57th day, but before noon of the 49th day, before ~~prior to~~ the date of the primary election in the year in which a presidential election is held.

(2) The Department of State shall prescribe the form to be used in administering the oath.

(3) The write-in candidates shall file with the department a certificate naming the required number of persons to serve as electors. The write-in candidates shall submit the Florida voter registration number and contact information for each presidential elector. Each presidential elector must be a qualified registered voter of this state. Such write-in candidates are ~~shall~~ not ~~be~~ entitled to have their names on the ballot.

Section 39. Subsection (4) of section 103.091, Florida Statutes, is amended to read:

103.091 Political parties.—

(4) Any political party other than a minor political party may by rule provide for the membership of its state or county executive committee to be elected for 4-year terms at the primary election in each year a presidential election is held. The terms ~~shall~~ commence on the first day of the month following each presidential general election; but the names of candidates for political party offices may ~~shall~~ not be placed on the ballot at any other election. The results of such election are ~~shall be~~ determined by a plurality of the votes cast. In such event, electors seeking to qualify for such office shall do so with the Department of State or supervisor of elections not earlier than noon of the 71st day, or later than noon of the 67th day, preceding the primary election. A qualifying office may accept and hold qualifying papers submitted not earlier than 14 days before the beginning of the qualifying period, to be processed and filed during the qualifying period. The outgoing chair of each county executive committee shall, within 30 days after the committee members take office, hold an organizational meeting of all newly elected members for the purpose of electing officers. The chair of each state executive committee shall, within 60 days after the committee members take office, hold an organizational meeting of all newly elected members for the purpose of electing officers.

Section 40. Section 104.16, Florida Statutes, is amended to read:

104.16 Voting fraudulent ballot.—

(1) Any elector who knowingly votes or attempts to vote a fraudulent ballot, or any person who knowingly solicits, or attempts, to vote a

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 52 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 228 of 248

fraudulent ballot, is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) Subsection (1) does not apply to an elector to whom notice has been sent pursuant to s. 98.075(7) and who votes a provisional ballot or vote-by-mail ballot before a final determination of eligibility is made.

Section 41. Section 104.18, Florida Statutes, is amended to read:

104.18 Casting more than one ballot at any election.—

(1) Except as provided in s. 101.6952, whoever willfully votes more than one ballot at any election commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. In any prosecution under this section, the prosecution may proceed in any jurisdiction in which one of the ballots was willfully cast, and it is not necessary to prove which of the ballots was cast first.

(2) For purposes of this section, the term "votes more than one ballot at any election" means an occurrence of any of the following:

(a) Voting more than once in the same election within a county located within this state.

(b) Voting more than once in the same election by voting in two or more counties located in this state.

(c) Voting more than once in the same election by voting in this state and in one or more other states or territories of the United States.

Section 42. Subsection (1) of section 104.42, Florida Statutes, is amended to read:

104.42 Fraudulent registration and illegal voting; investigation.—

(1) The supervisor of elections is authorized to investigate fraudulent registrations and illegal voting and to report his or her findings to the local state attorney and the Office of Election Crimes and Security ~~Florida Elections Commission~~.

Section 43. Paragraph (c) is added to subsection (4) of section 105.031, Florida Statutes, to read:

105.031 Qualification; filing fee; candidate's oath; items required to be filed.—

(4) CANDIDATE'S OATH.—

(c) In addition, each candidate for judicial office shall, at the time of subscribing to the oath or affirmation, state in writing whether he or she owes any outstanding fines, fees, or penalties that cumulatively exceed $250 for any violations of s. 8, Art. II of the State Constitution, the Code of Ethics

App. 0050

for Public Officers and Employees under part III of chapter 112, any local ethics ordinance governing standards of conduct and disclosure requirements, or chapter 106. If the candidate owes any outstanding fines, fees, or penalties exceeding the threshold amount specified in this paragraph, he or she must also specify the amount owed and each entity that levied such fine, fee, or penalty. For purposes of this paragraph, any such fines, fees, or penalties that have been paid in full at the time of subscribing to the oath or affirmation are not deemed to be outstanding.

Section 44. Present paragraphs (a), (b), and (c) of subsection (7) of section 106.03, Florida Statutes, are redesignated as paragraphs (b), (c), and (d), respectively, and a new paragraph (a) is added to that subsection, to read:

106.03 Registration of political committees and electioneering communications organizations.—

(7) The Division of Elections shall adopt rules to prescribe the manner in which committees and electioneering communications organizations may be dissolved and have their registration canceled. Such rules shall, at a minimum, provide for:

(a) Payment of fines prior to registration cancelation or dissolution.

Section 45. Subsection (1) and paragraph (c) of subsection (8) of section 106.07, Florida Statutes, are amended to read:

106.07 Reports; certification and filing.—

(1) Each campaign treasurer designated by a candidate or political committee pursuant to s. 106.021 shall file regular reports of all contributions received, and all expenditures made, by or on behalf of such candidate or political committee. Except for the third calendar quarter immediately preceding a general election ~~as provided in paragraphs (a) and (b)~~, reports must ~~shall~~ be filed on the 10th day following the end of each calendar quarter ~~month~~ from the time the campaign treasurer is appointed, except that, if the 10th day following the end of a calendar quarter ~~month~~ occurs on a Saturday, Sunday, or legal holiday, the report must ~~shall~~ be filed on the next following day that is not a Saturday, Sunday, or legal holiday. Quarterly ~~Monthly~~ reports must ~~shall~~ include all contributions received and expenditures made during the calendar quarter ~~month~~ which have not otherwise been reported pursuant to this section.

(a) A statewide candidate or a political committee required to file reports with the division must file reports:

1. On the 60th day immediately preceding the primary election, and each week thereafter, with the last weekly report being filed on the 4th day immediately preceding the general election.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 54 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 230 of 248

2. On the 10th day immediately preceding the general election, and each day thereafter, with the last daily report being filed the 5th day immediately preceding the general election.

(b) Any other candidate or a political committee required to file reports with a filing officer other than the division must file reports on the 60th day immediately preceding the primary election, and biweekly on each Friday thereafter through and including the 4th day immediately preceding the general election, with additional reports due on the 25th and 11th days before the primary election and the general election.

(c) Following the last day of qualifying for office, any unopposed candidate need only file a report within 90 days after the date such candidate became unopposed. Such report shall contain all previously unreported contributions and expenditures as required by this section and shall reflect disposition of funds as required by s. 106.141.

(d)1. When a special election is called to fill a vacancy in office, all political committees making contributions or expenditures to influence the results of such special election or the preceding special primary election shall file campaign treasurers' reports with the filing officer on the dates set by the Department of State pursuant to s. 100.111.

2. When an election is called for an issue to appear on the ballot at a time when no candidates are scheduled to appear on the ballot, all political committees making contributions or expenditures in support of or in opposition to such issue shall file reports on the 18th and 4th days before such election.

