No. 23-12313

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

HISPANIC FEDERATION, PODER LATINX, VERÓNICA HERRERA-LUCHA, NORKA MARTÍNEZ, and A. DOE,

*Plaintiffs-Appellees*,

v.

CORD BYRD, in his official capacity as Florida Secretary of State, and ASHLEY MOODY, in her official capacity as Florida Attorney General,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:23-cv-00218-MW-MAF (Hon. Mark Walker)

_____

## BRIEF OF PLAINTIFFS-APPELLEES

_____

Roberto Cruz
Miranda Galindo
Delmarie Alicea
LATINOJUSTICE PRLDEF
4700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 754-1935

Cesar Z. Ruiz
Fulvia Vargas De-Leon*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752

Adriel I. Cepeda Derieux
Julie A. Ebenstein
Megan C. Keenan
Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

*Additional Counsel Listed on Inside Cover*

Estee M. Konor*
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065

John A. Freedman
Jeremy Karpatkin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5316

Nicholas L.V. Warren
ACLU FOUNDATION OF FLORIDA
1809 Art Museum Drive, Ste. 203
Jacksonville, FL 32207
(786) 363-1769

Daniel B. Tilley
Caroline A. McNamara
ACLU FOUNDATION OF FLORIDA
4343 W Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

Evan Preminger*
Rayne Ellis*
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019
(212) 836-7786

* *Admission Pending*

*Counsel for Plaintiffs-Appellees Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico (formerly A. Doe)*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees submit the following statement of their corporate interests:

1.  Plaintiff Hispanic Federation has no parent corporation or any other publicly held corporation owning 10% or more of its stock.

2.  Plaintiff Poder Latinx is a fiscally sponsored project of Tides Advocacy, a California nonprofit benefit corporation. Tides Advocacy has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.  All other Plaintiffs are individual persons.

Plaintiffs-Appellees further certify that the following persons have an interest in the outcome of this case:

1.  Alicea, Delmarie, *Counsel for Plaintiffs*

2.  Beato, Michael, *Counsel for Defendant*

3.  Bell, Daniel W., *Counsel for Defendant*

4.  Byrd, Cord, *Defendant*

5.  Campbell-Harris, Dayton, *Counsel for Plaintiffs*

6.  Cepeda Derieux, Adriel I., *Counsel for Plaintiffs*

7.  Chappell, David W., *Counsel for Defendant*

8.  Cruz, Roberto, *Counsel for Plaintiffs*

9.  Darlington, Andrew, *Declarant for Defendants*

i

10.   Davis, Ashley, *Counsel for Defendant*

11.   Doe, A., *Plaintiff*

12.   Ebenstein, Julie A., *Counsel for Plaintiffs*

13.   Ellis, Rayne, *Counsel for Plaintiffs*

14.   Freedman, John A., *Counsel for Plaintiffs*

15.   Galindo, Miranda, *Counsel for Plaintiffs*

16.   Herrera-Lucha, Verónica, *Plaintiff*

17.   Hispanic Federation, *Plaintiff*

18.   Jazil, Mohammad O., *Counsel for Defendant*

19.   Karpatkin, Jeremy, *Counsel for Plaintiffs*

20.   Keenan, Megan C., *Counsel for Plaintiffs*

21.   Konor, Estee M., *Counsel for Plaintiffs*

22.   Lin Lakin, Sophia, *Counsel for Plaintiffs*

23.   Martínez, Norka, *Plaintiff*

24.   McNamara, Caroline A., *Counsel for Plaintiffs*

25.   McVay, Bradley, *Counsel for Defendant*

26.   Moody, Ashley, *Defendant*

27.   Morse, Stephanie, *Counsel for Defendant*

28.   Poder Latinx, *Plaintiff*

29.   Pratt, Joshua E., *Counsel for Defendant*

ii

30. Preminger, Evan, *Counsel for Plaintiffs*

31. Ruiz, Cesar Z., *Counsel for Plaintiffs*

32. Schenck, Robert S., *Counsel for Defendant*

33. Sjostrom, Noah, *Counsel for Defendant*

34. Tilley, Daniel B., *Counsel for Plaintiffs*

35. Van de Bogart, Joseph S., *Counsel for Defendant*

36. Vargas De-Leon, Fulvia, *Counsel for Plaintiffs*

37. Walker, Mark E., *U.S. District Court Judge*

38. Warren, Nicholas L.V., *Counsel for Plaintiffs*

39. Whitaker, Henry C., *Counsel for Defendant*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns constitutional rights of significant importance—namely, whether a state can facially discriminate against non-citizens without offering a compelling basis or narrow tailoring—but the issues raised on appeal may be resolved on the papers.  Fed. R. App. P. 34(a).  Plaintiffs-Appellees recognize that this Court has tentatively scheduled oral argument for the week of January 22, 2024, as noticed in the consolidated case, *Florida State Conference of Branches and Youth Units of the NAACP v. Byrd*, No. 23-12308.  Plaintiffs-Appellees in this appeal welcome the opportunity to participate if the Court determines that oral argument would help the resolution of this appeal.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF THE ISSUE..............................................................3

STATEMENT OF THE CASE ...............................................................3

     A.   The Non-Citizen Ban's Burdensome Provisions ......................3

     B.   The Non-Citizen Ban's Severe Impact on Plaintiffs and their Voter Registration Activities .............................................................4

     C.   Plaintiffs' Challenge to the Non-Citizen Ban ..........................9

     D.   The District Court Enjoins Enforcement of the Non-Citizen Ban .........11

STANDARD OF REVIEW ...................................................................14

SUMMARY OF ARGUMENT .............................................................15

ARGUMENT .........................................................................................18

  I.   The District Court Did Not Abuse Its Discretion in Finding Plaintiffs Are Likely to Succeed on the Merits.......................................18

     A.   Strict scrutiny applies because the Non-Citizen Ban targets people based on their alienage, a suspect class.................................18

     B.   The political-function exception to strict scrutiny does not apply to the Non-Citizen Ban.......................................................27

     C.   The Non-Citizen Ban flunks strict scrutiny.............................34

  II.   The District Court Correctly Determined that the Remaining Factors Favor Plaintiffs. ........................................................38

     A.   Absent an injunction, Plaintiffs will suffer irreparable harm.................38

B.   The balance of equities and public interest favor Plaintiffs. ...................38

CONCLUSION ......................................................................................................41

## TABLE OF AUTHORITIES

**Cases**

*Ambach v. Norwick,*
    441 U.S. 68 (1979)............................................................................29

*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission*
    *Services, LLC,*
    425 F.3d 964 (11th Cir. 2005) ...........................................................14

*Bernal v. Fainter,*
    467 U.S. 216 (1984)................................................................... *passim*

*Bruni v. City of Pittsburgh,*
    824 F.3d 353 (3d Cir. 2016) ...............................................................23

*Cabell v. Chavez-Salido,*
    454 U.S. 432 (1982)............................................................ 27, 28, 29

*Cervantes v. Guerra,*
    651 F.2d 974 (5th Cir. 1981) ....................................................... 30, 31

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)............................................................................21

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015)..........................................................................22

*Club Madonna Inc. v. City of Miami Beach,*
    42 F.4th 1231 (11th Cir. 2022) ............................................ 21, 22, 23

*Dandamudi v. Tisch,*
    686 F.3d 66 (2d Cir. 2012) .................................................... 18, 24, 25

*Democratic Executive Committee of Florida v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) ..........................................................40

*Department of Agriculture. v. Moreno,*
    413 U.S. 528 (1973)..........................................................................34

*Doe v. City of Albuquerque,*
    667 F.3d 1111 (10th Cir. 2012) ..................................................... 22, 23

*Estrada v. Becker*,
    917 F.3d 1298 (11th Cir. 2019) .................................................. 25, 27