(e) The filing officer shall provide each candidate with a schedule designating the beginning and end of reporting periods as well as the corresponding designated due dates.

(f) A county, a municipality, or any other local governmental entity is expressly preempted from enacting or adopting a reporting schedule that differs from the requirements established in this subsection.

(8)

(c) Any candidate or chair of a political committee may appeal or dispute the fine, based upon, but not limited to, unusual circumstances surrounding the failure to file on the designated due date, and may request and shall be entitled to a hearing before the Florida Elections Commission, which shall have the authority to waive the fine in whole or in part. The Florida Elections Commission must consider the mitigating and aggravating circumstances contained in s. 106.265(3) ~~s. 106.265(2)~~ when determining the amount of a fine, if any, to be waived. Any such request shall be made within 20 days after receipt of the notice of payment due. In such case, the candidate or chair of the political committee shall, within the 20-day period,

App. 0052

notify the filing officer in writing of his or her intention to bring the matter before the commission.

Section 46. Paragraph (c) of subsection (7) of section 106.0702, Florida Statutes, is amended to read:

106.0702 Reporting; political party executive committee candidates.—

(7)

(c) A reporting individual may appeal or dispute the fine, based upon, but not limited to, unusual circumstances surrounding the failure to file on the designated due date, and may request and is entitled to a hearing before the Florida Elections Commission, which has the authority to waive the fine in whole or in part. The Florida Elections Commission must consider the mitigating and aggravating circumstances contained in s. 106.265(3) ~~s. 106.265(2)~~ when determining the amount of a fine, if any, to be waived. Any such request shall be made within 20 days after receipt of the notice of payment due. In such case, the reporting individual must, within 20 days after receipt of the notice, notify the supervisor in writing of his or her intention to bring the matter before the commission.

Section 47. Paragraph (a) of subsection (1) and paragraph (c) of subsection (7) of section 106.0703, Florida Statutes, are amended to read:

106.0703 Electioneering communications organizations; reporting requirements; certification and filing; penalties.—

(1)(a) Each electioneering communications organization shall file regular reports of all contributions received and all expenditures made by or on behalf of the organization. Except for the third calendar quarter immediately preceding a general election ~~as provided in paragraphs (b) and (c)~~, reports must be filed on the 10th day following the end of each calendar quarter ~~month~~ from the time the organization is registered. However, if the 10th day following the end of a calendar quarter ~~month~~ occurs on a Saturday, Sunday, or legal holiday, the report must be filed on the next following day that is not a Saturday, Sunday, or legal holiday. Quarterly ~~Monthly~~ reports must include all contributions received and expenditures made during the calendar quarter ~~month~~ that have not otherwise been reported pursuant to this section.

(7)

(c) The treasurer of an electioneering communications organization may appeal or dispute the fine, based upon, but not limited to, unusual circumstances surrounding the failure to file on the designated due date, and may request and shall be entitled to a hearing before the Florida Elections Commission, which shall have the authority to waive the fine in whole or in part. The Florida Elections Commission must consider the mitigating and aggravating circumstances contained in s. 106.265(3) ~~s. 106.265(2)~~ when determining the amount of a fine, if any, to be waived. Any

such request shall be made within 20 days after receipt of the notice of payment due. In such case, the treasurer of the electioneering communications organization shall, within the 20-day period, notify the filing officer in writing of his or her intention to bring the matter before the commission.

Section 48. Paragraph (b) of subsection (2) of section 106.08, Florida Statutes, is amended to read:

106.08 Contributions; limitations on.—

(2)

(b) A candidate for statewide office may not accept contributions from national, state, or county executive committees of a political party, including any subordinate committee of the political party, or affiliated party committees, which contributions in the aggregate exceed $250,000. Polling services, research services, costs for campaign staff, professional consulting services, ~~and~~ telephone calls, and text messages are not contributions to be counted toward the contribution limits of paragraph (a) or this paragraph. Any item not expressly identified in this paragraph as nonallocable is a contribution in an amount equal to the fair market value of the item and must be counted as allocable toward the contribution limits of paragraph (a) or this paragraph. Nonallocable, in-kind contributions must be reported by the candidate under s. 106.07 and by the political party or affiliated party committee under s. 106.29.

Section 49. Section 106.1436, Florida Statutes, is created to read:

106.1436 Voter guide; disclaimers; violations.—

(1) As used in this section, the term "voter guide" means direct mail that is either an electioneering communication or a political advertisement sent for the purpose of advocating for or endorsing particular issues or candidates by recommending specific electoral choices to the voter or by indicating issue or candidate selections on an unofficial ballot. The term does not apply to direct mail or publications made by governmental entities or government officials in their official capacity.

(2) A person may not, directly or indirectly, represent that a voter guide is an official publication of a political party unless such person is given written permission pursuant to s. 103.081.

(3) A voter guide circulated before, or on the day of, an election must, in bold font with a font size of at least 12 point, prominently:

(a) Display the following disclaimer at the top of the first page of the voter guide:

1. If the voter guide is an electioneering communication, the disclaimer required under s. 106.1439; or

2. If the voter guide is a political advertisement, the disclaimer required under s. 106.143.

(b) Be marked "Voter Guide" with such text appearing immediately below the disclaimer required in paragraph (a).

(4)(a) In addition to any other penalties provided by law, a person who fails to comply with this section commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or by a fine of not less than $25 for each individual voter guide distributed.

(b) Any fine imposed pursuant to paragraph (a) may not exceed $2,500 in the aggregate in any calendar month.

Section 50. Present subsections (2) through (6) of section 106.265, Florida Statutes, are redesignated as subsections (3) through (7), respectively, subsection (1) of that section is amended, and a new subsection (2) is added to that section, to read:

106.265 Civil penalties.—

(1)(a) The commission or, in cases referred to the Division of Administrative Hearings pursuant to s. 106.25(5), the administrative law judge is authorized upon the finding of a violation of this chapter or chapter 104 to impose civil penalties in the form of fines not to exceed $2,500 ~~$1,000~~ per count. The fine may be multiplied by a factor of 3, not to exceed $7,500, for each subsequent count of the same category, beginning with the fourth offense.~~, or,~~

(b) If applicable, the commission or the administrative law judge may instead ~~to~~ impose a civil penalty as provided in s. 104.271 or s. 106.19.

(2) A fine imposed against a political committee jointly and severally attaches to the chair of the political committee if the political committee does not pay the fine within 30 days.

Section 51. Paragraph (e) of subsection (4) of section 322.142, Florida Statutes, is amended to read:

322.142 Color photographic or digital imaged licenses.—

(4) The department may maintain a film negative or print file. The department shall maintain a record of the digital image and signature of the licensees, together with other data required by the department for identification and retrieval. Reproductions from the file or digital record are exempt from the provisions of s. 119.07(1) and may be made and issued only:

(e) To the Department of State or a supervisor of elections pursuant to an interagency agreement to facilitate determinations of eligibility of voter

Case 4:23-cv-00218-MW-MAF Document 60-1 Filed 06/23/23 Page 58 of 650
USCA11 Case: 23-12313 Document: 37-1 Date Filed: 08/28/2023 Page: 234 of 248

registration applicants and registered voters in accordance with ss. 98.045 and 98.075;

Section 52. Except as otherwise expressly provided in this act and except for this section, which shall take effect upon this act becoming a law, this act shall take effect July 1, 2023.