*Examining Board Of Engineers, Architects & Surveyors v. Flores de Otero*,
    426 U.S. 572 (1976) ................................................................. 37

*Foley v. Connelie*,
    435 U.S. 291 (1978) .............................................................. 29, 30

*Gonzalez v. Governor of Georgia*,
    978 F.3d. 1266 (11th Cir. 2020) ......................................... 38

*Gonzalez v. Immigration & Customs Enforcement*,
    416 F. Supp. 3d 995 (C.D. Cal. 2019) .................................. 6

*Graham v. Richardson*,
    403 U.S. 365 (1971) .............................................................. 18

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) .............................................................. 28

*In re Griffiths*,
    413 U.S. 717 (1973) ........................................................ 19, 26

*Janklow v. Planned Parenthood, Sioux Falls Clinic*,
    517 U.S. 1174 (1996) ........................................................... 21

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) .......................................... 40

*Klay v. United Healthgroup, Inc.*,
    376 F.3d 1092 (11th Cir. 2004) .......................................... 15

*Lawrence v. Texas*,
    539 U.S. 558 (2003) .............................................................. 34

*League of Women Voters of Florida v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) ............................ 14, 40

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................... 38

*LeClerc v. Webb*,
  419 F.3d 405 (5th Cir. 2005) ............................................................ 25, 26, 36, 37

*Nyquist v. Mauclet*,
  432 U.S. 1 (1977) ................................................................................18

*Plyler v. Doe*,
  457 U.S. 202 (1982)...............................................................................18

*Ramirez v. Secretary, Department of Transportation*,
  686 F.3d 1239 (11th Cir. 2012) ...........................................................20

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1223 (11th Cir. 2005) ...........................................................15

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) ...........................................................40

*Shaw v. Hunt*,
  517 U.S. 899 (1996)......................................................................... 35, 36

*Skafte v. Rorex*,
  430 U.S. 961 (1977).............................................................................31

*Sugarman v. Dougall*,
  413 U.S. 634 (1973)......................................................... 30, 32, 33, 34

*Takahashi v. Fish & Game Commission*,
  334 U.S. 410 (1948)...............................................................................18

*United States v. Frandsen*,
  212 F.3d 1231 (11th Cir. 2000) ...........................................................21

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886)...............................................................................18

**Statutes**

28 U.S.C. § 1292 ......................................................................................3

42 U.S.C. § 1981 ......................................................................................9

Fla. Stat. § 97.0575 ......................................................................... 1, 3, 4, 22

**Other Authorities**

Fla. Admin. Code. R. 1S-2.042 (Sept. 26, 2023)......................................................11

**INTRODUCTION**

On May 24, Florida passed a law that, on its face, prohibits anyone who is not a U.S. citizen from "collecting or handling voter registration applications" on behalf of a voter registration organization, and fines those organizations $50,000 per non-citizen who handles applications on its behalf. Fla. Stat. § 97.0575(f)(1) (the "Non-Citizen Ban"). Plaintiffs—two voter registration organizations whose staff and volunteer base consist primarily of legal permanent residents and other non-citizens authorized to work in the United States, and three individual non-citizens who are employed to conduct voter registration—promptly sued and sought an injunction. On July 3, 2023, the district court preliminarily enjoined enforcement of the Non-Citizen Ban.

The district court's ruling was legally sound and well supported by the facts. Plaintiffs established a substantial likelihood of success that the Non-Citizen Ban violates the Equal Protection Clause because the law, on its face, "discriminates on the basis of alienage," and Defendants did not come close to showing it could survive strict scrutiny. ECF 68 at 27–37 (quoting *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). The district court also correctly concluded that enforcement would irreparably harm Plaintiffs: the individual plaintiffs would lose their ability to register voters, while plaintiff organizations would lose the "vast majority of their

1

canvassing workforces" and see their "registration operations [] substantially interrupted." *Id.* at 51–52.

Defendants' appeal is exceedingly narrow. Defendants don't challenge the district court's findings about Plaintiffs' standing, Plaintiffs' irreparable harm, or the other injunctive factors. They focus exclusively on the district court's finding that the Non-Citizen Ban violated the Equal Protection Clause. In doing so, Defendants recycle arguments that the district court properly rejected.

First, Defendants argue that the provision should be reviewed for rational basis because it applies to "illegal aliens." But the district court rightly recognized that this argument only works if one rewrites the statute—which, on its face, applies to all noncitizens, not merely those who are undocumented. Defendants also ignore, as the district court recognized, the Supreme Court's repeated teaching that "a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Id.* at 28 (quoting *Bernal*, 467 U.S. at 219). And the district court also properly concluded that the "political function" exception did not apply to people collecting or handling voter registrations, noting that Defendants' effort to expand that "narrow" dispensation would "deviate from" decades of precedent stretch doctrine "far more broadly than the Supreme Court has ever permitted." *Id.* at 30–33.

This Court should affirm.

2

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to consider this appeal under 28 U.S.C. § 1292(a). *See* Defs.' Br. 2 (ECF 21) [hereinafter Br.].

## STATEMENT OF THE ISSUE

Whether the district court clearly abused its discretion in concluding that Plaintiffs were substantially likely to succeed on the merits of their Equal Protection Clause challenge to a law requiring every person "collecting or handling voter registration applications" on behalf of voter registration organizations to be a U.S. citizen.

## STATEMENT OF THE CASE[1]

### A.    The Non-Citizen Ban's Burdensome Provisions

The Non-Citizen Ban requires that, before engaging in voter registration activities, a third-party voter registration organization ("3PVRO") affirms to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications on behalf of" the 3PVRO is "a citizen of the United States."  Fla. Stat. § 97.0575(1)(f).

---

[1] The district court "conclude[d] that Plaintiffs are substantially likely to succeed on their claim that the citizenship requirement violates the Equal Protection Clause of the Fourteenth Amendment," ECF 68 at 37, and did not address Plaintiffs' remaining claims.  This appeal concerns only the equalprotection claim.  Plaintiffs have accordingly limited their statement of the case to presenting that narrow issue.

3

The Non-Citizen Ban imposes a $50,000 fine on 3PVROs for each violation—specifically, for "each such person" who collects or handles applications on the organization's behalf. *Id.* It authorizes the Secretary of State to refer any instance in which he "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement. *Id.* § 97.0575(8). There is no cap on the amount that any one organization can be fined for such persons' assistance, nor is knowledge of the violation needed for a fine.

## B. The Non-Citizen Ban's Severe Impact on Plaintiffs and their Voter Registration Activities

Plaintiffs—Hispanic Federation and Poder Latinx (Organizational Plaintiffs), and Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico (Individual Plaintiffs)—presented evidence that the Non-Citizen Ban severely burdens their voter registration activities, and the communities they serve, in at least five distinct ways.

*First*, the Non-Citizen Ban will decimate Organizational Plaintiffs' voter registration workforce. Concretely, it will result in Hispanic Federation losing approximately 70 percent of its canvassers. ECF 32-1 ¶ 24. It will also paralyze Poder Latinx's voter registration work, as approximately 90 percent of its staff are non-citizens. ECF 32-2 ¶ 24. And it will naturally prevent both groups from employing those people or volunteers to assist in registering voters. The abrupt loss

of these staff and volunteer non-citizens' assistance will severely restrict Organizational Plaintiffs' effectiveness to promote democratic participation.

*Second*, efforts to comply with the Non-Citizen Ban will significantly drain the Organizational Plaintiffs' resources in two ways. First, by depleting the organizations' experience and institutional knowledge. And second, by requiring additional staff time and financial resources to comply. Organizational Plaintiffs will lose many of their most experienced canvassers: people who have risen to senior and leadership positions, those who have developed deep relationships with the communities Plaintiffs serve, and those who train their new canvassers. *Id.* at 71–72, 85–87.