Approved by the Governor May 24, 2023.

Filed in Office Secretary of State May 24, 2023.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

# TAB B

# Section I
# Notice of Development of Proposed Rules and Negotiated Rulemaking

**DEPARTMENT OF STATE**

**Division of Elections**

RULE NO.: RULE TITLE:
1S-2.042 Third-Party Voter Registration Organizations

PURPOSE AND EFFECT: To conform to statutory changes in Ch. 2021-11, Ch. 2022-73, and Ch. 2023-120, Laws of Florida, including providing third-party voter registration organizations a mechanism to avoid fines regarding unauthorized persons collecting or handling voter registration applications.

SUBJECT AREA TO BE ADDRESSED: Third-party voter registration organizations.

RULEMAKING AUTHORITY: 20.10, 97.012(1), (2), (15), 97.0575(4), (6)

LAW IMPLEMENTED: 97.012(1), (2), (15), 97.0575

A RULE DEVELOPMENT WORKSHOP WILL BE HELD AT THE DATE, TIME AND PLACE SHOWN BELOW:

DATE AND TIME: July 10, 2023, at 11:00 a.m.

PLACE: Heritage Hall, R.A. Gray Bldg., 500 S. Bronough St., Tallahassee, FL 32399; or 1-888-585-9008, 201-297-717 (conference call room).

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 3 hours before the workshop/meeting by contacting: Ashley E. Davis at ashley.davis@dos.myflorida.com. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

THE PERSON TO BE CONTACTED REGARDING THE PROPOSED RULE DEVELOPMENT AND A COPY OF THE PRELIMINARY DRAFT, IF AVAILABLE, IS: Ashley E. Davis at ashley.davis@dos.myflorida.com.

THE PRELIMINARY TEXT OF THE PROPOSED RULE DEVELOPMENT IS AVAILABLE AT NO CHARGE FROM THE CONTACT PERSON LISTED ABOVE.

**DEPARTMENT OF STATE**

**Division of Elections**

RULE NO.: RULE TITLE:
1S-2.055 Vote-by-mail Requests

PURPOSE AND EFFECT: To conform to statutory changes in Ch. 2023-120, Laws of Florida, including providing a uniform statewide form for requesting a vote-by-mail ballot.

SUBJECT AREA TO BE ADDRESSED: Vote-by-mail requests.

RULEMAKING AUTHORITY: 20.10, 97.012(1), (2), (15), 101.62(1)(a)

LAW IMPLEMENTED: 97.012(1), (2), (15), 101.62(1)(a)

A RULE DEVELOPMENT WORKSHOP WILL BE HELD AT THE DATE, TIME AND PLACE SHOWN BELOW:

DATE AND TIME: July 10, 2023, at 12:00 p.m.

PLACE: Heritage Hall, R.A. Gray Bldg., 500 S. Bronough St., Tallahassee, FL 32399; or 1-888-585-9008, 201-297-717 (conference call room).

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 3 hours before the workshop/meeting by contacting: Ashley E. Davis at ashley.davis@dos.myflorida.com If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

THE PERSON TO BE CONTACTED REGARDING THE PROPOSED RULE DEVELOPMENT AND A COPY OF THE PRELIMINARY DRAFT, IF AVAILABLE, IS: Ashley E. Davis at ashley.davis@dos.myflorida.com

THE PRELIMINARY TEXT OF THE PROPOSED RULE DEVELOPMENT IS AVAILABLE AT NO CHARGE FROM THE CONTACT PERSON LISTED ABOVE.

**PUBLIC SERVICE COMMISSION**

RULE NO.: RULE TITLE:
25-14.004 Effect of Parent Debt on Federal Corporate Income Tax

PURPOSE AND EFFECT: To update and clarify the rule language.

Undocketed

SUBJECT AREA TO BE ADDRESSED: The assessment of tax expense in rate-making for electric, gas, water, and wastewater industries.

RULEMAKING AUTHORITY: 350.127(2), Florida Statutes

LAW IMPLEMENTED: 366.05(1), 367.121(1)(a), Florida Statutes

IF REQUESTED IN WRITING AND NOT DEEMED UNNECESSARY BY THE AGENCY HEAD, A RULE DEVELOPMENT WORKSHOP WILL BE NOTICED IN THE NEXT AVAILABLE ISSUE OF THE FLORIDA ADMINISTRATIVE REGISTER.

THE PERSON TO BE CONTACTED REGARDING THE PROPOSED RULE DEVELOPMENT AND A COPY OF THE PRELIMINARY DRAFT, IF AVAILABLE, IS: Susan Sapoznikoff, Florida Public Service Commission, Office of the General Counsel, 2540 Shumard Oak Blvd., Tallahassee, FL 32399-0850, (850)413-6630, Susan.Sapoznikoff@psc.state.fl.us.

THE PRELIMINARY TEXT OF THE PROPOSED RULE DEVELOPMENT IS AVAILABLE AT NO CHARGE FROM THE CONTACT PERSON LISTED ABOVE.

# Section II
# Proposed Rules

**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**

**Board of Architecture and Interior Design**

RULE NO.: RULE TITLE:
61G1-12.001 Grounds for Disciplinary Proceedings

PURPOSE AND EFFECT: The purpose of the amendment is to update the rule regarding the requirements for registered interior designers.

SUMMARY: The proposed amendment updates the rule text.

SUMMARY OF STATEMENT OF ESTIMATED REGULATORY COSTS AND LEGISLATIVE RATIFICATION:

The Agency has determined that this will not have an adverse impact on small business or likely increase directly or indirectly regulatory costs in excess of $200,000 in the aggregate within one year after the implementation of the rule. A SERC has not been prepared by the Agency.

The Agency has determined that the proposed rule is not expected to require legislative ratification based on the statement of estimated regulatory costs or if no SERC is required, the information expressly relied upon and described herein: During discussion of the economic impact of this rule at its Board meeting, the Board, based upon the expertise and experience of its members, determined that a Statement of Estimated Regulatory Costs (SERC) was not necessary and that the rule will not require ratification by the Legislature. No person or interested party submitted additional information regarding the economic impact at that time.

Any person who wishes to provide information regarding a statement of estimated regulatory costs, or provide a proposal for a lower cost regulatory alternative must do so in writing within 21 days of this notice.

RULEMAKING AUTHORITY: 481.2055 FS.

LAW IMPLEMENTED: 481.219, 481.225, 481.2251 FS.

IF REQUESTED WITHIN 21 DAYS OF THE DATE OF THIS NOTICE, A HEARING WILL BE SCHEDULED AND ANNOUNCED IN THE FAR.