The Non-Citizen Ban will also reduce the number of businesses that let canvassers register voters on their properties, because the staff that local businesses know and trust can no longer engage in voter registration. *Id.* at 36, 71–72, 86. If it takes effect, Organizational Plaintiffs will have to redirect funding that would have gone to community programming towards hiring, vetting, and training new staff and volunteers, as well as rebuilding institutional knowledge and relationships. *Id.* at 76–77, 91. And in preparing for compliance with the Non-Citizen Ban in the weeks before it was scheduled to take effect, Organizational Plaintiffs had *already* diverted resources and suffered concrete harms, including turning down qualified non-citizen applicants for open positions, redirecting staff time toward developing policies to

comply with the Non-Citizen Ban, and altering their planning for registering voters in the 2023 election cycle.  ECF 32-1 ¶¶ 28, 33–34, 42; ECF 32-2 ¶¶ 31, 43.

*Third*, Organizational Plaintiffs will be forced to take significant additional measures to ensure their staff and volunteers are citizens, given the Non-Citizen Ban's strict liability and $50,000 fine for each non-citizen who handles or collects voter registration forms.  Determining citizenship for any organization is a "complex inquiry" because of "the fluidity [individuals] may experience with respect to immigration status." *Gonzalez v. Immigr. & Customs Enf't*, 416 F. Supp. 3d 995, 1004 (C.D. Cal. 2019), *rev'd and vacated on other grounds*, 975 F.3d 788 (9th Cir. 2020).  And because Organizational Plaintiffs would be strictly liable for even inadvertent violations, they will also have to turn away help from *U.S. citizens* whose status cannot be readily verified.  For example, Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can provide *proof* of citizenship.  That will force Hispanic Federation to turn away even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish requisite proof.  ECF 32-1 ¶¶ 32–33.  Likewise, Poder Latinx will sever community-service partnerships that enabled local student volunteers to register voters, because of the added hurdle of confirming students' citizenship statuses.  ECF 32-2 ¶¶ 33–34.

*Fourth*, the Non-Citizen Ban will harm the communities and constituents Plaintiffs serve, because they will register substantially fewer citizens to vote.

6

Organizational Plaintiffs work closely with Latino citizens to help them register, relying in part on a network of key community activists who help shape the organizations' agendas and who play a critical role in implementing their programs. For the reasons described above, the severe burden the Non-Citizen Ban places on the Organizational Plaintiffs will force them to drastically curtail or potentially end their registration efforts. The Non-Citizen Ban will reduce the political voice of Latino voters who benefit from these programs. ECF 32-1 ¶¶ 44–45; ECF 32-2 ¶¶ 45–47.

Indeed, in response to the Non-Citizen Ban's threat of civil penalties, some organizations considered halting voter registration activities altogether. Organizational Plaintiffs' largest funders have already said they will withhold donations earmarked for voter registration efforts in Florida because of the threat of costly fines. ECF 32-1 ¶ 37; ECF 32-2 ¶ 38. Moreover, even if Organizational Plaintiffs do not cease these activities, they will significantly scale back the volume of voter registration drives they conduct, because most of their experienced staff and volunteers will be banned from participating. ECF 32-1 ¶¶ 39–42; ECF 32-2 ¶¶ 39–42.

*Fifth*, the Non-Citizen Ban will impose devastating personal and professional consequences on the Individual Plaintiffs. For example, Plaintiff Herrera-Lucha has been a lawful permanent resident since 2007 and Florida resident since 2016. ECF

7

66-1 ¶ 2. She obtained a law degree in El Salvador and a master's degree in international law in Spain. *Id*. ¶ 4. She is currently employed as the Florida State Field Director for Mi Vecino, Inc., a 3PVRO, and oversees that organization's voter registration activities. *Id*. ¶¶ 8–10. Ms. Herrera-Lucha is paid $55,000 per year for this work, which she uses to support four family members. *Id.* ¶ 11. Her work enables her to serve her community, raise awareness about Spanish-speaking candidates, and increase the number of registered eligible voters, including former residents of Puerto Rico who moved to Florida after Hurricane Maria and haven't registered to vote. *Id*. ¶ 25. If the Non-Citizen Ban takes effect, Plaintiff Herrera-Lucha cannot retain this role, which will harm her career and financially impact her ability to provide for herself and her family. *Id.* ¶¶ 19–21.

The other Individual Plaintiffs—Norka Martínez and Elizabeth Pico (previously, A. Doe), both of whom came to the United States from Venezuela and now hold Temporary Protected Status and work authorization here (ECF 66-2 ¶¶ 5–7; ECF 66-3 ¶¶ 5–8)—will likewise suffer serious harms if the Non-Citizen Ban takes effect. Plaintiff Martínez has health issues that limit her physical activity. Her work as a canvasser has enabled her to support her family while caring for her wellbeing. If the Non-Citizen Ban takes effect, she will no longer be able to work as a canvasser, depriving her of means to support her family in a manner consistent with her physical limitations. ECF 66-2 ¶¶ 18, 20–21. Likewise, the Non-Citizen

Ban will deprive Plaintiff Pico of her main source of income and the ability to conduct meaningful voter-registration work that supports her community. ECF 66-3 ¶¶ 23–25. Because Individual Plaintiffs cannot vote as non-citizens, the Non-Citizen Ban further stops them from ensuring that their communities receive adequate representation through meaningful civic and community work. ECF 66-1 ¶¶ 24–25; ECF 66-2 ¶¶ 22–23; ECF 66-3 ¶¶ 25–26.

### C.    Plaintiffs' Challenge to the Non-Citizen Ban

Seeking to prevent these serious harms, Plaintiffs filed this action challenging the Non-Citizen Ban under the First and Fourteenth Amendments and federal civil rights laws. ECF 1; *see also* ECF 79. The complaint alleged that the provision severely burdens and chills their constitutionally protected voter registration activities; that it is impermissibly vague and overbroad; that it unconstitutionally interferes with the fundamental right to vote; and that it unlawfully abridges the Individual Plaintiffs' right to make and enforce contracts under 42 U.S.C. § 1981. *Id.* at 99–109, 112–14.

Most relevant here, the Plaintiffs alleged that the provision violates the Equal Protection Clause by discriminating on the basis of citizenship status. *Id.* at 109–12. For instance, all three Individual Plaintiffs are lawfully present in the United States and authorized to work. *Id.* at 109–10. Yet all three stand to lose their jobs as canvassers engaged in voter registration if SB7050 takes effect. *Id.* Plaintiffs

9

accordingly explained that strict scrutiny applies to the Non-Citizen Ban, as it explicitly discriminates against all non-citizens and does not implicate the narrow political-function exception. *Id.* at 110–11. And SB7050 plainly fails strict scrutiny. It serves no compelling interest, nor is it narrowly tailored to achieve government aims. *Id.* at 111–12.

On June 8, 2023, Plaintiffs filed an emergency motion to preliminarily enjoin the Non-Citizen Ban before it took effect on July 1, 2023. ECF 32. Plaintiffs explained their likelihood of success on the merits and described the serious, irreparable harm they would experience absent an injunction, including the loss of opportunities to register voters and engage in protected speech. *See id.* at 13–23; *see also supra*, Statement of the Case, § B. Plaintiffs also highlighted that the draconian fines imposed on 3PVROs who employed non-citizens violated the First and Fourteenth Amendments, ECF 32 at 25–41, and would require the Plaintiffs (three individuals who are non-citizens employed by 3PVROs, and two organizations whose registration teams are 70% and 90% non-citizen respectively) to terminate or significantly curtail their voter registration activities. *Id. at* 13–23. Finally, Plaintiffs argued that an injunction would serve the public interest by preserving an important path to voter registration and would not harm the State in any way. *Id.* at 41–42.