THE PERSON TO BE CONTACTED REGARDING THE PROPOSED RULE IS: Stacey Buccieri, Executive Director, Board of Architecture and Interior Design, 2601 Blair Stone Road, Tallahassee, FL 32399-0790, (850)717-1400 or by electronic mail – Stacey.Buccieri@myfloridalicense.com

THE FULL TEXT OF THE PROPOSED RULE IS:

**61G1-12.001 Grounds for Disciplinary Proceedings.**

(1) through (3) No change.

(4) An architect, registered interior designer, or qualified business organization may not be negligent in the practice of architecture. The term negligence is defined as the failure, by an architect or registered interior designer, to exercise due care to conform to acceptable standards of architectural or interior design practice in such a manner as to be detrimental to a client or to the public at large.

(a) through (b) No change.

(5) An architect or registered interior designer shall not be incompetent to practice architecture. Incompetence in the practice of architecture shall mean the physical or mental incapacity or inability of an architect to practice architecture.

(6) An architect, registered interior designer, or qualified business organization shall not commit misconduct in the practice of architecture. Misconduct in the practice of architecture or interior design shall include but not be limited to:

(a) through (b) No change.

(c) Knowingly becoming involved in a conflict of interest as to an employer or client without the permission of the client or employer. In the event such conflict is suspected or determined to exist an architect or registered interior designer immediately shall:

1. No change.

2. Assure in writing that such conflict will in no manner influence the architect~~'s~~ or registered interior designer's judgment or the quality of his services to his employer or client; and

3. Promptly inform his client or employer in writing of any business association, interest or circumstances which may be influencing his judgment or the quality of his services to his client or employer;

(d) No Change.

(e) Soliciting or accepting gratuities, directly or indirectly, from contractors, their agents, or other parties dealing with the architect's client or employer in connection with work for which the architect or registered interior designer is responsible without the knowledge of the architect~~'s~~ or registered interior designer's employer or client;

(f) Violation of any law of the State of Florida directly regulating the practice of architecture or registered interior designer;

(g) Use of architectural or registered interior designer expertise or status as an architect or registered interior designer in the commission of a felony;

(h) No Change.

(i) Undertaking any activity, having any undisclosed significant financial or other interests, or accepting any

contribution that either compromises professional judgment or prevents any architect or registered interior designer from serving in the best interest of his client or employer;

(j) through (k) No change.

Rulemaking Authority 481.2055 FS. Law Implemented 481.219, 481.225, 481.2251 FS. History–New 12-23-79, Amended 12-19-82, Formerly 21B-12.01, Amended 9-23-86, 11-8-88, Formerly 21B-12.001, Amended 2-25-98, 4-1-01, 12-7-08, 11-9-20,____________________________.

NAME OF PERSON ORIGINATING PROPOSED RULE: Board of Architecture and Interior Design

NAME OF AGENCY HEAD WHO APPROVED THE PROPOSED RULE: Board of Architecture and Interior Design

DATE PROPOSED RULE APPROVED BY AGENCY HEAD: May 12, 2023

DATE NOTICE OF PROPOSED RULE DEVELOPMENT PUBLISHED IN FAR: June 7, 2023

# Section III
# Notice of Changes, Corrections and Withdrawals

**DEPARTMENT OF FINANCIAL SERVICES**

**Division of Risk Management**

RULE NO.: RULE TITLE:

69H-2.007 Loss Prevention Programs

NOTICE OF CHANGE

Notice is hereby given that the following changes have been made to the proposed rule in accordance with subparagraph 120.54(3)(d)1., F.S., published in Vol. 49 No. 63, March 31, 2023 issue of the Florida Administrative Register.

The bold language on the Form DFS-D0-1993 is amended to add "business" between "10" and "days" to now read as follows:

**The claim referenced above requires further explanation from the State Agency/University that reported the claim and to which the claim has been assigned. Please complete the information below and return it to the Division of Risk Management's Loss Prevention section within 10 business days of the date of receipt:**

# Section IV
# Emergency Rules

**DEPARTMENT OF HEALTH**

**Board of Osteopathic Medicine**

RULE NO.: RULE TITLE:

64B15ER23-4 Sex-reassignment Prescriptions

SPECIFIC REASONS FOR FINDING AN IMMEDIATE DANGER TO THE PUBLIC HEALTH, SAFETY OR WELFARE: : On May 17, 2023, Florida Governor, Ronald DeSantis, signed CSSB 254 into law creating Ch. 2023-90, Laws of Florida and section 456.52, Florida Statutes. Pursuant to section 456.52(1), F.S., sex-reassignment prescriptions are prohibited for patients younger than 18 years of age upon the effective date of the act; however, pursuant to section 456.52(1)(a), F.S., the Board of Osteopathic Medicine shall within 60 days after the effective date of the act, adopt emergency rules pertaining to standards of practice by which minors may continue to be treated if such treatment was commenced before, and is still active on, the effective date of the act. Section 456.52(1)(b), F.S., also provides a minor patient meeting the criteria outlined in section 456.52(1)(a), F.S., may continue to be treated by a physician with such prescriptions according to rules adopted pursuant to paragraph (1)(a).

Further, pursuant to section 456.52(2), F.S., if sex reassignment prescriptions or procedures are prescribed for or administered to patients 18 years of age or older, consent must be voluntary, informed, and in writing on forms adopted in rule by the Board of Osteopathic Medicine. Pursuant to section 456.52(4), F.S., the consent required for sex-reassignment prescriptions does not apply to renewals of sex-reassignment prescriptions if a physician and his or her patient have met the requirements for consent for the initial prescription. Section 456.52(6)(a), F.S., states "[t]he Board of Medicine and the Board of Osteopathic Medicine shall adopt emergency rules to implement this section."

Accordingly, the Board of Osteopathic Medicine, by emergency rule, hereby allows a patient's prescribing physician to renew a prior lawfully issued sex-reassignment prescription that was initially prescribed prior to May 17, 2023, up and until six months from the effective date of the Board's emergency