10

**D.    The District Court Enjoins Enforcement of the Non-Citizen Ban**

On July 3, 2023, the district court granted the preliminary injunction.  ECF 68.

The district court specifically found that Plaintiffs "carried their burden as to all four

of the preliminary injunction factors with respect to their equal protection and

vagueness claims."  *Id.* at 52.

 The Court found that the case did not meet the "extraordinary and narrow"

parameters for *Burford* abstention.  *Id.* at 8.  It explained that Defendants couldn't

show that the Court's resolution of constitutional claims "would in any way *interfere*

with an 'ongoing administrative proceeding or action,'" that Plaintiffs' "discrete

challenges to one of Florida's laws regulating 3PVROs does not threaten to

undermine all—or even a substantial part—of the state's regulatory scheme," and

that Defendants had not explained how agency rulemaking could "cure an otherwise

unconstitutional statute."[2]  *Id.* at 8–10.  The district court found that both sets of

Plaintiffs had standing to challenge Section 97.0575(1)(f): the Individual Plaintiffs

were "injured directly," because, as non-citizens, the provision "directly interferes

with their employment," *Id.* at 15–19, and the Organizational Plaintiffs "set out with

---

[2] Defendants do not appeal from the district court's ruling on *Burford* abstention.
Rulemaking proceeded apace after the district court's preliminary injunction.  *See*
Fla. Admin. Code. R. 1S-2.042 (Sept. 26, 2023) (final rule adopted and published).

precision the imminent injuries they face based on the challenged provision." *Id.* at 21 n.10; *see supra*, Statement of the Case, § B.

On the merits, the district court noted that "Defendants do not dispute that the citizenship requirement, on its face, discriminates against all noncitizens," and that a law "that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." ECF 68 at 28. The Court rejected Defendants' argument that it should apply "varying levels of scrutiny" of the statute to different classes of non-citizens based on their legal status because, on its face, the statute did not distinguish between non-citizens in this manner. *Id.* at 28–30.

The Court found that the "political function" exception allowing restrictions based on alienage did not apply to Section 97.0575(1)(f). *Id.* at 30–33. It concluded that individuals collecting information on behalf of 3PVROs were not "exercis[ing] broad discretionary power over the formulation or execution of public policies" as "those who collect and handle completed applications aren't vested with discretion or engage in policy making." *Id.* at 31–33. Ultimately, the law had hallmarks of being "fatally underinclusive," because non-citizens are not categorically barred from working as mail carriers or employment by the State of Florida in positions that involve handling registration applications. *Id.*

Defendants did not "attempt to demonstrate how the citizenship requirement satisfies strict scrutiny." *Id.* at 34. Nor did they identify "connective tissue" between

12

the problem of untimely submitted voter registration applications, which occurs regardless of the citizenship of the person collecting applications, "and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs." *Id.* at 35–36. The Court further found that Section 97.0575(1)(f) was "*not* the least restrictive means" to address timely voter application submissions.

Having considered Plaintiffs' evidence of harm, the district court also made factual findings about Plaintiffs' "concrete injuries"—namely, "the disruption to their employment, their livelihoods, and their mission to register voters on behalf of the organizations they work for" (*id.* at 19)—and the irreparable harm they faced, absent injunctive relief. The district court found that the Non-Citizen Ban "facially discriminates against these Plaintiffs because they are noncitizens, forces them to halt their efforts to communicate with would-be voters and properly register as many applicants as possible for fear of incurring devastating liability for their employers, and directly interferes with their employment." *Id.* "[A]bsent an injunction," the district court explained, "Plaintiffs will suffer irreparable injury because their voter registration operations will be substantially interrupted once the challenged provisions take effect." *Id.* at 51.

"For example," the district court underscored, "the Organizational Plaintiffs stand to lose the ability to have their noncitizen canvassers—in some instances, the

13

vast majority of their canvassing workforces—continue collecting or handling voter registration applications, thus limiting their ability to register new voters, or immobilizing their voter registration efforts altogether, until they can recruit and hire new employees and volunteers." The Individual Plaintiffs would be likewise directly harmed, because they are "explicitly banned from collecting or handling voter registration applications, thus extinguishing their opportunities to directly register new voters." *Id.* at 51 (citing *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever . . . . If an injunction does not issue now, there will be no way to remedy the plaintiffs' continuing loss through relief granted later in this litigation.")).

Finally, the district court found that the injunction was not adverse to the public interest and outweighed any damage to the State. *Id.* at 52.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction ruling under a demanding standard, for clear abuse of discretion. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). Reversal is proper "only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a

conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

A district court may grant an injunction when: (1) the movant has a substantial likelihood of success on the merits; (2) the movant will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the injunction may cause the opposing party; and (4) the injunction is not adverse to the public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it found Plaintiffs are likely to succeed on the merits of their Equal Protection Clause challenge to the Non-Citizen Ban.  The Non-Citizen Ban is properly reviewed by means of strict scrutiny because it prohibits individuals from collecting and handling voter registration applications based on their alienage, a protected class.

In claiming that Plaintiffs must show that there is no set of circumstances under which the Non-Citizen Ban could ever pass constitutional muster, Defendants wrongly invoke *United States v. Salerno* and attack a strawman.  There are no grounds to claim that varying levels of scrutiny ought to apply to different subgroups of immigrants because those subgroups "exist nowhere in the statute." ECF 68 at 28.  The statute prohibits *all* non-citizens from collecting or handling

15

voter registration applications.  Accordingly, the district court correctly considered whether this classification—and not any other hypothetical configuration of it—can overcome strict scrutiny.  In any event, this Court may easily dispense with Defendants' argument under *Salerno*, which was never raised before the district court and was therefore waived.

The district court properly rejected Defendants' other attempt to circumvent strict scrutiny review by holding that the political-function exception is inapplicable.  Individuals who collect and handle completed voter registration applications do not engage in policymaking, nor are they vested with the degree of discretion that would trigger such an exception.  Within the voter registration process, non-citizens do not have discretionary power over sensitive areas of life.  Further, as Defendants concede, non-citizens can access the same personal information on voter registration forms while performing comparable roles as trusted government employees.  Yet, the Non-Citizen Ban prohibits these individuals from accessing the same information when working for a 3PVRO.  Thus, the district court correctly concluded that the ban was underinclusive and that strict scrutiny must apply.

Under strict scrutiny, Defendants have yet to offer a compelling state interest to justify barring non-citizens from handling and collecting voter registration forms.  And even if one were to accept Defendants' proffered state interest as compelling,

16

they haven't shown how the Non-Citizen Ban is properly tailored to further Florida's interest in the timely submission of voter registration applications. Defendants didn't point to evidence suggesting that non-citizens "have such a fleeting presence in this country as to justify" the Non-Citizen Ban, nor do they offer a semblance of "connective tissue between the problem and the state's proposed solution." *Id.* at 34–35. The district court did not err.

Finally, the district court also correctly determined that the remaining preliminary injunction factors weigh in favor of granting Plaintiffs' motion. Absent an injunction, Plaintiffs will suffer irreparable harm from the extinguished opportunities to directly register new voters. The balance of equities also favors Plaintiffs. Reversing the injunction would subject them to excessive fines, loss of essential staff, loss of funding, and for Individual Plaintiffs, the loss of economic opportunities. Moreover, the injunction serves the public interest by registering voters in marginalized communities and preventing infringement of Plaintiffs' constitutional rights.

This Court should affirm the district court's order granting a preliminary injunction.