rule that formally adopts the required consent forms pursuant to section 456.52(1) and (2), F.S.
*** This emergency rule does not apply to Susan Doe, Gavin Goe, or Lisa Loe, or their parents or healthcare providers (see Jane Doe et al., v. Joseph A. Ladapo, et al, Preliminary Injunction, Filed June 6, 2023, Case No. 4:23cv114-RH-MAF, United States District Court for the Northern District of Florida). ***
REASON FOR CONCLUDING THAT THE PROCEDURE IS FAIR UNDER THE CIRCUMSTANCES: The procedure used for the promulgation of this emergency rule is fair under the circumstances. CSSB 254 was signed into law on May 17, 2023. The Board of Medicine was contacted by multiple licensed physicians and physician groups seeking clarification regarding the exception contained in section 465.52(4), F.S., and a timeframe for the required emergency rules shortly thereafter. In response, the Board of Medicine and the Board of Osteopathic Medicine held a Joint Rules/Legislative Committee (Joint Committee) meeting on June 1, 2023, to discuss the emergency rule. On May 19, 2023, the Board of Osteopathic Medicine published notice of the Joint Committee meeting both on its website and in the Florida Administrative Register. On June 2, 2023, the Board of Medicine discussed the report of the Joint Committee and voted upon emergency rule language. Likewise, on June 20, 2023, the Board of Osteopathic Medicine discussed the Joint committee report and voted upon emergency rule language. The Board of Osteopathic Medicine published notice of its June 20, 2023, meeting in the Florida Administrative Register and on its website on June 6, 2023. Each meeting was held in a public forum and was able to be attended by any interested parties. Accordingly, all notice requirements contained in Rule 28-102.001, F.A.C., were properly complied with and interested parties were given ample opportunity to participate in this rulemaking process.
SUMMARY: The proposed emergency rule allows a patient's prescribing physician to renew a prior lawfully issued sex-reassignment prescription that was prescribed prior to the effective date of section 465.52, F.S., up and until six months from the effective date of the Board of Osteopathic Medicine's emergency rule formally adopting a consent form per sections 456.52(1) and (2), Florida Statutes.
THE PERSON TO BE CONTACTED REGARDING THE EMERGENCY RULE IS: Danielle Terrell, Executive Director, Board of Osteopathic Medicine/MQA, 4052 Bald Cypress Way, Bin #C06, Tallahassee, Florida 32399-3256, or by email at Danielle.Terrell@flhealth.gov.

THE FULL TEXT OF THE EMERGENCY RULE IS:

64B15ER23-4 Sex-reassignment Prescriptions.

A patient's prescribing physician may renew a prior lawfully issued sex-reassignment prescription as defined in section 456.001(9)(a), Florida Statutes, that was prescribed prior to May 17, 2023, up and until six months from the effective date of the Board's emergency rule formally adopting a consent form per sections 456.52(1) and (2), Florida Statutes.
Rulemaking Authority 456.52(1)(a), (b), 456.52(6)(a) FS. Law Implemented 456.52(1), (2) FS., New 6-20-23.

THIS RULE TAKES EFFECT UPON BEING FILED WITH THE DEPARTMENT OF STATE UNLESS A LATER TIME AND DATE IS SPECIFIED IN THE RULE.
EFFECTIVE DATE: June 20, 2023

## Section V
## Petitions and Dispositions Regarding Rule Variance or Waiver

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
Division of Hotels and Restaurants
RULE NO.: RULE TITLE:
61C-5.001 Safety Standards
NOTICE IS HEREBY GIVEN that on June 19, 2023, the Department of Business and Professional Regulation, Division of Hotels and Restaurants, Bureau of Elevator Safety, received a petition for Reep-OFC Financial Center LLC at 3801 PGA Blvd, Palm Beach Gardens, FL. Petitioner seeks a variance of the requirements of ASME A17.1, 2016 edition, Sections 2.8.1 and 2.8.2.2, as adopted by 61C-5.001, Florida Administrative Code that requires an antenna not be placed in the elevator shaft which poses a significant hardship. Any interested person may file comments within 14 days of the publication of this notice with Division of Hotels and Restaurants, Bureau of Elevator Safety, 2601 Blair Stone Road, Tallahassee, Florida 32399-1013 (VW2023-062).
A copy of the Petition for Variance or Waiver may be obtained by contacting: Division of Hotels and Restaurants, Bureau of Elevator Safety, 2601 Blair Stone Road, Tallahassee, Florida 32399-1013. dhr.elevators@myfloridalicense.com

DEPARTMENT OF HEALTH
Board of Clinical Laboratory Personnel
RULE NO.: RULE TITLE:
64B3-5.003 Technologist
The Board of Accountancy hereby gives notice:
that the Petition filed by Nidhi Kapoor, on April 24, 2023, seeking a variance or waiver of Rule 64B3-5.003, F.A.C., has been withdrawn. The Notice of Petition was published in Vol. 49 No. 83 of the April 28, 2023, issue of the Florida Administrative Register.

A copy of the Order or additional information may be obtained by contacting:
Dayle Mooney, Executive Director, Board of Clinical Laboratory Personnel, 4052 Bald Cypress Way, Bin # C-07, Tallahassee, Florida 32399-3258, telephone: (850)488-0595, or email, Dayle.Mooney@flhealth.gov.

---

DEPARTMENT OF HEALTH
Board of Clinical Laboratory Personnel
The Board of Clinical Laboratory Personnel hereby gives notice:
of the issuance of an Order Denying the Petition for Variance or Waiver, filed on February 27, 2023, by Leah Marshall. The Notice of Petition for Waiver or Variance was published in Vol. 49, No. 59, of the March 24, 2023, Florida Administrative Register. Petitioner did not state a specific rule citation for the request on waiver or variance. The Board considered the instant Petition at a duly-noticed public meeting held on April 28, 2023. The Board's Order, filed on May 17, 2023, denied the petition stating that Petitioner failed to identify a level of licensure and rule for which she seeks a waiver. Petitioner failed to establish that the Board's application of existing rules to her circumstances would violate principles of fairness or impose a substantial hardship on her.
A copy of the Order or additional information may be obtained by contacting:
Dayle Mooney, Executive Director, Board of Clinical Laboratory Personnel, 4052 Bald Cypress Way, Bin # C-07, Tallahassee, Florida 32399-3258, telephone: (850)488-0595, or email, Dayle.Mooney@flhealth.gov.

---

DEPARTMENT OF HEALTH
Board of Physical Therapy Practice
NOTICE IS HEREBY GIVEN that on June 21, 2023, the Board of Physical Therapy Practice, received a petition for Variance or Waiver filed by Ashima Chohan. Petitioner is seeking a variance or waiver from Section 486.031(3)(b), Florida Statutes, which states that to be eligible for licensing as a physical therapist, and applicant must have received a diploma from a program in physical therapy in a foreign country and have educational credentials deemed equivalent to those required for the educational preparation of physical therapists in this country, as recognized by the appropriate agency as identified by the board, and have passed to the satisfaction of the board an examination to determine her or his fitness for practice as a physical therapist as hereinafter provided.
Comments on this petition should be filed with the Board of Physical Therapy Practice, 4052 Bald Cypress Way, Bin #C05, Tallahassee, Florida 32399-3253, within 14 days of publication of this notice.
A copy of the Petition for Variance or Waiver may be obtained by contacting: Allen Hall, Executive Director, Board of Physical Therapy Practice, 4052 Bald Cypress Way, Bin #C05, Tallahassee, Florida 32399-3253, or by electronic mail-Allen.Hall@flhealth.gov.