17

## ARGUMENT

I.   **The District Court Did Not Abuse Its Discretion in Finding Plaintiffs Are Likely to Succeed on the Merits.**

   A.   **Strict scrutiny applies because the Non-Citizen Ban targets people based on their alienage, a suspect class.**

The Fourteenth Amendment protects all persons within the United States.  It applies to all aliens.  *Plyler v. Doe*, 457 U.S. 202, 215 (1982); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).  The Supreme Court has accordingly long held that states cannot categorically discriminate on the basis of alienage.  "[T]he power of a state to apply its laws exclusively to its alien inhabitants *as a class* is confined within narrow limits."  *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948) (emphasis added).

Blanket alienage-based classifications by a State, therefore, are "inherently suspect and subject to close judicial scrutiny."  *Graham v. Richardson*, 403 U.S. 365, 372 (1971).  So strict scrutiny—not rational basis review—is appropriate to review a law, like this one, that facially discriminates on the basis of alienage.  *See Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) ("Alienage classifications by a State that do not withstand this stringent examination cannot stand."); *Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012) ("[L]aws that single out aliens for disparate treatment are presumptively unconstitutional absent a showing that the[y] [meet strict scrutiny].").  To meet it, the State must "show that its purpose . . . is both

18

constitutionally permissible and substantial, and that its . . . classification is 'necessary . . . to the accomplishment' of its interest.'" *In re Griffiths*, 413 U.S. 717, 721–22 (1973).

Defendants cannot dodge strict scrutiny's application. To start, they concede that strict scrutiny applies to laws that discriminate against permanent resident aliens. Br. 16–17. That admits that strict scrutiny applies to the Non-Citizen Ban's restriction on Individual Plaintiffs like Ms. Herrera Lucha and many of the Organizational Plaintiffs' employees and volunteers. *See, e.g.*, ECF 32 at 36–39; ECF 62 at 8; ECF 66-1 ¶ 2.

But Defendants refuse to engage with the relevant legal framework or even attempt to defend the actual text of the Non-Citizen Ban as written. Instead, they insist that, in a facial challenge, the Court must engage in a speculative thought experiment, considering hypothetical levels of scrutiny that might apply to distinct classes of aliens if the statute had been drafted differently. For example, Defendants say: if the provision had been drafted based on a classification of "illegal aliens," it would be subject to "rational basis" review. Br. 12–16.[3] Defendants assert that this type of hypothetical parsing[4] is appropriate because, in alienage cases, "the level of

---

[3] Insofar as the State argues that strict scrutiny wouldn't apply to non-citizens with unlawful status, they ignore the fact that *none* of the plaintiffs belong to that subclass.

[4] Defendants acknowledge the hypothetical nature of parsing they propose by

scrutiny ebbs and flows based on the kind of alien," and that "[c]hoosing one, and only one, level of scrutiny . . . isn't appropriate when a statute speaks in terms of citizens and noncitizens."  Br. 16.

The State's attempt to end run strict scrutiny fails for two reasons.  First, Defendants misstate the law governing facial challenges.  And second, the State cannot cite precedent that applies—or even considers—the hypothetical parsing approach they propose.

### i.  Defendants' *Salerno* argument is wrong.

Defendants point to the Supreme Court's discussion of facial challenges in *United States v. Salerno* as support for applying a lower level of scrutiny to the Non-Citizen Ban.  But their *Salerno* argument is wrong.[5]  Put simply, their "claim" that, under *Salerno*, Plaintiffs "need[] to show that the law is invalid in *all* circumstances," real or hypothetical, "misstates the law governing facial

---

stating, in a footnote, that it would be "easier" to determine the relevant level of scrutiny "if a statute were to specifically state that permanent residents cannot do something or to limit its reach to illegal aliens only . . .  But that is not the case here." Br. 16, n.3 (citation omitted).

[5] Defendants' argument under *Salerno* is also waived.  Defendants did not raise it below and it is accordingly not properly before the Court.  *See Ramirez v. Sec'y U.S. Dep't of Transp.*, 686 F.3d 1239, 1249 (11th Cir. 2012) ("It is well-settled that [the Court] will generally refuse to consider arguments raised for the first time on appeal.").

challenges." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (emphasis added).

To start, as Defendants themselves acknowledge, the Supreme Court has repeatedly "criticized" and declined to apply the same categorical gloss on *Salerno* that Defendants urge this Court to follow. Br. 13–14. Understandably so. The "no set of circumstances" language in *Salerno* that Defendants' argument hinges on is dictum—"unsupported by citation or precedent" and "unnecessary to the holding in the case." *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting denial of cert.). It has, in turn, "never been the decisive factor in any decision of th[e] [Supreme] Court." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality op.). Rather, the Court has "properly ignored [it] in subsequent cases." *Janklow*, 517 U.S. at 1175; *see also id.* n.3 (collecting cases); *United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (noting Supreme Court "has not [] consistently followed" so-called "rule" and collecting cases).

In any event, Defendants misconstrue the facial-challenge test that *can* be correctly gleaned from *Salerno*. Properly understood, in the equal-protection context, the *Salerno* framework asks whether no set of facts can justify *the classification made*. It doesn't ask whether the law could be justified had it hypothetically been drafted differently or more narrowly formatted. *See City of Los*

21

*Angeles v. Patel*, 576 U.S. 409, 418–19 (2015) ("[W]hen assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct.").

Instead, Defendants' proposed *Salerno* application to the Non-Citizen Ban asks the Court to "divorce[] review of the constitutionality of [the] statute from the terms of the statute itself, and . . . engage in hypothetical musings about potentially valid *applications* of the statute." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012); *see also Club Madonna*, 42 F.4th at 1256. Put simply: nothing in *Salerno* requires the Court to rewrite the statute or limit it to a far narrower, hypothetically constitutional classification. Because the Florida Legislature here chose to facially distinguish between persons who are a "citizen of the United States of America" and those who are "not a citizen," Fla. Stat. §97.0575(1)(f), the Court has to evaluate that classification, not some hypothetical application of the law to a narrower subgroup of individuals.

Indeed, Defendants ask the Court to deploy a version of the "*Salerno* rule" that it already declined to follow. In *Club Madonna*, this Court rejected the view that plaintiffs mounting a facial attack must "prove that there is *no* hypothetical situation in which [a challenged law] could be validly applied." 42 F.4th at 1256 (emphasis added). Rather, it explained, "the question that *Salerno* requires [the

Court] to answer is whether the statute [as written] fails the relevant constitutional test." *Id.* at 1257.

As *Doe*—which *Club Madonna* relied upon—explained: *Salerno*'s "no set of circumstances" language is "accurately understood not as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the [proper] constitutional standard." 667 F.3d at 1127. Courts "appl[y] the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). And "where a statute fails the relevant constitutional test (such as strict scrutiny . . .), it can no longer be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid.'" *Doe*, 667 F.3d at 1127 (collecting cases); *see also Club Madonna*, 42 F.4th at 1256 ("the question that *Salerno* requires us to answer is whether the statute fails the relevant constitutional test").

So here. As described *infra*, Defendants flunk the proper constitutional test, because they "do not even attempt to demonstrate how the citizenship requirement satisfies strict scrutiny." ECF 68 at 34. As below, "Defendants point to no record evidence indicating that noncitizens, as a class, have such a fleeting presence in this

country as to justify a wholesale ban on their collecting or handling voter registration applications." *Id.*

Defendants conspicuously cite no case that applies the test in the manner they suggest. And indeed, Defendants' proposed *Salerno* test (*i.e.*, asking whether *any* person/subset within the targeted class could be lawfully prohibited from engaging in the conduct at issue) would lead to plainly absurd results. Take, for example, a law that declares: "Black people cannot vote in state or federal elections." Of course, some Black people cannot vote for reasons other than their race (*e.g.*, they are under the age of 18, they are non-citizens, etc.), and the State can lawfully prohibit them from voting. But under Defendants' formulation of the *Salerno* test, a set of circumstances exists in which each of these laws would be valid, and so neither law would facially violate the Fourteenth Amendment's Equal Protection Clause. This Court should decline Defendants' invitation to employ a rule that would produce outlandish results.