---

FLORIDA HOUSING FINANCE CORPORATION
RULE NO.: RULE TITLE:
67-48.0072 Credit Underwriting and Loan Procedures
NOTICE IS HEREBY GIVEN that on June 21, 2023, the Florida Housing Finance Corporation, received a petition for waiver from paragraph 67-48.0072(17)(h) (5/24/2017), Florida Administrative Code from WRDG T3A, LP, allowing the General Contractor to subcontract to two affiliates.
A copy of the Petition for Variance or Waiver may be obtained by contacting: Ana McGlamory, Corporation Clerk, Florida Housing Finance Corporation, 227 North Bronough Street, Suite 5000, Tallahassee, FL 32301-1329. The Petition has also been posted on Florida Housing's website at floridahousing.org. Florida Housing will accept comments concerning the Petition for 14 days from the date of publication of this notice. To be considered, comments must be received on or before 5:00 p.m., Eastern Time, on the 14th day after publication of this notice at Florida Housing Finance Corporation, 227 North Bronough Street, Suite 5000, Tallahassee, Florida 32301-1329.

---

# Section VI
# Notice of Meetings, Workshops and Public Hearings

BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND
The Florida Department of Environmental Protection's Office of Resilience and Coastal Protection announces a public meeting to which all persons are invited.
DATE AND TIME: Monday, July 24, 2023, 1:00 p.m. – 4:00 p.m.
PLACE: 2796 Overseas Highway, Marathon, FL 33050 and online through TEAMS at
https://teams.microsoft.com/l/meetup-join/19%3ameeting_MjBjOGNiZTUtYjQ3NS00MmUyLWI3ZTMtNjkyNzE3NjBlNGU5%40thread.v2/0?context=%7b%22Tid%22%3a%22679d4c83-aea2-4635-b4f1-9f5012551b6a%22%2c%22Oid%22%3a%228a4d3c12-ab28-41cd-8d18-33487b7c82ba%22%7d
GENERAL SUBJECT MATTER TO BE CONSIDERED: The Advisory Committee for the Coupon Bight Aquatic Preserve Management Plan is meeting to review and discuss the draft

update to the Coupon Bight Aquatic Preserve Management Plan, previously approved in 1992. The management plan is available online at https://publicfiles.dep.state.fl.us/CAMA/Coupon-Bight-AP-Management-Plan-DRAFT.pdf. Members of the public are invited to attend and listen to comments. A separate public meeting will be held to present the management plan to the public for their comments.

A copy of the agenda may be obtained by contacting: Aquatic Preserve Manager, Dr. Nicholas Parr at Nicholas.Parr@FloridaDEP.gov.

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 5 days before the workshop/meeting by contacting: Dr. Nicholas Parr at Nicholas.Parr@FloridaDEP.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

---

WATER MANAGEMENT DISTRICTS

Northwest Florida Water Management District

The Northwest Florida Water Management District announces a public meeting to which all persons are invited.

DATE AND TIME: July 18, 2023, 2:00 p.m., Eastern Time (ET).

PLACE: Northwest Florida Water Management District, 81 Water Management Drive, Havana, Florida 32333.

GENERAL SUBJECT MATTER TO BE CONSIDERED: In accordance with the timeframe set forth in section 120.525, Florida Statutes, the District announces the opening of bids received in response to ITB No. 23B-012 - 2023 GROUND SITE PREP HERBICIDE TREATMENT SERVICES.

A copy of the agenda may be obtained by contacting: Northwest Florida Water Management District's website (http://www.nwfwater.com); the State of Florida's Vendor Information Portal website at: MyFloridaMarket Place Vendor Information Portal; or may be obtained by calling (850)539-5999.

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 72 hours before the workshop/meeting by contacting: Benjamin Faure at Office (850)722-9919 or Cell (850)510-0399, Benjamin.Faure@nwfwater.com. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: Benjamin Faure at Office (850)722-9919 or Cell (850)510-0399, Benjamin.Faure@nwfwater.com.

---

SPACE FLORIDA

The Space Florida announces a public meeting to which all persons are invited.

DATE AND TIME: June 30, 2023, 9:00 a.m., EDT

PLACE: Virtual Meeting via Zoom Meeting Link https://spaceflorida.zoom.us/j/6277636389?pwd=OUdidzM0ejU5aGhXZUtldU5hU2pvdz09

GENERAL SUBJECT MATTER TO BE CONSIDERED: Space Florida Transition Team Meeting

A copy of the agenda may be obtained by contacting: Terrie Ireland at tireland@spaceflorida.gov or (321)730-5301, ext. 241

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 2 days before the workshop/meeting by contacting: Terrie Ireland at tireland@spaceflorida.gov or (321)730-5301, ext. 241. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

If any person decides to appeal any decision made by the Board with respect to any matter considered at this meeting or hearing, he/she will need to ensure that a verbatim record of the proceeding is made, which record includes the testimony and evidence from which the appeal is to be issued.

For more information, you may contact: Terrie Ireland at tireland@spaceflorida.gov or (321)730-5301, ext. 241.

---

DEPARTMENT OF HEALTH

Board of Medicine

The Board of Medicine – Special Probable Cause Panel announces a public meeting to which all persons are invited.

DATE AND TIME: Thursday, June 29, 2023, 2:30 p.m., EST, or soon thereafter.

PLACE: You may join the meeting from your computer, tablet, or smartphone through the following link: https://global.gotomeeting.com/join/841195637. You may also join the meeting using your phone at the following number: (646)749-3122, access code: 841-195-637. To maximize your access to the meeting, the Department highly recommends that you download the GoToMeeting app on your computer, tablet, or smartphone prior to the meeting.

GENERAL SUBJECT MATTER TO BE CONSIDERED: The panel will conduct a meeting related to public disciplinary cases.

A copy of the agenda may be obtained by contacting: April Houston at (850)558-9858 or emailing her at April.Houston@flhealth.gov.

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the

agency at least 7 days before the workshop/meeting by contacting: April Houston at (850)558-9858 or emailing her at April.Houston@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

If any person decides to appeal any decision made by the Board with respect to any matter considered at this meeting or hearing, he/she will need to ensure that a verbatim record of the proceeding is made, which record includes the testimony and evidence from which the appeal is to be issued.

For more information, you may contact: April Houston at (850)558-9858 or emailing her at April.Houston@flhealth.gov.

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 19 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: June 27, 2023, 1:30 p.m. - 1:40 p.m.

PLACE: Virtual Meeting

Dial in number (888)585-9008

Conference Room number- 409-164-623

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: carol.wegener-vitani@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: carol.wegener-vitani@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: carol.wegener-vitani@flhealth.gov

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 19 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: July 25, 2023, 1:30 p.m. - 1:40 p.m.

PLACE: Virtual meeting

Dial in number (888)585-9008

Conference Room number- 409-164-623

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: carol.wegener-vitani@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: carol.wegener-vitani@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: carol.wegener-vitani@flhealth.gov

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 19 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: August 29, 2023, 1:30 p.m. -1:40 p.m.

PLACE: Dial in number (888)585-9008

Conference Room number- 409-164-623

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: carol.wegener-vitani@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: carol.wegener-vitani@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 19 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: September 26, 2023, 1:30 p.m. - 1:40 p.m.