> ### ii. Defendants' citation to cases examining narrower statutory classifications has no bearing on the analysis here.

Contrary to Defendants' suggestion, Supreme Court precedent doesn't "counsel[]" this Court to "judicially craft[] a subset of aliens, scaled by how [it] perceive[s] the aliens' proximity to citizenship." *Dandamudi*, 686 F.3d at 76–77 (citation and quotation marks omitted). The Supreme Court's "precedent supports

[] a distinction among aliens *only* as between lawfully admitted [ones] and those who are in the United States illegally." *Id* (emphasis added).

None of the cases involving non-citizens' equal protection claims that Defendants cite (Br. 16–17) support their suggestion that anything other than strict scrutiny applies. Defendants begin by acknowledging that the statute as written excludes "[a]ll noncitizens" from collecting or handling voter registration applications "regardless of their alienage status." Br. 14. So far, so good. But the State then ignores the statute's actual text to highlight the standard of review that *might* apply to a statute that targets immigrants not legally in the United States—a classification nowhere found in the Non-Citizen Ban. *Id.* To do this, Defendants chiefly rely on two cases—*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), and *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005)—for the proposition that "every time the government excludes a non-permanent resident from collecting or handling a voter registration application, the government must provide only a rational basis for that exclusion." Br. 14.

Defendants' reliance on *LeClerc* and *Estrada* is misplaced. In each, the reviewing court analyzed the challenged statute as written. It didn't engage in—or even consider—the hypothetical parsing Defendants propose. In *LeClerc*, the Fifth Circuit reviewed a statute that specifically required applicants for admission to the Louisiana bar to be either citizens or resident aliens. 419 F.3d at 410. The court

applied rational basis review to an equal-protection challenge brought by aliens "not entitled to live and work in the United States permanently" who had been excluded from admission to the bar. *Id.* at 410, 415. But understandably, *LeClerc*'s analysis focused on whether the specific group targeted by the challenged statute—as drafted—represented a suspect class. *Id.* at 419. Indeed, *LeClerc* contrasted the more targeted ban at issue there with the "'total exclusion of all aliens from the practice of law'" deemed a "'wholesale ban'" and "constitutionally infirm" by the Supreme Court in *Griffiths*. *Id.* at 415 (quoting *Griffiths*, 413 U.S. at 719). Of course, here, Florida has enacted a "wholesale ban" on the basis of alienage. So as *LeClerc* itself explains, this case is thus closer to *Griffiths*, not *LeClerc*.

In *LeClerc*, the Fifth Circuit did consider the ways in which resident aliens "are similarly situated to citizens" and noted that the status of aliens not entitled to live and work in the United States permanently "is far more constricted than that of resident aliens." *Id.* at 418–19. But its consideration of the characteristics of those alien subclassifications mirrored the classifications in the statute being challenged. *LeClerc*, therefore, does support the type of hypothetical parsing Defendants propose.

Similarly, this Court's decision in *Estrada* provides no support for hypothetical parsing among subclasses of aliens. In *Estrada*, this Court applied rational basis review to an equal-protection challenge of a Georgia policy requiring

26

"selective colleges and universities to verify the 'lawful presence' of all the students they admit." 917 F.3d at 1301–10. That policy was directed at any person "who is not lawfully in the United States," which the policy defined to include Deferred Action for Childhood Arrivals (DACA) recipients, but which did not include lawful permanent residents. *Id.* at 1301–02. Once again, the Court's consideration of whether a subclassification of aliens represented a suspect class mirrored the classification specified by the text of challenged statute. *Id.*

## B.   The political-function exception to strict scrutiny does not apply to the Non-Citizen Ban.

The district court also correctly rejected Defendants' next contention (Br. 17–21): that the Non-Citizen Ban falls within the "narrow political-function exception" to the "rule that discrimination based on alienage triggers strict scrutiny." *Bernal*, 467 U.S. at 220–21. Courts apply a two-part test when deciding whether a citizenship-based restriction falls within the political-function exception's ambit. It asks whether the law: (1) is "sufficiently tailored," such that it is not overinclusive nor underinclusive, and (2) applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions'"—that is, only to "officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Id.* at 221–22 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 440 (1982)) (citations omitted). The political-function exception is accordingly cabined to roles that "routinely exercise discretionary power" of the state, "plac[ing]

27

them in a position of direct authority over other individuals," like probation officers, teachers, or police. *Id.* It "recogni[zes] the authority of the people of the States to determine the qualifications of their most important government officials." *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).

As the district court concluded, the statute, at minimum, fails the second prong of the *Bernal* test. To the extent that Defendants find the political-function test "difficult to apply in particular cases," Br. 18 (quoting *Cabell*, 454 U.S. at 440), its application here is actually straightforward, because the Non-Citizen Ban "does not apply only to persons holding state elective or important nonelective executive, legislative, and judicial positions and, thus, participating directly in the formulation, execution, or review of broad public policy." ECF 68 at 32. "Without dispute, 3PVRO staff, members, and volunteers are not public employees of any branch of state government. Nor do they participate directly in the formulation, execution, or review of broad public policy." *Id.* And "Defendants expressly concede that 'those who collect and handle completed applications aren't vested with discretion or engage in policy making.'" *Id.* at 33 (quoting ECF 60 at 28).

Accordingly, the "political function" exception does not apply here—"[f]ull stop." *Id.* Defendants' "request runs counter to the Supreme Court's admonition that 'the political-function exception must be *narrowly* construed; otherwise *the exception will swallow the rule* and depreciate the significance that should attach to

28

the designation of a group as a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate.'" *Id.* (quoting *Bernal*, 467 U.S. at 222 n.7) (emphasis added). The district court was right to reject Defendants' attempt to "deviate from settled law and construe this exception far more broadly than the Supreme Court has ever permitted." *Id.*

On appeal, Defendants leave concerns about departing from settled precedent on the narrow political-function exception unaddressed. Instead, they re-hash the same arguments that failed in *Bernal*. According to the State, the Non-Citizen Ban "go[es] to the heart of representative government[,]" *Bernal*, 467 U.S. at 225, because non-citizens working for 3PVROs are "cogs" in Florida's election system, and elections are integral to representative democracy. Br. 21. But in *Bernal*, Texas likewise argued that notaries "perform functions that '[went] to the heart of representative government,'" to support its ban on non-citizen notaries. 467 U.S. at 223. Still, the Supreme Court explained: "The focus of [the] inquiry [is] whether a position" provides someone "broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population," like teachers or state officers.[6] *Id.* at 223–25.

---

[6] All told, the Supreme Court has only said that *Bernal*'s political-function exception to strict scrutiny applies to laws excluding noncitizens from employment or work as: police officers (*Foley v. Connelie*, 435 U.S. 291 (1978)); teachers (*Ambach v. Norwick*, 441 U.S. 68 (1979)); probation officers (*Cabell*, 454 U.S. at 442); and

29

Individuals collecting and handling voter registration forms lack the kind of discretion that *Bernal* and related cases say is needed for the political-function exception to apply. They in no way "exercise the State's monopoly of legitimate coercive force," or "the wide discretion typically enjoyed by public school teachers [in] present[ing] materials that educate youth." *Bernal*, 467 U.S. at 225. Nor are they "clothed with authority to exercise [] almost infinite [] discretionary powers . . . involving the most sensitive areas of daily life." *Id.* at 220 (quoting *Foley v. Connelie*, 435 U.S. 291, 297 (1978)). Nor, for that matter, do they have discretion "that places them in a position of direct authority over other individuals." *Id.* *Bernal*'s second prong accordingly cannot be met. *See Foley*, 435 U.S. at 296 (noting exception applicable in context of "policy responsibilities . . . the discretionary exercise of which can . . . immediately affect the lives of citizens").