PLACE: Dial in number (888)585-9008

Conference Room number- 409-164-623

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: carol.wegener-vitani@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: carol.wegener-vitani@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 19 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: October 31, 2023, 1:30 p.m. - 1:40 p.m.

PLACE: Dial in number (888)585-9008

Conference Room number- 409-164-623

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: carol.wegener-vitani@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: carol.wegener-vitani@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: carol.wegener-vitani@flhealth.gov

---

DEPARTMENT OF HEALTH

Division of Children's Medical Services

The Child Abuse Death Review Circuit 13 Committee announces a public meeting to which all persons are invited.

DATE AND TIME: July 12, 2023, 1:00 p.m. - 1:15 p.m.

PLACE: Zoom Meeting: https://us06web.zoom.us/meeting/register/tZMkcOCtpjkuH90D-CrNiBVsL9rmiVUlPLsT

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Committee will address administrative issues, review cases, and discuss the CADR Action Plan. A portion of the meeting is required by Section 383.412(3) (a), F.S. to be closed to the public to allow the Committee to discuss information that is confidential and exempt from public meetings and public records. This portion of the meeting will be announced at the meeting.

A copy of the agenda may be obtained by contacting: Carry.Simons@flhealth.gov

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 7 days before the workshop/meeting by contacting: Carry.Simons@flhealth.gov. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: Carry.Simons@flhealth.gov

---

DEPARTMENT OF CHILDREN AND FAMILIES

Refugee Services

The Jacksonville Area Refugee Task Force announces a public meeting to which all persons are invited.

DATE AND TIME: Wednesday, July 12, 2023; 1:30 p.m. - 3:30 p.m.

PLACE: Meeting will take place via the Microsoft Teams platform. Use the below link to connect to the meeting: https://teams.microsoft.com/l/meetup-join/19%3ameeting_NGU3Yjc4NjctNTRlZS00YjMzLWI1ZTQtZTQ2N2QxZDg0ZDY5%40thread.v2/0?context=%7b%22Tid%22%3a%22f70dba48-b283-4c57-8831-cb411445a94c%22%2c%22Oid%22%3a%224c7ac74e-0835-4242-a8cf-f26976fc1c32%22%7d

GENERAL SUBJECT MATTER TO BE CONSIDERED: The purpose of the Jacksonville Area Refugee Task Force meeting is to increase awareness of the refugee populations, share best practices, spot trends in refugee populations, build collaborations between agencies, help create good communication among service providers, get informed about upcoming community events, and discuss refugee program service needs and possible solutions to meeting those needs.

A copy of the agenda may be obtained by contacting: Lita Amin (904)524-1316 or David Draper at (407)317-7335.

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the

agency at least 5 days before the workshop/meeting by contacting: Lita Amin (904)524-1316 or David Draper at (407)317-7335. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: Lita Amin (904)524-1316 or David Draper at (407)317-7335.

DEPARTMENT OF ECONOMIC OPPORTUNITY

Division of Community Development

The Division of Community Development announces the availability of the Draft Federal Fiscal Year (FFY) 2023 Annual Action Plan for public comment and also announces a hearing to which all persons are invited.

DATE AND TIME: Public Hearing - June 29, 2023, 10:00 a.m., Eastern Standard Time (EST).

Public Comment Period - June 23, 2023 through July 7, 2023.

PLACE: Public Hearing will be held via Microsoft Teams and in-person:

Join by Computer/Tablet/Smartphone at https://teams.microsoft.com/l/meetup-join/19%3ameeting_ZDBlN2NhOTctYzMwZS00ZDQ5LWE0OTItZjM5YzljNDFhMjlj%40thread.v2/0?context=%7b%22Tid%22%3a%22931da019-f64e-4908-b0f6-92f46f78c512%22%2c%22Oid%22%3a%22b6e1445d-1082-4e7c-b08e-1559ee626f2f%22%7d

or

Dial-in at +1(850)988-5144 (Conference ID: 755 652 205#) or Attend In Person: Florida Department of Economic Opportunity, 107 E. Madison St., Caldwell Building, Room 114, Tallahassee, FL

GENERAL SUBJECT MATTER TO BE CONSIDERED: The Florida Department of Economic Opportunity (DEO), in cooperation with other agencies, requests public comment on the FFY 2023 Annual Action Plan for Housing and Community Development (FFY 2023 Annual Action Plan) prior to submitting it to the U.S. Department of Housing and Urban Development (HUD).

The HUD-funded programs included in the FFY 2023 Annual Action Plan are the Florida Small Cities Community Development Block Grant (CDBG) program administered by DEO, the Emergency Solutions Grant (ESG) program administered by the Florida Department of Children and Families, the Housing Opportunities for Persons With AIDS (HOPWA) program administered by the Florida Department of Health, the Home Investment Partnership (HOME) program, and the Housing Trust Fund (HTF) administered by the Florida Housing Finance Corporation.

The Draft FFY Annual Action Plan is available for public review and comment prior to submitting the plan to HUD. The 15-day comment period will begin on June 23, 2023, and will end on July 7, 2023. The draft of the Action Plan will also be posted on DEO's website: www.FloridaJobs.org/AnnualActionPlan.

Written comments on the drafted Action Plan are encouraged and may be made at the public meeting, emailed to CDBG@DEO.MyFlorida.com, or mailed to: Florida Small Cities CDBG Program, 107 East Madison St., MSC-400, Tallahassee, FL 32399.

A copy of the agenda may be obtained by contacting: CDBG@DEO.MyFlorida.com.

Pursuant to the provisions of the Americans with Disabilities Act, any person requiring special accommodations to participate in this workshop/meeting is asked to advise the agency at least 5 days before the workshop/meeting by contacting: CDBG@DEO.MyFlorida.com. If you are hearing or speech impaired, please contact the agency using the Florida Relay Service, 1(800)955-8771 (TDD) or 1(800)955-8770 (Voice).

For more information, you may contact: Florida Small Cities CDBG, CDBG@DEO.MyFlorida.com.