*Cervantes v. Guerra*—a pre-*Bernal* case upholding a prohibition that restricted non-citizens from serving on or voting for the board of directors of a hybrid public-private agency that was governmentally designated to reduce the causes of poverty in the United States—does not help the Defendants. *See* Br. 19, 20 (citing 651 F.2d 974, 976–76, 981 (5th Cir. 1981)). In upholding the ban on non-citizens' ability to vote, the Eleventh Circuit read the Supreme Court's decision in *Skafte v.*

_____

elective public office, but not civil service (*Sugarman v. Dougall*, 413 U.S. 634 (1973)).

*Rorex* as "holding that voting in a public election is always within the political functions exception," and concluded that, "when the Supreme Court speaks clearly, we are bound to obey." *Cervantes*, 651 F.2d at 981 (citing *Skafte*, 430 U.S. 961 (1977) (dismissing challenge to law banning non-citizens from voting in elections to a local school board for want of a substantial federal question)). And as for the ban on non-citizens' ability to serve on the board of directors, the court concluded that "the members of [the agency's] board of directors create policy and exercise discretion," including among other things to "design and carry out programs tailored to the needs of the poor as they perceive them." *Id.* at 981–82. That is plainly within the political-function exception's scope, because the role involved precisely the kind of discretion that *Bernal* subsequently suggested might satisfy the test's second prong. *See* 467 U.S. at 223–24 ("The focus of our inquiry has been whether a position was such that the officeholder would necessarily exercise broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population."). Rather than suggest the district court got it wrong, *Cervantes* reinforces the court's analysis.[7]

Plaintiffs here act nothing like the agency in *Cervantes*. The non-citizens who handle and collect voter registration forms do not have—let alone exercise—

---

[7] To the extent anything in *Cervantes* conflicts with the Supreme Court's later-in-time decision in *Bernal*, *Bernal* governs.

31

discretionary state power.  They engage their communities as private actors and perform a non-discretionary act subject to strict regulation and oversight by the state, consisting of providing eligible citizens with state-prescribed forms, helping to ensure that eligible citizens correctly complete those state-prescribed forms, and then returning those forms to state actors on a tight, state-mandated timeline.  As such, the political-function exception does not apply and strict scrutiny is appropriate.

Though the district court did not reach a conclusion on the *Bernal* test's first prong, the statute also fails that requirement.  The Non-Citizen Ban is insufficiently tailored to achieve its goals, because it is underinclusive.[8]  As Defendants conceded below (and maintain here, Br. 29), "postal workers also collect and handle voter registration applications submitted by mail, and noncitizens are allowed to be postal workers."  ECF 68 at 31.  The district court also recognized that "Defendants had no response to Plaintiffs' argument that noncitizens are also permitted to serve on Florida's Elections Commission and work for other state agencies."  *Id.*  Because "employees of several state agencies are also responsible for handling completed voter registration applications, and the State of Florida apparently has not decided

---

[8] The Supreme Court has previously found a similar citizenship-based restriction both overinclusive and underinclusive.  *See Sugarman*, 413 U.S. at 642 ("It is at once apparent, however, that [the State's] asserted justification proves both too much and too little.").

to exclude all noncitizens from these positions," *id.*, the law is insufficiently tailored. *See, e.g.*, *Sugarman v. Dougall*, 413 U.S. 634, 643 (1973) (law banning non-citizens from holding a position as "typist" or "office worker," within the context of a broader scheme that included "no citizenship restrictions" for "persons holding elective and high appointive offices," was too "imprecis[e]" to "withstand close judicial scrutiny").

On this point, the State argues—for the first time on appeal—that the Law is not underinclusive because 3PVROs are the only *non*-government entities authorized to collect and handle voter registration forms.  Br. 29.  That is a hollow distinction.  Whether a discriminatory law is underinclusive does not turn on whether non-citizens' employer is a public or private actor.   Instead, underinclusivity concerns whether the State specifies "only one particular post with respect to which the State asserts a right to exclude aliens" while allowing noncitizens to perform other similar functions. *Bernal*, 467 U.S. at 222–23.  Here, there is no dispute that non-citizens can access the exact same information on voter registration forms while serving in government offices:  Defendants concede the point.  *See* Br. 19 ("[P]ostal workers and state employees can handle voter registration forms without every

postal worker or state employee being a citizen."). As such, the Non-Citizen Ban is not sufficiently tailored to achieve the State's purported goals.[9]

## C. The Non-Citizen Ban flunks strict scrutiny.

Defendants haven't offered a compelling state interest to justify barring non-citizens as a class from handling and collecting voter registration forms. Instead, before the Non-Citizen Ban's enactment, legislators only used imprecise rhetoric, including testimony that the law (which applies equally to all non-citizens) was meant to target "illegal[s]."[10] *See* ECF 32 at 34. Separately, the restriction's sponsor leaned on the sweeping and unremarkable view that "there are certain rights in our

---

[9] The State suggests that the Non-Citizen Ban is not substantially overinclusive because it is limited to non-citizens who collect or handle voter registration forms. Br. at 19. But whether a regulation is overinclusive turns on the "range of offices and occupations" it implicates, not how many actions it prohibits. *Bernal*, 467 U.S. at 222. The law here "indiscriminately sweep[s] within its ambit" all non-citizens involved in collecting or handling voter registration forms, implicating a variety of roles at 3PVROs. *Id.* Positions from State Field Directors—like individual plaintiff Herrera-Lucha, ECF 66-1 ¶¶ 8–10—to canvassers like Norka Martínez, ECF 66-2 ¶ 11, and others at 3PVROs, ECF 66-3 ¶ 14, are implicated by the Non-Citizen Ban. Simply put, the Non-Citizen Ban is overinclusive because it fails to "specif[y] only one particular post" that "the State asserts a right to exclude" non-citizens from. *Bernal*, 467 U.S. at 222. Instead, it prohibits non-citizens from an unspecified number of occupations, which the Supreme Court has previously found unlawful. *See, e.g.*, *Sugarman*, 413 U.S. at 642 (invalidating a statute that barred non-citizens from employment in permanent civil service positions).

[10] "[A] bare [] desire to harm a politically unpopular group," *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), of course, cannot serve "legitimate state interests," *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring)—*especially* when the challenged law sweeps more broadly than that group alone.

country that only citizens get to enjoy." *Id.* That was the extent of any alleged justification for the provision: the legislative record contained no evidence that non-citizens are dangerous or untrustworthy.

Defendants' blanket ban on non-citizens collecting and handling voter registration applications is therefore not narrowly tailored to further a compelling state interest. The State argues that it has a compelling interest in ensuring "that the voter registration applications of every voter are delivered in a timely manner[,]" ECF 21 at 25, but failed to ground this assertion on *any* evidence that non-citizen staff or 3PVRO volunteers were responsible for returning applications late. In other words, there is no nexus between the advanced state interest and the statutory prohibition. "Without a factual underpinning, the State's asserted interest lacks the weight [the Supreme Court has] required of interests properly denominated as compelling." ECF 68 at 28; *Bernal v. Fainter*, 467 U.S. at 228 (1984); *see also Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (finding a "compelling interest" must have been "the legislature's 'actual purpose'" and legislature must have had "a strong basis in evidence").