## Section VII
## Notice of Petitions and Dispositions Regarding Declaratory Statements

NONE

## Section VIII
## Notice of Petitions and Dispositions Regarding the Validity of Rules

Notice of Petition for Administrative Determination has been filed with the Division of Administrative Hearings on the following rules:

NONE

Notice of Disposition of Petition for Administrative Determination has been filed with the Division of Administrative Hearings on the following rules:

NONE

# Section IX
# Notice of Petitions and Dispositions Regarding Non-rule Policy Challenges

NONE

# Section X
# Announcements and Objection Reports of the Joint Administrative Procedures Committee

NONE

# Section XI
# Notices Regarding Bids, Proposals and Purchasing

DEPARTMENT OF EDUCATION
University of Florida
Notice of Bid
Request for Qualifications (Construction)
University of Florida Board of Trustees
UF Bid Number FY23-QFC-020
New Graduate Residence – Homestead, FL
SCOPE OF WORK:
The project consists of the construction of graduate student housing inclusive of all required sitework. This building will provide housing for graduate students involved with the Tropical Research and Education Center (TREC). It will be a single story, roughly 3,052 GSF facility with eight bedrooms and four bathrooms.
Applicants unfamiliar with work at the University of Florida (UF) are strongly urged to familiarize themselves with the UF General Terms and Conditions, construction inspection & closeout procedures and forms, and other documents and materials available on the UF Planning Design & Construction (PD&C) website at www.facilities.ufl.edu.
PROPOSAL:
The method of delivery is design-bid-build, with an enhanced pre-bid qualification process. The following criteria shall be used to qualify potential bidders:

- Past Performance on Similar Projects
- Personnel Assigned to the Project
- Financial Standing, Qualifications, and Licensure
- Safety Record
- Workload
- Completeness of Pre-Qualification Documents

RFQ inquiries are due June 30, 2023, at 6:00PM.
RFQ submittals are due July 11, 2023, at 3:00PM.
Only applicants deemed to be qualified will be permitted to bid.
Tentative Bid Schedule (subject to change):
Posting of Pre-qualified Contractors – July 19, 2023
Bid Documents available – July 19, 2023
Mandatory Pre-bid Conference (for Pre-qualified Contractors) – July 25, 2023
Pre-bid Inquiries Due – August 1, 2023
Bids Due – August 16, 2023
Additional information, including Basis of Design Package, can be obtained on University of Florida's Schedule of Bids webpage:
https://bids.sciquest.com/apps/Router/PublicEvent?CustomerOrg=Florida

HILLSBOROUGH COUNTY AVIATION AUTHORITY
Executive Search Services
Solicitation Advertisement Executive Search Services
HILLSBOROUGH COUNTY AVIATION AUTHORITY (AUTHORITY)
Sealed proposals for the above referenced solicitation will be received from firms by the Authority electronically at www.TampaAirport.com > Learn about TPA > Airport Business > Procurement > Solicitations and Contracts > Current, Planned and Archived Solicitations.
Solicitation documents and detailed requirements will be available on the Tampa International Airport website at www.tampaairport.com > Learn about TPA > Airport Business > Procurement > Solicitations and Contracts > Current, Planned and Archived Solicitations on or about June 22, 2023.

# Section XII
# Miscellaneous

**DEPARTMENT OF STATE**

Index of Administrative Rules Filed with the Secretary of State

Pursuant to subparagraph 120.55(1)(b)6. – 7., F.S., the below list of rules were filed in the Office of the Secretary of State between 3:00 p.m., Friday, June 16, 2023 and 3:00 p.m., Thursday, June 22, 2023.

| Rule No. | File Date | Effective Date |
|---|---|---|
| 1A-39.001 | 6/16/2023 | 7/6/2023 |
| 64B5-12.013 | 6/20/2023 | 7/10/2023 |
| 64B15ER23-4 | 6/20/2023 | 6/20/2023 |
| 64B16-28.140 | 6/19/2023 | 7/9/2023 |
| 68A-20.005 | 6/16/2023 | 7/6/2023 |

| 68B-2.006 | 6/21/2023 | 7/11/2023 |
|---|---|---|
| **LIST OF RULES AWAITING LEGISLATIVE APPROVAL SECTIONS 120.541(3), 373.139(7) AND/OR 373.1391(6), FLORIDA STATUTES** | | |
| **Rule No.** | **File Date** | **Effective Date** |
| 40C-4.091 | 3/31/2023 | **/**/**** |
| 40C-41.043 | 3/31/2023 | **/**/**** |
| 60FF1-5.009 | 7/21/2016 | **/**/**** |
| 62-6.001 | 5/10/2022 | **/**/**** |
| 62-330.010 | 4/28/2023 | **/**/**** |
| 62-330.050 | 4/28/2023 | **/**/**** |
| 62-330.055 | 4/28/2023 | **/**/**** |
| 62-330.301 | 4/28/2023 | **/**/**** |
| 62-330.310 | 4/28/2023 | **/**/**** |
| 62-330.311 | 4/28/2023 | **/**/**** |
| 62-330.350 | 4/28/2023 | **/**/**** |
| 62-330.405 | 4/28/2023 | **/**/**** |
| 62-600.405 | 11/16/2021 | **/**/**** |
| 62-600.705 | 11/16/2021 | **/**/**** |
| 62-600.720 | 11/16/2021 | **/**/**** |
| 64B8-10.003 | 12/9/2015 | **/**/**** |
| 65C-9.004 | 3/31/2022 | **/**/**** |

DEPARTMENT OF TRANSPORTATION

Proposed Airport Site Approval Order for Orlando Health Lakeland Helipad

FLORIDA DEPARTMENT OF TRANSPORTATION

The Florida Department of Transportation intends to issue an "Airport Site Approval Order," in accordance with Chapter 330, Florida Statutes, "Regulation of Aircraft, Pilots, and Airports" and Chapter14-60, Florida Administrative Code, "Airport Licensing, Registration, and Airspace Protection" for the following site:

Orlando Health Lakeland Helipad, a private airport, in Polk County, at Latitude 27° 59' 40.00" and Longitude 81° 55' 04.00", to be owned and operated by Orlando Health Inc., 1900 Don Wickham Drive Attn: Kim McMurphy Clermont, FL 34711.

A copy of the Airport Site Approval Order, the Airport's application, the applicable rules, and other pertinent information may be obtained by contacting David A. Roberts, Interim State Aviation Manager, Florida Department of Transportation, Aviation Office, 605 Suwannee Street, Mail Station 46, Tallahassee, Florida 32399-0450; 850/414-4507; aviation.fdot@dot.state.fl.us. Website: http://www.fdot.gov/aviation.

ADMINISTRATIVE HEARING RIGHTS: Any person whose substantial interests will be determined or affected by this Airport Site Approval Order has the right, pursuant to Section 120.57, Florida Statutes, to petition for an administrative hearing. The petition for an administrative hearing must conform to the requirements of Rule Chapter 28-106, Florida Administrative Code, and must be filed, in writing, within twenty-one days of the publication of this notice, with the Clerk of Agency Proceedings, Office of General Counsel, Florida Department of Transportation, 605 Suwannee Street, Mail Station 58, Room 550, Tallahassee, Florida 32399-0450. Failure to file a petition within the allowed time constitutes a waiver of any right such person has to request a hearing under Chapter 120, Florida Statutes.

## Section XIII
## Index to Rules Filed During Preceding Week

NOTE: The above section will be published on Tuesday beginning October 2, 2012, unless Monday is a holiday, then it will be published on Wednesday of that week.

# TAB C

**CERTIFICATE OF SERVICE**

I e-filed this appendix on ECF, which will email everyone requiring notice.

Dated: August 28, 2023

*/s/ Mohammad O. Jazil*