"At the very least, Defendants must be able to marry the solution to the problem." ECF 68 at 36. They didn't do that below and fail again to do so here. At the district court, "Defendants conceded that banning all noncitizens from collecting or handling voter registration applications is not a *perfect* fit to alleviate the state's

35

concern about 'voter integrity.'" *Id.* at 36–37; ECF 65 at 85 (emphasis added). That hasn't changed. The State still fails to point to any connection between its timely receipt of voter registration forms on the one hand, and the citizenship status of people handling those forms, on the other.

In fact, Defendants have never linked the two. While they claim the Non-Citizen Ban is justified by the chance that noncitizens may "leave the country . . . without warning," Br. at 15, they've failed to connect citizenship with timely delivery of voter registration forms. That "connective tissue," ECF 68 at *Id.* at 35–36, has been absent during the legislative process, in preliminary injunction briefing, at the preliminary injunction hearing, and, now, in briefing to this Court. Defendants articulate no facts, much less a "strong basis in evidence," connecting the suspect classification with their purported interest. *Shaw v. Hunt*, 517 U.S. at 908 n.4 (1996).

And even if Defendants had established a factual basis for needing to protect the electorate from non-citizens mishandling voter registration forms, their ban on all non-citizens is in no way tailored—indeed, not even *rationally* tailored—to address that interest. In particular, Defendants' only purported factual basis for the law has no application to lawful permanent residents like plaintiff Verónica Herrera-Lucha and other members of the organizational plaintiffs' staff. As Defendants concede, lawful permanent residents "may not be deported, [and] are entitled to reside permanently in the United States." *LeClerc*, 419 F.3d at 418. As such,

resident aliens are "similarly situated to citizens in their economic, social, and civic . . . conditions." *Id.* The State's vague "tim[ing]" concerns for voter registration, *see* Br. 15–16, thus have no operation here. The State does not so much as try to argue otherwise.

To justify the ban's far-reaching restrictions, the State only offers that the Legislature's work was "good enough." ECF 68 at 56; ECF 65 at 85. That won't do. As the district court held, "such shoddy tailoring between restriction and government interest presents a dubious fit under rational basis review, and it falls woefully short of satisfying the strict scrutiny this Court must apply." ECF 68 at 56. Defendants do not explain how totally excluding non-citizens from collecting and handling voter registration forms enhances existing safeguards against mishandling voter registration applications. Defendants' ban on non-citizens' involvement in voter registration activities, purely based on alienage or citizenship status, are neither "necessary nor precise" and therefore fails the requirements of strict scrutiny. *Examining Bd. Of Eng'rs., Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 605 (1976) (striking down statute requiring "private employers and contractors to hire only engineers who are American citizens").

The Non-Citizen Ban cannot survive strict scrutiny and serves no legitimate purpose other than to intentionally attack the processes of 3PVROs in helping eligible citizens, often from marginalized communities, register to vote.

37

Accordingly, the district court correctly determined Plaintiffs were likely to succeed on the merits.

## II.    The District Court Correctly Determined that the Remaining Factors Favor Plaintiffs.

### A.    Absent an injunction, Plaintiffs will suffer irreparable harm.

The State's appeal rests solely on Defendants' likelihood-of-success-on-the-merits argument.  Defendants nowhere address the district court's well-supported factual findings going to Plaintiffs' irreparable harm or the concomitant equities.  *See supra*, Statement of the Case, § B.  And it is undisputed that extinguished opportunities to register voters constitute an irreparable harm.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  This Court reviews those findings for abuse of discretion requiring clear error, and the district court was well within its discretion to conclude that Plaintiffs stood to suffer grave, irreparable harm absent SB7050's injunction.

### B.    The balance of equities and public interest favor Plaintiffs.

The State does not engage in any analysis of the balance of equities to the Parties.  But it is clear the harms of staying this injunction far outweigh any purported harms of keeping it in place.  When a constitutional right hangs in the balance, that outweighs the harm to defendants.  *See Gonzalez v. Gov. of Ga.*, 978 F.3d. 1266, 1272 (11th Cir. 2020).  Defendants cannot show that the injunction would directly harm the electoral system given the State's existing regulations on

38

voter registration and related activities. But the opposite is true for Plaintiffs. Reversing the injunction would subject Organizational Plaintiffs to excessive fines, loss of essential staff, and loss of funding, and Individual Plaintiffs to the loss of economic opportunities—all because the State has imposed a suspect and unlawful alienage classification.

Reversing this injunction would cease Plaintiffs' day-to-day operations, and, most importantly, their ability to reach and register thousands of marginalized groups ahead of pivotal elections like Florida's March 2024 primaries. Absent the injunction, Plaintiffs would have to immediately "order their lives and organizational activities—including hiring, firing, and retraining employees and volunteers—to avoid impending fines and felony prosecutions." ECF 68 at 12. Indeed, because "failure to comply with the law's requirements within ninety days of notice from the Department of State results in *automatic* cancellation of the organizations' registrations, an imminent injury" (*id.* at 12 n.7), and the Department of State has already given such notice, keeping the injunction in place is the only way to prevent Plaintiffs' constitutionally protected conduct from triggering cancellation. *Id.* at 12 n.7. At stake here is the continuous infringement of Plaintiffs' equal protection under the law.

In contrast, the only harm Defendants can articulate is their inability to "enforc[e] its statutes" if this injunction is upheld. ECF 21 at 11. But Defendants

fail to show any substantial risk of harm or disruption in administrating voter registrations or carrying out elections.  The injunction maintains the status quo, which does not alter qualifications for registering to vote and prevents the imposition of extreme burdens on 3PVROs and non-citizen individuals.  The injunction does not alter Defendants' existing ability to conduct various quality control checks on voter registration and election administration.

The injunction also serves the public interest in registering voters in marginalized communities and preventing infringement of Plaintiffs' constitutional rights.  "The public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272–73 (11th Cir. 2006); *see also Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010).  Defendants do not point to a single reason why maintaining the status quo until trial is contrary to the public interest, while "[t]he vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).  Moreover, "allowing responsible organizations to conduct voter-registration drives—thus making it easier for citizens to register and vote" naturally and clearly "promotes democracy." *Id.*; *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (holding a preliminary injunction served the public interest because the public interest is served when constitutional rights are protected).

40

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court affirm the district court's order granting a preliminary injunction.

Dated: November 13, 2023

Respectfully submitted,

/s *Adriel I. Cepeda Derieux*

<table>
<tr><td>

Roberto Cruz
Miranda Galindo
Delmarie Alicea
LATINOJUSTICE PRLDEF
4700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org
dalicea@latinojustice.org

Cesar Z. Ruiz
Fulvia Vargas De-Leon*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
fvargasdeleon@latinojustice.org

Estee M. Konor*
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

John A. Freedman
Jeremy Karpatkin

</td><td>

Adriel I. Cepeda Derieux
Julie A. Ebenstein
Megan C. Keenan
Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
acepedaderieux@aclu.org
jebenstein@aclu.org
mkeenan@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Nicholas L.V. Warren
ACLU FOUNDATION OF FLORIDA
1809 Art Museum Drive, Ste. 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley
Caroline A. McNamara
ACLU FOUNDATION OF FLORIDA
4343 W Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714

</td></tr>
</table>

41

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

dtilley@aclufl.org
cmcnamara@aclufl.org

Evan Preminger*
Rayne Ellis*
ARNOLD & PORTER KAYE SCHOLER
LLP
250 W. 55th Street
New York, NY 10019
(212) 836-7786
evan.preminger@arnoldporter.com
rayne.ellis@arnoldporter.com

*Counsel for Plaintiffs-Appellees Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico (formerly A. Doe)*

42

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FRAP 32, because, excluding the parts of the document exempted by FRAP 32(f), this document contains 9,292 words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

Dated: November 13, 2023                    Respectfully submitted,

                                            /s *Adriel I. Cepeda Derieux*